```
 1                IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3   ILLINOIS TAMALE CO.,           ) Docket No. 16 C 5387
     an Illinois corporation,       )
 4                                  )
                      Plaintiff,    )
 5                                  )
                  vs.               )
 6                                  )
     EL-GREG, INC.,                 )
 7   an Illinois corporation,       ) Chicago, Illinois
                                    ) October 22, 2018
 8                   Defendant.     ) 9:45 o'clock a.m.

 9                          VOLUME ONE
                  TRANSCRIPT OF TRIAL PROCEEDINGS
10        BEFORE THE HONORABLE MATTHEW F. KENNELLY, AND A JURY

11   APPEARANCES:

12   For the Plaintiff:        SAUL, EWING, ARNSTEIN & LEHR, LLP
                               BY:  MR. JOSEPH M. KUO
13                                  MR. EUGENE J. GEEKIE, JR.
                                    MS. KELLIE Y. CHEN
14                             161 North Clark Street, Suite 4200
                               Chicago, Illinois  60601
15
     For the Defendant:        LITCHFIELD CAVO, LLP
16                             BY:  MR. ALAN I. BECKER
                                    MR. RYAN D. JANSKI
17                             303 West Madison Street, Suite 300
                               Chicago, Illinois  60606
18
     Court Reporter:           MR. JOSEPH RICKHOFF
19                             Official Court Reporter
                               219 S. Dearborn St., Suite 1232
20                             Chicago, Illinois  60604
                               (312) 435-5562
21
                 *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
22
                        PROCEEDINGS RECORDED BY
23                      MECHANICAL STENOGRAPHY
                  TRANSCRIPT PRODUCED BY COMPUTER
24

25
```

 1          THE CLERK:  Case No. 16 C 5387, Illinois Tamale vs.

 2   El-Greg.

 3                    *    *    *    *    *

 4      (Jury in.)

 5          THE COURT:  All right.  Everybody can have a seat.

 6          What we're going to start off with is I'm going to

 7   read you some instructions.  You should be seeing something on

 8   those screens there.  Does anybody have a screen that's blank?

 9   If your screen is blank, raise your hand.  They're all

10   working.

11          Follow along as I read.

12                       JURY INSTRUCTIONS

13          THE COURT:  Ladies and gentlemen, you are now the

14   jury in this case, and I want to take a few minutes to tell

15   you about your duties as jurors and to give you instructions

16   regarding the case.  At the end of the trial, I will give you

17   more detailed instructions.  Those are the instructions that

18   will control your deliberations.

19          One of my duties is to decide all questions of law

20   and procedure.  From time to time during the trial and at the

21   end of the trial, I will instruct you on the rules of law that

22   you must follow in making your decision.

23          You should not take anything I may say or do during

24   the trial as indicating what I think of the evidence or what

25   your verdict should be.

Jury Instructions

3

1    You have two duties as a jury.  Your first duty is to

2  decide the facts from the evidence in the case.  Your second

3  duty is to apply the law that I give you to the facts.  You

4  must follow my instructions, even if you disagree with them.

5    Perform these duties fairly and impartially.  Do not

6  allow sympathy, prejudice, fear or public opinion to influence

7  you.  You should not be influenced by any person's race,

8  color, religion, national ancestry, or sex.  All parties to

9  the case, whether they're individuals or corporations --

10  actually, they're all corporations in this case -- are

11  entitled to the same fair consideration.

12    The evidence consists of the testimony of witnesses,

13  any exhibits that I allow in evidence, and any facts that the

14  lawyers stipulate or agree to.

15    Pay close attention to the testimony as it's

16  presented.  At the end of the trial, you must make your

17  decision based on what you recall of the evidence.  You will

18  not have a written transcript to consult.

19    You will be permitted to take notes during the trial.

20  The purpose of this is to help you refresh your memory during

21  your deliberations after the trial is concluded.  Any notes

22  that you may take are not part of the evidence in the case.  A

23  juror's notes are not entitled to any greater weight than the

24  recollections or impressions of each juror about the

25  testimony.

1    When you leave the courthouse during the trial, your

2 notes should be left in the jury room.  When you leave at the

3 end of the day, your notes will be secured and no one will

4 read them.  At the end of the trial, your notes will be

5 destroyed and no one will be allowed to read the notes.

6    There are certain things that are not to be

7 considered as evidence.

8    First, if I tell you to disregard any testimony or

9 exhibits or strike any testimony or exhibits from the record,

10 that is not evidence, and you may not consider it.

11    Second, anything that you see or hear outside the

12 courtroom is not evidence and must be entirely disregarded.

13 This includes any press, radio, Internet, or television

14 reports that you might see or hear.

15    Third, questions and objections or comments by the

16 lawyers are not evidence.  Lawyers have a duty to object when

17 they believe a question is improper.  You should not be

18 influenced by any objection, and you should not infer from my

19 rulings that I have any view about how you should decide the

20 case.

21    Fourth, the lawyers' opening statements and closing

22 arguments to you are not evidence.  Their purpose is to

23 discuss the issues and the evidence.  If the evidence as you

24 remember it differs from what the lawyers say, your memory is

25 what counts.

1    You will have to decide whether the testimony of each

2    of the witnesses is truthful and accurate in part, in whole or

3    not at all.  I will give you more guidance about this at the

4    end of the case.  You also have to decide what weight, if any,

5    you give to the testimony of each witness.

6    You should use common sense in weighing the evidence

7    and consider the evidence in light of your own observations in

8    life.

9    In our lives, we sometimes look at one fact and

10   conclude from it that another fact exists.  In law, we call

11   this an inference.  A jury is allowed to make reasonable

12   inferences so long as they're based on the evidence that is

13   presented.

14   You may have heard the phrases "direct evidence" and

15   "circumstantial evidence."  Direct evidence is proof that does

16   not require an inference, such as the testimony of someone who

17   claims to have personal knowledge of a fact.  Circumstantial

18   evidence is proof of a fact or a series of facts that tends to

19   show that some other fact is true.

20   You are to consider all of the evidence, both direct

21   and circumstantial.  The law allows you to give equal weight

22   to both types of evidence.  But it is up to you to determine

23   how much weight to give to any particular evidence, whether it

24   is direct evidence or circumstantial evidence.

25   During this trial, you will be permitted to submit

1  questions for a witness after the lawyers have finished

2  questioning the witness.  Here is how the procedure works.

3  After each witness has testified and the lawyers have asked

4  all of their questions, I will turn to the jury to see if

5  anyone has any additional questions.  If you have a question,

6  you should write it down.  A member of my staff will collect

7  all the questions.

8       You may submit questions for a witness to clarify or

9  help you understand the evidence.  Our experience with juror

10 questions indicates that a juror will rarely have more than a

11 few questions for any one witness, and there may be no

12 questions for some witnesses.

13      If you submit a question, I will share it with the

14 lawyers.  If your question is permitted under the rules of

15 evidence, I will read your question to the witness so that the

16 witness may answer it.  In some instances, I may modify the

17 phrasing of a question so that it is proper under the rules of

18 evidence.  On other occasions, I may not allow the witness to

19 answer a question, either because the question cannot be asked

20 under the law or because another witness is in a better

21 position to answer the question.  If I cannot allow the

22 witness to answer a question, you should not draw any

23 conclusions from that fact or speculate on what the answer

24 might be.

25      There are several important things to keep in mind

1   about your questions for the witnesses:

2          First, all questions must be submitted in writing.

3   Please do not ask questions orally of any witness.

4          Second, witnesses may not be recalled to the witness

5   stand for additional juror questions, so if you have a

6   questions for a particular witness, you should submit it at

7   the end of that witness' testimony.

8          Finally, as jurors, you must remain neutral and keep

9   open minds throughout the trial.  As a result, you should

10  always phrase any questions in a neutral way that does not

11  express an opinion about the case or a witness.

12         The plaintiff in this case is Illinois Tamale Co.,

13  and I'll refer to it as ILTACO.

14         The defendant in this case is El-Greg, Inc., and I'll

15  refer to it as El-Greg.

16         In this case, ILTACO is asserting several claims

17  against El-Greg.  These include claims for trademark

18  infringement, trade dress infringement, false designation of

19  origin, unfair competition and deceptive trade practices, and

20  breach of contract.

21         The purpose of trademark law is to prevent confusion

22  among consumers about the source of products and to permit

23  trademark owners to show ownership of their products and

24  control their products' reputation.

25         ILTACO has a registered trademark for the term "Pizza

1     Puffs."

2              I see something here that should be on the next page.

3     Bear with me.

4          (Brief pause.)

5              THE COURT:  ILTACO has a registered trademark for the

6     term "Pizza Puffs."  In this lawsuit, ILTACO contends, first,

7     that El-Greg's use of the term "Pizza Pies," with a trademark

8     symbol, "(Puffs)" on its products is confusingly similar to

9     ILTACO's trademark.  Second, ILTACO contends that El-Greg's

10    product label is confusingly similar to ILTACO's product

11    label.  Third, ILTACO contends that it has the rights to a

12    family of trademarks using the word "puff" for food products,

13    and that El-Greg's use of the terms "Pizza Pies," trademark

14    symbol, "(Puffs)," "Veggie Puffs," "Chili Cheese Puff," and

15    "Deluxe Beef Puffs" is likely to confuse consumers about the

16    source of those products.

17             El-Greg denies ILTACO's claims.  El-Greg contends

18    that its label and use of the term -- every time I say it from

19    now on I'm not going to say that little "TM" thing, but you're

20    seeing it there -- the term "Pizza Pies (Puffs)" does not

21    infringe ILTACO's trademark.  El-Greg also contends that its

22    product label is not confusingly similar to ILTACO's product

23    label.  El-Greg denies that ILTACO has enforceable rights to a

24    family of trademarks using the word "puffs" or "puff."

25             In these instructions I'll use the term

1    "preponderance of the evidence."  When I say that a party has

2    to prove a proposition by a preponderance of the evidence, I

3    mean that the party must prove that the particular proposition

4    is more likely true than not true.

5         So, I'm going to go through each claim and explain to

6    you what has to be shown on the claims.

7         So, first is ILTACO's claim that El-Greg infringed

8    ILTACO's trademark for the term "Pizza Puffs."

9         A trademark is a word or combination of words used by

10   a company to identify its product, distinguish its product

11   from those made or sold by others, and indicate the source of

12   the product.

13        To succeed on this claim, ILTACO must prove each of

14   the following propositions by a preponderance of the evidence:

15        Number one, ILTACO owns "Pizza Puffs" as a trademark;

16   number two, El-Greg used the term "Pizza Pies," trademark,

17   "(Puffs)" in interstate commerce; number three, El-Greg used

18   the term "Pizza Pies," trademark, "(Puffs)" in a manner that

19   is likely to cause confusion regarding the source, origin,

20   sponsorship, or approval of El-Greg's product.

21        Second is if you find -- this is the next instruction

22   that goes with the first one.  If you find that ILTACO has

23   proven each of the three propositions that it's required to

24   prove on this claim, then you must consider El-Greg's defense

25   of fair use.  This defense is based on the principle that no

1    one should be able to appropriate descriptive language through

2    trademark registration.  To succeed on this defense, El-Greg

3    must prove each of the following propositions by a

4    preponderance of the evidence:

5         Number one -- and, again, I'm going to leave the "TM"

6    thing out -- El-Greg used the phrase "Pizza Pies (Puffs)" in a

7    way other than to indicate the source of its product; number

8    two, El-Greg's use of the phrase "Pizza Pies (Puffs)"

9    accurately describes its product; and, number three, El-Greg

10   used the phrase "Pizza Pies (Puffs)" in good faith and only to

11   describe its product.

12        The next claim is ILTACO's claim of trade dress

13   infringement.  ILTACO claims that El-Greg infringed ILTACO's

14   trade dress.

15        A trade dress is a type of trademark used by a

16   company to identify its product, to distinguish its product

17   from those manufactured or sold by others, and to indicate the

18   source of its product.  The term "trade dress" as used in this

19   case refers to the total image of a product packaging or

20   product label.  It includes features such as size, shape,

21   color or color combinations, and/or graphics.

22        To succeed on this claim, ILTACO must prove both of

23   the following propositions by a preponderance of the evidence:

24        Number one, ILTACO's product label is a valid trade

25   dress.  A valid trade dress includes packaging that is

1   distinctive, meaning that the packaging is capable of

2   distinguishing ILTACO's product from the products of others.

3   A trade dress is valid if it is inherently distinctive or if

4   it has acquired distinctiveness.  I'll explain these terms to

5   you in a moment.

6          Number two, El-Greg used a label on its products in a

7   manner likely to cause confusion regarding the source,

8   affiliation, association, or approval of its products with

9   ILTACO.

10          El-Greg has raised the defense of fair use.  To

11   succeed on this defense, El-Greg must prove each of the

12   following propositions by a preponderance of the evidence:

13          Number one, El-Greg used its product label in a way

14   other than to indicate the source of its product; number two,

15   El-Greg's use of its product label was merely descriptive of

16   its product; and, number three, El-Greg used its product label

17   in good faith and only to describe its product.

18          So, this goes with the previous instruction.

19          So, for purposes of this case, a valid trade dress is

20   product packaging that is distinctive, which means that the

21   packaging and overall presentation of the product is capable

22   of distinguishing ILTACO's products from the products of

23   others.  ILTACO's trade dress is valid if it is inherently

24   distinctive or if it had acquired distinctiveness.

25          A trade dress is inherently distinctive if purchasers

1  would almost automatically recognize it as identifying a

2  particular brand or source of the product.  You should

3  consider the packaging as a whole.

4       To show that its trade dress has acquired

5  distinctiveness, ILTACO must prove both of the following

6  propositions:

7       Number one, a substantial portion of the purchasing

8  public identifies ILTACO's packaging with a particular source,

9  whether or not purchasers know who or what the source is; and,

10  number two, ILTACO's trade dress acquired distinctiveness

11  before El-Greg first began to use its claimed trade dress.

12       Next is ILTACO's claim of trademark infringement

13  involving what's referred to as the "Puffs" trademark family.

14       ILTACO also contends that it has trademark rights in

15  a family of trademarks based on the term "puff" or "puffs" and

16  that El-Greg infringed ILTACO's rights by selling products

17  called "Spinach Puffs" -- there's a typo which I'm going to

18  fix right now -- products called "Spinach Puffs," "Chili

19  Cheese Puffs," "Deluxe Beef Puff" and "Veggie Pizza Puffs," as

20  well as "Pizza Pie (Puff)."

21       To succeed on this claim, ILTACO must prove each of

22  the following propositions by a preponderance of the evidence:

23       Number one, ILTACO owns a family of trademarks based

24  on the term "puff" or "puffs"; number two, ILTACO owned the

25  family of marks before El-Greg began selling products using

1   the term "puff" or "puffs"; and, number three, El-Greg used

2   the term "puff" or "puffs" in a manner that is likely to cause

3   confusion regarding the source, origin, sponsorship, or

4   approval of El-Greg's products.

5        So, this next thing here is a definition of family of

6   trademarks.

7        A family of trademarks is a group of trademarks

8   having a recognizable common characteristic in which the

9   trademarks are composed and used in such a way that the public

10  associates not only the individual marks, but also the common

11  characteristic of the family, with the trademark owner.

12       A descriptive term -- in other words, a term that

13  conveys an immediate idea of the ingredients, the qualities or

14  characteristics of goods -- can serve as a family name only if

15  there's a strong showing that the term has acquired

16  distinctiveness.  In other words, that it indicates that the

17  goods have a common origin.  ILTACO must show that an

18  appropriate segment of the public identifies this term with

19  ILTACO.

20       So, the next is the defense on this same claim.

21       If you find that ILTACO has proven each of the three

22  propositions that it's required to prove on this claim, then

23  you must consider El-Greg's defense of fair use.  To succeed

24  on this defense, El-Greg must prove each of the following

25  propositions by a preponderance of the evidence:

1    Number one, El-Greg used the word "puff" on product

2 names in a way other than to indicate the source of its

3 product; number two, El-Greg's use of the word "puff"

4 accurately describes its product; and, number three, El-Greg

5 used the word "puff" in good faith and only to describe the

6 product.

7    On each of the claims I've described so far, one of

8 the things that ILTACO must prove is that El-Greg used a term

9 or a label in a manner that's likely to cause confusion as to

10 the source, origin, sponsorship, or affiliation of El-Greg's

11 products.

12    ILTACO must prove a likelihood of confusion among a

13 significant number of people who buy or use or consider buying

14 or using the product or similar products.  In deciding this,

15 you should consider the following factors:

16    Any similarity between the trademarks or trade

17 dresses in appearance and suggestion; any similarity of the

18 products; any similarity in how, where and to whom the

19 products are promoted or sold; the degree of care likely to be

20 exercised by purchasers; the strength of ILTACO's trademark or

21 trade dress; any actual confusion; and, any intent on the part

22 of El-Greg to palm off its products as those of ILTACO.

23    The weight to be given to each of these factors is up

24 to you to determine.  No particular factor or number of

25 factors is required to prove likelihood of confusion.

1     The next claim is ILTACO's false advertising claim.

2     ILTACO contends that El-Greg's use of the slogan

3     "Makers of the Original Puffs" constitutes false advertising.

4     In order to prevail on this claim, ILTACO must prove each of

5     the following propositions by a preponderance of the evidence:

6     Number one, El-Greg made a false or misleading

7     statement of fact in a commercial advertisement about the

8     nature, quality or characteristics of its product. A

9     statement is misleading if it conveys a false impression or

10    actually misleads a purchaser.

11    Number two, the statement actually deceived or had

12    the tendency to deceive a substantial segment of El-Greg's

13    audience.

14    Number three, the deception was likely to influence

15    the purchasing decisions of purchasers.

16    Number four, El-Greg caused the false statement to

17    enter interstate commerce.

18    And, number five, ILTACO has been or is likely to be

19    injured as a result of the false statement, such as by

20    diversion of sales from itself to El-Greg or a loss of

21    goodwill associated with ILTACO's products.

22    This is ILTACO's breach of contract claim.

23    ILTACO also contends that El-Greg breached a

24    settlement agreement that they entered into in November of

25    2004, in which, among other things, El-Greg agreed not to use

1    the term "Pizza Puff" alone or in combination with other words

2    or design as a trademark, service mark, trade name, trade name

3    component, or other use in marketing or advertising its goods

4    or services, or as an identification of its goods or services.

5    ILTACO -- shouldn't be apostrophe S there.  ILTACO contends

6    that El-Greg breached the terms of the settlement agreement by

7    selling goods with the label "Pizza Pies," trademark symbol,

8    "Puffs" and through marketing a product as Veggie Pizza Puffs.

9         To prevail on this claim, ILTACO must prove each of

10   the following elements by a preponderance of the evidence:

11        Number one, the existence of a contract between

12   ILTACO and El-Greg; number two, performance by ILTACO of its

13   obligations under the contract; number three, failure by

14   El-Greg to perform its obligations under the contract; and,

15   number four, damages to ILTACO as a result.  And Propositions

16   1 and 2 are not disputed.

17        If you decide in favor of ILTACO on one or more of

18   its claims, then you will go on to consider the amount of

19   money damages to award to ILTACO.

20        If you decide in favor of El-Greg on all of ILTACO's

21   claims, then you will not consider the question of damages.

22        I will give you further instructions concerning

23   damages at the conclusion of the case.

24        Before we begin the trial, I want to discuss several

25   rules of conduct that you must follow as jurors.  And some of

Jury Instructions

17

1    this is repeating things I've already told you.

2          First, you must keep an open mind throughout the

3    trial.  Do not make up your mind about what your verdict

4    should be until after the trial is over, you've received my

5    final instructions on the law and you and your fellow jurors

6    have discussed the evidence.

7          Second, your verdict in this case must be based

8    exclusively on the law as I give it to you and the evidence

9    that's presented during the trial.  For this reason, and to

10   ensure fairness to both sides in this case, you must obey the

11   following rules.  These rules apply both when you're here in

12   court and when you're not in court.  They apply until after

13   you've returned your verdict in the case.

14         Number one, you must not discuss the case, or anyone

15   who is involved in the case, among yourselves until you go to

16   the jury room to deliberate after the trial is completed.

17         Number two, you must not communicate with anyone else

18   about this case, or about anyone who's involved in the case,

19   until after you have returned your verdict.

20         Number three, when you're not in the courtroom, you

21   must not allow anyone to communicate with you about the case

22   or give you any information about the case, or about anyone

23   who is involved in the case.  If someone tries to communicate

24   with you about the case or about someone who is involved in

25   the case, or if you overhear or learn any information about

1    the case or about someone involved in the case when you are

2    not in the courtroom, you must report this to me promptly.

3           Number four, you may tell your family and your

4    employer that you're serving on a jury so that you can explain

5    that you have to be in court.  However, you must not

6    communicate with them about the case or about anyone who is

7    involved in the case until after you've returned your verdict.

8           And, number five, all the information that you will

9    need to decide the case will be presented here in court.  You

10   may not look up, obtain or consider information from any

11   outside source.

12          There are two reasons for these rules.  First, it

13   would not be fair to the parties in the case for you to

14   consider outside information or communicate information about

15   the case to others.  Second, outside information may be

16   incorrect or misleading.

17          When I say that you may not obtain or consider any

18   information from outside sources and may not communicate with

19   anyone about the case, I am referring to any and all means by

20   which people communicate or obtain information.  This

21   includes, for example, face-to-face conversations; looking

22   things up; doing research; reading, watching or listening to

23   reports in the news media; and any communication using any

24   electronic device or media, such as a telephone, cell phone,

25   smartphone, iPhone, Android, BlackBerry, any similar device or

1  a computer; any sort of communication using the Internet, text

2  messaging, chat rooms, blogs, social networking sites like

3  Facebook, LinkedIn, You Tube, Twitter, Snapchat, Instagram,

4  and so on, or any other form of communication at all.

5      If you hear, see or receive any information about the

6  case by these or any other means, you must report that to me

7  immediately.

8      I want to emphasize to you how important these

9  obligations are.  To put it simply, your compliance with these

10  rules is vital to the appropriate conduct of your duties as

11  jurors, and it is vital to the obligation we have to ensure

12  that all parties receive a fair trial.  They cannot receive a

13  fair trial if any of you obtain information from outside

14  sources or if any of you communicate with anyone else about

15  the case or your deliberations before you have returned your

16  verdict.

17      We are now ready to begin the trial.  The trial will

18  proceed in the following manner.  First, attorneys for each of

19  the parties may make an opening statement.  An opening

20  statement is not evidence.  Rather, it's a summary of what

21  each side's attorneys expect the evidence will show.

22      After the opening statements, each side will present

23  evidence, consisting of the testimony of witnesses and

24  presentation of exhibits.

25      After the evidence has been presented, I will

1    instruct you on the law that applies to the case and the

2    attorneys will make closing arguments.

3            After that, you will go to the jury room to

4    deliberate on your verdict.

5            So, I'm going to switch the screens back over.  I

6    think based on the time, my hunch is, is that what's going to

7    happen is that we're going to do the plaintiff's opening

8    statement before lunch, then break for lunch, and then do the

9    defendant's after.  But we'll see how it goes.

10           So, we'll start with the opening statement on behalf

11   of the plaintiff.

12           Mr. Geekie, you can go ahead.

13           MR. GEEKIE:  Thank you, Judge.

14           OPENING STATEMENT ON BEHALF OF THE PLAINTIFF

15   BY MR. GEEKIE:

16           Well, it's now noon, so good afternoon.  As I told

17   you before, my name is Gene Geekie, and I represent ILTACO.

18   With me today are my clients from ILTACO.  First, as I

19   introduced to you before, Mr. Warren Shabaz, who is the

20   president and owner of ILTACO.  And also here in court is his

21   son Adam, who will testify today.  Adam is the CFO of the

22   company.

23           Now, you heard from Judge Kennelly that this is a

24   case about trademark and trade dress infringement and breach

25   of contract.  But it's really simpler than that.  This is --

1    was an attempt by El-Greg to misappropriate the most important

2    asset owned by ILTACO, and that is its Pizza Puffs registered

3    trademark.  This is the most important part of the company.

4    It's its most important asset.  And it's a well-identified

5    product throughout Chicago and the country.

6           ILTACO is a well-known Chicago food company, and it's

7    nearly a hundred years old.  It was founded by Warren Shabaz's

8    grandfather in the 1920s.  So, it's now a fourth-generation

9    Chicago company.  In the early 1970s, Warren Shabaz, who is a

10    Navy veteran and who had a top secret intelligence clearance,

11    had just come back from the U.S. Navy.  And he came back to

12    work in the family tamale business.  ILTACO is short for

13    Illinois Tamale Co.

14           And one of the first things that the company did, as

15    Mr. Shabaz will explain when he testifies, is they were making

16    tamales for Chicago hot dog carts that were very popular back

17    in the '20s.  And it's a really interesting story about how

18    the company moved from being a bun -- a bakery and bun company

19    to a tamale company and now a Pizza Puffs company.

20           So, Mr. Shabaz will tell you that story and how he

21    created -- he himself created -- the unique product that's

22    known as Pizza Puffs.

23           Now, Pizza Puffs are a dough-enrobed stuffed

24    sandwich.  They're inspired by other products that a lot of

25    cultures have, such as burritos and other types of stuffed

1    sandwiches.  And this product was created to help the

2    customers of ILTACO -- which were primarily hot dog carts and

3    hot dog stands -- so they could compete with pizzerias.

4    Because pizzerias had a product that all of us like, and

5    that's pizzas.  The hot dog stands and companies realized that

6    they needed a product to compete.

7            Well, Mr. Shabaz has an interesting story about he

8    came to be asked to create the product and how he did create

9    the product known as Pizza Puffs to compete with pizzerias,

10   but also how he came to name the product "Pizza Puff."

11           The important thing is that the evidence will show

12   you that in naming his creation the Pizza Puff, Mr. Shabaz

13   wanted a name that rolled off people's tongues, and that would

14   help them remember the Pizza Puff brand and that it was made

15   by ILTACO.  And when people hear the name "Pizza Puff," they

16   always remember that it's made right here in Chicago by

17   ILTACO.

18           Because these are a frozen product, I won't show you

19   the actual Pizza Puff that are in these boxes, but this will

20   give you an idea of what the product looks like.

21       (Brief pause.)

22   BY MR. GEEKIE:

23           So, this is the Pizza Puff.

24           Now, to protect his new creation, Mr. Shabaz and

25   ILTACO had to make clear that Pizza Puff was associated with

1    ILTACO and was an ILTACO brand name.  And because "Pizza Puff"

2    was such an important and essential trademark for ILTACO's

3    business, ILTACO obtained a federal trademark registration for

4    "Pizza Puff" that it would use for these stuffed sandwich

5    products.  And it did so right immediately after creating the

6    product.

7          And ILTACO began selling Pizza Puffs in the mid-'70s.

8    And it sold them to its customers of hot dog stands and hot

9    dog carts and other small restaurants.

10          Now, the evidence will also show that the Pizza Puff

11    was an immediate hit.  It was a way to eat a pizza, but pick

12    up a little pizza at a hot dog stand.  And while ILTACO

13    continued to sell tamales that it also made, the company's

14    Pizza Puff business boomed.

15          Importantly, the small restaurants that ILTACO sold

16    its Pizza Puffs to began asking for new flavors of the Puff

17    product.  And ILTACO obliged.  Mr. Shabaz and his employees

18    started to make other new products.  They made Pepperoni Pizza

19    Puffs, a Beef Pizza Puff, a Taco Puff, Sloppy Joes Puffs, and

20    many other flavors.

21          As an example, here's a Taco Puff, also a

22    dough-enrobed stuffed sandwich that's very handy, easy to eat

23    on the go.

24          With each one of these new ILTACO flavors that were

25    created for the Puff family, ILTACO used the term "Puff" as

1    part of the product's name, as you can see here.  ILTACO

2    considered these a family of products, and it has sold and

3    marketed its family of Puffs products together since the early

4    1980s.

5        And the family of Puffs products for ILTACO does an

6    important thing.  It helps build customer loyalty, and it

7    gives ILTACO's customers a choice when buying Puffs products

8    from ILTACO.  Customers, the evidence will show, tend to come

9    back if they have a choice -- a broader choice -- in flavor

10   selection for a food product.

11       Now, ILTACO's family of Puffs products continues to

12   grow and is advertised and sold to its customers in the

13   Midwest and around the country.  You see, ILTACO realized that

14   its success depended upon building a family of Puffs products

15   that were these dough-enrobed stuffed sandwiches.  And they

16   also, as they created these, they registered the trademark for

17   each of these products.

18       Now, within a short time after puffs were created by

19   Mr. Shabaz, ILTACO was making several thousand Puff sandwiches

20   a day.  They were made by hand in the company's facility here

21   in Chicago.  In a few short years, ILTACO had gone from a

22   small tamale company to a maker of, what has been recognized

23   by the Chicago Tribune and other publications as a Chicago

24   icon, Pizza Puffs and its related family of Puff sandwiches.

25       In 1983, after selling Puffs products only to the

Opening Statement - Geekie

1    small restaurant market, ILTACO decided to grow some more.  It

2    expanded into grocery store sales where it also became an

3    instant hit.  Today, ILTACO Puffs products can be found

4    virtually at every grocery store around Chicago.  They even

5    sell -- are sold by Wal-Mart.

6           But with success comes competition.  We all know

7    that.  Soon, large billion-dollar companies entered the dough-

8    enrobed stuffed sandwich market with similar products.  Hot

9    Pockets is an example.  Despite many competitors for stuffed

10   sandwich products with meat and sauce wrapped in dough, you

11   will see that every competitor, except one, respected Pizza

12   Puffs and the Puffs trademarks, and they gave their products

13   other names and never described their products as Puffs.

14          As for the one exception, El-Greg, the evidence will

15   show that in 1989, El-Greg was just a small pizzeria in

16   Chicago.  It was owned by the Lereno family.  Greg Lereno and

17   his sister Maria, who are right here in court today, were

18   running the company.  And they decided that they'd form a

19   company, El-Greg, from their pizzeria, and that they would try

20   to copy ILTACO's Pizza Puff sandwich and make it their own

21   stuffed sandwich product to compete with Pizza Puffs.

22          Indeed, the evidence will show that after Pizza Puffs

23   had been succeeding for nearly 15 years, in 1989, the Lerenos

24   admittedly created a product that was virtually identical to

25   Pizza Puffs, and they did so with the intention of copying

1    Pizza Puffs.  The Lerenos did this because Pizza Puffs was a

2    popular product, well-known throughout Chicago, and the

3    Lerenos knew that there was much less competition in the

4    stuffed sandwich market than there was in the pizza market.

5         But El-Greg at that time also knew that Pizza Puffs

6    was trademarked, and you'll hear evidence of that.  So, they

7    called their product Pizza Pies.  And that was in 1989.

8         So, they operated for about 10 or 11 years using only

9    the term "Pizza Pies."  El-Greg sold its Pizza Pies to a few

10   independent fast food restaurants and hot dog stands around

11   Chicago, but it had trouble making inroads into ILTACO's

12   well-known and well-respected business and its trademarks.

13        In 2002, ILTACO learned that El-Greg had some of

14   its -- and some of its customers had resorted to using

15   ILTACO's Pizza Puffs trademark and name on restaurant signs to

16   try and sell El-Greg's Pizza Pies.  They were selling to

17   restaurants, El-Greg was, not ILTACO, but they were using the

18   name "Pizza Puffs" to sell that product.

19        Well, ILTACO had no choice but to sue El-Greg to stop

20   in the early 2000s.  In 2004, as you heard Judge Kennelly tell

21   you as part of our claim, El-Greg settled with ILTACO.  It

22   didn't have to pay any money.  It just had to do one thing --

23   two things.  It had to recognize the Pizza Puffs trademark,

24   and it had to promise to never use that, again.

25        This is the settlement agreement.  And the evidence

1    will show that El-Greg promised that it would never use "Pizza

2    Puff" in any way, shape or form.  In Paragraph 2 of the

3    settlement agreement, El-Greg first acknowledges that ILTACO

4    has the Pizza Puffs trademark.

5         MR. GEEKIE:  Could you expand it, please.

6    BY MR. GEEKIE:

7         So, first you see they acknowledge that Illinois

8    Tamale Co. -- ILTACO -- has obtained a U.S. registration for

9    Pizza Puff.  They acknowledge that trademark.  And, then, it

10   goes on for the rest of that sentence in Paragraph 2 where

11   El-Greg promises it will not use "Pizza Puff" alone or in

12   combination with other words or designs.  And that's

13   important.  Not in combination with other words or designs.

14        Example -- and these are examples, but not mutually

15   -- or exclusive examples, but example:  El-Greg Pizza Puff or

16   Stuffed Pizza Puff.  And they won't use them as a trademark,

17   service mark, trade name, trade name component, or other use

18   in marketing or advertisement of their respective goods or

19   services or as an identification of their respective goods or

20   services.  The promise is clear and unequivocal.

21        So, that case settled and El-Greg made those two

22   promises, which ILTACO expected El-Greg to observe.  And for

23   five years or so, El-Greg kept its promise to ILTACO and it

24   refrained from using ILTACO's trademark "Pizza Puffs."  But in

25   the early 2000s, ILTACO and El-Greg were both selling their

 1   stuffed sandwiches at a chain of restaurant wholesale stores
 2   called Restaurant Depot.  You're going to hear a lot today
 3   about Restaurant Depot because it's really the center of the
 4   universe when it comes to this trademark infringement, trade
 5   dress infringement.  Because at Restaurant Depot, which was
 6   El-Greg's largest customer, it had stores throughout the
 7   country, including several in Chicago.
 8           If you're not familiar with Restaurant Depot, it's
 9   kind of like a Costco for restaurant owners.  They can go in
10   and buy large bulk supplies that's more focused on the
11   restaurant industry.
12           And at Restaurant Depots in the 2000s, because they
13   were selling both El-Greg Pizza Pies and ILTACO Pizza Puffs
14   and they were stuffed sandwiches, Restaurant Depot placed
15   El-Greg's Pizza Pies right next to ILTACO's Pizza Puffs in
16   their freezer case.  We all see that when we go to the grocery
17   store.  The pizzas are together.  Various canned beans are
18   together.  And at Restaurant Depot, Pizza Pies were put right
19   next to Pizza Puffs.
20           At that time, in the early 2000s, both ILTACO's and
21   El-Greg 's sandwich products that were being sold at
22   Restaurant Depot were in large white boxes that were -- held
23   like 48 Pizza Puffs or Pizza Pies.  Well, in early 2009,
24   Restaurant Depot contacted its suppliers, including ILTACO and
25   El-Greg, and they asked that each company create labels for

1  their boxes that would include a photo on the product and a

2  description of the contents of the box.  That was because some

3  Restaurant Depot customers, not seeing what was inside the

4  box, because they didn't have a picture, they'd open the boxes

5  to look inside.  And that was a problem for Restaurant Depot.

6  So, they asked ILTACO and El-Greg to make labels with a

7  picture and with a description.

8          ILTACO moved quickly and had a label in place within

9  a couple of months.  Their new label was put on their boxes

10  around August of 2009.  And this is a copy of what the box and

11  label looked like.  And you can see there -- note that it not

12  only says Pizza Puffs at the top; it also has on the picture

13  the logo of ILTACO, so that people can identify who the maker

14  is; and, then, it has a listing of the various Puffs products

15  that are available.

16          And, then, at the bottom of the label, very

17  importantly, it says they are the makers of the original Pizza

18  Puffs.  That's because they were.  Mr. Shabaz created the

19  original Pizza Puff.

20          Well, like I said, this label started appearing on

21  Restaurant Depot boxes in August of 2009.  El-Greg was slower

22  to get its label made, however.  And you'll see evidence here

23  that El-Greg didn't start making its label until the middle of

24  2010.  They started having conversations, and you'll see

25  e-mails exchanged by Maria Lereno, who was in charge of the

1    label product.  She exchanged e-mails with her label maker.

2    And you'll be surprised at what the evidence will show about

3    what they decided to put on the label.

4         But Ms. Lereno will testify here that she was keenly

5    aware of the label that ILTACO had already put in place at

6    Restaurant Depot.  Moreover, she was keenly aware of the 2004

7    settlement agreement in which El-Greg promised to never use

8    the term "puffs" in any way in its product.

9         Now, the label that Ms. Lereno worked on and created

10   would go right next to the labels of the boxes being sold at

11   Restaurant Depot by ILTACO.  And when the label for El-Greg

12   was released, it was virtually identical to ILTACO's Pizza

13   Puff label.

14        Shockingly, El-Greg, which had called its product

15   Pizza Pies for nearly 20 years except when it had that little

16   issue of, you know, showing -- using signs that said Pizza

17   Puffs, but it had sold to all of its customers in the

18   restaurant industry its product and it called them Pizza Pies

19   for 20 years -- now called their product, to be sold only at

20   Restaurant Depot right next to ILTACO's Pizza Puffs, they now

21   called them Pizza Pie (Puffs), putting a parentheses around

22   "Puffs."

23        MR. GEEKIE:  Can we see that label, please.

24   BY MR. GEEKIE:

25        So, here's the label that El-Greg created after

1    seeing ILTACO's label.  Note the similarity in the picture and

2    note that it says "Pizza Pies (Puffs)" at the very top just

3    like El-Greg says.

4        Note that it also says -- or also shows all of the

5    available flavors just like ILTACO's product.

6        And, then, what is most striking, if we can go to the

7    bottom part of that label, remarkably, El-Greg now claims that

8    it's the makers of the original Puff.  You can see in the

9    commercial outlet where ILTACO's Pizza Puffs and El-Greg's

10   Pizza Pies were competing side by side that El-Greg changed

11   its Pizza Pies name to add the word "Puffs" and made the

12   untruthful claim that they were the makers of the original

13   Puffs.

14       The evidence will show that El-Greg didn't need to do

15   this to sell its product, because it sold its product to its

16   other customers still using the name "Pizza Pies."  It was

17   only when it competed head to head, side by side with the

18   original Pizza Puffs made by ILTACO that El-Greg used this

19   infringing name and a name that was in outrageous breach of

20   its settlement agreement with ILTACO from 2004.

21       Now, when ILTACO learned that El-Greg was using this

22   confusingly similar name at Restaurant Depot and a virtually

23   identical label to compete head to head with ILTACO's Pizza

24   Puffs, ILTACO contacted Restaurant Depot and others in the

25   hopes of stopping the situation.  See, El-Greg didn't want --

Opening Statement - Geekie

1    ILTACO didn't want to have to sue El-Greg again.  Lawsuits are

2    expensive; they divert you from your business; and, they're

3    not productive.

4          So, ILTACO tried to get El-Greg to stop.  They

5    contacted Restaurant Depot.  They contacted various government

6    agencies.  They finally contacted El-Greg trying to get

7    El-Greg to stop.  El-Greg wouldn't have any of it.  El-Greg

8    continued to use its label, and it just ignored the pleadings

9    of ILTACO.

10         Well, eventually, ILTACO had to hire some lawyers to

11   send what's called a cease and desist letter telling El-Greg

12   to stop using the term "Puffs" on its product and to stop

13   claiming that it was -- falsely claiming that it was the maker

14   of the original Puffs on its boxes at Restaurant Depot.

15         El-Greg continued to ignore the demand by ILTACO and

16   continued to use the label and the term "Pizza Pie (Puffs)"

17   and to compete in breach of the settlement agreement.

18         Because ILTACO did not want to have to sue El-Greg

19   again, it spent more than two years trying to get Restaurant

20   Depot and the other government agencies to intercede and to

21   stop this infringement.  But El-Greg continued on.  El-Greg

22   continued on for more than five years selling this product at

23   Restaurant Depot head to head with ILTACO Pizza Puffs calling

24   its product Pizza Pie (Puffs).

25         Well, finally, El-Greg, when it wouldn't stop,

1  received another cease and desist letter from ILTACO.  ILTACO

2  at that time had hired my firm to represent it and to bring

3  suit if El-Greg wouldn't stop its infringement.  But ILTACO

4  wanted to give El-Greg one last chance.  So, another cease and

5  desist letter was sent, a second one.

6       Ms. Lereno received the cease and desist letter.

7  Ms. Lereno called -- after receiving it, called -- my

8  now-retired partner Judy Grubner, who had sent the letter, and

9  cursed at her and challenged ILTACO to sue.  El-Greg was not

10 going to change its infringing label, no matter what.

11      So, ILTACO had no choice but to sue.  And that's why

12 we're here today.

13      Now, let me tell you very briefly about ILTACO's

14 claims.  First -- and I'll try and be brief because I know

15 that Judge Kennelly went over this with you.  But first our

16 claim is that El-Greg infringed on ILTACO's Pizza Puffs

17 trademark.  You can see it right there.

18      Second, El-Greg engaged in federal unfair competition

19 by infringing on ILTACO's family of Puffs marks.  The evidence

20 will show that El-Greg sold a number of products -- several

21 products -- at Restaurant Depot that were called Puffs, in

22 violation of the contract, in violation of federal trademark

23 law.

24      Third, ILTACO claims that El-Greg when it advertised

25 that it was the maker of the original Puffs engaged in false

1    advertising.

2         Fourth, ILTACO claims that El-Greg engaged in

3    deceptive trade practices by using the term "Pizza Pies

4    (Puffs)" and claiming to be the maker of the original Puffs

5    and creating a box that you will see when you compare them

6    side by side -- that's the Pizza Puffs -- ILTACO Pizza Puffs

7    -- Restaurant Depot box and label.

8         And that's El-Greg's label that they created after

9    seeing the ILTACO Pizza Puffs label.

10        And sixth, and the simplest claim in this case,

11   ILTACO seeks a breach of contract finding against El-Greg

12   because they breached the settlement agreement by using the

13   term "Puffs" after they had promised not to do so to get

14   ILTACO to dismiss its first lawsuit.

15        Now, very quickly, El-Greg will try and claim that by

16   using ILTACO's Pizza Puffs trademark that it was fair use to

17   use the name "Puffs."  But, in essence, this was really just a

18   rip-off of ILTACO's label.  And it wasn't done in any form of

19   good faith, because El-Greg had promised not to use the term

20   "Puffs" ever again in any way, shape or form.  You saw the

21   settlement agreement.  You saw the terms.  You'll see it again

22   in this case.

23        And next, El-Greg will claim that the name "Pizza

24   Puffs" can be used because it's merely descriptive of the

25   product.  Well, the evidence will show that Pizza Puffs, while

1    they're extremely delicious sandwiches, they're not light and

2    airy and they do not puff up.  So, it's not a descriptive

3    term.

4            Now, finally, the evidence will show that El-Greg,

5    while it was breaching its settlement agreement and while it

6    was infringing on the trademarks by using this label with

7    "Puffs" on it during the more than five years that it sold

8    products at Restaurant Depot with this breaching label,

9    El-Greg sold $1,281,000 of product -- $1,281,000 -- with the

10   "Pizza Pies (Puffs)" infringing label.  We will ask you to

11   award that as the damages here in this case.

12           Thank you for your time, and thank you for your

13   service.  And we appreciate your efforts here.

14           THE COURT:  Okay.  So, we're right at 12:30.  So,

15   we're going to do our lunch break now and we'll do the

16   defendant's opening statement after lunch.

17           You've only heard one side, so don't start making up

18   your mind.  As I told you, you have to keep an open mind

19   throughout the trial.

20           So, we'll break for lunch.  I'll take you out.  And

21   we're going to resume at 1:30.  So, just be back in the jury

22   room ready to go at 1:30 in the afternoon.

23           All rise.

24      (Jury out.)

25           THE COURT:  See you at 1:30.

1      (Recess taken at 12:31 o'clock p.m., until 1:30 o'clock

2  p.m., of the same afternoon.)

3                    *     *     *     *     *

4

5  I certify that the foregoing is a correct transcript from the
   record of proceedings in the above-entitled matter.
6

7
   /s/ Joseph Rickhoff                    October 22, 2018
8  Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    IN THE UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF ILLINOIS
 2                             EASTERN DIVISION

 3   ILLINOIS TAMALE CO.,              ) Docket No. 16 C 5387
     an Illinois corporation,         )
 4                                     )
                       Plaintiff,      )
 5                                     )
                  vs.                  )
 6                                     )
     EL-GREG, INC.,                    )
 7   an Illinois corporation,         ) Chicago, Illinois
                                       ) October 22, 2018
 8                     Defendant.      ) 1:30 o'clock p.m.

 9

                      TRANSCRIPT OF TRIAL PROCEEDINGS
10         BEFORE THE HONORABLE MATTHEW F. KENNELLY, AND A JURY

11   APPEARANCES:

12   For the Plaintiff:        SAUL, EWING, ARNSTEIN & LEHR, LLP
                               BY:  MR. JOSEPH M. KUO
13                                  MR. EUGENE J. GEEKIE, JR.
                                    MS. KELLIE Y. CHEN
14                             161 North Clark Street, Suite 4200
                               Chicago, Illinois  60601
15
     For the Defendant:        LITCHFIELD CAVO, LLP
16                             BY:  MR. ALAN I. BECKER
                                    MR. RYAN D. JANSKI
17                             303 West Madison Street, Suite 300
                               Chicago, Illinois  60606
18
     Court Reporter:           MR. JOSEPH RICKHOFF
19                             Official Court Reporter
                               219 S. Dearborn St., Suite 1232
20                             Chicago, Illinois  60604
                               (312) 435-5562
21
                  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
22
                         PROCEEDINGS RECORDED BY
23                       MECHANICAL STENOGRAPHY
                     TRANSCRIPT PRODUCED BY COMPUTER
24

25
```

opening - defendant

38

1     (Proceedings heard in open court; jury out:)

2          THE COURT:  Okay.  Ready to go?

3          MR. BECKER:  Still waiting for our clients to come up

4     from the cafeteria.

5          THE COURT:  Ah, okay.  Yeah, actually we're a couple

6     minutes ahead.  This doesn't need to be on the record.

7     (Discussion held off the record.)

8     (Jury enters courtroom.) )

9          THE COURT:  All right.  Everybody can have a seat.

10          And next you are going to hear Mr. Becker give the

11     opening statement for El-Greg.

12          Mr. Becker, you can go ahead.

13          OPENING STATEMENT ON BEHALF OF THE DEFENDANT

14          MR. BECKER:  Thank you, your Honor.

15          Good afternoon, everyone.  I'll introduce myself

16     again.  My name is Alan Becker, and I represent El-Greg.  And,

17     again, the people we introduced earlier, my associate Ryan

18     Janski, Greg Lereno is at our table here.  Maria Lereno over

19     by there, and their mom Helen Kayaloglou.

20          During the plaintiff's opening statement, you heard

21     Mr. Geekie say that you're going to learn about the history of

22     ILTACO.  Well, during this case, you're also going to hear

23     about the history of El-Greg.

24          You'll hear about how this company began with Mrs.

25     Kayaloglou, at that time a widow with two children, starting a

opening - defendant

1    pizzeria at a time when Greg was just getting out of high

2    school, Maria still in school.  And after a few years of the

3    pizzeria, they were approached by some distributors, some

4    distributors of food products, who approached them with an

5    idea, and the idea was to see if they could come up with a

6    product that could compete with ILTACO's product.

7           Now, you heard Mr. Geekie talk about copying a

8    product.  ILTACO did not have any patent on its product.

9    Anyone was free to make a similar product, and Greg and his

10   mom set about seeing if they could come up with a competing

11   product.

12          Now, when you actually see what these products look

13   like, just to give you an idea of what they look like before

14   they're cooked, this is -- this is what an ILTACO product

15   looks like, and this is what an El-Greg product looks like.

16          Well, that's what they look like on the outside.  It

17   doesn't mean that they're the same on the inside because each

18   company has its own recipe.  ILTACO has its recipe, and

19   El-Greg has its own recipe.  And, in fact, that's what Greg

20   and his mom worked on for about six months to come up with

21   their own recipe for a product.

22          They also worked on how do you actually produce the

23   product?  And after they came up with the idea and got it

24   approved by the distributors who had approached them, they

25   decided to go into the business of making the product.

opening - defendant

1        They had to come up with a name.  They already had a

2   name for their company, El-Greg, and you'll hear about how

3   they came up with that name, but they also wanted to come up

4   with a brand for the product, and they called it Pizza Pies.

5        Now, neither of these things looks like a pizza pie

6   as any of us would think about a pizza pie, but you'll get an

7   explanation about how they came up with the name Pizza Pie as

8   a brand for this product, and because they had been approached

9   by distributors what they started out doing was simply making

10  these products for the wholesale, for distributors who were

11  going to sell them to small restaurants.  That's the typical

12  customer of these.

13       So they were going to sell them in some bulk.  And

14  they would put them in a box.  This is the box.  This is a box

15  that holds 48 of those things, and they put the name Pizza

16  Pies on the box, they put it on the side, they put it on the

17  top, they put it on the other side, and they put it on this

18  side as well together with all the ingredients because you

19  need to put all the ingredients on there.

20       And they came up with three -- three boxes.  Same

21  box, just different colors.  The original product was their

22  pizza using pork product as the meat, and that's in a red box.

23       Then they came out with a beef version of the

24  product, and they put that in a -- same box, just with blue.

25  And many years later, they came up with another beef version

1    but a halal version.

2            Now, I don't know if you're familiar with that term,

3    but this is a version of beef that has been prepared in

4    accordance with Islamic law.  It has to be certified.  El-Greg

5    does that and sells a halal version of the product and for

6    that, they have a green box.

7            But they also came up with some other products in

8    fairly short order.  They were starting with the initial

9    products in 1989, and in 1990, they decided to come up with a

10   product that didn't have any meat in it at all.  It was a

11   spinach product.  And they called that product -- can we see

12   this on the --

13           THE COURT:  Yes.  The way you know what they're

14   seeing is what you're seeing on that front monitor there.

15           MR. BECKER:  Oh, wonderful.

16           And they called that product Spinach Puffs, 1990.

17   They didn't have a separate box for that.  What they had were

18   labels, tear-off-type labels that you could simply paste on

19   top of the preprinted Pizza Pies.

20           Over time, they came up with some more products, one

21   of which we're going to hear some more about during this case,

22   and they came up with a product called Chili Cheese Puffs

23   again with a paste-on label that they would put on the box.

24           Now, you've heard about this lawsuit in 2002.  In

25   2002, ILTACO brought a complaint, and the complaint was that

opening - defendant

1    there were some restaurants that were advertising on their

2    menus or on their signboards pizza puffs, and these were

3    customers of El-Greg.  There was no accusation that El-Greg

4    was using the term Pizza Puffs.  The claim was that El-Greg

5    was encouraging these restaurants to use the term Pizza Puffs,

6    which El-Greg denied.

7           And then as you've heard, this case was settled.

8    You've heard quite correctly that lawsuits are very expensive,

9    and El-Greg agreed to settle the case and agreed not to do

10   something, but what was it that El-Greg agreed not to do?

11          El-Greg agreed not to use the term Pizza -- "Pizza

12   Puffs."

13          MR. JANSKI:  Your Honor, could you switch to the

14   computer, please?

15          THE COURT:  To the ELMO or the computer?

16          MR. JANSKI:  The computer.

17          THE COURT:  There you go.

18          MR. BECKER:  Now, you were shown in the plaintiff's

19   opening statement the very specific provision, and what it

20   says that El-Greg will not use, this is the term "Pizza Puff"

21   in quotations.  It's a phrase, Pizza Puff.  And then there was

22   a further agreement that they would not use it with an

23   adjective, like "El-Greg Pizza Puff" or "Stuffed Pizza Puff."

24   There is nothing in the agreement that said that they would

25   never use the word "Puff," and when this lawsuit was brought

opening - defendant

1    in 2002, when El-Greg had already been selling their Spinach

2    Puffs since 1990, there was no complaint made about Spinach

3    Puffs.

4         So I think I heard three times Mr. Geekie say that

5    El-Greg had agreed never to use the word "Puffs."  Well, they

6    never made any such agreement.  It's simply not there.

7         So after this agreement, El-Greg went on doing --

8    selling exactly what it was.  It also began to sell some

9    products at retail in addition to wholesale.  They weren't

10   getting their products into Walmart or into the Jewel, not

11   like a big company like ILTACO, but they were getting some

12   products into small neighborhood grocers.

13        Their big customer was Restaurant Depot, and you've

14   heard a little bit about Restaurant Depot.  Restaurant Depot

15   is a very large national wholesale supplier, specifically

16   supplier to restaurants.  That's how they hold themselves out.

17   And they have a number of facilities in the Chicago area.

18   They have facilities in Wisconsin and Indiana and Minnesota

19   and Kansas, as well as the rest of the country.

20        And they became a customer of El-Greg, not for retail

21   products, but for the products sold in those boxes, the

22   quantity products sold there.  And who shops at Restaurant

23   Depot?  People who buy for restaurants, people who buy in

24   these kinds of quantities, not people making an impulse

25   purchase walking down a grocery aisle.

1          You can't just walk into Restaurant Depot and buy

2    product there.  You have to become a member of Restaurant

3    Depot, and the only way to become a member of Restaurant Depot

4    is to have the appropriate type of business license because

5    Restaurant Depot is selling it wholesale, no sales tax.  You

6    have to -- you have to be in business, in the business of

7    reselling a product.

8          There's also an exception if you're a charity, but

9    the main thing is if you are a restaurant or in the business

10   of reselling, you can buy at Restaurant Depot.

11         So that's the type of purchasers who were there.  And

12   for a number of years, El-Greg was simply selling the product

13   to Restaurant Depot in this same box, and as Mr. Geekie told

14   you, Restaurant Depot put the El-Greg boxes in the freezer

15   here and the ILTACO products there, and the purchasers for

16   restaurants could come down and buy one or the other.

17         Now, one of the things that you'll learn during this

18   case is that these products were not sold for the same price.

19   The ILTACO product was sold at a higher price, always a higher

20   price than the El-Greg price.

21         In 2009, Restaurant Depot notified not just ILTACO

22   and El-Greg, but notified its suppliers generally that they

23   needed to have a label on their -- on their products, and they

24   explained that there were some customers who were opening

25   boxes, not specifically ILTACO boxes or El-Greg boxes, but

opening - defendant

1    boxes of products, and so they said we want our suppliers to

2    have labels.  What do we want?  And they explained.  They

3    wanted -- they wanted a picture of a product.  They wanted a

4    product name.  They wanted quantity and weight, and they

5    wanted it put on a label that would be on the side of the box

6    so you could see it when they stacked it.

7            This was not an exciting thing for El-Greg to do.

8    They weren't looking to do something like this because it's

9    just a little bit of extra expense.  You have to buy the

10   labels, and you have to put them on.

11           And they didn't do it right away, but Restaurant

12   Depot insisted that they do it.  And they explained to Greg

13   and Maria what they wanted.  This was -- this was something

14   new to Greg and Maria.  They said tell us exactly what you

15   want, and the explanation was, well, our other vendors are

16   putting labels on it.  Take a look around the store and you'll

17   see what they look like, and they did.  And you've seen those

18   charts that Mr. Geekie put up, and they have a style of label.

19           And this is what ILTACO is claiming is trade dress.

20   But there's nothing particularly distinctive about it.  It's a

21   rectangular label.  It has a picture of the product.  It has

22   information about the weight and the quantity of the product,

23   about as plain vanilla as you can get for a label.

24           And what about the picture?  Well, El-Greg did not

25   want to go to the expense of having some special picture made

opening - defendant

46

1    for Restaurant Depot, but they had some photographs because

2    they already were selling a retail line, and for the retail

3    line, they had a picture for each of their varieties on the

4    retail package.

5            So all they did is they took the picture that they

6    had been using on their retail product for their first one,

7    their original Pizza Pie, and they just had their printer put

8    that picture on it, unlike ILTACO, which went out in 2009 and

9    got a special picture done for their Restaurant Depot label.

10           So El-Greg was not copying the Restaurant Depot

11   label.  They were using the picture they already had.

12           So in 2011, ILTACO writes this cease-and-desist

13   letter to El-Greg.  El-Greg has that letter looked at by an

14   attorney, and afterwards does not comply with the demand to

15   change the label.

16           And what does ILTACO do as far as El-Greg is

17   concerned?  Nothing.  They may testify that they went to

18   Restaurant Depot, but Restaurant Depot didn't ask El-Greg to

19   do anything.  They may testify they went to government

20   agencies, but no government agencies asked El-Greg to do

21   anything.  El-Greg simply continued using the label just as --

22   just as it was.

23           And then in 2016, ILTACO sues El-Greg.  That was

24   in -- that lawsuit's filed, that's this lawsuit here, filed in

25   the middle of May of 2016.  And El-Greg considered this for a

opening - defendant

1  bit and at the end of the year, El-Greg changed the label.

2  They took the word "Puffs" off -- off the label.

3          Nevertheless, the suit has gone on.

4          Now, let's look at the label that's really the

5  subject of this complaint.

6          If I may have the ELMO, please?

7          THE COURT:  Yes, sir.

8          There you go.

9          MR. BECKER:  So this is the label, and one of the

10  features of the label, keeping in mind that ILTACO is claiming

11  that this is going to mislead customers at Restaurant Depot to

12  think that this is the ILTACO product, but first the main

13  thing on this label is the picture, the picture of the food.

14  The picture, which is an actual picture of the El-Greg

15  product.

16          And if you actually look at that picture and compare

17  it to the picture that you've been shown of the ILTACO

18  product, if I may use, the pictures are not the same.  ILTACO

19  took its own picture.  Sure, it's a picture of the product,

20  but the food is situated on a different base.  The food's

21  positioned differently.  The food looks somewhat different.

22          And, again, as the testimony will show, this is a

23  picture that El-Greg was already using.  What else did El-Greg

24  do?  El-Greg put its logo or had its logo there on the

25  picture.  Right by the food, it says very clearly El-Greg.

opening - defendant

 1   And then the words, and what do the words say?  They don't say

 2   Pizza Puffs.  They say Pizza Pies with a TM.  Pizza Pies,

 3   indicating that this is the Pizza Pies brand, the El-Greg

 4   brand, Pizza Pies, and then because Restaurant Depot had asked

 5   them to put a description of the product on the label, they

 6   put in (Puffs).

 7           Now, this label was just not floating around in the

 8   air.  This label was put -- was put on the box.  As it

 9   happens, there's one end of the box that didn't have -- that

10   didn't have the Pizza Pies name on it and the label went

11   there.  And all of the other sides -- the top, the bottom, the

12   long side, the long side, and the other end -- all said Pizza

13   Pies.

14           And before they put -- before El-Greg put that label

15   on there, they took that label to Restaurant Depot and they

16   asked is it okay if we use this label, and Restaurant Depot

17   said yes, that's okay.  And there they went.  And so that

18   label was there in use from the time they put it on in May of

19   2010 until they changed the label at the end of 2016.

20           So this is what we believe that the evidence, taken

21   in its totality, is going to show you at the end of this

22   trial.  First, that there was no breach of contract because

23   El-Greg did not agree not to use the word "puffs" just in

24   general, and because El-Greg did not use the phrase Pizza

25   Puffs.

1          Now, there will be one exception that I'll tell you

2     about.  There was one instance when Maria mistakenly made a

3     Facebook reference to Veggie Pizza Puffs when she meant to say

4     Veggie Pizza Pies.  One time.  They had no product called

5     Veggie Pizza Puffs.  They sold no product called Veggie Pizza

6     Puffs.  They got no orders for Veggie Pizza Puffs, and that

7     was a mistake that was not repeated.

8          There will be no evidence, no evidence that will

9     support the idea that there is a legal right that ILTACO has

10    to the word "puffs" in the food industry.  And how could they

11    when there are other companies that have used "puffs" for many

12    years, if any of you have ever had some Cheetos Puffs or Cocoa

13    Puffs, and there are others besides.

14         There will be no evidence that will show that any

15    relevant public associates the word "puffs" in itself, and

16    that's going to be the standard, with ILTACO.

17         On top of that, El-Greg was using the word puffs with

18    those Spinach Puffs since 1990, and the test for ILTACO would

19    be to show that they had established this family, that is,

20    people believing that the word "puffs" just by itself meant

21    ILTACO in 1990 before the Spinach Puffs came out.  There will

22    be no such evidence.

23         As far as the trademark, it doesn't say Pizza Puffs.

24    It says Pizza Pies with that TM notation indicating that that

25    is the brand.

1          The El-Greg witnesses will explain the slogan, a

2    slogan that there's no evidence that anyone paid any attention

3    to.  And as far as the trade dress, there will be no evidence

4    that this trade dress, this rectangular label with a picture

5    of product and weight and quantity information, is inherently

6    distinctive or somehow in the nine months before El-Greg used

7    its label had acquired some distinctive character that people

8    associated that general appearance, not the trade -- not the

9    Pizza Puffs name, but the appearance of the label, with --

10   with ILTACO.

11          And, finally, all of these claims relating to

12   trademark and trade dress and slogan, what have you, require

13   the plaintiff to prove that there was a likelihood of

14   confusion, but the likelihood of confusion is going to depend

15   on who are the purchasers who are looking at this, and it's

16   not just ordinary consumers.  It's people in the restaurant

17   industry.

18          It's people who for years had been going to

19   Restaurant Depot, going to that freezer case, knowing that the

20   two different companies' products are there side by side and

21   knowing which was which.  There's going to be no evidence of

22   any purchaser at Restaurant Depot who complained that they

23   took back, that they purchased product that was different from

24   what they wanted.  No one -- no evidence that any purchaser

25   said I meant to buy the ILTACO product, and instead I picked

opening - defendant

1       up the El-Greg product.

2               All that you're going to see is an Internet survey of

3       people who are not people who are purchasers at Restaurant

4       Depot with a small number of people who will look at the

5       labels and make a free association, but that's not the people

6       who are relevant.  The people who are relevant are the people

7       who buy this product, who go in and make a quantity purchase,

8       not just one of these things, but 48 at a time at the minimum

9       and who are not going to simply be confused by these labels

10      and by the El-Greg label that is on a box that says Pizza Pies

11      everywhere you look.

12              And so at the end of the evidence, we are going to

13      ask you to enter a verdict in favor of El-Greg on all counts.

14              THE COURT:  Okay.  You can call the first witness.

15              You can call the first witness.

16              MR. GEEKIE:  The plaintiff -- excuse me -- the

17      plaintiff calls Warren Shabaz.

18        (Witness sworn.)

19              THE COURT:  Have a seat right there.

20              What we should do now is move the mic for you.

21      There you go.

22              THE WITNESS:  Thank you.

23          WARREN SHABAZ, PLAINTIFF'S WITNESS, DULY SWORN,

24                      DIRECT EXAMINATION

25      BY MR. GEEKIE:

W. Shabaz - direct

1    Q.  Mr. Shabaz, would you explain to the jury your position

2    with ILTACO, please?

3    A.  I'm the owner of ILTACO.

4           THE COURT:  Let's have him first give his name and

5    spell both the first and the last.

6           MR. GEEKIE:  I'm sorry.

7    BY MR. GEEKIE:

8    Q.  Would you give us your name and spell your name, please,

9    for the court reporter?

10   A.  Yes.  My name is Warren Shabaz, W-A-R-R-E-N.  Last name is

11   spelled S-H-A-B, as in boy, A-Z.

12   Q.  Thank you.

13          Now, would you please tell the jury your position

14   with ILTACO.

15   A.  I'm the owner and I'm the president of the company.

16   Q.  How long have you been associated with ILTACO?

17   A.  I've been associated with ILTACO 63 years.

18   Q.  And so you would have started around 1955; is that right?

19   A.  That is correct, 1955.

20   Q.  And what business is ILTACO in now?

21   A.  We make primarily Pizza Puffs now and a family of Pizza

22   Puffs.

23   Q.  So you're in the food -- food manufacturing business?

24   A.  Yes.  We're in the food manufacturing business.

25   Q.  And because of your long association with ILTACO, is it

W. Shabaz - direct

53

1  fair to say you're familiar with the company history?

2  A.  Yes.  I'm intimately knowledgeable of the company.

3  Q.  And can you tell the jury, please, how ILTACO began?

4  A.  ILTACO began with my grandfather.  He came to this -- to

5  the United States about 1914, 1915.  He went into New York,

6  worked in the foundries there, and he worked on the bridges in

7  Connecticut.

8         And then he came to Chicago about 1922, 1923, and

9  worked for a bakery here that made hot dog buns, and after a

10  while there, he started his own bakery, started making hot dog

11  buns.

12  Q.  How old was your grandfather when he came to America?

13  A.  He was 14 years old.  Came here on his own.

14  Q.  And so he would have been in his early 20s when he started

15  his bakery?

16  A.  His bakery he started about 22, 23 years old.

17  Q.  Okay.  And how did his bakery do?

18  A.  He did very well.  He did very well in the bakery

19  business.

20  Q.  What kind of products did he make?

21  A.  Hot dog buns.

22  Q.  Nothing else?

23  A.  No, he didn't make anything else but hot dog buns.

24  Q.  Who did he sell the hot dog buns to?

25  A.  At that time, hot dog carts were really big in the city.

W. Shabaz - direct

1   The guys would push their carts, their given corners, and

2   they'd sell hot dogs out of them.  And he'd make the buns for

3   them, and a lot of them parked their carts in his little shop,

4   his bakery, and he'd give them the buns, and they'd go on with

5   their day.

6   Q.  And did he invent any kind of products to help in the

7   bakery business and the hot dog business?

8   A.  Yes.  When you -- back in the day, the guys would cut the

9   hot dog buns right at the stand level, but they would cut it

10  on the top.  My grandfather designed a way where you cut it in

11  the seam so when you put the hot dog in there, it wouldn't

12  fall apart.

13          So he made a conveyor system.  One hand would rotate

14  the bun on the blades, and the other hand would bring the

15  blades down to cut the bun.  That was one of his inventions.

16  Q.  Were other products sold to the hot dog carts?

17  A.  Yes.  There were -- they sold tamales and hot dogs.  That

18  was -- one was synonymous with the other.  If you had a hot

19  dog stand or a cart or a buggy, you sold tamales.

20  Q.  And how did he come to be involved in making tamales if he

21  was in the bakery business?

22  A.  There was one gentleman that had -- a good friend of his,

23  an Armenian man, he had fallen ill.  He had cancer.  And he

24  told my grandfather, listen, I can't pay you for that.  I got

25  to pay my bills at the hospital.

W. Shabaz - direct

1       My grandfather told him that's fine.  Just keep on

2  taking the buns.  When you get better, you can pay me, but

3  right now, let's keep it going the way it is.

4  Q.   What happened?

5  A.   Unfortunately, the gentleman passed away.  His wife walked

6  into my grandfather's bakery and said to him, listen, I can't

7  pay you.  I want to thank you for all the help you gave us,

8  but my husband told you to give the keys to the place to you,

9  a sausage stuffer, and you're going to make tamales.  And my

10  grandfather said, okay, that's fine.  Thank you.

11  Q.   So did your grandfather stay in the bakery business when

12  he started making tamales?

13  A.   No, he didn't.  He sold the bakery off and went full bore

14  into the tamale business.

15  Q.   Hence, the name Illinois Tamale Company?

16  A.   Yes.

17  Q.   And when you started with the company in 1955, you were

18  about 11 or 12 years old, right?

19  A.   No, actually, I was about 9.

20  Q.   Okay.  And at that time, how many employees did ILTACO

21  have in the mid '50s?

22  A.   ILTACO had my grandmother, my grandfather, Pete and myself

23  and my uncle, my Uncle John.

24  Q.   Was Pete a family member?

25  A.   No, he wasn't.  No, he wasn't.

W. Shabaz - direct

56

1    Q.  And what duties did you have when you started working at

2    ILTACO?

3    A.  I would throw out the trash, and I would sit there and

4    wrap and tie tamales.

5    Q.  And was your grandfather still involved in the business?

6    A.  Yes, he was.  Yes, he was.

7    Q.  And what jobs did he do?

8    A.  His job was cooking the tamales, the yellow cornmeal, the

9    red cornmeal, actually stuffing sausage stuffer and putting

10   them out on trays so the four of us would be able to wrap and

11   tie the tamales.

12          He would be doing all of the buying.  I remember way

13   back when he bought from Colonial Beef.  He bought from Tara

14   Della Cornmeal Company.  He would do the purchasing and the

15   cooking.

16   Q.  And you didn't mention your father.  Was he involved in

17   the business?

18   A.  My dad did something different.  He saw that the hot dog

19   stand business was extremely lucrative, so he built two of his

20   own carts and he had two of his own corners.  He had one of

21   his buddies running one of them, and he ran the other one.

22   Q.  And did your father ever go into the company -- family

23   business?

24   A.  No, he did not.

25   Q.  And did your grandfather -- did your father live to see

W. Shabaz - direct

1  you take over the company?

2  A.  No.  My dad died in '61.  I was 15 at the time.

3  Q.  What about your grandmother, was she involved in the

4  business?

5  A.  Yes, she was until she lost her eyesight.  She had --

6  yeah, she had loss in her eyesight.  She had to stay home

7  then.

8  Q.  And you sound like you were close with your grandfather.

9  Were you?

10  A.  You know, somebody that you grew up next to that's your

11  mentor, yeah, I dearly loved him very much.

12  Q.  Did he teach you the tamale business?

13  A.  Yes, he did.  From the beginning to the end.  The only

14  thing I couldn't do was drive the truck and deliver.

15          So I learned how to cook, I learned how to buy

16  products, and learned how to deal with the people that came in

17  to buy our products.  Yeah, it was -- he taught me everything

18  I knew.

19  Q.  Did he ever express to you an intent that you continue on

20  the business?

21  A.  Yes, he did.  He said to me:  You stay with this company.

22  This company's taking care of the entire family, and it will

23  take care of you and your family for the rest of your life.

24  Just be good to it, take care of it, and you'll do well.

25  Q.  How long did your grandfather stay involved in the

W. Shabaz - direct

58

1    business?

2    A.  He was with me until 1964.  I even lost my grandmother

3    just before him.  He passed away in '64.

4    Q.  And how old were you then?

5    A.  I was 18.  17, 18.

6    Q.  Had you graduated from high school?

7    A.  Yes.  I went to Lane Tech High School on Addison and

8    Western.

9    Q.  So who took over the business when your grandfather died?

10   A.  I did.

11   Q.  And so you did it right after high school?

12   A.  Yeah.  I took it over after high school.

13   Q.  Okay.  Did some other event happen not too long after you

14   graduated from high school that may have played into your

15   career plans?

16   A.  Yeah, I -- I received a draft notice.  I was 18.  And I

17   had to make some moves there because you can't say no to the

18   government.  You've got to go.

19   Q.  So what did you do?

20   A.  I went home that day and I sat my brother down, my brother

21   Glenn, and my mother, and I told them what was coming, and I

22   said I've got -- you have to come in the business.  This is an

23   ongoing thing.  This will be a very good business.  Just keep

24   it going while I'm gone.

25   Q.  And did you teach them how to run the business?

1  A.  Yes, I did.  I showed my brother how to cook.  I showed

2  him how to run the sausage stuffer.  I taught him how to --

3  his buying practices, who to buy it from, who were the good

4  guys, who were the bad guys and constantly check your meat

5  prices, check your cornmeal prices.  We used to wrap them in

6  parchment paper, the tamales, and the string people, and Wixon

7  Milwaukee was our spice people.

8          So, yeah, I had to teach him everything, and I also

9  had to teach him who the people were, where to go with -- I

10  gave him a wad of keys to all the garages where the guys had

11  their hot dog carts.  And he'd have to go in there, place the

12  tamales inside the refrigerators, and they would leave the

13  money there from the previous bill.  They would pay you.

14  Q.  Did you feel like you left the business in good hands?

15  A.  Yes, I did.  Yes, I did.

16  Q.  And so you said you were drafted.  Where did you end up

17  going?

18  A.  I had two cousins that were in the Navy.  One went to

19  Northwestern.  He was in their naval program.  My other cousin

20  went to Annapolis, and they both graduated and they came in

21  one day to pick up tamales, they loved tamales.  And they

22  said, no, you're not going anywhere.  You're going in the

23  Navy.  I looked at them.  I said really?  They said yeah.

24  Sign to the Navy.

25  Q.  So did you?

W. Shabaz - direct

60

1   A.  Yes, I did.

2   Q.  And what did you do in the Navy?

3   A.  Well, first I did basic training at Great Lakes, and then

4   I went to Pensacola, Florida.

5   Q.  And what did you do in Pensacola, Florida?

6   A.  I went into cryptographic work.  We had to learn

7   everything about cryptography, and I received a top secret

8   clearance, top secret Larum clearance.

9   Q.  And can you briefly explain what cryptography is?

10  A.  Cryptography is we had to be able to copy Chinese Cyrillic

11  and Vietnamese, Cyrillic being Russian.  We would get this

12  information, and we would send it on computers.

13          That was the early stages of computers.  Some of the

14  computers would probably be the size of this room here, and

15  we'd send messages back to the Joint Chiefs of Staff or even

16  the President would be looking at these messages.

17  Q.  Where were you stationed?

18  A.  I ended up Midway Island.

19  Q.  In the Pacific?

20  A.  In the Pacific, yes.

21  Q.  And so you were, in essence, deciphering foreign

22  countries' messages and cryptographizing or putting our

23  messages into secret codes?

24  A.  Yes.  We used what they call a baud system, and it would

25  look like a ticker tape, and the early computers were -- you

W. Shabaz - direct

61

1   would put it on there, put in the address of who it's supposed

2   to be going to, I'm putting it simply, an address and you

3   press a button and the ticker tape would go through there with

4   all this information of troop movement, if anything was going

5   on that wasn't correct and we had to know about it.

6   Q.   And how long were you in the Navy?

7   A.   I was in there about two-and-a-half years.

8   Q.   And what did you do when you came out of the Navy?

9   A.   I went right back to the family business.

10  Q.   And was it still being run by your mother and brother?

11  A.   Yeah.  I was very proud of them.  They did an excellent

12  job.  They kept it going.

13  Q.   And the company was still making tamales?

14  A.   Yes.

15  Q.   Selling to hot dog stands and hot dog carts?

16  A.   Yeah, the -- when I got back, the hot dog carts were

17  dwindling.  There wasn't that many on the street anymore.

18  Guys were renting 300- and 500-square-foot storefronts and

19  they were becoming much more popular because they would have

20  business all year round instead of you have a hot dog cart,

21  you probably have about eight-and-a-half to nine months' worth

22  of business coming your way because of the winters here, and

23  these guys were able to roll 12 months of the year.

24  Q.   And when you came back from the Navy, how many employees

25  did ILTACO have?

W. Shabaz - direct

62

1    A.  We had six.  There was my mother, my brother, Tommy,

2    Betty, and Rose Gasso and myself.  There were six of us.

3    Q.  So the business was doing well?

4    A.  Yes, it was.

5    Q.  And what did you do when you returned in terms of job

6    responsibility?

7    A.  Well, you wear many hats when you're still in your infancy

8    stages with a business.  I drove.  I still cooked.  We ran

9    seven days a week.  And sat there and wrapped and tied

10   tamales, too.

11   Q.  Were you in charge of the business when you returned?

12   A.  Yes, I did.  I ran the office, yes.

13   Q.  Have you stayed in charge since you returned from the

14   Navy?

15   A.  Yes, I have.

16   Q.  And I presume the company has grown since you returned?

17   A.  Oh, yeah.  It's grown quite a bit.

18   Q.  How many employees does ILTACO have today?

19   A.  With sales staff, drivers, we have 64 people now.

20   Q.  Now, a short time ago, Mr. Becker referred to ILTACO as a

21   big company.

22         Would you consider your company a big company?

23   A.  No, no, we're not.

24   Q.  Where was the company located originally?

25   A.  The company was originally located 806 North Orleans.  If

W. Shabaz - direct

63

```
 1   you all know where 806 Orleans is, if you drove there, it
 2   would be Orleans and Chicago Avenue, and right now it's a
 3   Shell Gas station.  They knocked the storefront that I had
 4   down.
 5   Q.  Where is ILTACO located now?
 6   A.  We're at -- we've been at 1376 West Hubbard now.  We've
 7   been there for 45 years.
 8   Q.  So you're just a stone's throw from downtown, right?
 9   A.  Correct.
10   Q.  Now, let's talk about ILTACO's growth.
11           When you came back from the Navy and you were running
12   the company, did something happen that changed the course of
13   your company's future?
14   A.  Yes.  When you have a business like ours, you get very
15   close to the people that you service, and one of the fellows
16   came to me.  He came in to purchase some tamales, he says, you
17   know what?  It's rough out there.  I'm only carrying two
18   products.  I have your tamales.  I'm selling hot dogs.  I need
19   something else to help me out.
20           I have pizza places, I got Italian beef places around
21   me, I've got hamburger places.  I need something to combat the
22   pizza place right down the street from him.  He had -- the
23   pizza place was making pizzas, panzerottis and calzones, so he
24   wanted something else to help him out.
25   Q.  And did you offer to help him?
```

W. Shabaz - direct

1    A.  Yes, I did.

2    Q.  What did you do?

3    A.  I called a friend of mine, his name was Art Velasquez, and

4    Art owns Azteca Corn Products if you've ever seen it.  They

5    make tortillas, flour and corn tortillas.

6         And I called him up.  I said I want to come over

7    there and talk to you.  He was making tortillas for himself,

8    his dad who had restaurants, and he was selling them retail

9    also.

10        So I went over there and I know he had -- his dad

11   sold soft shell burritos and hard shell burritos, and he would

12   french fry them.  So you know what, let me go talk to Art.

13   Maybe he has an idea for me.

14        So I went over and discussed it with him.  He goes,

15   Warren, the best thing for you is to put your formulation

16   together, whatever you're going to do, and put it in a

17   tortilla.  I said great.  Sounds great.

18        So I worked on it for about a year.

19   Q.  What timeframe are we talking about here?  What year are

20   you doing this?

21   A.  About 1976.

22   Q.  Okay.  So you worked on the formula for a year, and what

23   did you come up with?

24   A.  I came up with we're talking about right now, a

25   self-enrobed Pizza Puff.

1   Q.  So it was flavored like a pizza?

2   A.  Yes.

3   Q.  And then did you try creating this dough-enrobed product

4   with a tortilla?

5   A.  Yes, I did.

6   Q.  And how did that work?

7   A.  It worked very well.

8           What happens is when you drop a flour tortilla into a

9   french fryer -- most of my fellows had french fryers, little

10  french fryers, so they could cook them off.  And when you

11  dropped it in there, it -- it worked very well, extremely

12  well.

13  Q.  Could you have used or did you consider using a puff

14  pastry or something puffy?

15  A.  Well, we're probably going to be talking about it anyway,

16  if you use a pastry-type dough, what happens when it goes in

17  there, if it's not cooked off a little bit, like our press

18  that runs about 485 by 30 degrees, it sizzles both sides of

19  the tortilla.  But if you throw raw dough into a french fryer,

20  it will dissipate.  It will blow out.  Everything that's

21  inside will be in your fryer, and your customer is not going

22  to be happy.

23  Q.  So is that why you chose a tortilla over a puff pastry?

24  A.  Yes.

25  Q.  And was your original mission to make a pizza-style

1    sandwich?

2    A.   If this gentleman didn't come to me, no, but when he came

3    to me and I saw a need there, I wanted to fulfill his need.

4    Q.   So how big was the sandwich?

5    A.   A Pizza Puff is about 4-by-6-by-1-inch thick.

6    Q.   And after you created it, did you start selling it to

7    customers?

8    A.   I -- I put them out there first with two or three of them

9    that I knew well, and I gave them samples.  And they said,

10   Warren, this is excellent, you know.  And then I started

11   selling to the masses.

12   Q.   And when you created this product, was there anything like

13   it on the market?

14   A.   No, there wasn't.

15   Q.   And did you continue to buy tortillas from Art Velasquez?

16   A.   Yeah, I did.  And then one day I came in there.  I'd have

17   to go down there about 3:00, 4:00 in the morning to pick them

18   up so they were still hot.  I had these huge Styrofoam boxes.

19        And he said to me why are you killing yourself?  Why

20   don't you go and buy a tortilla press, and you're probably

21   going to save 75 percent on each tortilla that you make.

22        We were paying about $0.09 a unit.  It brought us

23   down to about $0.02 a unit, which is huge.

24   Q.   So how big of a tortilla press did you buy?

25   A.   He gave me a name of a family in California, Casa Herrera,

W. Shabaz - direct

1    and it was a six-placement press.  We were able to put six

2    tortillas down.  The dough balls.  First you make the dough

3    ball and you put them on, and it made it at about eight to

4    nine cycles a minute, that little press.

5    Q.  And when you started making your product, your new

6    sandwich, did you stay in the tamale business, too?

7    A.  Yes.

8    Q.  And did you just sell your new product to your hot dog

9    stand and restaurant customers?

10   A.  No, no, no.  What we were able to do is we were able to

11   sell it to the schools, the high schools in and around

12   Chicago.  There was a guy that had a carnival, he'd come by

13   and pick them up.  Anybody that had a food service capability,

14   that had a french fryer or an oven we were able to sell to.

15   Q.  And how many of these new pizza sandwiches were you making

16   a day when you first created them?

17   A.  When we first started, we were doing about a thousand to

18   2,000 units a day.

19   Q.  And did you make them by hand or by machine?

20   A.  We still do it.  We still do it by hand.  It's on a

21   conveyor system.  You don't want to lose the quality.  If you

22   go and machine something, it looks too manufactured.  This

23   looked like a homemade item by doing it by hand.

24   Q.  And you say it's still made by hand today?

25   A.  Still made by hand.

W. Shabaz - direct

68

1   Q.  How many do you make a day now?

2   A.  We make about 100,000.

3   Q.  And how many employees do you have that work on the line

4   you mentioned to make these?

5   A.  Minus the sales staff, the drivers, I'd say we have, like,

6   52, 53.

7   Q.  And you mentioned that you have continued to make them by

8   hand for quality.

9        Do you take great pride in your product?

10  A.  Very much so.

11  Q.  Do you feel that your product's the best out there?

12  A.  I do.

13  Q.  And let's talk about the name of your product.  We've all

14  heard it, but what did you decide to call this product?

15  A.  I decided to call it Pizza Puffs.

16  Q.  And can you explain to the jury why you decided to call it

17  Pizza Puffs?

18  A.  Yes, I can.

19        When I was a young boy and my brother -- my mom,

20  there was a milk company in the neighborhood, it was called

21  Borden's Milk.  And Borden made cream, it made butter, sticks

22  of butter, produced milk.  At the same time, too, they wanted

23  to venture into other things, and they made a pizza-flavored

24  popcorn, and it was called Pizza Puff Popcorn.

25  Q.  So that was a childhood memory of yours?

W. Shabaz - direct

1    A.  Yes, it was.

2    Q.  And so what did you do when you decided that you wanted to

3    use the term Pizza Puffs?  Did you just start using the term?

4    A.  We could have because it was so different than popcorn.

5    Popcorn is light and airy, and our product is not light and

6    airy.  It's quite thick.

7            So back in the day, you were able to call people.  So

8    I called the president and --

9    Q.  President of who?

10   A.  Borden's.

11   Q.  Okay.

12   A.  And we were able to converse, and I said, listen, I want

13   to use the name Pizza Puffs.  And he said back to me, you

14   know, Warren, it just so happens we're dropping our trademark.

15   We're not going to sell popcorn.  We're in the milk business.

16   It was an offshoot of what we did, so in about two months

17   we're out, but you can start using it now.  Don't worry about

18   it.

19           And he called his legal department to see if that was

20   okay, and he said fine, because you have a frozen product and

21   this is popcorn.  Two different elements.

22   Q.  And so did you give your product the name Pizza Puffs

23   originally?

24   A.  Yes.  It was Pizza Puffs.  We came out strong in '76,

25   1976.

1    Q.  And do you consider ILTACO the original maker of Pizza

2    Puffs?

3    A.  Yes, I do.

4    Q.  And did you officially trademark the name Pizza Puffs?

5    A.  Yes, we did.

6    Q.  Did you register your trademark?

7    A.  I did.

8    Q.  Why did you do that?

9    A.  You know, when I was talking about my grandfather, he came

10   up with that conveyor system, he came up with some other

11   unique things, and he never protected them, and to this day,

12   they use those ideas and him cutting the bread on the bun

13   exactly what he said right in the seam.

14          He made up steam tables, and somebody took his ideas

15   of so water wouldn't drip on the buns.  He made a system where

16   they wouldn't drip on the buns.  Nobody wants a soggy bun.

17   And he didn't protect them and that went away.  Bigger

18   companies took them over.

19   Q.  So you registered Pizza Puffs as a trademark to protect

20   that name for the company?

21   A.  Yes, I did.

22          MR. GEEKIE:  Can we have Exhibit 1, please?

23          THE COURT:  I've got to get it over to you -- I need

24   to switch it over to your thing.

25          MR. GEEKIE:  Okay.

W. Shabaz - direct

1          THE COURT:  Okay.  There you go.

2          MR. GEEKIE:  Thank you.

3          Can you click out to the whole document first?

4    BY MR. GEEKIE:

5    Q.  This is Plaintiff's Exhibit 1, Mr. Shabaz.  Could you

6    identify this for the jury?

7    A.  Yes.  This is our trademark.  This is our principal

8    register on the Pizza Puff with the U.S. -- States Patent &

9    Trademark Office.

10   Q.  And is this -- it's dated May 26th, 2009 in the upper

11   right-hand corner?

12   A.  Yes.

13   Q.  And do you know what that date is intended to be?

14   A.  That is -- we had to renew it from '76.

15   Q.  And --

16   A.  So we can keep enforcing it.

17   Q.  And is it your understanding this comes from the U.S.

18   Patent & Trademark Office?

19   A.  Yes, it does.

20   Q.  And I'd like to point out to you where it says:  First use

21   10-17-1976?

22   A.  Yes.

23          MR. GEEKIE:  And I'll ask that Ms. Warren pull that

24   out.

25   BY MR. GEEKIE:

W. Shabaz - direct

72

1    Q.  And is that the date that you understood or around the

2    date you started first using Pizza Puffs --

3    A.  Yes.

4    Q.  -- as a trade name?

5    A.  Yes.

6    Q.  And has ILTACO used the trademark Pizza Puffs nonstop

7    since 1976?

8    A.  Nonstop since 1976, correct.

9    Q.  So how did the business of selling Pizza Puffs go after

10   you created them?

11   A.  They went extremely well.  Everybody liked them.  We were

12   getting into different areas that we never thought it was

13   going to grow the way it did.

14   Q.  Did you begin making new formula Puffs?

15   A.  Yes.  If you know about Chicago, Chicago back in the day

16   was the pork capital of the world at one time, and everything

17   here was pork.

18          Because of different geographic areas, they let you

19   know what they liked.  So we made a Beef Puff, we made a Taco

20   Puff.  As soon as you started going east a little bit or out

21   of the Chicago area, pepperoni is very popular, so we made a

22   Pepperoni Puff, too.

23   Q.  Pepperoni Pizza Puff?

24   A.  Pepperoni Pizza Puff.

25   Q.  So you expanded outside of the Chicago area, correct?

W. Shabaz - direct

```
 1    A.  Yes, we did.

 2    Q.  Did you expand to the East Coast?

 3    A.  Yes, we did.

 4    Q.  And did you have any other Puff products that you created

 5    in that timeframe?

 6    A.  Yeah, we -- we came out by -- we had about six or seven of

 7    them at that time.  Anything from Pepperoni Puff, a Taco Beef

 8    Puff.  We had six.  Sloppy Joe Puff was one of them.

 9    Q.  And did they all have the name Puffs?

10    A.  Every one of them.

11    Q.  And sounds like you did this in response to customer

12    demand; is that right?

13            MR. BECKER:  Objection, Your Honor.  It's leading.

14            THE COURT:  Sustained.  Rephrase the question,

15    please.

16    BY MR. GEEKIE:

17    Q.  What was the reason that you expanded your line of puff

18    products?

19    A.  Well, that allowed us to sell other products to the same

20    stands we already had.  You don't always go in and buy the

21    same product every day.

22            So this enabled us to make, let's say, a Taco Puff.

23    They would come into that store.  That would strengthen that

24    store's capability of selling products continuously, our

25    products.  So we had a Pepperoni Puff, it worked, and so on
```

W. Shabaz - direct

74

1    and so on.

2    Q.  So in the late '70s and early '80s, did you continue to

3    just sell to restaurants and hot dog stands?

4    A.  No.  When you think of the business what you can do with

5    it, there's a lot of things you can do with the business, and

6    I saw the retail stores as an untapped resource.

7            So I wanted to be able to sell to the retail stores,

8    the grocery stores, whether it be Kroger, Jewel, now we have

9    Mariano's, Food 4 Less.  There was a group of stores that were

10   friends of mine, and they were called the Leamington Stores,

11   and the Casaccio family owned those grocery stores.  And I

12   always use them, even to this day, I use them like a test.  If

13   it works in their stores, it will work anywhere.

14           So we made a retail package up.  That's the package

15   right there on the table.  I said, here, here's a few cases.

16   Let's put them up.  Let's see what you can do with them.  And

17   he was successful with them.

18   Q.  So were Leamington Stores your first stores?

19   A.  Those are my first stores.

20   Q.  And about when did you first go into the retail business?

21   A.  About '83, '84.

22   Q.  And you mentioned a number of other stores.  So was

23   Leamington successful?

24   A.  They were very successful.

25   Q.  And are they still around Chicago these days?

W. Shabaz - direct

75

 1   A.  Yes.  There's four of them now.

 2   Q.  And are they still a customer?

 3   A.  Yes, they are.

 4   Q.  And so you've had a 35-year relationship with them; is

 5   that right?

 6   A.  Correct.

 7   Q.  Do you still consider them a valuable customer?

 8   A.  Yes, I do.

 9   Q.  And you mentioned some of the other stores.  Could you

10   repeat some of the other grocery stores you sell to?

11   A.  We have the Jewel Stores, both retail and food service,

12   they'll cook them off right in the stores.  We do the same

13   thing with Walmart.  They'll sell it retail and in food

14   service.  Kroger, Food 4 Less, Tony's, Mariano's.  We have

15   quite an extensive group of people that buy from us.

16   Q.  And to this day, have you continued to expand the Puffs

17   product line?

18   A.  Yes, we have.  We have a Reuben Puff now.  We have a

19   Buffalo Puff now.  I left the -- I can't remember them all

20   right now, but there's 12 in all.

21   Q.  And how about Pulled Pork Puffs?

22   A.  We have a Pulled Pork Puff, yes.

23   Q.  Do you try and stay current in terms of your Puff flavors

24   with the tastes of America?

25   A.  Yes, we do.

W. Shabaz - direct

1   Q.  And you mentioned earlier a family of products.

2           What do you understand your family of products to be

3   or to mean to you?

4   A.  Our family of products, the Puff line, is extremely

5   important to us, but it's also important when you go into a

6   grocery store or even at the restaurant level because when you

7   go into, let's say, Food 4 Less or Jewel or Walmart, if you

8   just have one product of your family of products in there,

9   you're going to be unnoticed.

10          By having, like, 8, 9, 10, 12 products, you block out

11  an area, and you become much more noticed.  You're stronger

12  that way.

13  Q.  And have you considered this variety of products a family

14  of products since you started creating them?

15  A.  Yes, I do.

16  Q.  And do you advertise and sell the Puffs family of products

17  together?

18  A.  Yes, we do.

19  Q.  And other than the different filling, are all of these

20  Puffs products made the same way?

21  A.  All of them are made the same way.  Quality ingredients,

22  they're all hand wrapped.  We still do it today.

23  Q.  And just so we're clear, have you trademarked and

24  registered every Puffs sandwich that you've created?

25  A.  Every Puff sandwich has been trademarked.

```
 1   Q.  And has any company ever challenged in court or with the
 2   Trademark Office any of your Puffs trademarks?
 3   A.  No, no one has.
 4           MR. GEEKIE:  Could you put up Exhibit 31?
 5           And this is Plaintiff's Exhibit 31, Mr. Shabaz.
 6           Sara, could you flip through each of the pages just
 7   so he can see it.
 8   BY MR. GEEKIE:
 9   Q.  And I'd ask you to look at it and identify it for the
10   jury.
11   A.  It's one of our price lists.
12           MR. GEEKIE:  Well, let's let Ms. Warren show the next
13   few pages of the document.
14           THE WITNESS:  Okay.
15           MR. GEEKIE:  And then the last page.
16   BY MR. GEEKIE:
17   Q.  Now, can you identify that group of documents?
18   A.  Yes.  This was our brochures at that time.  This is going
19   back to '85 to '95.  These are very early brochures.
20   Q.  And going back to the first page --
21           MR. GEEKIE:  And can you now expand the Puffs
22   section?
23   BY MR. GEEKIE:
24   Q.  Was this your line of Puff products in the 1990s?
25   A.  Yes.
```

W. Shabaz - direct

1    Q.  And was there a purpose for listing them together on your

2    price sheet?

3    A.  Yes.  It was to let everybody know what we had and listing

4    them all as a family of products.

5            MR. GEEKIE:  And can we go on to the next page,

6    please.

7    BY MR. GEEKIE:

8    Q.  And what does this page show?

9    A.  It shows the original Pizza Puff, the Taco and the

10   Burritos and our tamales.  We made burritos also.  We still

11   do.

12           MR. GEEKIE:  And the last page.

13   BY MR. GEEKIE:

14   Q.  And what is this page intended to reflect?

15   A.  Our family of products.  Our Puff product, our handheld

16   sandwiches.  This is where -- this is a little bit newer, and

17   it lists a lot of our Puff family here.

18   Q.  And did you advertise and market your Puffs products like

19   this in the 1980s?

20   A.  The same way.

21           MR. BECKER:  Object to the form of the question.

22           THE COURT:  Overruled.

23           The answer can stand.  He said, "The same way."

24   BY MR. GEEKIE:

25   Q.  And what about the 19 -- after this in the 1990s and

W. Shabaz - direct

79

1   2000s, did you do it the same way?

2   A.   Exactly the same way.  We listed all our family of

3   products.

4   Q.   Is that for the reason you testified earlier, to give your

5   customers options?

6   A.   Definitely.  They would be able to sell all our products.

7   That would strengthen their sales.  It would strengthen our

8   sales.

9   Q.   Now, lets talk about El-Greg.  Do you consider El-Greg a

10  competitor?

11  A.   Yes.

12  Q.   Why is that?

13  A.   Well, they make the product exactly like ours.  Not the

14  same -- I'll say not the same quality, but in the same format.

15  Q.   And are there other products like yours, a

16  stuffed-sandwich-type product that are out in the marketplace

17  that also compete with you?

18  A.   No.

19  Q.   Okay.  What about other products from big companies that

20  purported or tried to compete with you?

21  A.   No.

22  Q.   Okay.  What would you consider Hot Pockets?

23  A.   Hot Pockets is not a competitor of ours.  That's a

24  machined product.  You're talking Hot Pockets, they're a

25  billion-dollar company.

W. Shabaz - direct

1   Q.   Other than El-Greg, has any other company ever used Puffs

2   to describe or advertise their handheld stuffed sandwiches?

3   A.   No.  Nobody has.  Nobody.

4   Q.   Now, your son Adam will testify about what El-Greg did

5   that led to this lawsuit, but this isn't your first lawsuit

6   with El-Greg, is it?

7   A.   No, it isn't.

8   Q.   Are you familiar with the earlier one that I discussed in

9   my opening statement?

10  A.   Yes, I am.

11  Q.   And what was the gist or the reason for that lawsuit?

12  A.   Well, it was them using our name, using our signs, and I

13  just wanted them to stop and desist, you know?  I didn't want

14  them attacking our family of products.

15  Q.   And what came of that lawsuit?

16  A.   They agreed.  Not only did they agree not to use it in any

17  format that would be "pizza" or "puff" or putting it together,

18  they also agreed not to tell the distributors to sell it as a

19  Pizza Puff or their customers, tell them it's not a Pizza

20  Puff.

21          MR. GEEKIE:  Okay.  Can we put up Plaintiff's

22  Exhibit 11, please?

23          And would you expand the first page?

24  BY MR. GEEKIE:

25  Q.   Can you identify Plaintiff's Exhibit 11, please.

W. Shabaz - direct

1              Let me expand the first paragraph.

2              Looking at the first paragraph and the caption, do

3    you recognize this document?

4    A.  Yes, I do.

5    Q.  And what is it?

6    A.  It was a settlement agreement between El-Greg and

7    ourselves and one of the hot dog stands, Michael's.

8    Q.  And is this the settlement agreement that you talked about

9    that settled the lawsuit that you brought back in 2002?

10   A.  Yes.

11   Q.  And were you involved in negotiating this settlement?

12   A.  Through our lawyers, yes, I was.

13   Q.  Did you play a role in, along with your lawyers, in

14   creating the terms of this settlement agreement?

15   A.  Yes, I was.

16   Q.  And now directing you to page -- or Paragraph 2 on the

17   second page, which we'll pull up, and the first portion of

18   Paragraph 2 says that El-Greg and Michael's acknowledge that

19   Illinois Tamale has obtained Illinois registration number, and

20   then the number, and U.S. registration number for Pizza Puff.

21              What did you understand that provision to mean?

22   A.  That they were in direct conflict with us.

23   Q.  Well, if you look at it again, El-Greg and Michael's

24   acknowledge that Illinois Tamale has obtained Illinois

25   registration and U.S. registration.  Do you see that?

1   A.   Yeah, I guess I jumped down to where it says El-Greg stole

2   Pizza Puff.

3   Q.   Let's talk about the first clause there.

4   A.   Okay.

5   Q.   What was that intended to reflect?

6   A.   That they respected our name, our trademark as Pizza

7   Puffs.

8   Q.   Okay.  And then we go down, and the remainder of that

9   sentence where it says that --

10          MR. GEEKIE:  Sara, is there any way to make it a

11  little larger?

12          I apologize, my eyes aren't as good anymore.

13          Okay.  That should help.

14  BY MR. GEEKIE:

15  Q.   So I can read this, it says that the second portion of

16  that says El-Greg and Michael's, and their respective

17  shareholders, officers, directors, and employees will not use

18  Pizza Puff alone or in combination with other words or

19  designs; example, "El-Greg Pizza Puff" or "Stuffed Pizza

20  Puff," as a trademark, service mark, trade name, trade name

21  component, website, metatag, linked to their websites or other

22  use in the marketing or advertisement of their respective

23  goods or services except for comparative advertising.

24          Do you see that?

25  A.   Yes.

 1    Q.  And they say they won't use it as an identification of

 2    their respective goods or services.

 3            When that was drafted and put in the agreement and

 4    signed, did you have an understanding of what that meant?

 5    A.  Yes.

 6    Q.  And what was your understanding of what it meant?

 7            MR. BECKER:  Objection, Your Honor.

 8            THE COURT:  Can I see the lawyers at sidebar to

 9    discuss the objection?  I just want to get a preview of

10    something.

11      (Proceedings heard at sidebar:)

12            THE COURT:  So, again, you've got to talk into this.

13            Okay.  You going to ask your guy the same thing?

14            MR. BECKER:  No, the --

15            THE COURT:  No, just answer my question.

16            MR. BECKER:  Yeah, the answer is no.

17            THE COURT:  You're not going to ask your guy what he

18    understood it to mean, did he understand that what he was

19    doing violated it?

20            MR. BECKER:  That question --

21            THE COURT:  So if I sustain this objection, you're

22    not going to get to ask the question.

23            Do you really want to make the objection?

24            MR. BECKER:  My objection is to having the witness

25    give an interpretation of the settlement agreement that goes

W. Shabaz - direct

 1  beyond the actual terms of the settlement agreement, such as

 2  his belief that it says you can't use the word "Puffs."  The

 3  agreement doesn't say that.  He can't testify beyond what the

 4  agreement says.

 5          THE COURT:  So you're going to ask your client

 6  whether he understood the agreement to prevent him from doing

 7  the opposite of that?  Just asking.

 8          MR. BECKER:  If he's allowed --

 9          THE COURT:  No, no, no.  Once again, irrespective.

10  So let's say he doesn't ask him that.

11          Are you going to ask your guy whether he thought he

12  was breaching the agreement and why not?

13          Come on.  Long pause.

14          MR. BECKER:  Yes.

15          THE COURT:  Yeah, you are.  So the objection is

16  overruled.

17    (Proceedings heard in open court:)

18          THE COURT:  Okay.  The objection is overruled.  Why

19  don't you put the question again so the witness has it in

20  mind.

21  BY MR. GEEKIE:

22  Q.  Do you remember the question?

23          THE COURT:  No, put it again so he has it in mind.

24          MR. GEEKIE:  I'm sorry, Judge.  I missed what you

25  said.

1      THE COURT:  You don't remember it either is probably

2  what that means.

3    (Laughter.)

4      MR. GEEKIE:  I'm sorry, Judge.

5      THE COURT:  Tell you what.  I have an advantage over

6  both of you.

7      So the question was -- so he read the second part

8  that said will not use Pizza Puff alone, et cetera, et cetera.

9  He asked you, "When that was drafted and put in the agreement

10  and signed, did you have an understanding of what it meant?"

11      You said, "Yes."

12      He said, "What was your standing of what it meant?"

13      That's the question.

14      MR. GEEKIE:  Thank you, Judge.

15      THE WITNESS:  Thank you, Your Honor.

16  BY MR. GEEKIE:

17  Q.  Go ahead.

18  A.  I had an understanding that they would not use this in

19  that context.  The Pizza Puff name would not be used.

20  Q.  And do you see this the section, Mr. Becker in his opening

21  referred to the parenthetical where it says (e.g.  "El-Greg

22  Pizza Puff" or "Stuffed Pizza Puff").  Do you see that?"

23  A.  Yes.

24  Q.  Okay.  Those -- e.g., did you understand that to mean

25  examples?

1   A.  No.

2   Q.  Did you -- "El-Greg Pizza Puff" or "Stuffed Pizza Puff,"

3   were those intended to be the only ways that they couldn't use

4   Pizza Puff?

5   A.  Any combination of the Puff.

6   Q.  Okay.

7   A.  Any combination of the Puff, Pizza Puff, Pizza Pie Puff,

8   they couldn't use that.  That's my understanding of the way it

9   was supposed to be.

10  Q.  Did you understand that they could put a parens around

11  Puffs and put it with Pizza Pies?

12  A.  No.  They were not supposed to.

13  Q.  Now, Mr. Becker in his opening statement said that nowhere

14  does the document say that Puffs is prohibited.

15          Do you agree with that statement?

16  A.  No, I do not.

17  Q.  Now, in his opening regarding this lawsuit, Mr. Becker

18  talked about El-Greg making Spinach Puffs when you sued in

19  2002.

20          Did you know that El-Greg was making Spinach Puffs?

21  A.  I had no idea.

22  Q.  And if you'd known, what would you have done?

23  A.  I would have trademarked it.

24          MR. BECKER:  Objection.

25          THE COURT:  Overruled, overruled.  The answer can

1    stand.

2          Go ahead and finish.

3    BY MR. GEEKIE:

4    Q.  No, if you knew they were making, El-Greg was making

5    Veggie or Spinach Puffs, he said Spinach Puffs in the early

6    2000s?

7    A.  I would have gone after that.

8    Q.  You would have sued them?

9    A.  Yes, I would have.

10          MR. GEEKIE:  Okay.  I'd like to circle back for a

11    minute, and can we pull up Plaintiff's Exhibit 14, please?

12          And do you see this exhibit?  Can you see it -- I'm

13    sorry, it's not up yet.

14    BY MR. GEEKIE:

15    Q.  Okay.  Are you able to see that --

16    A.  Yes.

17    Q.  -- Mr. Shabaz?

18          And is this from the 1980s?

19    A.  Yes, it is.

20    Q.  And can you explain to the jury what this is?

21    A.  This is our family of products, all the Puffs that we were

22    making at that time, along with the tamales, which we still

23    make.

24    Q.  And is this an advertising piece?

25    A.  Yes, it is.

W. Shabaz - direct

1    Q.  And just to clarify, it's from the 1980s when you were

2    first starting your line?

3    A.  Correct.

4    Q.  Okay.

5           MR. GEEKIE:  All right.  One last thing, and I

6    apologize to go back to Exhibit 11, the settlement agreement,

7    and if we could expand Paragraph 3, please.

8    BY MR. GEEKIE:

9    Q.  And the beginning of Paragraph 3, Paragraph 3 says:

10   El-Greg shall not request, encourage, or suggest to the

11   distributors of its products or to the retailers who sell its

12   products that any of El-Greg's products be advertised or sold

13   as a "Pizza Puff."  Do you see that?

14   A.  Yes, I do.

15   Q.  Is Restaurant Depot a retailer or distributor of El-Greg

16   product?

17   A.  Yes, it is.

18   Q.  And is it your understanding that Restaurant Depot did

19   sell El-Greg product that was you believe termed a Pizza Puff?

20   A.  Correct.

21          THE COURT:  Are you changing topics?

22          MR. GEEKIE:  Yeah.

23          THE COURT:  We're going to take a ten-minute break.

24   All rise, and the jurors can follow me.

25      (Recess taken.)

 1      (Change of reporters.)

 2      (Jury enters courtroom.)

 3          THE COURT:  Okay.  Everyone can have a seat.  And,

 4   Mr. Geekie, you can go ahead.

 5   BY MR. GEEKIE:

 6   Q.  Mr. Shabaz, is ILTACO still, in your mind, a family

 7   business?

 8   A.  It's a family business, very much so.

 9   Q.  And are other family members involved in the business?

10   A.  Yes, I do.  I have my daughter, who's in human resources.

11   Q.  What's her name?

12   A.  Alisha Shabaz.

13   Q.  Can you point her out?

14   A.  She's right in the middle between her two brothers.

15   Q.  And who else?

16   A.  Her brother Adam Shabaz.  He's my CFO.  He's in sales

17   also.  And her other brother Andrew Shabaz, who is -- he's in

18   R & D and heavily into the sales also.

19   Q.  Can you point him out, please.

20   A.  He's on the right side of Alisha.  My wife is my

21   accountant.

22   Q.  So, she's involved, too?

23   A.  Yeah.  I'm safe.

24   Q.  All five family members?

25   A.  All five family members.

W. Shabaz - direct

1   Q.   Do you intend for ILTACO to remain a family business?

2   A.   Yes, very much so.

3   Q.   And are you proud of your Pizza Puff and Pizza Puff family

4   of products?

5   A.   Yes, I am.

6   Q.   Why is that?

7   A.   We've worked very hard to make these products, put some

8   great materials into our products, the best beef we can get,

9   best seasonings we can get.  So, it's something that I'm

10  extremely proud of.

11  Q.   And what would you say to someone who claims they are the

12  maker of the original puffs?

13  A.   They're not telling you the truth.

14  Q.   Have you received awards or recognition for your Pizza

15  Puffs?

16  A.   We've had numerous articles written about us saying that

17  it is an iconic thing from Chicago, like -- Chicago's known

18  for deep dish pizza.  They're known for great Italian beefs.

19  They're known for great hotdogs.  And they know ILTACO and the

20  Pizza Puff name.

21  Q.   You almost sound like you're speaking about a child that

22  you're proud of.

23  A.   Well, when you design a product or make a product like a

24  Pizza Puff and you do it 50 years ago, you're extremely proud

25  of it.  It almost becomes one of your children.

W. Shabaz - cross

```
 1                MR. GEEKIE:  I have no more questions, your Honor.

 2                THE COURT:  Cross?

 3                          CROSS-EXAMINATION

 4    BY MR. BECKER:

 5    Q.  Mr. Shabaz, what are the annual sales of ILTACO?

 6    A.  The annual sales are about 15 million.

 7    Q.  Now, you told -- told us that when you came up with the

 8    product, there was nothing like it on the market.  Did you

 9    apply for a patent?

10    A.  In '76, yes.

11    Q.  Okay.  Did you get a patent for the product?  Not a

12    trademark, a patent.

13    A.  Not a patent.  It was a trademark.

14    Q.  Did you ever apply for a patent on the product?

15    A.  No.

16    Q.  So, you have no patents on the product?

17    A.  No.

18                MR. GEEKIE:  Objection. Relevance, your Honor.

19                THE COURT:  Well, you've asked three times now, so

20    you've established the point.  Let's move on.  The objection

21    is overruled.

22    BY MR. BECKER:

23    Q.  Do you believe, Mr. Shabaz, that having a trademark

24    precludes someone else from making a competitive product?

25    A.  Having a trademark name doesn't stop them from making
```

1    something like it.

2    Q.  Now, you just gave a bit of testimony about Plaintiff's

3    Exhibit 14.  Can we bring that one back up, please.

4         THE COURT:  I'm switching it over to you here.  There

5    you go.

6    BY MR. BECKER:

7    Q.  And when you looked at this -- this is an advertisement or

8    a brochure?

9    A.  This is a brochure.

10   Q.  And you described this brochure as displaying the ILTACO

11   family of products, is that right?

12   A.  Correct.

13   Q.  So, the family of products that you are showing here

14   includes a couple of products that have the word "puffs" and a

15   product that has the word "burritos" and a product that has

16   "tamales," and that's all part of the family, right?

17   A.  Correct.

18   Q.  Now let's talk a little bit about the lawsuit back in

19   2002, so if we can bring up Plaintiff's Exhibit 11.  Okay.

20   Let's look at the -- just the very first paragraph, if we

21   could show that.

22        Now, in this settlement agreement, there were three

23   parties, not two, correct?

24   A.  There were two on their side and myself.

25   Q.  Well, one of the parties to the settlement was Michael's

W. Shabaz - cross

1   Chicago Style Red Hots, Inc., right?

2   A.  Correct.

3   Q.  Okay.  And that was a restaurant, right?

4   A.  Hotdog stand.

5   Q.  Hotdog stand.  And this was a hotdog stand that was

6   displaying on its menu Pizza Puffs, right?

7   A.  Correct.

8   Q.  And the claim that was brought in this case against

9   Michael's was that it was infringing the trademark, right?

10  A.  Correct.

11  Q.  And the claim that was brought against El-Greg was that

12  El-Greg was inducing or encouraging Michael's to do that,

13  right?

14  A.  Incorrect.

15  Q.  In that case, did you make a claim that El-Greg sold a

16  product to Michael's that bore the name Pizza Puffs?

17  A.  No.

18  Q.  In that case, did you make a claim that El-Greg sold

19  products to anyone that bore the name Pizza Puffs?

20  A.  Are you saying on their boxes?

21  Q.  On their boxes.

22  A.  No, I didn't claim that they had Pizza Puffs on their

23  boxes at that time.

24  Q.  Now, let's look at paragraph 2 of the settlement

25  agreement.  This is the paragraph in which El-Greg agrees

W. Shabaz - cross

1    that it will not use, quote, "Pizza Puff," close quote.  Do

2    you see that?

3    A.   Yes.

4    Q.   It says that phrase, "Pizza Puff" in quotes, "alone or in

5    combination with other words," right?

6    A.   Correct.

7    Q.   And then some examples are given of how it can't be used

8    in combination with other words, such as calling it El-Greg

9    Pizza Puff, right?

10   A.   Correct.

11   Q.   Now, you've testified that you believe that this agreement

12   says that El-Greg could not use -- simply use the word "puff."

13   Can you show us where in this agreement it said that?

14   A.   I don't understand what you mean.

15   Q.   Can you show us where in this agreement it says that

16   El-Greg cannot use the word "puff"?

17   A.   It says right here, they cannot use "Pizza Puffs" or

18   "Stuffed Pizza Puff."

19   Q.   That wasn't my question, sir.  My question is:  Can you

20   show us where it says they can't use the word "puff," just

21   the word "puff"?

22   A.   It says right here, "Will not use 'Pizza Puff' alone or in

23   combination of other words, designs (El-Greg Pizza Puffs or

24   Stuffed Pizza Puffs)."

25   Q.   And what you just read kept saying, "Pizza Puff."  So, my

W. Shabaz - cross

1    question again to you, sir, is:  Can you show us any place in

2    this agreement that says they can't use the word "puff" not

3    connected to pizza?

4    A.   I'm just going to come back with, "not use 'Pizza Puff'

5    alone or in combination of other words, (as in El-Greg Pizza

6    Puff or Stuffed Pizza Puff)."

7            So, when you're asking me did you see puff, yes, I

8    see it right here.

9    Q.   And is there any place where you see that it says that

10   El-Greg can't use the word "puff" standing alone?

11   A.   It says right here, "in combination," and "puff" would be

12   included.

13   Q.   Again, I'll ask you my question.

14           THE COURT:  You've asked the question four times.

15   The answer is not going to change, so let's move on.  You made

16   your point.  You'll argue it later.

17   BY MR. BECKER:

18   Q.   And let's also look at paragraph 11.  Now, paragraph 11

19   says, "This writing constitutes the entire understanding and

20   agreement between the parties with respect to the matters

21   referred to herein.  No changes, alterations, modifications,

22   or qualifications to the terms hereto shall be made or be

23   binding unless in writing and signed by all parties."

24           Do you see that, sir?

25   A.   Yes, I do.

1   Q.  And do you understand that that means that what this

2   agreement says is the entire scope of what the agreement is,

3   and you can't put any additional qualifications on it?

4   A.  Correct.

5   Q.  Okay.  And that is your understanding, correct?

6   A.  Correct.

7   Q.  Now, you testified a little bit about the -- your

8   application for the trademark that issued in 2009.  And you

9   were personally involved working with your lawyers in that

10  application process, correct?

11  A.  Correct.

12  Q.  And when that application went in, the application was

13  initially rejected by the trademark office, isn't that right?

14  A.  No.

15          MR. GEEKIE:  Objection.  Relevance, your Honor.

16          THE COURT:  Hang on a second.

17          Sustained.  The jury is directed to disregard the

18  question and the answer.

19          It doesn't -- it's not a problem for you to put in

20  whatever limitations there are on the -- what was actually

21  issued, but the history of it is not relevant.

22          MR. BECKER:  May we have a sidebar, your Honor?

23          THE COURT:  No, you may not.  You can talk about it

24  at the end of the day.  My guess is we'll not be done with

25  this witness today; and if we are, he'll still be here

1   tomorrow.

2   BY MR. BECKER:

3   Q.  Does ILTACO have a trademark for the word "puffs"?

4         THE COURT:  You mean "puffs" by itself?

5         MR. BECKER:  Just "puffs" by itself.

6   BY THE WITNESS:

7   A.  Pizza Puffs.

8   BY MR. BECKER:

9   Q.  Okay.  Again, my question, sir, is does ILTACO have a

10   trademark just for the word "puffs"?

11   A.  I'm just going to answer you Pizza Puffs.

12         THE COURT:  You're going to have to answer the

13   question that he asked.  Do you have a trademark for just

14   the word "puffs" by itself?

15   BY THE WITNESS:

16   A.  No.

17   BY MR. BECKER:

18   Q.  Has ILTACO ever conducted or had conducted for it a survey

19   to determine whether people associate the word "puffs" all by

20   itself with ILTACO?

21   A.  Yes, they do.

22   Q.  When was that done?

23   A.  It's done every day.

24   Q.  A survey?

25   A.  No, not a survey.

1  Q.  My question was a survey.  Have you ever had a survey done

2  or conducted for you to see whether people associate the word

3  "puffs" --

4  A.  No.

5  Q.  -- just by itself with ILTACO?

6  A.  No.

7  Q.  Can we put up Plaintiff's Exhibit 31.  I believe we have

8  several pages of this exhibit.  Is this the first page?

9         Okay.  So, looking at the first page of this exhibit,

10  where you have a list of products, that list includes both

11  products that have the word "puff" in the name and products

12  that don't have the word "puff" in the name, is that right?

13  A.  On that page, yes.

14  Q.  And this page comes from September 15th of 1995, is that

15  right?

16  A.  Correct.

17  Q.  The next page, please.

18         Now, this next page that has the number ILTACO, a

19  bunch of 0s, and 5, is this from an advertisement or a

20  brochure?

21  A.  This is a brochure.

22  Q.  And when was that brochure published?

23  A.  Early '80s.

24  Q.  And does this reflect the products that ILTACO was selling

25  in the early '80s?

W. Shabaz - cross

1   A.  Yes.

2   Q.  Let's go to the next page.

3        This one has the number ILTACO, 0s, 6.  What would

4   you describe this page to be?

5   A.  A brochure.

6   Q.  And can you tell us when this brochure was published?

7   A.  '86.

8   Q.  And how can you determine that the date was 1986?

9   A.  I just -- I noticed when you said ILTACO 006, that was

10  '86 when we first made this one.

11  Q.  And when did you introduce the product called Pepperoni

12  Pizza Puff?

13  A.  We first introduced it '85.

14  Q.  When did you produce -- when did you first introduce the

15  product called Beef Pizza Puff?

16  A.  About the same time.

17  Q.  And when did you first produce the product Ham, Cheese,

18  and Jalapeno Puff?

19  A.  Came out with that in about '84, '85.

20  Q.  Do you personally have dealings with Restaurant Depot?

21  A.  Do I personally call on them?

22  Q.  Yes.

23  A.  No, I do not personally call on them.

24  Q.  Who calls on Restaurant Depot?

25  A.  My son Adam.

W. Shabaz - cross

1   Q.  How -- I want to see if I understood this correctly.

2   Did you say that you produce 100,000 units a day?

3   A.  Units.

4   Q.  And what's a unit?

5   A.  One piece.

6   Q.  And you do that seven days a year?

7   A.  No, five.

8        THE COURT:  You meant a week, I assume, right?  You

9   said, "seven days a year."

10        MR. BECKER:  I'm sorry.  I meant seven days a week.

11        THE COURT:  You also meant five days a week, right?

12        THE WITNESS:  That's correct, yes, your Honor.

13        MR. BECKER:  Five days, five days a week.

14   BY MR. BECKER:

15   Q.  So, that amounts to -- is that 250 million units?

16   A.  200 -- I wouldn't know.  I'm not calculating.

17        THE COURT:  I think your math's kind of off there.

18   BY THE WITNESS:

19   A.  That would mean you're doing 125 million a year.  That's

20   incorrect.

21        THE COURT:  If you were -- just to kind of get

22   through this, if you're doing the math, half a million a week,

23   which is 100,000 times five, times 52 weeks in a year would be

24   26, not 260.

25   BY MR. BECKER:

W. Shabaz - cross

1  Q.  So, you do about 26 million pieces a year?

2  A.  If that's what it multiplies out to, yes.

3  Q.  Were you involved with the sending of the cease and desist

4  letter to El-Greg in 2011?

5  A.  No, sir.

6  Q.  Who was involved with that from the companies?

7  A.  I don't remember.

8          THE COURT:  Is there a question?

9          MR. BECKER:  Yes.  May I approach the witness?

10         THE COURT:  Can you tell Mr. Geekie what you're

11 handing him?

12         MR. GEEKIE:  Thank you, Judge.

13         We'll object to this.

14         THE COURT:  Well, I haven't heard a question yet, so

15 let's -- we need to pick up the pace here.  Let's get it

16 going.

17 BY MR. BECKER:

18 Q.  Sir, I want to go back to the complaint that was filed in

19 2002.  Now, do you recall that in that complaint, the count

20 that was raised against El-Greg was an allegation that El-Greg

21 induced certain restaurants to sell El-Greg's products using

22 plaintiff's trademark Pizza Puff?

23         MR. GEEKIE:  Objection, your Honor.  Relevance.

24         THE COURT:  I think it was already asked.  I kind of

25 remember it.  So, the relevance objection is overruled.  Is

W. Shabaz - cross

1   that the allegation that was made in 2002?

2   BY THE WITNESS:

3   A.  The allegation was they were using our signs, and they

4   were delivering knowing that those signs were up.

5   BY MR. BECKER:

6   Q.  Who was using the signs?  The restaurants?

7   A.  The restaurants.

8   Q.  So, the allegation was that El-Greg knew that the

9   restaurants were using the signs?

10  A.  Correct.

11  Q.  There was no allegation that El-Greg gave them the signs,

12  correct?

13  A.  I don't remember that.

14  Q.  Okay.  Let me show you the --

15          THE COURT:  There has got to be a better way to

16  establish what was not in a probably 20-page complaint other

17  than showing it to him and waiting for him to page through it.

18  The spaces between the questions are way too long here.

19  You've got to do this in some other way.  Maybe it can be by

20  stipulation.  Maybe it can be by something else.

21          MR. BECKER:   Count 1 is only two pages.

22          THE COURT:  Yeah.  Okay.  I told you how we're going

23  to do it.  Okay?  So, that's how we're going to do it.  You

24  need to figure this out some other way.  What is it that you

25  want to establish?

1      MR. BECKER:  I want to establish that there was no

2  allegation that El-Greg was using the term "Pizza Puff."

3      THE COURT:  I'm looking over at plaintiff's table

4  here.

5      MR. GEEKIE:  Well, we'll stipulate that there was no

6  allegation --

7      THE COURT:  There you go.  Okay.  That means

8  everybody's agreed to it, so it's established.

9      MR. BECKER:  And with that, your Honor, I have no

10  further questions for this witness.

11      THE COURT:  Redirect.

12      MR. GEEKIE:  Could you switch us back over, your

13  Honor?

14      THE COURT:  Yes, sir.  There you go.

15      MR. GEEKIE:  Thank you.

16                    REDIRECT EXAMINATION

17  BY MR. GEEKIE:

18  Q.  Just to clarify for the jury, Mr. Shabaz, the 2002 suit

19  wasn't about use of the Pizza Puffs name, was it, by El-Greg

20  in selling its product, right?

21  A.  No.

22  Q.  It was that they were selling product to people that were

23  using the Pizza Puffs sign, right?

24  A.  Correct.

25  Q.  And El-Greg settled the case, right?

W. Shabaz - redirect

1   A.  Correct.

2   Q.  They signed a settlement agreement, right?

3   A.  Correct.

4   Q.  And in the settlement agreement, they said they wouldn't

5   use "Pizza Puffs" in any combination, correct?

6   A.  Correct.

7   Q.  Mr. Becker asked you questions about a patent.  He asked

8   you several questions about a patent.  Are you suing for any

9   patent violations here?

10  A.  Not at all.

11  Q.  Could you pull up Exhibit 14, please.

12          Now, Mr. Becker asked you about this exhibit, and

13  there's -- this is a brochure with a variety of products on

14  it.  There's some that are puffs, burritos, and tamales.  Your

15  family of puffs, is this intended to show your products and --

16  strike that.  I'll start over.

17          Does this brochure show just Puffs family or other

18  products?

19  A.  Other products.

20  Q.  And what Puffs family products does it show?

21  A.  It's showing the Beef and Pepper Puff.  It's showing the

22  Pizza Puff, Sloppy Joe Puff, and those are the three.

23  Q.  Okay.  Exhibit 31, please.

24          And on this first page, could you expand the top

25  section, sir, please.

W. Shabaz - redirect

1   Now, on this cost sheet, is this -- does this show

2   Puffs products and other products, or is this the Puffs family

3   here?

4   A.  It's a mixture.

5   Q.  Okay.  And what do the Puffs family products show?

6   A.  That is starting at the Original Pizza Puff, going to the

7   Pepperoni, the Beef Pizza Puff, Spinach Pizza Puff, Cheese

8   Pizza Puff, and we came out with a -- it's listed Ham and

9   Cheddar, but we started putting ham and cheddar and jalapeno,

10  the Ham and Cheese Jalapeno Puff.

11  Q.  Okay.  So, those are the Puffs family --

12  A.  Yes.

13  Q.  And if we could go to the third page, please.

14   And does this page show your Puffs family?

15  A.  It's a mixture --

16  Q.  Okay.

17  A.  -- of --

18  Q.  Okay.  I'm sorry.  I didn't mean to interrupt you.

19  A.  That's -- on the left side are the Puff family of

20  products, and then on the right side, there are the ham and

21  cheddar and the jalapeno, and that's mixed in with the burrito

22  and the meatless tamales and meat tamales.

23  Q.  Are you on the bottom half of the page?

24  A.  Yes.

25  Q.  Okay.  What about the top half of the page?  Is the Puffs

1   family shown there?

2   A.  Yes.

3   Q.  And what portion -- you don't need to expand.

4          What portion of that top page shows the Puffs family?

5   A.  The top and in the middle.

6   Q.  Okay.  Do they have headings?

7   A.  Pardon me?

8   Q.  Do they have headings?

9   A.  Yes.

10  Q.  What are the headings there that you're referring to?

11  A.  They're Ham and Cheddar Cheese Puffs with the Jalapeno

12  Puffs, Taco Puffs, Deluxe Pizza Puffs, Spinach Pizza Puffs,

13  Cheese Pizza Puffs, again, Beef Pizza Puffs, Pepperoni Pizza

14  Puffs, and an Original Cheese and Sausage Pizza Puff.

15  Q.  And just so we're clear, are the headings, "Pizza Puffs,"

16  and, "More Puffs," with an exclamation mark?  Are those the

17  headings for the family?

18  A.  I didn't understand that.

19  Q.  Just so we're clear, on that page --

20  A.  Yes.

21  Q.  -- for the headings, are the headings for the family of

22  Puffs, do they state, "Pizza Puffs," and, "More Puffs,"

23  exclamation mark?

24  A.  Yes.

25  Q.  Okay.  And then finally, Mr. Becker asked you to -- asked

1   you several questions about the settlement agreement.  Did it

2   only say "Puffs"?  Many -- could you expand the right half of

3   the box label, please.

4           THE COURT:  This is Exhibit 8, for the record.

5           MR. GEEKIE:  Yes.  Thank you, Judge.

6   BY MR. GEEKIE:

7   Q.  Now, Mr. Shabaz, we're showing you an expanded part of

8   Exhibit 8.  And Mr. Becker asked you several questions about

9   anywhere in the settlement agreement, does it only say,

10  "Puffs."

11          This is the label that you're suing on that El-Greg

12  used, correct?

13  A.  Correct.

14  Q.  And anywhere on that label, does it use the term "Puffs"

15  all by itself?

16  A.  No.

17  Q.  And what is your contention about how they used "Puffs"?

18          MR. BECKER:  Objection to the form of the question,

19  your Honor.

20          THE COURT:  Overruled.  You can answer.

21  BY THE WITNESS:

22  A.  Say it again?

23  BY MR. GEEKIE:

24  Q.  What is your contention here about what El-Greg did that

25  infringed in using the term "Puffs"?

W. Shabaz - redirect

1   A.  They violated what they said they wouldn't.

2   Q.  And how are they using it here incorrectly?

3   A.  They shouldn't have "Puffs" with --

4   Q.  With what?

5   A.  -- with "Pizza."

6   Q.  Okay.  So, it's your contention they're using it in

7   combination here?

8   A.  Correct.

9           MR. GEEKIE:  I have no more questions, your Honor.

10          THE COURT:  Remember I told you at the beginning that

11  you have the opportunity to ask questions.  Do any of the

12  jurors have questions for the witness?  And this is where I

13  get to pretend like I'm the elementary school teacher.  If I

14  see you looking down, I'll know you're writing.  If I see

15  nobody looking down, I'll know you're not writing.

16          And I see nobody looking down.  The witness is

17  excused.

18          (Witness excused.)

19          THE COURT:  Please call the next witness.

20          MR. KUO:  Can I have a quick sidebar?

21          THE COURT:  Is it about the next witness?

22          MR. KUO:  Yes.

23          THE COURT:  Okay.

24          (Proceedings heard at sidebar, not reported.)

25          THE COURT:  It was just a scheduling issue.

G. Lereno - direct

```
 1                Okay.  You can call the next witness.

 2                MR. KUO:  Plaintiff calls Mr. Greg Lereno to the

 3     stand.

 4                THE COURT:  Mr. Lereno, raise your right hand,

 5     please.

 6                (Witness sworn.)

 7                THE WITNESS:  Yes.

 8                THE COURT:  Have a seat and pull the mic back so it's

 9     right in front of your mouth.

10           GREGORY LERENO, DEFENDANT'S WITNESS, DULY SWORN.

11                        DIRECT EXAMINATION

12     BY MR. KUO:

13     Q.  Good afternoon.

14     A.  Good afternoon.

15                THE COURT:  Pull it forward, the whole thing.  Yeah,

16     there you go.  Way further.  You can pull it all the way out

17     to the end.  It's got to be way closer.  Keep going, keep

18     going, keep going.  There you go.

19                MR. KUO:  Should get the wireless ones.

20                THE COURT:  Too much trouble.  We've got them.  It's

21     too much trouble.

22     BY MR. KUO:

23     Q.  Could you please state your name and spell it for the

24     record, please.

25     A.  Gregory Lereno, L-E-R-E-N-O.
```

G. Lereno - direct

110

```
1   Q.  And, Mr. Lereno, you're here with El-Greg, correct?

2   A.  Yes, sir.

3   Q.  And what is your position with El-Greg?

4   A.  I'm one of the owners.

5   Q.  You're one of the cofounders of the company, correct?

6   A.  Yes.

7   Q.  Your mother was the other one?

8   A.  Yes, me and my mother, yes.

9   Q.  And so the Greg in El-Greg is you, correct?

10  A.  Greg is me, and my mom's name is Eleni, so El-Greg.

11  Q.  And you founded this company in 1986?

12  A.  Yes.

13  Q.  And at that time, it was founded as a frozen pizza

14  company, correct?

15  A.  In the beginning, we started frozen pizzas, yes.

16  Q.  And you tried making frozen pizzas for a couple of years

17  or so?

18  A.  A few years, yes.

19  Q.  And you stopped because there was too much competition in

20  frozen pizzas?

21  A.  Yeah, we just -- yeah, um-hum.

22  Q.  And at that time, you decided to make -- I'm sorry.

23  Strike that.

24          After you realized that there was too much

25  competition in frozen pizzas, some people came to you and
```

G. Lereno - direct

1   suggested that you make a different product, a pizza puff,

2   correct?

3   A.  Right, comparable.

4   Q.  And they asked specifically to make a product like the

5   Pizza Puff, is that right?

6   A.  Well, they told me there's nobody in the market, and they

7   said, "Why don't you -- there's a demand for this, for another

8   company, more -- so there's more competition, maybe better

9   pricing."  So, they suggested it, and I liked it.

10  Q.  And that other company they mentioned was ILTACO, right?

11  A.  Well, because they were the only ones, yes.

12  Q.  So, those companies, they knew that the Pizza Puff came

13  from ILTACO?

14  A.  Yes.

15  Q.  Now, would you -- you would describe this -- the ILTACO

16  product as a burrito-type product, right?

17  A.  Right.

18  Q.  And it's about -- it's about yay big, I don't know,

19  5-by-3, and an inch thick?

20  A.  Yes.

21  Q.  It's entree-sized?

22  A.  Yes.

23  Q.  You wouldn't describe it as something that's light and

24  fluffy, would you?

25  A.  No.  Well, it puffs up in the fryer.  I don't know how --

G. Lereno - direct

1   ours does, at least, our pie.

2   Q.  And I think you testified that there was -- there's no one

3   out there except for ILTACO selling this kind of product?

4   A.  Right, yes.

5   Q.  And you didn't -- you didn't call your product a puff, did

6   you?

7   A.  No.  We called it a Pizza Pie from the very beginning.

8   Q.  And the reason you called it a Pizza Pie is because you

9   knew that ILTACO had a trademark, right?

10  A.  Well, I had found out, yeah, that there was a trademark on

11  that name, yes.

12  Q.  So, you knew that you couldn't call yours a puff or a

13  Pizza Puff, right?

14  A.  Right.  We called it a pie from the very beginning.

15  Q.  So, from the very beginning, when was that, 1989?

16  A.  Approximately, yes, when we first started making it, yeah.

17  Q.  And you sold it as a Pizza Pie until today, correct?

18  A.  Yeah, yes.

19  Q.  There's no need for you to call it a Pizza Puff, right?

20  A.  No, no.

21  Q.  We had discussed earlier today the settlement agreement

22  between ILTACO and El-Greg as well as Michael's.  You were

23  involved in those discussions, correct?

24  A.  Yes, yes.

25  Q.  Okay.

G. Lereno - direct

113

1          MR. KUO:  Can we bring that up, please.  And could

2     you go to the last page.  I'm sorry.  The page before that.

3     Could you zoom in on the signature.

4          I'm sorry.  I have the wrong page.  I apologize.

5     My eyesight, too, is not what it used to be.  On page 5.

6     Could you zoom in on the bottom paragraph.  The bottom

7     paragraph.  Yes.

8          No, the bottom paragraph, please.

9          THE COURT:  Tell you what.  It's big enough.  Let's

10    just ask a question.

11         MR. KUO:  Okay.  I'm sorry.  I just want Mr. Lereno

12    to confirm that that's his signature.

13         THE COURT:  His signature is above the part that you

14    cut out there.  So, just take the cut-out off.

15         Is that your signature in the middle of the page

16    there?

17         THE WITNESS:  It looks like my signature, yes.

18    BY MR. KUO:

19    Q.  Okay.  And I don't want to spend too much time on this

20    because we've gone through this language before, but in

21    paragraph 2, you signed on behalf of El-Greg that you agreed

22    to the provisions in this agreement, correct?

23    A.  Right.

24    Q.  Okay.  So, in paragraph 2, it states that, "El-Greg and

25    its shareholders, officers, directors, employees, will not

G. Lereno - direct

114

1    use 'Pizza Puff' alone or in combination with other words or

2    designs," and it gives an example, and it says, "As a

3    trademark, service mark, trade name, trade name component,

4    website metatag," et cetera, et cetera, "or as an

5    identification of the respective goods or services."

6            And you agreed to that, right?

7    A.   Yes.

8    Q.   So, is it correct that with the accused label that we've

9    been discussing with Restaurant Depot, that you used the words

10   "Pizza" and "Puff" in conjunction with other words as an

11   identification of your product?

12   A.   Well, we stated, "Pizza Pie," and we put the "Puffs" in

13   parentheses as descriptive.

14   Q.   So, the answer to my question is yes?

15   A.   Can you repeat that again?

16   Q.   Sure.  Do you use the words "Pizza" and "Puff" in

17   conjunction with other words as an identification of your

18   product?

19   A.   No.

20   Q.   You did not?  You did not use the words "Pizza" and "Puff"

21   in conjunction with other words to identify your product?

22   A.   Well, it's Pizza Pie, and there's -- it's in parentheses.

23   So, it's not together as a Pizza Pie Puff.  That's why we put

24   it in parentheses.

25   Q.   That's not what I asked you.

G. Lereno - direct

1    A.   Okay.

2    Q.   I asked you did you use the words "Pizza" and "Puff"

3    together with other words to identify your product?

4    A.   I believe not.

5    Q.   Can you see this?

6    A.   Yes.

7    Q.   Okay.  There's a word "Pizza"?

8    A.   Right.

9    Q.   There's a word "Puff"?

10   A.   Right.

11   Q.   And it's used with other words, right?

12   A.   Yes, sir.

13   Q.   And it identifies your product?

14   A.   It's on the same label, yes, it's on the same label.

15   Q.   And it identifies your product?

16   A.   Pizza Pies identifies my product.  "Puffs" is just

17   descriptive.  I don't know how else to put it.

18   Q.   You're familiar with Restaurant Depot, correct?

19   A.   Yes.

20   Q.   Restaurant Depot is a warehouse-type store similar to

21   Costco?

22   A.   Yes.

23   Q.   And at Restaurant Depot, they sell products in -- at least

24   your product and ILTACO's product --

25   A.   Yes.

G. Lereno - direct

116

1   Q.  -- in frozen -- or freezer cases with glass doors, right?

2   A.  Right, frozen section.

3   Q.  And, in fact, your product and ILTACO's product are sold

4   side by side?

5   A.  Right.

6   Q.  And, in fact, your products and ILTACO's products are both

7   sold with the label -- were sold with the labels that we're

8   talking about facing out to the consumer?

9   A.  They face them out, yes.

10  Q.  When did you start selling to Restaurant Depot?  Was it

11  around '99, 2000?

12  A.  Yes.

13  Q.  And at that time that you started -- that El-Greg started

14  selling at Restaurant Depot, ILTACO was already there, right?

15  A.  Yes.  Restaurant Depot approached us.  They wanted the

16  product.

17  Q.  In fact, you saw ILTACO's products at Restaurant Depot?

18  A.  Yes, you would see them, yes.

19  Q.  When you first started selling products to Restaurant

20  Depot, you sold them in white craft boxes, right?

21  A.  Right.

22  Q.  Same type of boxes that ILTACO uses?

23  A.  Like the one shown before.

24  Q.  Um-hum.  And at that time, you used the words "Pizza

25  Pie" --

G. Lereno - direct

1   A.  "Pizza Pie," yes.

2   Q.  -- to describe your product?

3        And that was the name that you had come up with back

4   in 1989?

5   A.  From the beginning.

6   Q.  And at that time, you used the phrase -- the slogan

7   "Indescribably Delicious," is that right?

8   A.  Yes.

9   Q.  When you first started selling to Restaurant Depot, you

10  didn't include the word "puff" on there anywhere, did you?

11  A.  No, nowhere.

12  Q.  And you don't have any advertising or anything where you

13  describe the Pizza Pie as a puff?

14  A.  No.

15  Q.  Let's look at the label again, show you the label again.

16  A.  Yes.

17        MR. KUO:  If you could put it up on the screen, too.

18  BY MR. KUO:

19  Q.  So, this is the label that you created to put into

20  Restaurant Depot, right?

21  A.  Right, yes.

22  Q.  And you testified that Restaurant Depot -- I'm sorry, you

23  did not, but I'm going to ask you.

24        Restaurant Depot requested that El-Greg create a

25  label for its product, right?

G. Lereno - direct

1    A.  Yes, they needed a label.

2    Q.  And the only thing that Restaurant Depot asked you to do

3    was to have a picture and then some sort of description?

4    A.  Description, yeah.

5    Q.  They didn't tell you the particular size label to use?

6    A.  No.

7    Q.  They didn't tell you how to position the picture relative

8    to the text?

9    A.  Well, they told me to go look outside and see how

10   everybody else's is.

11   Q.  But they didn't tell you how to position the --

12   A.  Oh, yeah.

13          THE COURT:  You've got to wait until he finishes the

14   question.  Ask the whole question.

15   BY MR. KUO:

16   Q.  I will.  They didn't say -- they didn't tell you how to

17   position the photo relative to the text?

18   A.  No.

19   Q.  They didn't tell you what font to use for the text, did

20   they?

21   A.  No.

22   Q.  They didn't tell you how to lay out other -- other flavors

23   that you might have?

24   A.  No.

25   Q.  They didn't tell you what slogan to use?

G. Lereno - direct

119

1    A.  No.

2    Q.  Okay.  So, all those decisions that were made, those were

3    made by you and Maria, correct?

4    A.  Me and the -- yeah, and the shop, yes.

5    Q.  So, it was your decision to put onto the label the

6    slogan -- if you could zoom in on it -- "Makers of the

7    Original Puffs"?

8    A.  Yes.  Because we had started making our own version of

9    puff products that were different, you know, triangles and

10   hors d'ouevres.  And we still call them puffs, spinach puffs,

11   cheese puffs.  We have puff pastry.  So, we have a lot of

12   puffs.

13   Q.  And you'll agree with me that the word "original" means

14   the first one to do it?

15   A.  Yes.

16   Q.  Okay.  And there's no mention in this label about your

17   other puffs products?  The only reference here is to the Pizza

18   Pie --

19   A.  Well, if you go on our --

20   Q.  Let me finish.

21   A.  I'm sorry.

22   Q.  The only references here are to the Pizza Pie products,

23   correct?

24   A.  On here, yes.

25   Q.  So, there's nothing on here that says, "Look at our other

G. Lereno - direct

120

1   products that we decided to call puffs"?

2   A.  On this particular label, no.

3   Q.  And this is a product that you testified just a little bit

4   ago that you never described as a puff before?

5   A.  No.  We just put this in the description, the parentheses.

6   Q.  And this is a product that you never called a puff before?

7   A.  Called Pizza Pies always.

8           MR. KUO:  And I'm going to apologize because this

9   might take me just a second to put up the easels, or maybe I

10  can have people hold it.

11          THE COURT:  No, they can see it, but I'm not sure he

12  can.

13          MR. KUO:  Yeah.

14          THE COURT:  So, here's my suggestion.  Go up there,

15  and talk loudly.

16          MR. KUO:  Okay.

17          THE COURT:  Or use the easel.  That would be the

18  other way.

19          MR. KUO:  Can everyone see these?  Can everyone hear

20  me?

21          A JUROR:  Yes.

22          MR. KUO:  Okay.  Okay.

23  BY MR. KUO:

24  Q.  So, would you agree with me that it was your decision to

25  add, "Makers of the Original Puffs," right?

G. Lereno - direct

121

1   A.  Yes.

2   Q.  And you had seen the ILTACO label prior to your label,

3   right?

4   A.  I had seen it, yes.

5   Q.  You saw it in the store?

6   A.  In the store, yeah.

7   Q.  And so you had seen that ILTACO had added the slogan,

8   "Makers of the Original Pizza Puffs," right?

9   A.  Right.

10  Q.  And so you decided to add, "Makers of the Original Puffs"?

11  A.  Puffs.

12  Q.  So, you just took out one word?

13  A.  Because that's what's trademarked.

14  Q.  Can you see this?

15  A.  Yes.

16  Q.  And would you agree with me that the font that you chose

17  to use is identical to the font that ILTACO was already using?

18  A.  Well, when you pick the font, you know, my printer, he

19  picked the font.  We gave it to him, so -- and we went with

20  it.

21  Q.  Would you agree with me that the font that you chose to

22  use --

23  A.  Um-hum.

24  Q.  -- is identical to the font that ILTACO used?

25  A.  It looks similar.

G. Lereno - direct

1   Q.  And they're the same size, too, right?

2   A.  It's the -- the box is similar-sized, so everything is

3   similar-sized.

4   Q.  And you used the same font and size for the count units

5   and the unit weight and the net weight, right?

6   A.  Yes.

7   Q.  And then you decided to put available flavors right below

8   the counts, right?

9   A.  Right.

10  Q.  Just like ILTACO did?

11  A.  It's a similar product.

12  Q.  That's right.  In fact, they are almost -- except for the

13  recipe inside --

14  A.  Different company.

15  Q.  -- they're very similar products?

16  A.  Right.

17  Q.  And they look like similar products in the pictures,

18  right?

19  A.  Well, if you say so.  They look a little different to me,

20  but --

21  Q.  And then you decided to use the same font for your

22  different flavors as ILTACO did, right?

23          Right?

24  A.  I didn't decide.  Like I said, we took it to the printer.

25  He did the proof, and we said, "Okay."  We give it to

G. Lereno - direct

123

 1    Restaurant Depot.  They said, "Fine.  Go with it."

 2    Q.  Right.  And you approved it?

 3    A.  Yeah, well all together.

 4    Q.  And you decided to use bullet points, just like ILTACO

 5    did?

 6    A.  To describe our flavors.

 7    Q.  And you made all of those decisions knowing full well that

 8    these two products were going to be sitting there side by side

 9    in the freezer cases, right?

10    A.  Well, I didn't know how they were going to set them in

11    the -- the store was going to set them, but they put them

12    together, yeah.

13    Q.  And you knew they were displayed together, right?

14    A.  Yeah, I mean, they put them together, yes.

15    Q.  Now, am I correct -- well, now I don't have to yell.

16          It's correct that the only place that you decided to

17    change -- or add the word "puff" to Pizza Pie was in

18    Restaurant Depot, right?

19    A.  Restaurant Depot, yes.

20    Q.  And it's correct that the only place you decided to add

21    the word "puffs" was where you knew that the ILTACO product

22    and the El-Greg product were going to be shown side by side to

23    consumers?

24    A.  Well, there was more thought process behind it.  It wasn't

25    just because they were going to be side by side.  It was

G. Lereno - direct

124

1 | because people want to know what this is, and you have to give

2 | them some explanation for what it's like.  It's not --

3 | Q.  So, you knew when you decided to put "puff" only on the

4 | Restaurant Depot label that they were going to be displayed

5 | side by side?

6 | A.  Because it's in a display case and people are shopping.

7 | You're not getting delivery from another distributor where

8 | they just take it off a truck.

9 | Q.  So, the answer to my question is yes?

10 | A.  Yes.

11 | Q.  And you didn't know if that was going to cause confusion

12 | or not; you just went with it, right?

13 | A.  Right.  And there wasn't any, because we would have heard.

14 | Anytime there's a problem, they tell us from the management.

15 |         MR. KUO:  I move to strike that second part as

16 | non-responsive.

17 |         THE COURT:  Everything after the word "right" is

18 | stricken because it was not responsive to the question.  The

19 | jury is directed to disregard it.

20 | BY MR. KUO:

21 | Q.  After -- after El-Greg added the label to the Restaurant

22 | Depot boxes, El-Greg received a cease and desist from ILTACO,

23 | correct?

24 | A.  No.  In the beginning, they just sent us a letter -- in

25 | the beginning, the first letter we received.

G. Lereno - direct

125

1    Q.  I apologize.  By cease and desist, I do mean a letter.

2    A.  Oh, okay.  Yes.

3              MR. KUO:  Could you please show that, Exhibit 57.

4    And if you could just zoom in on the date, the address, and

5    the subject heading.

6    BY MR. KUO:

7    Q.  And, "Mr. Gregory Lereno, Owner," that's you, correct?

8    A.  Yes.

9    Q.  And you received this letter?

10   A.  Yes.

11   Q.  And after receiving this letter, you just -- you gave it

12   to your lawyers?

13   A.  Yeah.  The lawyers looked over it, yes.

14   Q.  And were there communications between your lawyers and

15   ILTACO's lawyers?

16   A.  I don't recall.  There might have been.  I'm not sure.

17   Q.  You don't know?

18   A.  No.  It was just me and the lawyers.  We talked it over

19   about the letter and --

20   Q.  But you don't know --

21   A.  They counseled us on it.

22   Q.  Please let me finish.

23   A.  I'm sorry.

24   Q.  You don't know what discussions went on between El-Greg's

25   lawyers and ILTACO's lawyers?

G. Lereno - direct

126

1    A.  No.

2    Q.  Do you know how long El-Greg and ILTACO were talking about

3    this letter?

4    A.  This letter was sent to us just once, yes.

5    Q.  That's not my question.  My question was -- and I'll back

6    up.

7    A.  Yeah.

8    Q.  So, you got this letter?

9    A.  Correct.

10   Q.  And you sent it to your lawyers?

11   A.  Right.

12   Q.  And then your lawyers talked to ILTACO's lawyers, right?

13   A.  I don't know if they did.  I don't remember.

14   Q.  Oh, you don't know.  Okay.

15   A.  I think they just counseled us that it's --

16          MR. BECKER:  Don't --

17          THE COURT:  I'll tell you what.  Your problems will

18   be solved if you simply answer the question that is asked and

19   don't try to volunteer information.

20          THE WITNESS:  Sure, sure.

21          THE COURT:  Mr. Becker will have a shot after Mr. Kuo

22   is done.

23   BY MR. KUO:

24   Q.  After receiving this letter --

25   A.  Yes.

G. Lereno - direct

127

1   Q.  -- El-Greg didn't stop using its label, did it?

2   A.  No.

3           MR. KUO:  Could you bring up Exhibit 12, please.  And

4   I think it's the fifth page.  If you could zoom in on the --

5   yeah, right there.

6   BY MR. KUO:

7   Q.  So, this is a Facebook page, El-Greg's Facebook page,

8   right?

9   A.  Yes.

10  Q.  And El-Greg uses its Facebook page to advertise its

11  products?

12  A.  On and off, yes.

13  Q.  And this advertisement here, it's hard to see, but it's

14  dated April 23rd, 2013, is that right?

15  A.  Yes.

16  Q.  And that's -- that's both after the settlement agreement

17  and after the cease and desist letter?

18  A.  Yes.

19  Q.  And there, you're advertising a product, and you're

20  calling it a Veggie Pizza Puff, right?

21  A.  Right.

22  Q.  And, in fact, El-Greg wasn't even selling a Veggie Pizza

23  Puff?

24  A.  No.  This is a mistake.

25  Q.  They're selling a Veggie Pizza Pie, right?

G. Lereno - direct

128

1   A.  Pizza Pie, yes.

2   Q.  But you advertised a Veggie Pizza Pie as a Veggie Pizza

3   Puff, right?

4   A.  Veggie Pizza -- but that was a misprint probably or

5   some -- whoever wrote this, because I didn't write this.  I

6   didn't write this.

7   Q.  Did you ever point out to people, "Hey, that's a mistake"?

8   A.  I didn't even know about this.  This was pointed out to me

9   later that this was on the website.  And it was an honest

10  mistake.  We don't sell Pizza Puffs.  We sell Veggie Pizza

11  Pies.

12  Q.  That's right.  You don't sell Veggie Pizza Puffs.

13  A.  Right.

14  Q.  But you advertise it as a Veggie Pizza Puff?

15  A.  Well, it's not an advertisement.  This is a blog.

16  Q.  Well, I just asked you a little bit ago whether El-Greg

17  advertises its products on its Facebook page, and I think you

18  testified yes.

19  A.  Well, this is a -- I mean, it's not an advertisement.  If

20  you call it an advertisement, people talk, and you say --

21  whoever wrote this, it could have been my sister, it was a

22  mistake.

23  Q.  Well, let's read it.

24  A.  Yes.

25  Q.  It says, "It's that time of year again.  The great Lent

G. Lereno - direct

1   and Holy Week is just around the corner.  Come and get you

2   Lenten specialties, Spanakopites --

3   A.  Spanakopitas, yes.

4   Q.  -- "Veggie Pizza Puffs, and lots more"?

5   A.  Right.

6   Q.  So, you were asking people to come and buy products,

7   including Veggie Pizza Puffs, right?

8   A.  Yeah.  Like I said, this was a mistake.  It's nowhere

9   else.  You don't see anywhere else.  If you go back, front,

10  it doesn't exist.  It was -- that was a mistake.  We don't

11  advertise it as a Pizza Puff, never did.  Mistake.

12  Q.  This is your Facebook page.  This is an advertisement,

13  right?

14  A.  It's a blog.

15  Q.  And it says, "Veggie Pizza Puffs," right?

16  A.  People come off the street.  They say, "Pizza Puffs."

17  Q.  Just answer my question.

18  A.  I tell them, "Pizza Pies."

19          THE COURT:  The answer is stricken as non-responsive.

20          So, I'm going to tell you for a second time.  There

21  will not be a third.  You must answer the questions, and you

22  don't volunteer.

23  BY MR. KUO:

24  Q.  Your Facebook page that advertised the product --

25  A.  Right.

G. Lereno - cross

130

1   Q.   -- advertised the Veggie Pizza Puff, correct?

2   A.   It says, "Veggie Pizza Puffs," here, yes.

3   Q.   Thank you.

4            THE COURT:  Is that it, Mr. Kuo?

5            MR. KUO:  Yes.

6            THE COURT:  Mr. Becker?

7            And just so you know, the plaintiff called one of

8   the defendant's representatives in their case; and I basically

9   told the lawyers once the witness is on the stand, we'll do

10  all the questioning of the witness.  I don't expect this to

11  finish today, so we'll carry over until tomorrow.

12           Go ahead, Mr. Becker.

13           MR. JANSKI:  Your Honor, may I get the screen?

14           THE COURT:  Yes, sir.

15           MR. JANSKI:  Thank you.

16                       CROSS-EXAMINATION

17  BY MR. BECKER:

18  Q.   Greg, how old are you?

19  A.   53.

20  Q.   Did you go to high school in the Chicago area?

21  A.   Yes.

22  Q.   Okay.  Where did you go?

23  A.   Niles West.

24  Q.   And did you graduate?

25  A.   Yes.

G. Lereno - cross

1   Q.   When was that?

2   A.   '84.

3   Q.   And what did you do after you graduated from high school?

4   A.   Went to college.

5   Q.   Were you going full-time?

6   A.   Yes.

7   Q.   Okay.  Did you get any employment after you left high

8   school?

9   A.   Yeah.  I used to work as a waiter.

10  Q.   Where did you work as a waiter?

11  A.   Marriott.

12  Q.   When did the pizza business begin for El-Greg?

13  A.   It was around 1986.

14  Q.   Okay.  And who -- who were the original owners of the

15  business?

16  A.   It was me and my mother, Helen.

17  Q.   And you called this company El-Greg, right?

18  A.   El-Greg, yes.

19  Q.   So, could you explain again, where does the Greg come

20  from?

21  A.   Greg comes from my name, Gregory.

22  Q.   And where does the El come from?

23  A.   My mother, Helen, in Greek, Eleni, so E-L.

24  Q.   And at the time that you started this business, where was

25  your sister Maria?

G. Lereno - cross

1   A.  She was still in high school.

2   Q.  Now, you -- you've testified a little bit about how you

3   changed from the pizza business -- why don't we go -- get this

4   going through chronologically.

5   A.  Um-hum.

6   Q.  You were operating the pizza business, and what happened

7   that caused you to make a change in the type of business?

8   A.  Well, we were operating a pizza business -- we're talking

9   about the frozen pizza business right now, or we're talking

10  about regular pizza?

11  Q.  Yeah.  Well, where did you start?

12  A.  We had a pizza parlor.

13  Q.  That was the original business?

14  A.  Original business, yes.

15  Q.  And then it morphed into what?

16  A.  Into a frozen pizza.

17  Q.  And how did that happen?

18  A.  The customers, people, they were asking for frozen pizza,

19  and we decided to try it.

20  Q.  Okay.  And what happened next?

21  A.  It was okay in the beginning, but then too much

22  competition.  It got tough, so we stopped.

23  Q.  Okay.  Did you subsequently get involved in another line

24  of business?

25  A.  Well, yes.  It came out that a lot of customers started

G. Lereno - cross

1    asking about the product in the market, mentioning about the

2    Pizza Puff.  "Why don't you try to make something comparable

3    to this product?"  And we tried it.

4    Q.   Okay.  And what type of people were these who were making

5    this suggestion to you?

6    A.   Distributors, distributors, restaurants.  People just

7    approached me.

8    Q.   Okay.  And did they do anything to give you any type of

9    encouragement to look into this line of business?

10   A.   Well, they told me they would start purchasing from us if

11   we did.

12   Q.   So, in order to get started into this business, what did

13   you do?

14   A.   Well, we started making them.  We started -- I researched

15   it, and we started doing whatever we could to come close to

16   this kind of product that people wanted out there.

17   Q.   Did you have -- did you start off with having any recipes?

18   A.   No.  We started developing our own recipe.

19   Q.   And who was principally involved with developing the

20   recipes?

21   A.   Principally, it was Helen, and me, too.

22   Q.   Now, did you know how -- actually how to make the product?

23   A.   No.  We just figured it out.  We talked to some companies

24   with machinery.  They gave us the ins and outs, and we moved

25   on.

G. Lereno - cross

1   Q.  Did you need to acquire any type of equipment to go into

2   this line of business?

3   A.  Yes.

4   Q.  What did you have to acquire?

5   A.  We needed the lines.  We needed a pizza press, kettles,

6   freezers, mixers.  Of course, we had a mixer, but bigger

7   mixers.

8   Q.  And what was the initial product that you came up with?

9   A.  The Pizza Pie, which was a pork flavor.

10  Q.  And what's it surrounded by?

11  A.  It's a tortilla, tortilla dough.

12  Q.  Now, how did you come up with the name Pizza Pies as your

13  brand name?

14  A.  Well, it's a pizza flavoring, and the pie, we decided to

15  call it pie, just like in spinach pie, cheese pie.  We said

16  Pizza Pie.  In the Greek nomenclature, there's Spanakopita,

17  Tiropita.

18  Q.  And what are those?

19  A.  Just pies.  They call them pies.  Not your regular pie,

20  but it's a pie that's encrusted in -- filling encrusted in

21  dough.

22  Q.  So, the -- the Greek products, the product filling in

23  dough, translated into English literally, it becomes --

24  A.  Pie.

25  Q.  And when did you actually introduce your new product to

G. Lereno - cross

1  the market?

2  A.  '89.

3  Q.  And that was the -- that was the product with the pork?

4  A.  Yes.

5  Q.  Okay.  Did you subsequently go to another product?

6  A.  Well, later on, we came into the -- with the beef.  They

7  had a lot of demand for the beef one.

8  Q.  When did you do that?

9  A.  '89, later on in the year.

10  Q.  Okay.  And what was your next product?

11  A.  The spinach product.

12  Q.  Okay.  And when was that one introduced?

13  A.  That was 2006, I believe.

14  Q.  The Spinach Puff or the Chili Cheese Puff?

15  A.  The Chili Cheese Puff, yeah.  The Spinach Puff was before

16  that.  1999, I believe.  I could be off a little bit, so --

17  but it was afterwards, excuse me.

18  Q.  Okay.  Your products have numbers, correct?

19  A.  Yes.

20  Q.  Okay.  And product -- what's the pizza -- the original

21  pizza product number, what do you give that?

22  A.  It's a 501 code.

23  Q.  And the next number, 502, what's that?

24  A.  502 is the beef, and 503 is the spinach.

25  Q.  So, does that numbering help you figure out when you

G. Lereno - cross

1   introduced the spinach?

2   A.  Well, they just come right after the other.  Yeah, they're

3   just in --

4   Q.  Was the spinach close to the beef?

5   A.  You mean time-wise?

6   Q.  Time-wise.

7   A.  Yes.  It was about a year or two years later that we

8   created it.

9   Q.  And then do you have a product called Chili Cheese Puffs?

10  A.  Yes.

11  Q.  And when did those come out?

12  A.  That came out 2006.

13  Q.  Now, those products, the Spinach Puffs and the Chili

14  Cheese Puffs, when you put the word "puffs" in those product

15  names, why did you do that?

16  A.  Well, they puff up in the fryer.  They get really puffed

17  up, so -- and, of course, we were careful not to call nothing

18  Pizza Puff.

19  Q.  Okay.  So, those two products don't have the word "pizza"

20  in them, do they?

21  A.  No.

22  Q.  Okay.  Do you have another product called Deluxe Beef

23  Puffs?

24  A.  Yes.

25  Q.  When did that one come out?

G. Lereno - cross

1    A.   2010.

2    Q.   And what's the difference between Deluxe Beef Puffs and

3    your Beef Pizza Pies?

4    A.   It has -- includes green peppers and onions.

5    Q.   Did you ever actually make a product called Veggie Pizza

6    Puffs?

7    A.   No.   We call them veggie pies, Veggie Pizza Pies.

8    Q.   And Mr. Kuo showed you an entry on the -- on your Facebook

9    page that uses the words "Veggie Pizza Puffs."

10   A.   Right.

11   Q.   Was that intentional?

12   A.   No.

13   Q.   Apart from that one entry, is there any other place that

14   you've ever used the term "Veggie Pizza Puffs"?

15   A.   No.

16   Q.   Now, we've -- we've seen --

17        MR. BECKER:   The product.

18   BY MR. BECKER:

19   Q.   Okay.   I'm showing you what we've marked as Defendant's

20   Exhibit 792.   Can you tell us what this product is?

21   A.   Chili Cheese Puff.

22   Q.   And is this a foodservice or a retail package?

23   A.   That's a retail package.

24   Q.   Did you have other products that you had retail packages

25   for?

G. Lereno - cross

138

 1    A.  Yes, the whole line of the different flavors, not all of

 2    them, but four of the flavors.

 3    Q.  When did you start doing retail?

 4    A.  200- -- around 2013, 2012, 2013.

 5    Q.  Is that when you started or when you ended?

 6    A.  Well, we have stopped now for a while.  We're not -- we

 7    haven't been selling that type of retail product in the market

 8    at this time; but it had to be around 2011, 2012.

 9    Q.  Did you have retail products on the market prior to the

10    time that you created the label for Restaurant Depot?

11    A.  Yes, yes.

12    Q.  Okay.

13    A.  That's the same label, yeah.

14    Q.  And that label was in 2010, right?

15    A.  Right.  So, that would mean it would have been before

16    that, yeah.

17    Q.  Okay.  And did you have a photograph on your retail

18    package of the product?

19    A.  Yes.

20    Q.  And was there a picture of each different type of product

21    on the retail package?

22    A.  Yes, on the retail, yes.

23    Q.  And when you did the label for Restaurant Depot, did you

24    have a new picture made up for that label?

25    A.  No.

G. Lereno - cross

1   Q.  What did you use?

2   A.  We used one of the labels from the retail package.  The

3   Original Pizza Pie label, we used.

4   Q.  Now, in addition to products of this size, do you make

5   other sized products?

6   A.  Yes.

7   Q.  What other size products do you make?

8   A.  We make appetizers, 1 ounce appetizers, puff pastries,

9   puff pastry appetizers.

10  Q.  And how long have you been making those?

11  A.  How long have we been making them?  Over 10 years.

12  Q.  So, were you making those puff pastries before you created

13  the label for Restaurant Depot?

14  A.  Yes, yes, yes.

15  Q.  Okay.  Can you describe -- let's just take the basic Pizza

16  Pie product.  Can you describe how that is produced?

17  A.  How that is produced?

18  Q.  Yeah, the production method that you use.

19  A.  We have -- we make a dough.  We divide the dough.  We have

20  a kettle.  We cook meat, the filling.  We go through a press,

21  and then there's a line of workers and some machinery that

22  deposit different types of filling for the dough.  And they're

23  wrapping them up, and they encase them, put them in cases for

24  freezing.

25  Q.  Okay.  So, is there -- I think you mentioned you bought

G. Lereno - cross

1    conveyers?

2    A.   We have conveyer belts, yes.

3    Q.   So, what first goes onto the conveyer belt?

4    A.   The tortilla dough, the tortilla shells.

5    Q.   Okay.  And is that dough divided up into a separate piece

6    for each piece that's going to be made?

7    A.   Yes.  Well, there's a division going on before that's cut

8    into pieces, yes.

9    Q.   Okay.  And then you said you had a kettle where you have

10   the filler in?

11   A.   For product that is cooked in the kettle, yes.

12   Q.   Okay.  And then how does that product get to the -- the

13   tortilla?

14   A.   The employees.  They take it over to the other machine,

15   and they -- and it goes into the different type of filling

16   machine, which gets deposited.

17   Q.   Okay.  And after -- after the filler is deposited onto the

18   dough, what happens next with the dough?

19   A.   Well, there's a line of women wrapping, some on packaging.

20   There's different -- the employees, they wrap the product.

21   Q.   So, they're all hand-wrapped?

22   A.   They're all hand-wrapped, yes.

23   Q.   Now, is there any difference on this process depending on

24   which particular filling goes in?

25   A.   The process is similar, just different fillings.

G. Lereno - cross

1   Q.  And on these smaller products, the puff pastry or

2   appetizers, how are those made?

3   A.  Those are made on different lines, just different

4   machines.  Some of them are made just by hand, with no

5   machines at all.

6   Q.  Are they all hand-wrapped?

7   A.  Everything's hand-wrapped, yes.

8   Q.  And are they all dough that's -- has some filling put into

9   it?

10  A.  Everything has dough with filling in it, yes.

11  Q.  Now, in terms of the cost of the labor to create the

12  various products, is there any difference in the cost to

13  create the product with the pizza filling versus the product

14  with the beef filling versus the product with the chili cheese

15  filling?

16  A.  No.  I mean, there's -- the cost of labor stays constant

17  because they're working all day long doing the different

18  products, you know, doing production.  It's a constant cost.

19          It just, you know, when you change products,

20  depending on when you're producing -- yes, some products have

21  more overhead than others.

22  Q.  And is that from the different cost of the ingredients?

23  A.  It could be the different cost of, yes, the ingredients,

24  yes.

25  Q.  Is the labor cost essentially the same from product to

G. Lereno - cross

1    product?

2    A.  Very similar, yes, very similar.  Some of the electrical

3    costs may go up because of more machinery involved than

4    others.

5            THE COURT:  Are you changing topics?  Are you

6    changing topics?

7            MR. BECKER:  I have one more question on this topic.

8            THE COURT:  Go ahead and finish that, and then we'll

9    stop right there.

10   BY MR. BECKER:

11   Q.  And when you have differences in the cost of the materials

12   between beef and pork or chili cheese, do those differences

13   get reflected in the price you charge for the product?

14   A.  Yes.

15           MR. BECKER:  Okay.

16           THE COURT:  All right.  We're going to stop for the

17   day.  So, tomorrow, I'm going to ask you to be here at 9:45,

18   but I'm guessing start time is going to be closer to 10:00,

19   given the number of cases I have, but just in case.

20           So, be here at 9:45 ready to go.  Don't discuss the

21   case with each other or anyone else.  Leave your notebooks in

22   the jury room.  My suggestion is you put your names on them

23   somewhere so you can easily find them in the morning.  And

24   we'll see you tomorrow morning.

25           And I'll come back out to talk to the lawyers after I

 1    take the jury back.

 2                (Jury exits courtroom.)

 3                THE COURT:  Okay.  Mr. Becker, you wanted to address

 4    something.  I believe the question that was on the table was

 5    whether the trademark application by Illinois Tamale was

 6    originally rejected, and I sustained a relevance objection.

 7    So, go ahead.

 8                MR. BECKER:  Yes.  This relates to the discussion

 9    that we had --

10                THE COURT:  The rest of you people don't need to be

11    standing up.

12                MR. BECKER:  -- that we had before trial relating to

13    the laches issue.

14                THE COURT:  What does that have to do with the laches

15    issue?

16                MR. BECKER:  One of the grounds of prejudice -- we

17    had multiple grounds of prejudice that we raised -- was that

18    by delaying the lawsuit until after five years, we could not

19    object to the trademark on the grounds that it was merely

20    descriptive without secondary meaning.

21                THE COURT:  Okay.

22                MR. BECKER:  And the fact that I think that it is --

23    so, we can't in this case put on a case based on

24    descriptiveness; but for purposes of the laches defense, we

25    think that we're entitled to bring out that the trademark

1    examiner held that it was merely descriptive.

2         THE COURT:  So, the idea being that that tends to

3    make it more likely that if you had been able to get in there

4    and object, that what?

5         MR. BECKER:  That we could have succeeded on --

6         THE COURT:  That you would have won?  In other words,

7    the trademark would not have been issued?

8         MR. BECKER:  Or that the trademark would be canceled.

9         THE COURT:  Canceled.

10        MR. BECKER:  Because before five years, they still

11   would have to prove that the trademark was valid.

12        THE COURT:  Okay.  So, let me just ask -- and I

13   apologize on this.  I suspect that I've already dealt with

14   some of this stuff, and I'm just trying to refresh my memory

15   quickly here.

16        So, the laches issue, it's an issue on recovery of

17   damages, not just on injunction, right?

18        MR. BECKER:  Yes.

19        MR. KUO:  Correct.

20        MR. BECKER:  It solely relates to damages.

21        THE COURT:  And the law on it is -- how does it

22   relate to what the statute of limitations is?

23        MR. BECKER:  That the decisions in the Seventh

24   Circuit hold that if a suit is brought more than three years

25   after the plaintiff has knowledge of the facts on which the

1    suit is brought --

2              THE COURT:  Right.

3              MR. BECKER:  -- that laches is presumed, and that the

4    general remedy is that damages are limited to the period --

5              THE COURT:  Cut it off?

6              MR. BECKER:  -- from the filing of the lawsuit,

7    though in some cases, they've been disallowed altogether.

8              THE COURT:  Okay.  Is that more or less right?

9              MR. KUO:  Similar to -- I guess that's not necessary.

10             Similar to any presumption, as long as we put on

11   evidence --

12             THE COURT:  Yeah, it's a bursting bubble.

13             MR. KUO:  Yeah, as long as we put on evidence that

14   there's no harm or whatever.

15             THE COURT:  No, I understand.  So, let me ask this:

16   And the determination of the laches and prejudice and all of

17   that --

18             MR. KUO:  Is yours.

19             THE COURT:  -- is it an issue for the Court or an

20   issue for the jury?

21             MR. KUO:  It's yours, your Honor.

22             MR. BECKER:  It's an issue for the jury -- I'm sorry.

23   It's an issue for the Court.

24             THE COURT:  Okay.  So, just as a practical matter, so

25   laches is a term that comes out of equity, and so historically

1   that was considered a defense to equitable relief, not

2   damages.  That's gotten blurred, obviously, in this context.

3         So, how does it -- so, the jury deciding damges, if I

4   decide laches, how does that overlay get done?

5         MR. KUO:  You had suggested to us, and we've done it,

6   that our experts put up figures for the entire period and the

7   figures for a truncated period.

8         THE COURT:  No, I know that much.  But then how

9   does -- just as a practical matter, how does it get -- so, in

10  other words, I'm not going to put the question to the jury,

11  "Should it be three years, or should it be more than three

12  years?"  Or am I?

13        MR. KUO:  I don't believe so.

14        MR. BECKER:  I don't think so.

15        MR. KUO:  I don't believe so.

16        MR. BECKER:  I think what happens --

17        THE COURT:  So, let me -- the body language suggests

18  to me that you both need to do a little bit more thinking

19  about how this is going to work in practical terms.

20        I guess what I would say, though, is that a

21  determination of laches, yes or no, is an issue for me.

22  That's one more reason why I should have sustained the

23  objection because it's an issue for me.

24        So, I think the way we ought to handle this is if

25  there's evidence that either side wants to put on that is

1    exclusively admissible on the question of laches, we can do

2    that.  We just don't do it when the jury's out here.  We'll do

3    it -- you know, we can make a list of it, and we'll just do

4    it -- right when the jury goes out to deliberate, they'll go

5    out to deliberate, I'll come back out, and we'll say, "Okay.

6    Here's the laches stuff."  And you can put Mr. Shabaz back on

7    the stand at that point and get what you want out of him.

8    Okay?

9              MR. KUO:  Okay.

10             THE COURT:  But think about -- I'm just trying to

11   envision what the instructions to the jury are going to say,

12   and if I'm going to say to the jury, "Decide damages," then

13   I'm not going to be able to sort out -- so, the jury -- you're

14   going to give the jury numbers.  They might not pick either

15   one of your numbers.  That sometimes happens.  And then I'm

16   going to have to make a determination after the trial, if

17   there's a finding for the plaintiff on damages, having

18   applied -- or having determined the laches issue.

19             And I'm just trying to figure out, since I've got to

20   plan for all the alternatives, if I determine that laches has

21   been shown, how am I going to then figure out what to do with

22   the jury's award?  So, think about that.  You don't have to

23   decide it right now, but it's something everybody ought to

24   think about.

25             And the reason being is if there's something that I

1   can have the jury do that would kind of help me on that, even

2   if it's in the capacity of what you'd call an advisory jury,

3   then maybe there's something to be said for that.  So, just

4   think about that.  Okay?

5           MR. KUO:  And I have one other question.

6           THE COURT:  Yeah.

7           MR. KUO:  Since the witness is technically still

8   up --

9           THE COURT:  He's being questioned by his own lawyer,

10  though, so I'm not going to put any prohibition on him.

11          Okay.  See you tomorrow.  So, be ready to go at 9:45,

12  but it's more likely to be 10:00.

13          (Court adjourned, to reconvene 10/23/18 at 9:45 a.m.)

14

15                          CERTIFICATE

16    We certify that the foregoing is a correct transcript from

17  the record of proceedings in the above-entitled matter.

18

19  */s/Kathleen M. Fennell*          *October 23, 2018*

20  _____          _____
    Kathleen M. Fennell          Date
    Official Court Reporter

21

22

23  */s/Charles R. Zandi*          *October 23, 2018*

24  _____          _____
    Charles R. Zandi          Date
    Official Court Reporter

25