1                    IN THE UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF ILLINOIS
2                            EASTERN DIVISION

3    ILLINOIS TAMALE CO.,              ) Docket No. 16 C 5387
     an Illinois corporation,          )
4                                      )
                     Plaintiff,        )
5                                      )
                 vs.                   )
6                                      )
     EL-GREG, INC.,                    )
7    an Illinois corporation,          ) Chicago, Illinois
                                       ) October 25, 2018
8                    Defendant.        ) 9:58 o'clock a.m.

9                              VOLUME FOUR
                     TRANSCRIPT OF TRIAL PROCEEDINGS
10        BEFORE THE HONORABLE MATTHEW F. KENNELLY, AND A JURY

11   APPEARANCES:

12   For the Plaintiff:          SAUL, EWING, ARNSTEIN & LEHR, LLP
                                 BY:  MR. JOSEPH M. KUO
13                                    MR. EUGENE J. GEEKIE, JR.
                                      MS. KELLIE Y. CHEN
14                               161 North Clark Street, Suite 4200
                                 Chicago, Illinois  60601
15
     For the Defendant:          LITCHFIELD CAVO, LLP
16                               BY:  MR. ALAN I. BECKER
                                      MR. RYAN D. JANSKI
17                               303 West Madison Street, Suite 300
                                 Chicago, Illinois  60606
18
     Court Reporter:             MR. JOSEPH RICKHOFF
19                               Official Court Reporter
                                 219 S. Dearborn St., Suite 1232
20                               Chicago, Illinois  60604
                                 (312) 435-5562
21
                     * * * * * * * * * * * * * * * * *
22
                          PROCEEDINGS RECORDED BY
23                        MECHANICAL STENOGRAPHY
                     TRANSCRIPT PRODUCED BY COMPUTER
24

25

                              Fisher - cross
                                                                    594

 1              THE CLERK:  Case No. 16 C 5387, Illinois Tamale vs.

 2   El-Greg.

 3              THE COURT:  All right.  The same lawyers are here.

 4              We're going to get the jury, and we'll resume with

 5   Ms. Fisher's testimony; and, then, we'll deal with the jury

 6   instructions right after that.

 7         (Brief pause.)

 8         (Jury in.)

 9              THE COURT:  All right.  Everybody can have a seat.

10              Good morning.

11              Ms. Fisher, do you understand you're still under

12   oath?

13              THE WITNESS:  I do.

14              THE COURT:  Go ahead and have a seat.

15              We're ready to start the cross-examination of

16   Ms. Fisher.

17              Mr. Geekie, you can go ahead.

18              MR. GEEKIE:  Thank you, Judge.

19         LINDSEY FISHER, DEFENDANT'S WITNESS, PREVIOUSLY SWORN

20                        CROSS-EXAMINATION

21   BY MR. GEEKIE:

22   Q.  Ms. Fisher, I'd like to go over a few things that

23   Mr. Becker covered with you yesterday.

24              At one point, you testified that the accused products

25   at restaurant -- the accused products make up over 70 percent

Fisher - cross

1    of El-Greg's sales.

2           Do you remember that?

3    A.   I first said accused products, and then I said the 501,

4    502 and 524 made up --

5    Q.   Okay.

6    A.   -- over 70 percent.

7    Q.   Were you here when Ms. Lereno testified that they made up

8    60 percent?

9    A.   I was not in the room.  I did review her testimony.  I

10   don't recall what time period or the fact that she said -- I

11   don't know if she said over 60 percent.  I don't recall that

12   testimony, but if you say so.

13   Q.   Now, you mentioned that the manufacturer of products, here

14   El-Greg, had the same labor costs across its different product

15   line; is that right?

16   A.   I interviewed Ms. Lereno, and she told me that generally

17   they do not keep track of labor costs for individual products

18   and that it was relatively the same over all products.

19   Q.   Did you discuss with her the products -- different

20   products that the company makes?

21   A.   I did.

22   Q.   Okay.

23          So, you're aware they make small one-ounce hors

24   d'oeuvres, right?

25   A.   I am.

Fisher - cross

1   Q.  And you're aware that they make pizzas?

2   A.  I am.

3   Q.  Frozen pizzas?

4       They make Pizza Pies, as we're all aware, right, and

5  they make large casseroles, correct?

6   A.  Correct.

7   Q.  And did you examine any documents to confirm that the

8  labor costs were the same despite the size of the products?

9   A.  I don't know that they have that information.  I

10  specifically asked Mr. Becker and Ms. Lereno if there were

11  product-specific cost-of-goods-sold information, and I

12  understand there is not.

13   Q.  Mr. Becker told you there was not product-by-product cost

14  information?

15   A.  Yes.

16   Q.  Ms. Lereno told you there was not product-by-product cost

17  information?

18   A.  Yes.  And I did read her testimony.  So, I understand

19  there may be some confusion there.

20   Q.  Okay.  We'll get back to that.

21       I'd like to talk to you for a minute about the --

22  some of the critiques you had of Mr. Polash and his lost-

23  profits calculation.

24       Now, as I understand it from Mr. Becker's examination

25  of you, you said that Mr. Polash did not take into account in

Fisher - cross

1    the lost-profit calculation El-Greg's marketing program with

2    Restaurant Depot; the fact that they went from some retail to

3    all wholesale, and that there were more locations.

4           Were those the three items that you discussed that

5    there was a problem with?

6    A.   You summarized that.  I don't know exactly what my exact

7    words were, but that sounds about right.

8    Q.   Okay.

9           And your testimony was that you saw no empirical --

10   or did you see any empirical evidence regarding the amount

11   that these three items would have on the effect of revenue at

12   El-Greg?

13   A.   So, my observation were that there was the vendor program,

14   that there were sales to new Restaurant Depot locations.  As

15   far as the marketing program, no, there were no specific

16   information regarding what sales increased that I am aware of

17   --

18   Q.   Okay.

19   A.   -- due to that.

20   Q.   The additional locations, what was the additional revenue

21   that was generated by the additional locations?  How much?

22   A.   I could look.  I have an exhibit.  But I can't recall.

23   Q.   You don't recall?

24          What about going from retail to wholesale?  How much

25   did that add to the bottom line at El-Greg?

Fisher - cross

1  A.  Well, as we were looking at my report yesterday, the 2013

2  numbers, the gross profit margin was quite a bit higher in

3  2013.  I think that kind of leveled out.

4  Q.  Okay.

5        So, the gross profit margin went up in 2013, but do

6  you know if that's attributable to just going to a wholesale

7  sale basis?

8  A.  I think there's probably a number of reasons, so it

9  wouldn't just be that.

10 Q.  Okay.

11       And how much of it is attributable to just going to

12 the wholesale market?

13 A.  I don't know.

14 Q.  And, then, the vendor program -- I called it a marketing

15 program.  I think we're talking about the same thing.  But how

16 much did the vendor program add to the additional income?

17 A.  I don't know.  I only know the costs of the vendor

18 program.

19 Q.  Okay.

20       So, while you criticize Mr. Polash for not taking

21 that into account, you don't know whether or not it actually

22 had a dollar effect on revenue?

23 A.  It likely would --

24 Q.  Okay.

25 A.  -- have an effect.  I don't know the exact dollar amount.

Fisher - cross

1    Q.  Likely.  That's the term you used in your report, right?

2    A.  Most -- I'd have to look exactly, but --

3    Q.  Likely isn't an exact term, is it?

4    A.  It's not an exact term, no.

5    Q.  And what you were doing was giving kind of a ballpark view

6    on these topics, right?

7    A.  I was finding the flaws in Mr. Polash's report.

8    Q.  And did you run alternative calculations for these?

9    A.  For that -- for those specific, no.

10   Q.  Yes.

11   A.  I have run alternative calculations for other ones that

12   were more easily quantifiable.

13   Q.  Okay.  Well, since we didn't go into those, I won't go

14   into that.  But these three you testified about and I didn't

15   hear any testimony about alternative calculations, so I wanted

16   to ask about those.

17          Now, going on to your other two critiques.  Now, I

18   know you said they were two separate critiques, but I kind of

19   understood them to both be about price elasticity.  Was that

20   correct?

21   A.  You would have to let me know what those --

22   Q.  Well, there was the issue of greater growth attributed --

23   attributable to El-Greg pricing and, then, an issue regarding

24   the higher pricing that ILTACO had with its products.

25          You don't remember your testimony on that yesterday?

Fisher - cross

1    A.  I'd have to see what my exact testimony was, but the gist

2    of what I was saying was that what Mr. Polash based his

3    calculation on was first the customer growth for Restaurant

4    Depot should mirror its growth for other customers; second,

5    that all of those -- that additional growth would then have

6    gone to ILTACO; and, third, that ILTACO would have made those

7    sales at El-Greg's price.

8            So, those were the three categories that I recall.

9    If it didn't come out clearly --

10   Q.  And, then --

11   A.  -- I apologize.

12   Q.  -- your critique was that he didn't take into account

13   price elasticity, right?

14   A.  That was one of my critiques.

15   Q.  And price elasticity, just so we're all on the same page,

16   means that the higher the price, the lesser the demand,

17   generally, correct?

18   A.  Generally, yes.

19   Q.  That's not always the case, though, is it?

20   A.  It's not always the case.  For commodities, for example.

21   If you need sugar or other commodities, it wouldn't be as

22   price elastic.

23   Q.  Another thing that can affect price elasticity is a

24   better-quality product, right?

25   A.  I don't know if that would affect price elasticity, but it

Fisher - cross

1    might affect the price.

2    Q.  Well, if a customer is willing to pay a higher price for a

3    better product, that shows that the demand isn't being driven

4    down by the higher price, right?

5    A.  Not necessarily, because the customers who are buying

6    El-Greg products are -- want the lower price.

7    Q.  We're not --

8    A.  And we're talking about El-Greg's customers here.  We're

9    not actually talking about ILTACO's customers.

10   Q.  Did you survey any of the customers to see if there was

11   any price elasticity?

12   A.  I did not survey anybody.

13   Q.  Do you have any empirical data that showed price

14   elasticity was actually a factor here?

15   A.  I would assume there was some price elasticity.  This is

16   not a commodity.

17   Q.  My question to you wasn't whether you'd assume it.

18   Because we know that.  I'm asking if you have any empirical

19   data to show it.

20   A.  I did show a graph that showed when price increased, that

21   the -- when price increased by ILTACO, the gap in sales

22   widened between the two competitors.  So, I don't -- I

23   wouldn't say I don't have any evidence.  I did do a graph and

24   I did do a table.

25   Q.  Ms. Fisher, I'm going to hand you a copy of your report.

Fisher - cross

602

1    I don't know if you still have a copy there.  Well, here's

2    another copy.

3    A.  Okay.

4        (Document tendered.)

5    BY MR. GEEKIE:

6    Q.  And just so we can refer to another document, that's

7    Exhibit 5 of your report, too, right?

8    A.  It is.  It's ILTACO's.

9    Q.  Okay.

10           So, I'd like to compare Table 7 in your report, which

11   is on Page 16 -- do you have that?

12   A.  Okay.  I'm there.

13   Q.  All right.

14           Table 7.  And that shows the sales of the El-Greg

15   product, right, at Restaurant Depot?

16   A.  The accused products, correct.

17   Q.  Year by year, the accused products.

18           And, then, your Exhibit 5 shows the sales year by

19   year for the ILTACO products, right?

20   A.  Yes.  And I want to --

21   Q.  Well, hold on.

22   A.  -- clarify that these are ILTACO pizza products.  So,

23   these are much more than three products.  There was a whole

24   handful of products that Mr. Polash summarized.  And I tried

25   to take those same bucket of products.

         1           MR. GEEKIE:  Your Honor, I'm sorry, ask that the

         2   answer be --

         3           THE COURT:  Everything after the word "yes" is

         4   stricken as non-responsive.  The jury is directed to disregard

         5   it.

         6   BY MR. GEEKIE:

         7   Q.  Okay.  Let's go through these because yesterday you

         8   testified about both of these, and I just want to be sure.

         9           We're talking about price elasticity again, and you

        10   criticize Mr. Polash because he didn't take it into account.

        11   And elasticity is a higher price leads to less demand,

        12   correct?

        13   A.  Yes.

        14   Q.  And you criticize Mr. Polash for that because he didn't do

        15   a calculation for that, correct?

        16   A.  Correct.

        17   Q.  Okay.

        18   A.  And I didn't --

        19   Q.  Let me ask you another question, okay?

        20   A.  I didn't -- that was --

        21   Q.  Because Mr. Becker will be able to ask you questions if

        22   you need to give further explanations.

        23   A.  Okay.

        24   Q.  Okay.

        25           In 2010 -- now, let's look at Table 7.  2010, when

Fisher - cross

604

```
 1   -- the accused sales here for that short part of the year were

 2   57,468, right?

 3   A.  Yes.

 4   Q.  On an annualized basis, that was about 114,000.

 5           In 2011 -- this is El-Greg now -- El-Greg's sales

 6   were 108,000 at Restaurant Depot, right?

 7   A.  Yes.

 8   Q.  Okay.

 9           So, they were going down, correct?

10   A.  Yes, they did go down.

11   Q.  They had the lower price, right?  El-Greg's prices were

12   lower?

13   A.  El-Greg's prices have always been lower.

14   Q.  Okay.

15           Now, in 2010, ILTACO's sales were 475, right?

16   A.  Yes, of --

17   Q.  Based on Exhibit 5?

18   A.  Yes, based on a bucket of products, yes.

19   Q.  Their sales were 475,000 versus 50- -- annualized 114.

20   So, they were three to four times higher than El-Greg's,

21   right, sales?

22   A.  Yes.  And we're talking about three products compared to a

23   bundle of products; but, yes.

24   Q.  Well, there's no evidence of that.  And what we're --

25   A.  Right.
```

Fisher - cross

1   Q.   -- talking here are the --

2   A.   In my --

3   Q.   -- accused sales.

4   A.   That is in my report.

5   Q.   Okay.

6            So, you can clarify that if you think -- if you think

7   your chart is inaccurate, you can clarify that --

8   A.   It's accurate.

9   Q.   -- with Mr. Becker.

10           But in 2011, then, you say that El-Greg's product

11  went down to 108,000 in sales.

12           Do you see that on Table 7?

13  A.   Yes, 108,000.

14  Q.   In 2011?

15  A.   That was 2011.

16  Q.   In 2011, ILTACO, the higher-priced product, their sales

17  went from 475,000 to 520,000, right?

18  A.   Correct.

19  Q.   So, what we had was the lower-priced product sales are

20  going down.  The higher-priced product sales are going up,

21  right?

22  A.   Correct.

23  Q.   Okay.

24           Then the next year, 2012, El-Greg's sales were

25  111,000, right?

Fisher - cross

1   A.  Yes.

2   Q.  And in 2012, according to your Exhibit 5, ILTACO's sales

3   were 542,000, right?

4   A.  Yes.

5   Q.  So, El-Greg went up by 3,000.  ILTACO's sales went up by

6   over 20,000, correct?

7   A.  Correct.

8   Q.  And what we have now in 2012 is ILTACO is outselling

9   El-Greg by a five-to-one margin, correct?

10  A.  That sounds about right.

11  Q.  Okay.

12         So, again, you say price elasticity would drive down

13  the higher-priced product, but here we had the higher-priced

14  product and its sales keep going up, correct, and the lower

15  price, ILTACO, they're going down, right?

16  A.  Correct.

17  Q.  Okay.

18         And, in fact, looking at Exhibit 5, ILTACO's sales

19  continued to increase every year; isn't that correct?

20  A.  They did, for these bucket of products --

21  Q.  Sure.

22  A.  -- and they didn't look into those.

23  Q.  And El-Greg's sales did not go up every year, did they?

24  A.  In 2016, they went down slightly.

25  Q.  Okay.

Fisher - cross

1    Now I'd like to talk to you about the incremental

2    pricing issue.  And just so we understand it, when I deposed

3    you, I talked about a proxy methodology; and, you did

4    acknowledge, didn't you, that that's a term that you used in

5    your report?

6    A.  I think I corrected you and said I wouldn't use that term

7    personally.  I'd use the word "proxy" --

8    Q.  Okay.  You --

9    A.  -- in my report, but --

10   Q.  You use --

11   A.  -- there's different terms that are more appropriate to

12   use than the proxy methodology.

13   Q.  Oh, sure.

14        But you used proxy in your report, right?

15   A.  I used the word "proxy" in my report.  I didn't call it

16   the proxy methodology.

17   Q.  So, your answer is, yes, you used proxy?

18   A.  I used the word, not with approach next to it.

19   Q.  And that word was used to describe what you did here, and

20   that was you didn't have exact cost of goods sold for the

21   El-Greg product, so you used an overall number and did some

22   math --

23   A.  Correct.

24   Q.  -- correct?

25        So, you used estimates, right?

Fisher - cross

608

```
 1  A.  I used actual P&L.

 2  Q.  You used actual P&L but --

 3  A.  Costs.

 4  Q.  -- it was unrelated to the specific products --

 5  A.  Not unrelated, no.

 6          THE COURT:  You know what?  You need to stop jumping

 7  in before he finishes the --

 8          THE WITNESS:  I apologize.

 9          THE COURT:  -- question, okay?

10          Thanks.

11  BY MR. GEEKIE:

12  Q.  They weren't specifically related to these accused

13  products, were they?

14  A.  They were for the company as a whole.

15  Q.  Your answer is "Yes," right?

16  A.  Say the question one more time.

17  Q.  The data that you used was not specifically product

18  related to the accused products here, correct?

19  A.  Yes.

20  Q.  And it's your understanding that in this case and in doing

21  your calculations that El-Greg bears the burden in this case

22  of showing what its cost of goods sold are for the accused

23  products, right?

24  A.  That's true.  El-Greg bears that burden.

25  Q.  And what El-Greg gave to you were broad category numbers
```

Fisher - cross

1  for the costs making all the company products, right?

2  A.  Correct, through the profit-and-loss statement.

3  Q.  And the reason you did -- you used that was because

4  Mr. Becker told you that the company did not have

5  product-by-product cost information, correct?

6  A.  Mr. Becker told me that, and Ms. Lereno --

7  Q.  Right.

8  A.  -- confirmed.

9  Q.  And that was my next question.  So, thank you.

10        Ms. Lereno told you that?

11  A.  Correct.

12  Q.  Now, when you were first retained, you had a couple of

13  conversations or couple of phone calls with Mr. Becker, right?

14  A.  Yes.

15  Q.  And you discussed this issue of lack of product-by-product

16  cost information?

17  A.  Yes.

18  Q.  And just so we're on the same page, you were talking about

19  cost information for -- exact cost information for -- the

20  three accused products here, right?

21  A.  Correct.

22  Q.  And those were the 501 and 502 and 524 products?

23  A.  To Restaurant Depot.

24  Q.  Yes.  So, those were El-Greg's product numbers.

25        And we'd all agree, wouldn't we, that the accepted

Fisher - cross

1    methodology -- because you have experience doing trademark

2    infringement damage calculations, right?

3    A.  I do.

4    Q.  And you and I would both agree that the accepted

5    methodology is you take the overall revenue of the accused

6    products -- if the accused party is found liable of

7    infringement, you take the overall revenue -- and then you

8    deduct the cost of goods sold and any other product-related

9    cost to back out and essentially come down to a net profit

10   number, right?

11   A.  I wouldn't say net profit.  I use the term "incremental

12   profit."  Net profit includes many fixed costs.

13   Q.  Okay.

14         So, the incremental method is you have the revenue,

15   take out the costs and you come up with the incremental

16   number, right?

17   A.  Correct.

18   Q.  And just so we understand things, to get to that

19   incremental number here, you didn't have specific

20   product-by-product costs, so you used company categories and

21   then did a calculation, right?

22   A.  I did.

23   Q.  And if you had the actual product-by-product cost, you

24   would have used those exact numbers, right, to come up with

25   your incremental number, correct?

Fisher - cross

 1    A.  If I had actual product-level costs of goods sold and/or

 2    incremental costs by product, I would have reviewed it,

 3    analyzed it and, if it was accurate, I may have used that.  I

 4    would have likely used that.

 5    Q.  Now, I'm going to hand you a page of notes.

 6        (Document tendered.)

 7    BY MR. GEEKIE:

 8    Q.  And this is -- as I understand it, that's your

 9    handwriting, correct?

10    A.  Yes.

11    Q.  And this is a document that was produced along with your

12    expert report.  It's stamped S193, correct?

13    A.  Correct.

14    Q.  That's to show that it's from your firm Stout, correct?

15    A.  I didn't put that number on it, but --

16    Q.  Okay.

17          You don't know, then?

18    A.  I don't know.

19    Q.  Okay.

20          But it came -- these are your notes and they came

21    from your firm as you understand it, correct?

22    A.  Yes.

23    Q.  And these notes were -- are dated 10-2 of '17, right?

24    A.  Yes.

25    Q.  And these are your notes of a conversation.  "Question for

Fisher - cross

612

1   counsel," do you see that on top?

2   A.   Yes.

3   Q.   And these are notes for a conversation you had or would

4   have with Mr. Becker?

5   A.   These look to be my questions.

6   Q.   Okay.

7         And the top under "Northern District of Illinois" --

8   that's the court we're in -- you have a notation that begins

9   "typically."  Could you read that to the jury, please?

10  A.   "Typically uses incremental approach.  Not very favorable

11  to accused infringer."

12  Q.   Okay.

13        Who was the accused infringer here?

14  A.   El-Greg.

15  Q.   Okay.

16        So, your notation was that this incremental approach

17  is typically used; would not be favorable to El-Greg, right?

18  A.   This is because the other approaches available for other

19  districts, and possibly this district, as well, allows the

20  deduction of more cost, whereas the Northern District

21  possibly -- I'm not a lawyer, but my understanding is using

22  this incremental approach, you're not allowed to take as many

23  fixed costs, whereas other approaches you are allowed to take

24  a portion of rent, a portion of fixed costs to deduct, as

25  well.

Fisher - cross

613

1   Q.  So, your answer is, yes, it was not favorable to El-Greg?

2   A.  Incremental approach compared to the other two approaches.

3   Q.  Doesn't say anything about other two approaches, does it?

4   A.  Well, if you read on, it explains somewhat of what I was

5   just saying.

6   Q.  Okay.

7        My question to you is, Ms. Fisher:  It doesn't say

8   anything about other approaches, does it?

9   A.  No, but it says manufacturing costs deduct --

10  Q.  Okay.

11  A.  -- deducted.

12  Q.  Ms. Fisher, does it say anything about any other

13  approaches?

14  A.  I'm interpreting what I wrote as a shorthand --

15        THE COURT:  He's asking what it said.

16        THE WITNESS:  It says --

17        THE COURT:  Please answer that question so we don't

18  have to go through every question three times.

19        THE WITNESS:  I'm sorry.

20  BY THE WITNESS:

21  A.  "Typically uses incremental approach."

22  BY MR. GEEKIE:

23  Q.  Okay.

24        And you go down and do you see where it says "need"?

25  Do you see that?

Fisher - cross

1          What does it say where it said "need some"?

2     A.   "Need -- " what does it say?

3     Q.   Yeah.

4     A.   "Need some help on which costs would be permitted."

5     Q.   Now, was that you asking for help -- that you'd be asking

6     for help about costs, or were you trying to find another

7     methodology to help El-Greg?

8     A.   That is -- I needed help from the attorney to say which

9     costs would be permitted.

10    Q.   Okay.

11         You didn't know at the time?

12    A.   No.  I have experience, but every court is different.

13    Q.   So, you were looking to Mr. Becker to tell you, the

14    expert, what kind of costs would be permitted?

15    A.   I needed help on this specific court on which approach was

16    permitted.

17    Q.   Now, your report references telephone calls you had with

18    Ms. Lereno in multiple locations in your report.

19         Did you have telephone conversations with Ms. Lereno?

20    A.   I did.

21    Q.   And did she provide you with information that you used in

22    your report?

23    A.   I did.

24    Q.   She did?

25    A.   She did.

Fisher - cross

1   Q.  And you said you read the transcript.  Did Mr. Becker

2   inform you that Ms. Lereno -- well, actually, let me ask you

3   this:  Did Ms. Lereno tell you that the company did not

4   maintain product-by-product costs?

5   A.  She -- so, I looked back on my notes.  She specifically

6   said they do not keep product-by-product cost of goods sold

7   information.

8   Q.  Okay.

9        And did Mr. Becker tell you that her testimony was

10  two days ago that El-Greg did actually keep product-by-product

11  cost information?

12  A.  He told me about her testimony, and then I read her

13  testimony.

14  Q.  And you saw her testimony that she did keep product-by-

15  product cost information on Excel spreadsheets, right?

16  A.  I talked to her about that because I thought the testimony

17  was unclear and I --

18  Q.  Okay.  Go ahead.

19  A.  So, I talked to her about that issue because I thought the

20  testimony was unclear because when she answered the question

21  by Mr. Becker, she said we don't keep product costs, which is

22  what she has told me.  And then when -- I don't remember who

23  was giving the cross, but whatever attorney was giving the

24  cross, she then said, no, I do keep cost information and that

25  had to do with how she priced her product.  So, I asked, do

1    you have cost information for this period?  And --

2            MR. GEEKIE:  Objection.  Now she's -- the witness is

3    going to hearsay now, your Honor.

4            THE COURT:  Well, then you shouldn't have asked her

5    an open-ended question.  But we're going to stop it right

6    here.

7            Ask another question.

8    BY MR. GEEKIE:

9    Q.  Now, you read the transcript and the transcript --

10           THE COURT:  By the way, the jury has heard the

11   testimony and the jury is not bound by any witness'

12   interpretation of what you have heard live.  I'm not saying

13   she's right or she's wrong, but it's up to you to decide what

14   the testimony and the evidence was.

15   BY MR. GEEKIE:

16   Q.  Were you ever given the Excel spreadsheets by Ms. Lereno?

17   A.  I was not on these spreadsheets that we're talking about.

18   Q.  I didn't understand your question.

19   A.  That was a --

20   Q.  Did you ever get -- did Ms. Lereno ever give you Excel

21   spreadsheets that had product-by-product cost information

22   regarding the three accused products?

23   A.  No.

24           MR. GEEKIE:  I have no more questions.

25           THE COURT:  Redirect.

Fisher - redirect

617

```
 1              MR. BECKER:  May I have the Elmo, please?

 2              THE COURT:  The Elmo.  There you go.

 3              MR. BECKER:  I'm sorry, I guess it's the computer.

 4              THE COURT:  It's okay.

 5              Do you want the computer or the Elmo?

 6              MR. BECKER:  Computer.

 7              MR. JANSKI:  Thank you, your Honor.  Sorry about

 8  that.

 9              THE COURT:  No worries.  It's fine.

10              MR. GEEKIE:  Objection, your Honor.  This is --

11              THE COURT:  First of all, is the exhibit in evidence?

12              MR. GEEKIE:  No.

13              THE COURT:  All right.  So, stuff that isn't in

14  evidence doesn't go up there until I say it's in evidence.

15              MR. BECKER:  Sorry.  It's from her report.

16              THE COURT:  I understand, but it's not in evidence.

17  So, the way I've got it set up now is she -- you can put it

18  back on.  I've taken it off the jury's monitors.  You want to

19  show it to her to lay a foundation or whatever, then go ahead.

20                      REDIRECT EXAMINATION

21  BY MR. BECKER:

22  Q.  Ms. Fisher, I show you a document that --

23              THE COURT:  Mr. Janski has to get it back up on the

24  screen, though.

25              There it is.  All right.
```

Fisher - redirect

618

1    BY MR. BECKER:

2    Q.   That says Fisher report dated October 13th, 2017, Exhibit

3    9 at Page 20.   Is this a document that you prepared as part of

4    your report?

5    A.   I did not prepare this graph in my report.   The numbers

6    from this graph are in Exhibit 9 and Page 20.   So, no, this

7    graph specifically wasn't in my report.

8    Q.   All right.

9          When you were doing your analysis of the sales of

10   El-Greg and you also had sales of ILTACO, did you look at the

11   relationship of the changes of sales at El-Greg to various

12   events that took place?

13   A.   I did.

14   Q.   And, so, Mr. Geekie was showing you a period of time when

15   El-Greg's sales declined?

16   A.   Yes.

17   Q.   And one of the events that took place during that period

18   was 2010 date that we've all looked at when the accused label

19   was put on; is that right?

20   A.   Yes.

21   Q.   Okay.

22         What happened to El-Greg's sales after -- in the six

23   months after the accused label was put on?

24   A.   It went down.

25   Q.   Okay.

Fisher - redirect

619

1          And what happened in the following year?

2    A.   It went down.

3    Q.   Okay.

4          That's 2011?

5    A.   Yes.

6    Q.   Okay.

7          And, then, 2012, what happened to El-Greg's sales?

8    A.   It went up.

9    Q.   By very much?

10   A.   Not that much.

11   Q.   By how much?

12   A.   About 3,000.

13   Q.   Okay.

14          Then when we get to 2013, what happens to El-Greg's

15   sales?

16   A.   It went up again.

17   Q.   Okay.

18          And in 2014, what happened to El-Greg's sales?

19   A.   It went up.

20   Q.   Okay.

21          And what events did you observe in your review of

22   information that occurred in this period around 2014?

23   A.   The halal product was introduced; the vendor marketing

24   program was introduced; and, then, we also discussed -- which

25   is not on this graph -- that El-Greg began selling to multiple

1  Restaurant Depot locations.

2  Q.  And in 2015, from your review, did the -- did El-Greg

3  continue with the marketing program?

4  A.  As far as I know, it did.

5  Q.  Well, did you see expenses for it?

6  A.  I did.  I saw expenses.

7  Q.  What happened to El-Greg's sales?

8  A.  From 2014 to 2015 or from 2015 to 2016?

9  Q.  From 2014 to 2015.

10 A.  They increased.

11 Q.  And, then, in 2016, what happened to El-Greg's sales?

12 A.  They went down.  Well, yes, they went down slightly.

13 Q.  Okay.

14       Was it approximately the same as the 2015 sales?

15 A.  About a thousand difference.

16 Q.  A thousand dollar difference?

17 A.  Yeah.  A little bit more than that.

18 Q.  Mr. Geekie asked you about whether any of your data was

19 data for costs of the accused products, the 501, the 502 and

20 524.  Are the costs associated with the production of those

21 products included within the overall costs of El-Greg?

22 A.  They would be.

23 Q.  And, again, what -- from your review of the sales figures

24 for these products compared to overall sales products, what

25 did you find to be the proportion of sales of the accused

Fisher - redirect

621

1    products?

2    A.  I have the exact numbers in my report, but I recall that

3    the 501, 502 and 524 product sales were in the 70 -- overall

4    for the longer damages period were in the 70 percentile range.

5    Q.  And Mr. Geekie asked you some questions about discussions

6    that you had with me about the incremental approach, and you

7    were talking about some other approaches.  What are the

8    distinctions that you were trying to talk about?

9    A.  So, my notes -- and, again, this was over a year ago, but

10   I know what I was trying to ask you.  I was trying to say it

11   appears, from my experience and from looking at sources, that

12   this court has used the incremental approach before, which you

13   are not allowed to deduct fixed cost.

14           Now, there are other approaches that you can deduct

15   fixed costs.  I did not deduct fixed costs.

16   Q.  Are the there other versions of the incremental approach

17   that just allow additional deductions?

18   A.  There are other approaches.  I don't know if it's a

19   version of the incremental approach.  He might call it

20   something else because they would include fixed costs.  So,

21   you know, you could call it a fully allocated method and that

22   would include more costs.  It would be a different method or

23   different approach.

24   Q.  In terms of coming up with a lower gross -- lower

25   margin -- lower profit margin -- would it be advantageous if

Fisher - redirect

1   you could deduct more things like share of rent and utilities,

2   and so forth?

3           MR. GEEKIE:  Objection.  This is beyond the scope of

4   the cross, your Honor, and it's not relevant, either.

5           THE COURT:  Hang on a second.  Let me just look at

6   the question, again.

7       (Brief pause.)

8           THE COURT:  Was this covered in cross?

9           MR. BECKER:  I believe that Mr. Geekie asked

10  questions about her questions to me about what method was --

11          THE COURT:  The objection is overruled.

12          You can answer.

13          THE WITNESS:  Can you repeat the question?

14  BY MR. BECKER:

15  Q.  So, if you were in a court that allowed you to deduct a

16  portion of fixed costs, would that end up making the

17  incremental --

18          THE COURT:  Well, now that you've rephrased it, I

19  need to ask you a question at sidebar about this.

20      (Proceedings had at sidebar:)

21          THE COURT:  So, I need to deal with Mr. Geekie's

22  relevance objection now.  So, are we in a court where you're

23  allowed to deduct a --

24          MR. BECKER:  No.

25          THE COURT:  -- portion of fixed costs?

 1                MR. BECKER:  No.

 2                THE COURT:  Then why should -- why do we waste time

 3     on this?

 4                MR. BECKER:  Because he was getting into her

 5     questions to me.  And, basically, I was telling her that in

 6     this -- in the Seventh Circuit, you can't deduct a share of

 7     fixed costs, although --

 8                THE COURT:  Why don't you just ask that:  Isn't it a

 9     fact that I told you that in this district or circuit you

10     can't deduct that?

11                Just do that.

12                MR. BECKER:  Okay.

13                THE COURT:  Okay.

14                MR. BECKER:  Sure.

15          (Proceedings had in open court:)

16                THE COURT:  Okay.  The question is going to be

17     rephrased.  Go ahead, Mr. Becker.

18     BY MR. BECKER:

19     Q.  Ms. Fisher, in the discussions that you and I had had, did

20     I explain to you that in the courts here in the Seventh

21     Circuit federal courts, you are not allowed to deduct a share

22     of rent and so forth, although other circuits around the

23     United States allow you to do that?

24     A.  I can't recall the exact conversation, but I know that was

25     the gist of our conversation back and forth.  I don't know who

Fisher - redirect

624

 1   told who what.

 2   Q.  So, your question was just to find out what was allowed in

 3   this circuit compared to other parts of the country?

 4   A.  Right.

 5   Q.  And, then, you told us that you -- I'm sorry.

 6          MR. BECKER:  Just going back for one second, your

 7   Honor.  Your Honor, may we display the --

 8          THE COURT:  The chart?

 9          MR. BECKER:  -- chart as a demonstrative exhibit

10   only?

11          THE COURT:  I can explain to the jury what a

12   demonstrative is.

13          Do you have any problem with that?

14          MR. GEEKIE:  I do, your Honor, because the witness

15   said she she's never seen this document.

16          THE COURT:  Well, that's a fair point.  You need

17   to --

18          MR. GEEKIE:  And Mr. Kuo reminds me it wasn't --

19          THE COURT:  The foundation hasn't been laid for it

20   even as a demonstrative at this point.

21          MR. BECKER:  All right.

22   BY MR. BECKER:

23   Q.  Ms. Fisher, you testified that you read the entirety of

24   Ms. Lereno's testimony regarding the issue of question about

25   spreadsheets?

Fisher - redirect

625

1  A.  I did.  I read it last night.

2  Q.  Okay.

3      And did you see the portion of her testimony when she

4  testified that she didn't keep those historically?

5      THE COURT:  So, look, I'm going to cut this off here.

6  Consistent with what I told the jury before, the jury has

7  heard Ms. Lereno's testimony and we're not going to have

8  witnesses getting up here interpreting it.  Okay?  That's the

9  deal.  You can do that in argument.  The lawyers can do it in

10  argument.  If you want to show it, I'll let you do that.  But

11  we are not going to have witnesses interpreting it, because

12  that's not what witnesses do.

13      Proceed with something else.

14  BY MR. BECKER:

15  Q.  So, finally, Ms. Fisher, going back to your critique of

16  Mr. Polash's approach, you were asked about the various things

17  that you criticized.  And the first one was his assumption

18  that sales to -- that El-Greg's sales to Restaurant Depot

19  would mirror sales to other customers.

20      Do you recall that?

21  A.  I do recall that.

22  Q.  Okay.

23      And just to be clear, did you see any evidence that

24  would suggest that that was in El-Greg's historic practice,

25  that its sales to one customer mirrored its sales to another

1   customer?

2   A.   No.

3   Q.   I should say its sales growth to one customer mirrored its

4   sales growth to another customer.  Did you see anything?

5   A.   I did not see anything.

6   Q.   Now, Mr. Geekie asked you some questions about ILTACO

7   increasing its sales even though its price was greater than

8   El-Greg's price.  In your experience, have you seen where

9   Company A sells products at a higher price than Company B and

10  continues to increase its sales?

11  A.   Yes.  Those customers are likely not as price sensitive as

12  maybe another customer would be.

13  Q.   And did you observe in your data that there was a change

14  in the relationship of the prices between El-Greg and ILTACO

15  over the years?

16  A.   Yes.

17  Q.   Okay.

18       What is that change that you saw?

19  A.   For most of the years, the change widened or the gap in

20  price widened.  I think maybe in 2016 maybe it lessened.  I'd

21  have to look at the numbers again.

22  Q.   Looking at your numbers -- and that's your -- in fact, you

23  could turn -- if you have your report there, you can turn to

24  your graph and we can put that one back up.

25       MR. GEEKIE:  What's the exhibit number?

```
 1              MR. BECKER:  That would be Graph 1 from her report.

 2              MR. GEEKIE:  Can you give me a page or --

 3              MR. BECKER:  I think it's on Page 18.

 4              MR. GEEKIE:  Thank you.

 5              MR. BECKER:  Is that correct, Ryan?

 6              MR. JANSKI:  Correct.

 7         Your Honor, can we publish this to the jury?  This

 8  has already been shown to them.

 9              MR. BECKER:  This is from the report.  She testified

10  about this --

11              THE COURT:  This has been shown before.

12              MR. BECKER:  It has.

13              MR. GEEKIE:  It was shown.  I didn't --

14              THE COURT:  That's fine.

15              MR. GEEKIE:  -- realize that it was shown yesterday.

16         Was the whole graph shown or was --

17              THE COURT:  I saw this exact thing right here.

18              MR. GEEKIE:  Okay.

19              THE COURT:  So, it was definitely shown.

20  BY MR. BECKER:

21  Q.  And this is the data that you were talking about when you

22  were discussing price elasticity?

23  A.  Yes.

24  Q.  Okay.

25         Are all customers -- in your experience, are all
```

Fisher -

628

1    customers equally price sensitive?

2    A.  Likely not.

3    Q.  Okay.

4            So, when a difference between companies' prices

5    increases, does that affect all of that company's existing

6    customers or some of them or none of them?

7    A.  Each customer will act differently most likely, but I

8    couldn't know for sure.

9    Q.  Okay.

10           So, some customers may be sensitive to a differential

11   change and others not; is that your testimony?

12   A.  Yes.

13           MR. BECKER:  That's all the questions I have, your

14   Honor.

15           THE COURT:  Do any of the jurors have any questions

16   for the witness?

17           Pass it on down.

18      (Proceedings had at sidebar:)

19           THE COURT:  "How much of the El-Greg business was the

20   halal product?

21           Anybody have a problem with that?

22           MR. GEEKIE:  No.

23           MR. BECKER:  She'll have probably have to look it up.

24           THE COURT:  She might have to look it up.  Yeah,

25   that's fine.

1           "Was ILTACO in all the new Restaurant Depots that
2    El-Greg had acquired?"
3               I'm not even sure I understand that.
4               Can you interpret it?
5               MR. GEEKIE:  I think that -- I think she's -- they're
6    talking about the new ones El-Greg went into.  But --
7               THE COURT:  Got it.
8               MR. GEEKIE:  But she wouldn't have -- I don't think
9    she has -- she probably -- I have no problem with --
10              THE COURT:  We can ask if she knows.
11              MR. GEEKIE:  I doubt she has the answer.
12              MR. BECKER:  I think the answer will be that she
13   doesn't --
14              THE COURT REPORTER:  I can't hear Mr. Becker.
15              THE COURT:  Yeah, you've got to speak --
16              MR. BECKER:  I'm just saying I think that she doesn't
17   --
18              THE COURT:  She probably won't know?
19              MR. BECKER:  -- have that information.  I haven't
20   seen it.
21              THE COURT:  Okay.
22              "How much was the increase in sales due to the new
23   locations?"
24              MR. GEEKIE:  No problem with that.
25              MR. BECKER:  She can testify to that.

Fisher -

1          THE COURT:  "How much were the halal sales?"

2          That's a duplicate of that other one.

3          MR. GEEKIE:  Yep.

4          THE COURT:  "Do you know why 2013 is such a

5   difference for GM?"

6          MR. BECKER:  Yeah, she can answer that.

7          THE COURT:  "If it was exiting retail -- "

8          MR. GEEKIE:  "GM" might mean gross margin.

9          THE COURT:  Gross margin.  I was going to say, what

10  is that?  Gross margin.  Okay.

11         "If it was exiting retail, wouldn't that also be the

12  case in 2014, '15, et cetera?"

13         Okay.  I mean, I think she can answer that.  She may

14  not know the answer to any of these.  I don't know.

15         "What was the cost of the vendor marketing plan, and

16  did this lower the selling price or increase cost of goods

17  sold or discounts?"

18         Any problem with that?

19         MR. GEEKIE:  No.

20         MR. BECKER:  No.

21         THE COURT:  "Were monthly sales reviewed to see if

22  there was an impact from participating, example -- " wow.

23         MR. JANSKI:  It looks like "from participating in the

24  sales and marketing -- "

25         THE COURT:  From participating in the sales and -- in

Fisher -
631

```
 1    the marketing program, in the marketing plan maybe?
 2           Example, flyer.
 3           MR. GEEKIE:  Example, flyer.
 4           THE COURT:  Okay.  I got it.
 5       (Proceedings had in open court:)
 6           THE COURT:  Do you have any information on whether
 7    ILTACO was selling to all of the new Restaurant Depot
 8    locations that El-Greg got into?
 9           THE WITNESS:  I don't.
10           THE COURT:  Okay.
11           Now I'm just going to ask you about El-Greg.
12           So, are you able to determine how much of the
13    increase in sales was due to them having the new locations?
14           THE WITNESS:  I have information in my report.
15           THE COURT:  If you need to look up something, that's
16    fine.
17       (Brief pause.)
18           THE WITNESS:  So, I have at Exhibit 5.2 -- I would
19    have to do some more investigation.  I have a list of every
20    Restaurant Depot location and their sales.  However, it's not
21    as clear as me doing that right now because there are sales to
22    some locations, and then in certain years they -- there are no
23    sales and then certain years --
24           THE COURT:  Got it.
25           THE WITNESS:  -- there are sales.
```

Fisher -

632

```
1              THE COURT:  So, you'd have to do more work to sort

2    that out?

3              THE WITNESS:  Yes.

4              THE COURT:  Fair enough.

5              THE WITNESS:  But I could.

6              THE COURT:  Do you know why 2013 was such a big

7    difference for gross margin -- I'm just going to read the

8    question the way it was asked.

9              "GM," I'm assuming, is gross margin, whoever wrote

10   that.  Yes.  Okay.

11             Do you know why 2013 is such a difference for gross

12   margin?  If it was exiting retail, wouldn't that also be the

13   case for 2014, 2015, and so on?  But the margins decreased in

14   those years.

15             So, do you follow the question?

16             THE WITNESS:  I do follow.

17             THE COURT:  In other words, there's an increase in

18   gross margin for one year.  It's not in the other years.

19   What's the reason for the difference?

20             THE WITNESS:  Yes.  That's a good question.  I asked

21   that question.

22             There were a lack of purchases for some costs.  For

23   example, packaging costs.  They just stopped purchasing it for

24   that year and used everything they had.  And, then, they began

25   purchasing for wholesale and/or -- wholesale isn't the right
```

Fisher -

633

 1    term.  Distributors or wholesale.  So, that would be one

 2    reason.

 3              And, also, just the margins in general for wholesale

 4    and distributors are different than their margins on retail.

 5              THE COURT:  Okay.

 6              Do you know what the cost of the vendor marketing

 7    plan was to them?

 8              THE WITNESS:  I do.

 9              THE COURT:  And did it lower the selling price or

10    increase the cost of goods sold?

11              THE WITNESS:  That's a good question.  It was a fixed

12    cost, and then there was also a rebate that would have altered

13    the average price.

14              THE COURT:  Did you do any kind of an analysis to see

15    if there was an impact in participating in the marketing plan

16    in terms of sales increases and using flyers?  Is that part of

17    what you did?

18              THE WITNESS:  That is not what I did.  I just did the

19    costs.

20              THE COURT:  And, then, what proportion of the El-Greg

21    business was the halal product?

22              THE WITNESS:  So, halal -- I have that information.

23    Let me just switch to a different exhibit.

24              THE COURT:  That's fine.

25         (Brief pause.)

Fisher -

634

```
1              THE WITNESS:  Found it.
2              Okay.  So, for the 524, the halal, sales didn't begin
3    until 2014.  So, in 2014, there were very little sales.  They
4    picked up in 2015.  By 2016, it was 61,000.  So, in total, the
5    actual dollar sales are a small portion, less than ten
6    percent.
7              THE COURT:  Less than ten percent.
8              THE WITNESS:  However, for the --
9              THE COURT:  But it was going up?
10             THE WITNESS:  It was going up.  So, for 2016, that
11   percentage was much more.
12             THE COURT:  Any follow-up based on any of that,
13   Mr. Becker?
14             MR. BECKER:  No, your Honor.
15             MR. GEEKIE:  No, your Honor.
16             THE COURT:  The witness is excused.
17        (Witness excused.)
18             THE COURT:  Any further witnesses or evidence for the
19   defendant?
20             MR. BECKER:  No, your Honor.
21             THE COURT:  So, you're resting?
22             MR. BECKER:  We are.
23             THE COURT:  Any evidence in rebuttal for the
24   plaintiff?
25             MR. GEEKIE:  No rebuttal.
```

635

1          THE COURT:  Okay.

2          So, you've heard all the evidence.  So, here's where

3     we are.  The lawyers and I spent a lot of time after hours

4     last night working on the instructions.  We have a few more

5     things to kind of tie down on that.  That's probably going to

6     take us, I'm going to say, 10 or 15 minutes; then they have to

7     have a break, and I've to get the instructions duplicated so

8     you can all have copies.

9          Here's the plan.  And I've given them time limits for

10    their closing arguments.  The plan is we're probably going to

11    go a little bit longer before the lunch break today, so that

12    we can get it all done.  I'm thinking it's maybe going to be

13    closer to 1:00.  And, then, lunch will be on us today.

14         So, at some point later in the morning you'll see an

15    officer come and sit down here.  That's not because I'm going

16    to arrest any of you.  It's because that's the person who will

17    be outside during the deliberations, and he or she will take

18    you to lunch once we break for lunch.

19         So, that's the plan.  So, we're going to take a break

20    now.  It's going to be longer than the usual break.

21         And even though you've heard all the evidence, you

22    haven't seen my instructions and you haven't heard the

23    arguments.  So, don't start deliberating, still keep an open

24    mind.  We'll get going very shortly.

25         Thanks.

636

1          I'll be right back out.

2      (Jury out.)

3          THE COURT:  So, we need to get the instructions put

4   to bed so I can get them copied.  So, that's what we're going

5   to talk about right now.

6          I know you're going to file a Rule 50 motion.  We'll

7   take care of that in a second.  I want to --

8          MR. KUO:  We already filed it, your Honor.

9          MR. JANSKI:  It's been filed.

10         THE COURT:  It's taken under advisement, too.

11         MR. BECKER:  And we technically have to renew our

12  Rule 50 motion.

13         THE COURT:  And you're doing that right now.

14         MR. BECKER:  I just did.

15         THE COURT:  There you go.  Good.

16         So, I sent a draft right before the end of court

17  yesterday of the jury instructions.  I got red-lines back from

18  the lawyers.  My advice to you is going to be that you find a

19  way to file those at some point.  Like slap a cover sheet on

20  it and file it, so that you've made a record of the back and

21  forth.

22         We're going to go over it here, but you want to have

23  that in the record.

24         MR. JANSKI:  Is that okay if we do it --

25         THE COURT:  Yeah, you can do that off-line later on.

1      That's fine.

2              MR. JANSKI:  Okay.

3              THE COURT:  So, let me just kind of go through the

4      things that I changed and some of the things that I didn't do

5      and explain why, and then there's a couple things we have to

6      talk about.

7              MR. JANSKI:  Do you have a set of instructions up

8      there that we could use?  I don't know if you --

9              THE COURT:  I'm going to put them on the screen.

10             MR. JANSKI:  I thought that would be the case.  Thank

11     you, your Honor.

12             THE COURT:  Thanks for the reminder.  That was my

13     intention to do that.

14             Bear with me one second.

15             MR. KUO:  You're about to show the ones you sent last

16     night?

17             THE COURT:  I'm about to show the red-line version

18     that I sent later last night.

19             MR. KUO:  Right, the last one, yeah.

20             THE COURT:  Yeah, which I've now made another change

21     on, which I'll go through with you.

22         (Brief pause.)

23             THE COURT:  First of all, I took out the reference to

24     the playing depositions.  We didn't have that.

25             I took out the reference to demonstrative exhibits.

638

1   We ended up not having that.

2          So, on the expert witness instruction -- so, the

3   plaintiff wanted to add the word "expert."  We've actually

4   kind of gotten away from doing that.  The idea being if the

5   judge calls the person an expert, it's kind of like an

6   imprimatur.  So, we just talk about witnesses who gave

7   opinions.

8          So, I didn't add the word "expert."  But there was an

9   opinion about family of marks, so I added that.

10          MR. KUO:  Okay.  I just didn't know if the fact that

11   it's opinion testimony versus fact testimony, if that matters.

12          THE COURT:  Well, it does in terms of dealing with

13   qualifications.  So, anyway --

14          MR. KUO:  Okay.  That's fine.

15          THE COURT:  I mean, as time goes on, I really wonder

16   whether we even need that instruction, but that's an issue for

17   the Jury Instruction Committee on another day.

18          So, now we're over to -- so, here's the change I made

19   this morning.  So, I had added all of this stuff to the

20   interstate commerce instruction about definitions.  One of the

21   questions I had asked in the e-mail exchange is whether it was

22   disputed.  I was told by the defendant this morning that it

23   wasn't.  And, so, I took out all the definitional stuff

24   because we really don't need it.

25          It just now says, "Used in interstate commerce.  This

1    proposition not disputed."  So, I made that change in each of

2    the instructions that had an interstate commerce element,

3    which I think is Claim 1 and Claim 2 and Claim 4.  So, the

4    trademark, the trade dress and the false advertising.

5    Trademark around the Pizza Puffs.  I made that change.

6             It was pointed out to me that there's a "both" where

7    it should say "each."  I fixed that.

8             So, in the trade dress infringement instruction, I

9    made the same change to interstate commerce just to say it's

10   not disputed and take out the definition.

11            I did not yet make the change about functionality.

12   We'll come back to that.

13            I made the same change about interstate commerce in

14   the false advertising instruction, which you're seeing right

15   there.

16            Okay.  So, let me now -- before I get to the rest,

17   let me go back to some of the stuff that you sent me.

18            So, the plaintiff -- or the defendant wanted to add

19   on the "family of marks" instruction -- which I'll put up on

20   the screen here.  The last sentence of the definition -- or

21   the last paragraph of the definition of family of marks reads

22   in the instruction as follows:  "A descriptive term - in other

23   words, a term that conveys an immediate idea of the

24   ingredients, qualities or characteristics of goods - can serve

25   as a family name only if there is a showing that the term

1   acquired distinctiveness; in other words, that it indicates

2   that the goods have a common origin."

3           So, the defendant wanted to add the word "strong."

4   Strong showing.  And you're absolutely correct that that is in

5   the cases that you cite from the Seventh Circuit.

6           They weren't drafting jury instructions.  I've got to

7   tell you, I don't know what it means.  It's not defined.  I

8   don't think it changes the burden of proof.

9           What I think appropriately could be added, which

10  maybe gets across the concept, would be to change it, "if

11  ILTACO proves by a preponderance of the evidence."

12          So, I'd be willing to make that change, but the other

13  one I don't think -- I don't think there was any intention in

14  that discussion in the Spraying Systems or the American Aloe,

15  A-l-o-e, case to change any kind of burden of proof.  So, I

16  mean, if people are okay with the change that I just put up

17  there about making it preponderance of the evidence, then I'm

18  okay.  Then I could do that.

19          MR. KUO:  I'm fine with it, your Honor.

20          MR. BECKER:  Well, your Honor, we believe that the

21  cases hold that a stronger showing is required --

22          THE COURT:  Well, do you think that they changed the

23  burden to clear and convincing?  Because that would be what a

24  stronger -- that would be the next level up.

25          MR. BECKER:  I think that clear and convincing would

1  be more consonant with what the Court said in the Seventh

2  Circuit cases.

3          THE COURT:  I don't think there's support for that,

4  so that's overruled.

5          Do you want me to change it to "proves by a

6  preponderance of the evidence," or do you want me to just

7  leave it as it was?

8          MR. BECKER:  I would certainly prefer the language

9  that your Honor has just added --

10          THE COURT:  Then I'll keep it in.

11          MR. BECKER:  -- to what was there originally.

12          THE COURT:  Okay.  Then I'll keep it in.

13          The defendant -- I've got a page blank in here.  I've

14  got to fix that before we too much farther here.  You're

15  seeing this in all of its glory here.

16          The defendant wanted to add on Page 23 --

17          MR. KUO:  Oh, by the way, your Honor -- oh, no,

18  that's right.  I just saw two claims --

19          THE COURT:  Defendant wanted to add on Page 23 a

20  sentence that says, in effect, don't consider attorneys' fees

21  or the cost of suit in calculating damages.

22          I'm not adding that.  I'm overruling that objection.

23  I don't think it's needed.  There hasn't been evidence

24  introduced on the amounts anyway, and there's nothing in the

25  jury instructions that suggests that damages are anything

1    other than the specific items that are here.  So, I don't

2    think it's necessary.

3           So, that's overruled.  I don't think you need --

4           MR. BECKER:  I would just like to say, so we have it

5    on the record, that I've had the experience where juries who

6    have not been given this advice have simply on their own made

7    an assumption that lawsuits are expensive, so we're going to

8    add an amount of money to what we find as damages.  And, of

9    course, we only learn about this after we talk to the jurors

10   after the case.

11          THE COURT:  Okay.  Thanks.  The ruling stands.

12          The defendant wanted me to remove the "loss of

13   goodwill" instruction.  I asked the plaintiff whether they had

14   put on evidence of that.  They said no.  I took it out.

15          The verdict form we're going to have to discuss in a

16   second.

17          So, on the -- the plaintiff wanted me -- or the

18   defendant wanted me to add to the trade dress instruction,

19   which is entitled "Claim 2" --

20          MR. KUO:  What page is that?

21          THE COURT:  It's Page 15.

22          -- wanted me to add an element or a sentence.  Where

23   is it?  Oh, it's Page 17.  My mistake.  Page 17.  Definition

24   of a valid trade dress.

25          They wanted to add "you should consider -- " where it

1  says "you should consider the packaging as a whole," wanted to

2  add the language "however, functional aspects of the package

3  should not be considered."

4          So, can you give me the rationale for adding that?

5          MR. BECKER:  Well, I think that case law holds that

6  functional elements can't be the subject of a trademark or

7  trade dress.

8          THE COURT:  Fair enough.

9          What do you think are the -- I mean that's certainly

10 true as kind of a general proposition.

11         What do you think in this case are the functional

12 elements of the packaging?

13         MR. BECKER:  The numbers that appear.  48 units, six

14 ounces, 18 pounds are functional elements.  They are there to

15 provide objective information.  They're not stylistic in any

16 way.

17         And we also think that simply having a photograph of

18 the actual contents is functional.  It's simply providing

19 information.  It's not an artistic design.

20         THE COURT:  Mr. Kuo?

21         MR. KUO:  Well, functionality in the trademark sense

22 or trade dress sense isn't simply that it performs some sort

23 of -- performs a function.  I mean, the TrafFix case says that

24 in order for something to be -- a feature to be functional, it

25 has to be essential to the use or purpose of the device or

644

1   when it affects the cost or quality of the device.

2          I don't believe there's been any evidence that that

3   --

4          THE COURT:  TrafFix, by the way, Joe, is

5   T-r-a-f-F-i-x.

6          MR. KUO:  And it's 532 U.S. 23, is the cite.

7          I think what Mr. Becker is trying to do is -- he

8   elicited some testimony about what's the function of, you

9   know, the numbers, to tell you how many are in there; but,

10  that's not functionality for purposes of trade dress

11  infringement.

12         I mean, the trade dress is more than just the number

13  itself.  It's the particular font they use, where they've

14  located it, and its impact on the overall impression.  I'm

15  just choosing that one because that's one of the ones he

16  mentioned.

17         THE COURT:  Fair enough.

18         Do you want to respond to that?

19         MR. BECKER:  I don't think that the TrafFix case is a

20  limiting decision.  I think that it goes to -- the broad idea

21  is that you can't acquire trade dress for something that is

22  simply there to provide the function of providing objective

23  information about the contents of the package.

24         THE COURT:  Okay.  I don't agree.  I don't think this

25  is what the functionality in trade dress covers.

1           So, I'm overruling that objection.  I'm not going to

2   make the change.

3           Let's see.  Okay.  So, the other change -- now we get

4   to the damages instructions.  So, one of the -- I made a

5   change.

6           MR. KUO:  The instructions or the verdict form?

7           THE COURT:  No, the damages instruction.

8           I made a change to the damages instruction that's

9   entitled, "Damages Claims 1, 2, 3, and 4," to take out some

10  language at the beginning.  I essentially adopted the

11  plaintiff's proposal on that.  And I don't know whether the

12  defendant had any objection to me changing any of that or

13  what.

14          It's on your screen there.  It's on Page 24.

15          MR. KUO:  I'm sorry.

16          THE COURT:  I'm sorry, whether the defendant has any

17  objection to that change.

18          I did the change you want.  So, presumably, you don't

19  have an objection to it.

20          MR. KUO:  No, I don't have an objection.  I was just

21  going to explain the reasoning.  It's kind of because we don't

22  even get to that --

23          THE COURT:  Yeah, go ahead.

24          MR. KUO:  -- unless we've proven -- all the predicate

25  that we took out is in the earlier instruction where if we

1    prove what we did, then you consider damages.

2            THE COURT:  So, do you have any objection to that

3    change, Mr. Becker?

4            MR. BECKER:  I'd have to go back, but as long as what

5    Mr. Kuo is saying --

6            THE COURT:  Well, I --

7            MR. BECKER:  -- is correct, then I --

8            THE COURT:  I need to know -- I can't have an if --

9    on the if-come objections.

10           MR. JANSKI:  I don't believe it specifically says

11   ILTACO sustained an injury in the previous instructions.  But

12   it would be up to Mr. Becker --

13           MR. BECKER:  I think --

14           MR. JANSKI:  -- whether or not that's --

15           MR. BECKER:  I have to go back and look at that

16   previous instruction.

17           THE COURT:  So, 1, 2 and 4.

18           That element is not in the instruction for Claim 1 or

19   2.  It just says "used in a manner likely to cause confusion."

20   It is used in the instruction for Claim 4, caused harm or

21   likely to cause harm.

22           MR. KUO:  That's not the part I was referring to.

23           THE COURT:  I guess what I was --

24           MR. BECKER:  I see it, your Honor.  We don't object

25   to the change.

647

1              THE COURT:  Okay.  Fine.  There we go.

2              And, then, we get to the verdict form.  I'm hoping

3    you looked at the revised version that I gave you.  I

4    apologize for not giving you a "Changes Accepted" version.

5              By the way, there was also a reference to ten jurors,

6    which comes from the case that I cut and pasted this from, but

7    I fixed that.

8              So, what I did on the verdict form was I --

9    consistent with the discussion we had yesterday, I took out

10   the claim-specific damages numbers, which I think both sides

11   were actually suggesting, and I put in -- this was a proposal

12   by the plaintiff, I think.  I put in for each claim a little

13   sort of shorthand title.

14             And, so, for each one, it just says "find in favor of

15   ILTACO," "find in favor of El-Greg"; "if you found for ILTACO,

16   please answer the next question," and the question is, "Did

17   you find the infringement willful?"  That's in there for the

18   three -- for Claims 1 -- actually, for the first four.

19             And, then, I did not yet -- and, so, then there's a

20   single damages instruction, one for damages, one for profits.

21   And those are -- those obviously relate back to the

22   definitions.  And, then, a separate damages instruction for

23   breach of contract.

24             So, I'm going to have a question about that, but we

25   don't need to deal with that just this second.

1               I think I can take out this other sentence here, too.

2               The defendant wanted me to put in a breakdown of the

3     damages number, and I thought the reason that you gave me was

4     the reason you were going to give me, but I wanted to hear you

5     say it, I guess.

6               MR. BECKER:  Yes.

7               THE COURT:  You basically proposed to break it down,

8     whole period and then like July through December.

9               MR. BECKER:  Right.

10               THE COURT:  And, so, that, I take it, is to have a

11     fallback number if I make a determination that the laches

12     defense is valid?

13               MR. BECKER:  That was the reason for it.

14               THE COURT:  Okay.

15               And, so, you'd need to have the defendant's version.

16     So, what it says -- so, when you get to the section for

17     damages here, it said, "State the amount of damages to be

18     awarded for the following time period."  So, the first one

19     says July, 2010, to December 31, 2016; and, the second one is

20     essentially a subset.  It says May 19th, December -- or 2016

21     to December 31 of 2016.

22               And I will tell you if I was going to do that, I

23     would explain to the jury as I'm explaining the verdict form

24     that the second one is essentially a subset of the first and

25     it's for a purpose that I'm not -- it's really not a matter

1    that you have to worry about; it's for my purposes.

2         So, what's your position on that?

3         MR. KUO:  I think it's confusing, I think,

4    notwithstanding the fact that you would, you know, give them

5    additional instructions.

6         THE COURT:  So, then, my question is going to be --

7         MR. KUO:  How do we deal with it?

8         THE COURT:  -- what do I do then?

9         MR. KUO:  Yeah.

10        THE COURT:  This at least gives me something -- and I

11   have no opinion as I sit here on the laches defense.

12        What am I going to do?

13        MR. KUO:  And I recognize, your Honor, that you told

14   us to think about this a few days ago.

15        You know what?  That's reasonable, that approach.

16        THE COURT:  Okay.  And I'll do my best to explain it.

17   So, let me just change that right now.

18      (Brief pause.)

19        THE COURT:  All right.  So, then my only other

20   question -- we're still going to have a little "how to sort it

21   out" issue if damages are awarded on Claims 1 through 4 and

22   also on Claim 5.  We're going to have a potential issue of

23   overlap and duplication.

24        And, I mean, I suppose, in theory, we could say, oh,

25   I can figure out that out later.  I would not be surprised,

1    though, assuming the jury is finding liability -- ends up

2    finding liability on one or more of the first four counts and

3    also on Count 5, I wouldn't be at all surprised that we get a

4    question from them, what about this?

5         So, it would -- if we can figure out an answer to

6    that now and build it in here, it would be great to do that.

7         Does anybody have an answer?

8         MR. BECKER:  I think that you could put in the same

9    language that's used where there's the instruction with

10   respect to lost profits under the Lanham Act that you should

11   not duplicate --

12        THE COURT:  You see there on the screen?

13        MR. BECKER:  You may not --

14        THE COURT:  Yeah, so here's the problem with that.

15   That's easy enough -- I mean, by the way, that's a pretty

16   difficult concept anyway right there.  When you're now

17   applying it to different claims, if we tell them you can't

18   award them on the breach of contract claim any damages that

19   they already awarded on the Lanham Act claim, then it's

20   conceivable they could read that as, okay, then zero, which

21   would be the wrong answer.

22        And, then, if what ends up happening, you know, in

23   later proceedings is that the first four claims drop out and

24   all you're left with, a breach of contract claim, then we

25   don't know what the zero means.  Does it mean they thought the

1   damages were zero, or does it mean they thought the damages

2   were no more than what they already awarded?  So, I don't

3   think that helps.

4           MR. KUO:  I think that -- I understand that you're

5   anticipating that the jury's going to ask the question, but --

6           THE COURT:  So, you're going to propose kick the can

7   down the road?

8           MR. KUO:  That's kind of what I'm doing.

9           THE COURT:  Okay.  I can live with kicking the can

10  down the road.

11          All right.  So, are there other issues people want to

12  raise on the instructions?

13          MR. KUO:  Well, we have just one super-minor one.

14          THE COURT:  Go ahead.

15          MR. KUO:  On --

16          THE COURT:  Give me a page number.

17          MR. KUO:  34.  If it's still 34.

18          THE COURT:  Is it the verdict form?

19          MR. KUO:  Yeah.

20          THE COURT:  Yeah.

21          MR. KUO:  In the section with Claims 1, 2, 3, and

22  4 --

23          THE COURT:  Yes.

24          MR. KUO:  -- I talked to them -- well, whispered to

25  them -- if we could change where it says "one or more of

652

 1    Claims 1, 2, 3, or 4" as opposed to "and"?

 2              THE COURT:  Sure.  That's fine.

 3              MR. JANSKI:  And, then, your Honor, if you scroll up

 4    to the top of the Page 4, the verdict form --

 5              THE COURT:  Yeah.

 6              MR. BECKER:  The very first page, sorry.

 7              THE COURT:  Very first page.  Okay.

 8              MR. JANSKI:  -- I believe there should be a close

 9    parens after the quotation marks.

10              THE COURT:  Oops.

11              MR. KUO:  That's correct.

12              THE COURT:  Double paren.  Got it.

13              MR. JANSKI:  And, then, it may be helpful if you do a

14    clean version, just to make sure --

15              THE COURT:  I'm going to --

16              MR. JANSKI:  I wasn't sure if you were going to do

17    that.

18              THE COURT:  Are there any other changes that anybody

19    is proposing?

20              MR. JANSKI:  I don't think so.  I think there was

21    some formatting changes.

22              THE COURT:  Yeah, there's going to be.  So, let me

23    now -- actually, before I do that, I'm going to save it as a

24    different -- call it "final final" --

25              MR. KUO:  Final 2.

```
 1              THE COURT:  -- and then accept all the changes and
 2    see what it looks like.
 3              MR. JANSKI:  See that "do" comes up there?
 4              THE COURT:  Yeah, you're right.
 5         (Brief pause.)
 6              THE COURT:  So, let me just go through and make sure
 7    we don't have any blank pages anywhere.  And we do.
 8         (Brief pause.)
 9              THE COURT:  And since it was a jury of ten before, I
10    just realized we're short two signature lines.
11              MR. KUO:  We actually had that in our --
12              THE COURT:  Oh, you had it?  Then I probably just
13    didn't notice it.
14              All right.  So, I'm going to -- so, now are we all in
15    shape on the exhibits?  Have you got your thumb drives all --
16    are there any issues I have to deal with?
17              MR. JANSKI:  One remaining issue, unfortunately.
18              THE COURT:  Okay.
19              MR. JANSKI:  Plaintiff's intending to admit
20    Plaintiff's Exhibit 36.  My understanding is that wasn't used
21    anywhere in the testimony or with any other witness.  The
22    contents of Plaintiff's Exhibit 36 was actually tagged onto
23    Plaintiff's Exhibit 31, which was --
24              THE COURT:  What is Plaintiff's Exhibit 36?
25              MR. JANSKI:  It's a --
```

```
 1              THE COURT:  Does somebody have it?

 2              MR. JANSKI:  -- product list.  I can get it.

 3              MR. KUO:  It's a brochure that had Pizza Puffs in a

 4   bunch of different flavors and it said "More Puffs" and then

 5   had some other flavors.

 6              THE COURT:  Okay.

 7              And you are saying it wasn't admitted?

 8              MR. JANSKI:  36 was not.  31 was used, which was the

 9   exact same thing.  So, my preference --

10              THE COURT:  The question is whether it goes in twice,

11   basically?

12              MR. JANSKI:  Right.

13              My objection --

14              THE COURT:  Is there a reason --

15              MR. JANSKI:  -- is that it would not go in twice.

16              MR. KUO:  It was used.  I used 36 and Mr. Geekie used

17   31.  I didn't realize the difference.

18              The only concern I would have about not putting it in

19   twice --

20              THE COURT:  Is if somebody took notes.  Yeah.

21              MR. KUO:  Exactly.

22              THE COURT:  It's going to go in.  I don't think it's

23   prejudicial.  If people have taken notes, somebody might say,

24   where's 36?  And, by the way, I have had that happen.

25              MR. JANSKI:  Okay.  Thank you, your Honor.
```

655

1          THE COURT:  So, we're all good.  So, these are

2     printing out right now.

3          So, you've got about ten minutes and then we're going

4     to get going.  Remember, I read the instructions first.

5          MR. BECKER:  Your Honor, what is your policy

6     regarding using the instructions during closing argument?

7          THE COURT:  That's why I give them before.  That's

8     why I give them before the instructions.  Please use them.  I

9     never understood why you couldn't do that.

10          MR. BECKER:  And they can be displayed to the jury?

11          THE COURT:  Absolutely.  And they'll have them all in

12     their hands.

13          MR. GEEKIE:  Reserving rebuttal time, your Honor?  Do

14     you --

15          THE COURT:  You tell me how much.

16          MR. GEEKIE:  Ten minutes or if I happen to get done

17     -- do I get the bonus -- if I finish early, I can --

18          THE COURT:  I'll tell you you used 30, et cetera.

19          MR. GEEKIE:  Thank you, Judge.

20      (Brief recess.)

21

22

23

24

25

Jury Charge

656

1       THE COURT:  All rise.

2    (Jury enters courtroom.)

3       THE COURT:  So everybody have a seat, and let me just

4  get my computer arranged so that I can also display the

5  instructions as I'm reading them and can talk in a microphone.

6       So first of all, I'm going to apologize not

7  necessarily so much to you as to the extra trees that have to

8  be knocked down because we printed these on one side.  The

9  weird thing about our printer is it literally takes four times

10  as long, four times as long, to print on two sides than it

11  does on one.  I don't understand that math, but that's how it

12  works.

13       So you're going to be able to see the instructions

14  and also read them, so please feel free to follow along in

15  whichever manner you want.

16                            JURY CHARGE

17       THE COURT:  Members of the jury, you have seen and

18  heard all the evidence and you're about to hear the arguments

19  of the attorneys.  Now I will instruct you on the law.

20       You have two duties as a jury.  Your first duty is to

21  decide the facts from the evidence in the case.  This is your

22  job and yours alone.

23       Your second duty is to apply the law that I give you

24  to the facts.  You must follow these instructions, even if you

25  disagree with them.

Jury Charge

1       Each of the instructions is important, and you must

2  follow all of them.  You must also continue to follow the

3  instructions that I gave you at the start of the trial, that

4  you may not communicate about the case or about people

5  involved in the case with anyone other than your fellow jurors

6  until after you've returned your verdict.

7       Perform these duties fairly and impartially.  Each

8  party to the case is entitled to the same fair consideration.

9  Do not allow sympathy, prejudice, fear or public opinion to

10  influence you.  You should not be influenced by any person's

11  national origin, race, color, age or sex.

12       Nothing I'm saying now and nothing I said or did

13  during the trial is meant to indicate any opinion on my part

14  about what the facts are or about what your verdict should be.

15       The evidence consists of the testimony and the

16  exhibits.  In determining whether any fact has been proved,

17  you should consider all of the evidence bearing on that fact,

18  regardless of who offered the evidence.

19       You must make your decision based on what you recall

20  of the evidence.  You will not have a written transcript of

21  the testimony to consult.

22       Certain things are not evidence.  I'll list them for

23  you.

24       First, if I told you to disregard any testimony or

25  exhibits or struck any testimony or exhibits from the record,

Jury Charge

658

1    such testimony or exhibits are not evidence and must not be

2    considered.

3         Second, anything that you may have seen or heard

4    outside the courtroom is not evidence and must be entirely

5    disregarded.  This includes any press, radio, Internet or

6    television reports you may have seen or heard.  Such reports

7    are not evidence, and your verdict must not be influenced in

8    any way by such publicity.

9         Third, questions and objections or comments by the

10   lawyers are not evidence.  Lawyers have a duty to object when

11   they believe a question is improper.  You should not be

12   influenced by any objection, and you should not infer from my

13   rulings that I have any view as to how you should decide the

14   case.

15        Fourth, the lawyers' opening statements and closing

16   arguments to you are not evidence.  Their purpose is to

17   discuss the issues and the evidence.  If the evidence as you

18   remember it differs from what the lawyers said, your memory is

19   what counts.

20        Any notes you've taken during the trial are only aids

21   to your memory.  The notes are not evidence.  If you've not

22   taken notes, you should rely on your independent recollection

23   of the evidence and not be unduly influenced by the notes of

24   other jurors.  Notes are not entitled to any greater weight

25   than the memory -- than the recollections or impressions of

Jury Charge

659

1    each juror about the testimony.

2         You should use common sense in weighing the evidence

3    and consider the evidence in light of your own observations in

4    life.  In our lives we sometimes look at one fact and conclude

5    from it that another fact exists.  In law we call this an

6    inference.  A jury is allowed to make reasonable inferences so

7    long as they're based on the evidence in the case.

8         You may have heard the phrases "direct evidence" and

9    "circumstantial evidence."  Direct evidence is proof that does

10   not require an inference, such as the testimony of someone who

11   claims to have personal knowledge of a fact.

12        Circumstantial evidence is proof of a fact or a

13   series of facts that tends to show that some other fact is

14   true.  You're to consider both direct and circumstantial

15   evidence.  The law allows you to give equal weight to both

16   types of evidence, but it is up to you to decide how much

17   weight to give to any evidence in the case.

18        You must decide whether the testimony of each of the

19   witnesses is truthful and accurate in part, in whole, or not

20   at all.  You also must decide what weight, if any, you give to

21   the testimony of each witness.  In evaluating the testimony of

22   any witness, including any party to the case, you may consider

23   among other things:

24        The ability and opportunity the witness had to see,

25   hear or know the things that the witness testified about;

Jury Charge

660

 1              The witness's memory;

 2              Any interest, bias or prejudice the witness may have;

 3              The witness's intelligence;

 4              The manner of the witness while testifying;

 5              The reasonableness of the witness's testimony in

 6    light of all the evidence in the case;

 7              And any inconsistent statements or conduct by the

 8    witness.

 9              It's proper for an attorney to meet with any witness

10    in preparation for trial.

11              You've heard witnesses who gave opinions about

12    certain subjects, including likelihood of confusion, family of

13    marks and damages.  You do not have to accept the testimony of

14    such a witness.  You should judge it in the same way you judge

15    the testimony of any other witness.  In considering how much

16    weight to give to this testimony, you should consider each

17    such witness's qualifications, how the witness reached his --

18    it should say his or her opinions, and the factors I have

19    described for determining the believability of testimony.

20              The law does not require any party to call as a

21    witness every person who might have knowledge of the facts

22    related to this trial.  Similarly, the law does not require

23    any party to present as exhibits all papers and things

24    mentioned during this trial.

25              You may find the testimony of one witness or a few

1   witnesses to be more persuasive than the testimony of a larger

2   number of witnesses.  You need not accept the testimony of the

3   larger number of witnesses.

4           The plaintiff in this case is Illinois Tamale

5   Company, and I'll refer to it as ILTACO.  The defendant in

6   this case is El-Greg, Inc., and I'll refer to it as El-Greg.

7           In this case ILTACO is asserting several claims

8   against El-Greg.  These include claims for trademark

9   infringement, trade dress infringement, false designation of

10  origin, unfair competition and deceptive trade practices, and

11  breach of contract.

12          So, by the way, those titles don't necessarily

13  correspond to what you're going to see later on the claims.

14  The claims that are asserted you're going to see later are

15  identified as Claim 1, Claim 2, Claim 3, so that's what you

16  should go by.

17          The purpose of trademark law is to prevent confusion

18  among consumers about the source of products and to permit

19  trademark owners to show ownership of their products and

20  control their product's reputation.

21          ILTACO has a registered trademark for the term "Pizza

22  Puffs."  In this lawsuit, ILTACO contends:

23          First, that El-Greg's use of the term "Pizza Pies™

24  (Puffs)" on its products is confusingly similar to ILTACO's

25  trademark.

1          Second, ILTACO contends that El-Greg's product label

2   is confusingly similar to ILTACO's product label.

3          Third, ILTACO contends it has the right to a family

4   of trademarks using the word "Puff" for food products and that

5   El-Greg's use of the term "Pizza Pies™ (Puffs)," "Veggie

6   Puffs," "Chili Cheese Puffs" and "Deluxe Beef Puffs" is likely

7   to confuse consumers about the source of the products.

8          El-Greg denies ILTACO's claims.  El-Greg contends

9   that its label and use of the term "Pizza Pies™ (Puffs)" does

10  not infringe ILTACO's trademark.  El-Greg also contends that

11  its product label is not confusingly similar to ILTACO's

12  product label.  El-Greg denies that ILTACO has enforceable

13  rights to a family of trademarks using the word "Puff" or

14  "Puffs."

15         In these instructions, I'll use the term

16  "preponderance of the evidence."  When I say that a party has

17  to prove a proposition by a preponderance of the evidence, I

18  mean that the party must prove that the particular proposition

19  is more likely true than not true.

20         Claim 1.  ILTACO claims that El-Greg infringed

21  ILTACO's trademark for the term "Pizza Puffs."  A trademark is

22  a word or combination of words used by a company to identify

23  its product, distinguish its products from those made or sold

24  by others, and indicate the source of the product.

25         To succeed on this claim, ILTACO must prove each of

Jury Charge

663

1    the following propositions by a preponderance of the evidence:

2              No. 1, ILTACO owns "Pizza Puffs" as a trademark.

3              No. 2, El-Greg used the term "Pizza Pies™ (Puffs)" in

4    interstate commerce.  This proposition is not disputed.

5              No. 3, El-Greg used the term "Pizza Pies™ (Puffs)" in

6    a manner that is likely to cause confusion regarding the

7    source, origin, sponsorship, or approval of El-Greg's product.

8              If you find that ILTACO has proven each of the three

9    propositions that it's required to prove on this claim, then

10   you must consider El-Greg's defense of fair use.  This defense

11   is based on the principle that no one should be able to

12   appropriate descriptive language through trademark

13   registration.

14             To succeed on this defense, El-Greg must prove each

15   of the following propositions by a preponderance of the

16   evidence:

17             No. 1, El-Greg used the phrase "Pizza Pies™ (Puffs)"

18   in a way other than to indicate the source of its product;

19             No. 2, El-Greg's use of the phrase "Pizza Pies™

20   (Puffs)" accurately describes its product;

21             And No. 3, El-Greg used the phrase "Pizza Pies™

22   (Puffs)" in good faith and only to describe its product.

23             Claim 2.  ILTACO claims that El-Greg infringed

24   ILTACO's trade dress.  A trade dress is a type of trademark

25   used by a company to identify its product, to distinguish its

Jury Charge

664

1    product from those manufactured or sold by others, and to

2    indicate the source of its product.

3          The term "trade dress" as used in this case refers to

4    the total image of a product packaging or product label.  It

5    includes features such as size, shape, color or color

6    combination and/or graphics.

7          To succeed on this claim, ILTACO must prove each of

8    the following propositions by a preponderance of the evidence:

9          No. 1, ILTACO's product label is a valid trade dress.

10   A valid trade dress includes packaging that is distinctive,

11   meaning that the packaging is capable of distinguishing

12   ILTACO's product from the product of others.  A trade dress is

13   valid if it is inherently distinctive or if it has acquired

14   distinctiveness.  I'll explain these terms to you in a moment.

15         No. 2, El-Greg used its product label in interstate

16   commerce.  This proposition is not disputed.

17         And, No. 3, El-Greg used its product label in a

18   manner likely to cause confusion regarding the source,

19   affiliation, association, or approval of its products with

20   ILTACO.

21         El-Greg has raised the defense of fair use.

22         This concerns Claim 2 as the title there says.

23         To succeed on this defense, El-Greg must prove each

24   of the following propositions by a preponderance of the

25   evidence:

1    No. 1, El-Greg used its product label in a way other

2    than to indicate the source of its product;

3    No. 2, El-Greg's use of its product label was merely

4    descriptive of its product;

5    And, No. 3, El-Greg used its product label in good

6    faith and only to describe its product.

7    This still concerns Claim 2.  It's a definition.

8    For purposes of this case, a valid trade dress is

9    product packaging that is distinctive, which means that the

10   packaging and overall presentation of the product is capable

11   of distinguishing ILTACO's products from the products of

12   others.  ILTACO's trade dress is valid if it is inherently

13   distinctive or if it has acquired distinctiveness.

14   A trade dress is inherently distinctive if purchasers

15   would almost automatically recognize it as identifying a

16   particular brand or source of the product.  You should

17   consider the packaging as a whole.

18   To show that its trade dress has acquired

19   distinctiveness, ILTACO must prove both of the following

20   propositions:

21   No. 1, a substantial portion of the purchasing public

22   identifies ILTACO's packaging with a particular source whether

23   or not purchasers know who or what the source is;

24   And, No. 2, ILTACO's trade dress acquired

25   distinctiveness before El-Greg first began using the claimed

1     trade dress.

2          Next is Claim 3.

3          ILTACO also contends that it has trademark rights in

4     a family of trademarks based on the term "Puff" or "Puffs" and

5     that El-Greg infringed ILTACO's rights by selling products

6     called Spinach Puffs, Chili Cheese Puffs, Deluxe Beef Puff,

7     and Veggie Pizza Puffs, as well as Pizza Pie™ (Puff).

8          To succeed on this claim, ILTACO must prove each of

9     the following propositions by a preponderance of the evidence:

10         No. 1, ILTACO owns a family of trademarks based on

11    the term "Puff" or "Puffs."

12         No. 2, ILTACO owned the family of marks before

13    El-Greg began using the products using the term "Puff" or

14    "Puffs";

15         And, No. 3, El-Greg used the term "Puff" or "Puffs"

16    in a manner that is likely to cause confusion regarding the

17    source, origin, sponsorship or approval of El-Greg's products.

18         So the next is a definition of family of trademarks.

19         A family of trademarks is a group of trademarks

20    having a recognizable common characteristic in which the

21    trademarks are composed and used in such a way that the public

22    associates not only the individual marks but also the common

23    characteristics of the family with the trademark owner.  A

24    descriptive term, in other words, a term that conveys an

25    immediate idea of the ingredients, qualities or

1   characteristics of goods, can serve as a family name only

2   if -- there should be a little space in there, sorry about

3   that -- only if ILTACO -- well, that didn't work -- only if

4   ILTACO proves by a preponderance of the evidence that the term

5   has acquired distinctiveness; in other words, that it

6   indicates that the goods have a common origin.  ILTACO must

7   show that an appropriate segment of the public identifies this

8   term with ILTACO.

9           Next instruction still concerns Claim 3.

10          If you find that ILTACO has proven each of the three

11  propositions that it's required to prove on this claim, then

12  you must consider El-Greg's defense of fair use.  To succeed

13  on this defense, El-Greg must prove each of the following

14  propositions by a preponderance of the evidence:

15          No. 1, El-Greg used the word "Puff" in product names

16  in a way other than to indicate the source of its product;

17          No. 2, El-Greg's use of the word "Puff" accurately

18  describes its product;

19          And, No. 3, El-Greg used the word "Puff" in good

20  faith and only to describe its product.

21          This definition applies to all of the first three

22  claims.

23          On each of the claims that I've described so far, one

24  of the things that ILTACO must prove is that El-Greg used the

25  term or a label in a manner that's likely to cause confusion

1    as to the source, origin, sponsorship, or affiliation of

2    El-Greg's products.  ILTACO must prove a likelihood of

3    confusion among a significant number of people who buy or use

4    or consider buying or using the product or similar products.

5           In deciding the issues, you should consider the

6    following factors:

7           Any similarity between the trademarks or trade

8    dresses in appearance and suggestion;

9           Any similarity of the products;

10          Any similarity in how, where, and to whom the

11   products are promoted or sold;

12          The degree of care likely to be exercised by

13   purchasers;

14          The strength of ILTACO's trademark or trade dress;

15          Any actual confusion and any intent on the part of

16   El-Greg to palm off its products as those of ILTACO.

17          The weight to be given to each of these factors is up

18   to you to determine.  No particular factor or number of

19   factors is required to prove likelihood of confusion.

20          Next is Claim 4.  ILTACO contends that El-Greg's use

21   of the slogan "Makers of the Original Puffs" constitutes false

22   advertising.  In order to prevail on this claim, ILTACO must

23   prove each of the following propositions by a preponderance of

24   the evidence:

25          No. 1.  El-Greg made a false or misleading statement

Jury Charge

669

1   of fact in a commercial advertisement about the nature,

2   quality or characteristics of its product.  A statement is

3   misleading if it conveys a false impression or actually

4   misleads a purchaser.

5          No. 2.  The statement actually deceived or had the

6   tendency to deceive a substantial segment of El-Greg's

7   audience.

8          No. 3 the deception was likely to influence the

9   purchasing decision of purchasers.

10          No. 4, El-Greg caused the false statement to enter

11   interstate commerce.  This proposition is not disputed.

12          And, No. 5, ILTACO has been or is likely to be

13   injured as a result of the false statement, such as by a

14   diversion of sales from itself to El-Greg or a loss of good

15   will associated with ILTACO's products.

16          Claim 5 is the next one.  ILTACO also contends that

17   El-Greg breached a settlement agreement that they entered into

18   in November 2004 in which, among other things, El-Greg agreed

19   not to use the term "Pizza Puff," -- in quotes, that's how it

20   is in the instruction, in other words -- alone or in

21   combination with other words or design as a trademark, service

22   mark, trade name, trade name component, or other use in

23   marketing or advertising its goods and services or as an

24   identification of its goods or services.

25          That's a mouthful.

1          ILTACO contends that El-Greg breached the terms of

2    the settlement agreement by selling goods with the term "Pizza

3    Pies™ (Puffs)" and through marketing a product as "Veggie

4    Pizza Puffs."  To prevail on this claim, ILTACO must prove

5    each of the following elements by a preponderance of the

6    evidence:

7          No. 1, the existence of a contract between ILTACO and

8    El-Greg;

9          No. 2, performance by ILTACO of its obligations under

10   the contract;

11          No. 3, failure by El-Greg to perform its obligations

12   under the contract;

13          And, No. 4, damages to ILTACO as a result.

14          Propositions 1 and 2 are not disputed.

15          If you decide in favor of ILTACO on one or more of

16   its claims, then you will go on to consider the amount of

17   money to award to ILTACO.  This includes any damages that

18   ILTACO sustained because of El-Greg's conduct, which I'll

19   refer to as damages, as well as on certain of ILTACO's claims

20   any profits that El-Greg made because of its conduct, which I

21   will refer to as profits.  If you decide in favor of El-Greg

22   on all of ILTACO's claims, then you will not consider this

23   issue.

24          So this instruction concerned Claims 1, 2, 3 and 4.

25          If you find that ILTACO has proved Claims 1, 2, 3

1    and/or 4, then you must consider what amount of money, if any,

2    to award to ILTACO as damages.  Damages consist of the amount

3    of money required to compensate ILTACO for the injury caused

4    by El-Greg's infringement or false advertising.  ILTACO must

5    prove its damages by a preponderance of the evidence.  You may

6    consider the following type of damages:

7         ILTACO's lost profits on lost sales, which consist of

8    the revenue that ILTACO would have earned but for El-Greg's

9    infringement or false advertising, less the expenses that

10   ILTACO would have incurred to earn those revenues.

11        If you find in favor of ILTACO on Claim 5 -- that's

12   the breach of contract claim -- to calculate damages, you

13   should determine the sum of money that will put ILTACO in as

14   good a position -- oops, see what I was reading there -- see,

15   now, my secret is out, okay?

16        I confess I was looking at CNN during part of the

17   questioning.  I apologize.

18     (Laughter.)

19        THE COURT:  If you find -- I don't know why that

20   switched over like that.  Apparently the gremlins were trying

21   to out me, I think is what it was.

22        If you find in favor of ILTACO on Claim 5, to

23   calculate damages you should determine the sum of money that

24   will put ILTACO in as good a position as it would have been in

25   if El-Greg had performed its obligations under the contract.

1         Next is profits.  If ILTACO prevails on Claim 1,

2 Claim 2, Claim 3 and/or Claim 4, it may also recover, in

3 addition to damages, the profits that El-Greg gained from the

4 trademark infringement, which is Claim 1 and Claim 3, trade

5 dress infringement, which is Claim 2, and/or false

6 advertising, which is Claim 4.

7         You may not, however, include in any award of profits

8 any amount that you took into account in determining ILTACO's

9 actual damages on these claims.  Profit is determined by

10 deducting expenses from gross revenue.  Gross revenue is all

11 the money El-Greg received due to the conduct for which you

12 found it liable.

13         ILTACO is required only to prove El-Greg's gross

14 revenue by a preponderance of the evidence.  El-Greg is

15 required to prove by a preponderance of the evidence any

16 expenses that it argues should be deducted in determining its

17 products.

18         ILTACO is entitled to recover El-Greg's total profits

19 from its use of the trademark, use of the trade dress and/or

20 false advertising unless El-Greg proves that a portion of the

21 product is due to other factors.

22         If you find that El-Greg infringed ILTACO's

23 trademark, infringed ILTACO's trade dress, and/or engaged in

24 false advertising, you'll also have to determine whether

25 ILTACO has proven by a preponderance of the evidence that at

Jury Charge

673

1    the time El-Greg acted willfully.

2            El-Greg acted willfully if it knew that it was

3    infringing ILTACO's trademark, knew it was infringing ILTACO's

4    trade dress, knew that the advertising was false or

5    misleading, or if it acted with indifference to ILTACO's

6    trademark rights, acted with indifference to ILTACO's trade

7    dress rights, acted with indifference to whether its

8    advertising was false or misleading.

9            Once you're all in the jury room, the first thing you

10   should do is choose a presiding juror.  The presiding juror

11   should see to it that your discussions are carried on in an

12   organized way and that everybody has a fair chance to be

13   heard.  You may discuss the case only when all jurors are

14   present.

15           Once you start deliberating, do not communicate about

16   the case or your deliberations with anyone except other

17   members of your jury.  You may not communicate with others

18   about the case or your deliberations by any means.

19           This includes oral or written communication, as well

20   as any electronic method of communication, such as by using a

21   telephone, cell phone, smartphone, iPhone, Android,

22   BlackBerry, or any type of computer; by using text messaging,

23   instant messaging, the Internet, chat rooms, blogs, websites

24   or social media, including services like Facebook, LinkedIn,

25   Google+, YouTube, Twitter, Instagram, or Snapchat, or by using

1    any other method of communication.

2           If you need to communicate with me while you're

3    deliberating, send a note through the Court Security Officer.

4    The note should be signed by the presiding juror or by one or

5    more members of the jury.  To have a complete record of this

6    trial, it's important that you not communicate with me except

7    by a written note.

8           I may have to talk to the lawyers about your message,

9    so it may take me some time to get back to you.  You may

10   continue your deliberations while you wait for my answer.  If

11   you send me a message, do not include the breakdown of your

12   votes; in other words, do not tell me that you're split 6 to 6

13   or 8 to 4, or whatever your vote happens to be.

14          A verdict form is being -- has been prepared for you,

15   and you'll take this form with you to the jury room.

16          Flip ahead two pages.  You're going to see something,

17   it's about three or four pages long.  It looks like this.

18   Now, it looks complicated, but it's not all that complicated.

19   It basically says, "We, the jury, find as follows on the

20   claims of ILTACO against El-Greg," and there's a heading for

21   each claim that corresponds to the instructions about the

22   claim.

23          So for each claim it says, "We find in favor of," and

24   you check one.  You check in favor of ILTACO if you find in

25   favor of ILTACO on that claim.  You check El-Greg if you find

1    in favor of El-Greg on that claim, and then for the first

2    four, there's another question.

3         It says so if it says if you found for ILTACO, answer

4    the following question, and for 1 through 4 there's a question

5    which you just answer yes or no.

6         So that's 1 through 4.

7         Then at the end of 1 through 4, yeah, there's a

8    damages instruction. So it says, "If you found for ILTACO on

9    one or more claims of 1, 2, 3, or 4, please proceed to answer

10   the following questions."

11        The first one is: "State the amount of damages,"

12   remember I used the term "damages" and the term "profits," so

13   those are two different things so you'll refer back to the

14   instructions for that. So the first is the amount of damages,

15   if any, that are to be awarded to ILTACO. The second is the

16   amount of profits, El-Greg's profits that are to be awarded to

17   ILTACO, and I want to explain this little breakdown for you.

18        So it says for two time periods. If you look at it,

19   you'll see that the first one goes from July 2010 to the end

20   of December 2016, and the next one is a subset. It's not a

21   different period, it's a subset. It's May 19th to December

22   31st of 2016. That's for my purposes for a separate issue

23   that I have to deal with after you return your verdict, and

24   that's just there to kind of to help me, but it's important

25   for you to understand that it's not two different periods.

1    One's a subset of the other, but I need that second figure if

2    you decide to award damages.

3         So then we go on to Claim 5.  We find in favor of,

4    check 1, just like the other ones.  And then it says, "If you

5    found for ILTACO, state the amount of damages that are to be

6    awarded to ILTACO," and then there's a place for everybody to

7    sign.

8         So if you go back to Page 29.  When you've reached

9    unanimous agreement, your presiding juror will fill in and

10   date the verdict form, and each of you will sign it.

11        Advise the Court Security Officer once you reached a

12   verdict, and when you come back to the courtroom, I will read

13   the verdict out loud.

14        So I'm going to take these off the screen, and we're

15   going to go right into the closing arguments.  And as I told

16   you as we were walking out here, we're essentially just going

17   to plow right through.

18        I've given the lawyers time limits.  You're going to

19   hear me saying "you've used up X," "you've used up Y."  The

20   way it goes is that because the plaintiff has the burden of

21   proof on its claims, there's something the defendant has the

22   burden of proof on.  The plaintiff goes first and last.

23   There's an opening argument, then the defendant argues, then

24   there's a rebuttal.

25        So Mr. Geekie, you've got the computer, and you have

closing - plaintiff

1    the floor.

2           Go ahead.

3           CLOSING ARGUMENT ON BEHALF OF THE PLAINTIFF

4           MR. GEEKIE:  Thank you, Judge.

5           Good morning, and thank you very much for your

6    attention and participation in this case.  The whole trial

7    team and the Shabaz family thanks you for your efforts here.

8           I know you're tired of seeing these boards.  Like me,

9    you're probably seeing them in your dreams, and I want to show

10   them to you and put them up because -- and I know I may be

11   belaboring this, but this is the whole case right here, these

12   two labels.  And it's your duty to decide if this label

13   infringed on that and if this label was a breach of the

14   contract.

15          Now, there's some other claims, too.  But those two

16   labels, they're the most important part of this case.

17          Before I discuss all the evidence, I'd like to cover

18   a few other things.  The -- the one thing you should think

19   about when you're deliberating is the credibility of the

20   witnesses that you saw here, and that's very important.

21          You heard from Warren Shabaz and his son Adam, very

22   credible, forthright people.  And then you heard from the

23   Lerenos, Greg and Maria, and I don't think either one of them

24   was especially honest with any of us, and, in fact, Maria was

25   caught telling several non-truths here.

closing - plaintiff

678

1      She, for example, we all have heard it, she said she

2   produced all of the product-by-product -- or she didn't keep

3   product-by-product information regarding the cost of goods

4   sold to Restaurant Depot.  And you just saw the instructions.

5   That's a critical, critical piece of information here because

6   El-Greg has the burden of coming forward and proving what

7   their costs were.

8      The data that would prove the cost Ms. Marino --

9   Lereno said didn't exist.  And so their expert, Lindsey

10  Fisher, used estimates, used data unrelated to these products.

11  That's a burden that El-Greg has to prove, and El-Greg failed

12  to come forward with the evidence that would have shown what

13  the actual costs were.

14      You heard Ms. Lereno say didn't have it, didn't keep

15  it, and then when I questioned her further, because Mr. Becker

16  asked her about it, she said that data doesn't exist.  But

17  when I questioned her more thoroughly, she said I do have it.

18  I have it on Excel spreadsheets.  And her language was not

19  that I had it and threw it away, she said I have it.  Of

20  course, I have it.

21      So weigh the credibility of the Shabaz family versus

22  the Lereno family and their testimony here when you

23  deliberate.

24      Now, I'm going to jump around a little bit.  I don't

25  have a whole lot of time, so I'm going to try and hit right

closing - plaintiff

679

1  now some of the more important highlights and then go through

2  some of the instructions.  But, first, as you recall from the

3  instructions you just saw, the -- there's going to be

4  questions that you're going to have to discuss and answer to

5  yourselves on defenses that were raised by El-Greg here.  One

6  of the defenses is fair use, and fair use --

7         Sara, could you pull up the contract.

8         Fair use means that El-Greg, in terms of whether they

9  infringed on the Pizza Puffs trademark, Pizza Puffs trademark,

10 whether they were fair in their use.

11        Well, we have the contract, the settlement agreement.

12        And if you could expand Paragraph 2, Sara.

13        Way back in 2004, El-Greg, Greg Lereno signed this

14 and Maria Lereno knew about this agreement.  They said that

15 they recognized the trademark, they recognized the Pizza Puffs

16 trademark, and they agreed to never use Pizza Puffs again in

17 any combination.

18        Well, I propose to you that they broke their

19 agreement.  They knew what their restrictions were.  It's

20 written right there.  They had a lawsuit against El-Greg

21 dismissed by ILTACO based on that promise, and they broke that

22 promise.

23        So not only did they breach the contract, they didn't

24 act in good faith.  They didn't fairly use the term Pizza

25 Pies™ (Puffs), okay?

closing - plaintiff

1    They also didn't fairly use the term "Puffs" when

2    they started claiming they were makers of the original Puffs.

3    But keep in mind as you deliberate whether or not

4    El-Greg has a defense of fair use.  They broke the contract.

5    They knew -- they recognized the trademark of Pizza Puffs, and

6    they agreed not to use Pizza Puff ever again.

7    Now, Mr. Becker will probably quibble with me over

8    this, and he's going to say, well, we put it in parentheses,

9    we put it after the TM, and we made it distinctive.  This was

10   a description.

11   Now, before we get to descriptiveness, which is

12   another one of their defenses, the settlement agreement is

13   very clear, and because time is limited, I'm going to stop

14   right after this on the settlement agreement.  We've seen it

15   enough.

16   But they said they wouldn't use "Pizza Puffs" in any

17   combination, alone or in combination with other words or

18   designs.  What's a design?  Putting it in parentheses?  They

19   said they wouldn't do that, but they did.  And they said they

20   wouldn't use it in combination with other words.  "Pizza

21   Puffs," and then they tried to use it in combination with

22   "pies."

23   They knew they had a contractual obligation to not do

24   that, and they did it.  So, therefore, when you consider their

25   fair use defense, keep in mind that they broke this contract

closing - plaintiff

681

1   knowing that they weren't supposed to use these words in that

2   manner.

3           Their other claim of descriptiveness.  Well, is it

4   really descriptive?  Could you pull up the email, please.

5           What exhibit is this?

6           MS. WARREN:  58.

7           MR. GEEKIE:  58, okay.

8           Here's the email to Prairie State that Ms. Lereno

9   sent.  This is her first email saying what she needs in that

10  agreement.

11          Can you expand it?

12          And in that email, does she say anywhere let's have a

13  description?  I need descriptiveness.  No.  What does she do?

14  She basically says copy Pizza Puffs' label.  That's what she

15  says.  Look at that email, and she pretty much just says copy

16  it.  Everything that's in there is what's already on Pizza

17  Puffs' label.

18          And you heard the undisputed evidence that for many,

19  many months, Pizza Puffs' label had been in Restaurant Depot.

20  El-Greg knew it.  El-Greg saw it.  And while Pizza Puffs'

21  label was out there and Pizza Puffs' sales were going up,

22  El-Greg's sales were going down.  Why?  You saw the plain

23  white box.  You have a plain white box and, you know, this box

24  with nothing on it versus this box.

25          But El-Greg says, really, Puffs, our use of Puffs was

closing - plaintiff

1   just descriptive.  Well, it's not in Ms. Lereno's email, is

2   it?  It doesn't say let's put some descriptiveness language in

3   there.

4             Excuse me.

5             So next we'll go to the proof that she got back.  So

6   this is the picture, the proof of the first label.

7             Can you expand the top half, please?

8             And we all remember seeing this.  Shocking.  This is

9   some of the most incriminating evidence you'll see.  Her

10  designer has taken their picture and combined it with the

11  Pizza Puffs' label.

12            Now, when pointed out to Ms. Lereno, she admitted, I

13  sent the Pizza Puffs label, and she sent it to be copied.

14  There was a jury question that said what other labels did you

15  send?  She claims she sent other labels.  She couldn't

16  remember any others.  Why?  Because the only label she sent

17  was the Pizza Puffs label, and obviously from this first

18  proof, she said copy it, and somebody did.

19            So what happens next?  After that, this comes out,

20  this label, and it has the same general appearance.  That's

21  the trade dress claim that I'm going to get to in a little

22  bit, but El-Greg got really cute because they were really

23  smart and they said we've got to use puffs because we've got

24  to compete with this right next to us in Restaurant Depot.

25  These guys are crushing us in sales.

closing - plaintiff

683

1          Well, how do you react?  Do you make a better

2     product?  We all heard that the Pizza Puffs product was better

3     than the El-Greg product.  Fresher ingredients, just overall

4     better quality and a higher price.  The higher price.  Even

5     Ms. Fisher told you, the higher price was outselling the

6     lower-priced product, and their sales were going up and going

7     up substantially.  El-Greg was dying in Restaurant Depot.

8          And Restaurant Depot was their biggest customer.  So

9     how do you solve that problem?  Well, when you're side by side

10    in the freezer case, and you saw the pictures, side by side,

11    what do you do?  You copy.  You're right there, and you hope

12    people when they're coming don't pay attention in the freezer

13    case.

14         We've all done it when we shop at a grocery store and

15    we go in the freezer case.  I can't tell you how many times I

16    do it.  I hate to shop probably because half the time, I reach

17    into the freezer case, it gets fogged up, and I grab the wrong

18    thing.

19         You know, different pizzas are next to each other,

20    different ice creams, and if you're in a hurry and you're not

21    paying attention, you see this and this, you may grab this

22    one.  But it's not descriptive.  If they wanted to describe to

23    the consumer what this product did, they would have said "this

24    puffs up," "puffs when you fry it," because if you read this,

25    does that tell you that it's a description?  Does that tell

closing - plaintiff

684

1    you what it does when it cooks?  Absolutely not.

2          What it does is it mimics the Pizza Puffs box.

3          Now, throughout this case, we've had Mr. Becker

4    asking a lot of questions of witnesses about these two labels,

5    and do you notice that he always talks about up here?  He

6    never talks about down here.  ILTACO said "Makers of the

7    Original Pizza Puffs," and after five or six months of seeing

8    this box, "Makers of the Original Pizza Puffs," El-Greg says,

9    gosh, if we're going to copy, let's go all in.  Let's add

10   "Makers of the Original Puffs."

11         They weren't.  ILTACO had been making Puffs products

12   for 15 or more years before El-Greg was even a twinkle in the

13   eye of Greg Lereno, but suddenly they became Makers of the

14   Original Puffs, and that's a flat-out lie.  There's the maker

15   of the original Puffs, and that's ILTACO.

16         Another issue that will come up in your

17   deliberations, you're going to eventually get to the point, I

18   think, where you're going to have to decide if El-Greg's

19   conduct was willful, and I think the evidence is overwhelming

20   of willfulness.  The settlement agreement and its clear

21   restriction on the use of the term "Pizza Puffs," but they did

22   it, that shows willfulness.

23         The fact that Ms. Lereno took the label, admittedly

24   took the label and sent it to Prairie State to be copied shows

25   willfulness.

1        The fact that they -- when they first had the label

2   come back and it was literally copied, I mean literally

3   copied, they said, no, no, let's do this.  Let's put it in

4   parentheses.  Let's keep it up here in the name.  Let's don't

5   move it down anywhere, keep it up top because that's what

6   people see first and read first, and we want them to think

7   this is a Puffs product.

8        That was willful.

9        Was it willful, "Makers of the Original Puffs," when

10  they copied that?  That shows willfulness.  Everything about

11  El-Greg's label screams willfulness.  It's clear that it's a

12  knock-off label in an attempt to steal business.

13       Now, I just mentioned Mr. Becker focusing on the

14  Pizza Pies™ (Puffs) when he discusses this label and his

15  complete and utter fear of discussing "Makers of the Original

16  Puffs" because there's no excuse for that.  There's no simple

17  explanation, there's no way to say that's descriptive.  That

18  is the obvious rip-off that everybody can figure out.

19       But Mr. Becker, recognizing that the facts and the

20  law here really hurt his client, he's got to come up with

21  distractions for you, get you to focus on things that really

22  aren't at issue.

23       You heard him question witnesses about patents and

24  whether ILTACO had patents on Pizza Puffs.  That's not an

25  issue.  There are no patents on any of these products.  I

closing - plaintiff

686

 1    don't even know if you can get a patent.  We haven't sued on

 2    patents.

 3            So don't be distracted by that.  It's not an issue,

 4    and it's not something that matters.

 5            Similarly, you heard Mr. Becker examine Ms. Lereno

 6    about the retail boxes and how the carrots were behind the --

 7    you know, the food was on the plate and on a cutting board and

 8    the carrots and the tomatoes were behind.  You'll remember the

 9    picture, it was all up above.

10            But you know what?  Those were the retail packages of

11    El-Greg's.

12            Yes, they were in the original 2011 letter that said

13    stop infringing.  They were referenced there.  Why?  Because

14    El-Greg was in the retail business at the time, but it's now

15    2018.  The suit was filed in 2016, and Mr. Becker spent an

16    enormous amount of time asking about those retail boxes and

17    making a big deal that ILTACO did not sue on them, but why?

18    He didn't tell you that El-Greg had gotten out of the retail

19    business five years ago, 2013.  They had gotten out, so there

20    was no reason to sue.  They weren't infringing anymore with

21    their retail packages because they weren't making them

22    anymore.

23            But that's a diversion.  Get you away from the real

24    issues, and that is the label rip-offs.

25            Mr. Becker also tried to divert your attention when

closing - plaintiff

1    he started asking Adam Shabaz about the snack.  Remember the

2    retail pack, he showed a small package, retail package, and on

3    it didn't say stuffed sandwich, it said snack?

4           That's a food category.  It's not meant to signify

5    whether or not it's a sandwich or not, but that's not an issue

6    here.  That's not part of this case.  We're not suing over a

7    retail package.  We're suing over a food service package, what

8    is at Restaurant Depot.

9           So asking Mr. Shabaz about a food -- a retail package

10    that says snack on it, it's another diversion.

11           Beware of the diversions by El-Greg because the real

12    issue is, is the El-Greg label infringing?  Are there breaches

13    of false advertising.  Those are the kinds of issues we face,

14    what's on the label.

15           Now, Claim 1.  Okay, Claim 1.  This is the trademark

16    infringement, and ILTACO owns Pizza Puffs as a trademark.  I

17    don't think that's disputed.  It's in the settlement

18    agreement.  It's up here, okay?  Pizza Puffs is actually a

19    registered trademark.

20           I hope by now everybody understands the difference

21    between a registered and a not registered trademark, but Pizza

22    Puffs is a registered trademark.  It's registered with the

23    Patent & Trademark Office.  You saw the registration,

24    Exhibit 1.

25           Okay.  A registered trademark is when you file for a

closing - plaintiff

1    trademark with the Patent & Trademark Office and you receive

2    it.  There are also unregistered trademarks, like Pizza Pies,

3    okay?  Pizza Pies has been used by El-Greg, and we recognize

4    and admit they have a trademark in that product.  We're not

5    going to try and rip off their product.  We're not going to

6    try and use their name because they have a trademark.  They've

7    used it regularly, and they're entitled to use Pizza Pies,

8    just as we're entitled to use Pizza Puffs, but we registered

9    ours with the Patent & Trademark Office.  They're both,

10   registered or not registered, they're entitled to protection.

11           So, was there trademark infringement?  Well, we have

12   a trademark in Pizza Puffs, and the question comes down to

13   you, and that's No. 3, did El-Greg use the term Pizza Puffs in

14   a manner likely to cause confusion regarding the source of

15   origin, sponsorship or approval of El-Greg's product?

16           This all comes down, as several of the other claims

17   will, as to whether you believe Dr. Maronick or Mr. Block, and

18   you heard both of their testimony yesterday.

19           So Dr. Maronick did a survey, and his survey said

20   that there was a likelihood of confusion by El-Greg's label.

21   I think it's common sense.  We can look at this and see that

22   there would be confusion, but Dr. Maronick did an Internet

23   survey and he sampled people, and there was a statistically

24   high enough number by expert standards to say there's a

25   likelihood of confusion.

1    It doesn't have to be 100 percent confusion, but a

2  significant number is acceptable because that shows that

3  consumers will be confused.  And they may buy the product when

4  they want to buy Pizza Puffs.  They may buy the El-Greg

5  product and say, oh, that's awful, and that was a Puff.  I'll

6  never buy ILTACO brand again.

7    But the survey done by Mr. -- Dr. Maronick said that

8  there is a likelihood of confusion because of the similarity

9  of those labels.  And we heard Mr. Block.  Mr. Block came in,

10  and he had a lot of quibbles with what Dr. Maronick did.

11    And Mr. Block seemed like a nice enough man, but he

12  didn't do what a good expert would do, and that is, he

13  didn't -- all he did was quibble with Dr. Maronick, and he had

14  all these reasons why Dr. Maronick did a bad survey.  But when

15  Mr. Kuo asked him did you do your own survey, he said no.

16    You know, some people say, you know, if you walk the

17  walk, you got to talk the talk or vice-versa, or put up or

18  shut up.  When it came down to it, Mr. Block chose to argue

19  with Dr. Maronick, but he didn't do his own survey that would

20  prove Dr. Maronick wrong.

21    So I would propose to you that Dr. Maronick's survey

22  of likely -- likelihood of causing confusion is unrebutted.

23  There isn't a counter-survey that says, oh, no, there is --

24  there's no likelihood of confusion.

25    Who knows?  Maybe Mr. Block did a survey and threw it

1   out, but he said -- he said I didn't do a survey, and if he

2   had all these problems with what Dr. Maronick did, he could

3   have easily done a survey himself, an Internet survey, but he

4   chose not to.  So we don't know if his quibbles have any

5   effect or if they're valid.  I think you should disregard them

6   because he can't prove their validity.

7            So I think you should render a verdict and I ask you

8   to render a verdict on Claim 1 because of the likelihood of

9   confusion that the label infringed.

10           Now, El-Greg has its first defense to that on the

11  next page, page -- I think it's 14 -- is fair use.  They have

12  the burden of proving fair use, and I think that what really

13  knocks fair use out is the lack of good faith, as you'll see

14  in the instruction.  And I'm not going to belabor this because

15  I've already talked about it, but I don't think there's fair

16  use here.

17           El-Greg knew what it was doing, and the evidence

18  shows that they were doing this as a rip-off.  They weren't

19  fairly using this.  This wasn't a mistake or anything like

20  that.  This wasn't just we made a label and there were a few

21  things that came up the same.  We see the process.  We saw

22  that Ms. Lereno sent ILTACO's label and sent an email that

23  basically said do these things, and then she got back a

24  product that says -- that's a virtual identical label, and

25  they tweaked it a little bit.  They tweaked it by using a

closing - plaintiff

691

1    parentheses and putting Pizza Pies back in.

2            But it's not fair use to break a contract.  It's not

3    fair use to take a label and copy it and just add a

4    parentheses and magically it becomes fair use.

5            Claim 2, trade dress infringement.  The trade dress

6    infringement -- I should say the first one on Claim 1 is Pizza

7    Puffs, and whether it's an infringement of the copyright, and

8    I think it clearly is an infringement of the copyright -- or

9    the trademark.  And that's, as you see here, because Pizza

10   Puffs, and this is strikingly similar, as Dr. Maronick said,

11   likely to cause confusion.

12           The next is trade dress.  The trade dress claim is

13   the whole label, is the whole label an infringement of the

14   trade dress?  The trade dress is ILTACO creating this label to

15   sell its product so that people will recognize it and will buy

16   the product, the ILTACO Pizza Puffs.

17           And what you'll have to determine here is did El-Greg

18   use the phrase "Pizza Pies" -- sorry.  What you'll have to

19   decide here is if ILTACO has a valid trade dress.  Well, we

20   think the evidence shows that they do have a valid trade

21   dress.

22           They talked about how they created their label long

23   before El-Greg, how they put -- you heard Adam's testimony

24   yesterday, how the family put their ideas together on the

25   phrase, the slogan at the bottom, how they added the various

closing - plaintiff

692

1   available flavors which hadn't been done before.

2          So they put a lot of thought into how to dress up

3   their label, how to dress their product, Pizza Puffs, and they

4   did it, and it was out there for many months competing against

5   El-Greg's plain white box.  And El-Greg, as the testimony

6   shows, as the evidence shows, took a copy of that label and

7   created the same label, and I think that's an infringement of

8   trade dress, and I think the evidence will show that.  I think

9   the testimony shows that once you go back and deliberate on

10  it.

11         Well, is it likely to cause confusion?  That's point

12  3 under Claim 2.  And point 3, likelihood of confusion,

13  Dr. Maronick testified about that, too.

14         Dr. Maronick said that it was likely to cause

15  confusion, the entire label, and, again, Mr. Block quibbled

16  with him, but Mr. Block doesn't have a survey to counter Dr.

17  Maronick's.

18         Dr. Maronick's survey, the Internet survey, showed a

19  likelihood of confusion between the two trade dress labels.

20  And I think if you look at them you'll say, again, there's a

21  likelihood of confusion because of how similar they look.

22         Now, a defense to the trade dress is fair use.

23  Again, is it fair use to copy?  Was it fair use to send a copy

24  of the label and then use the same description, the same

25  shape, form, putting a picture, a very similar picture, and

1   then putting on the slogan, the virtually identical slogan,

2   falsely claiming that El-Greg was the maker of the original

3   Puff?

4           This label, the El-Greg label, was simply there to

5   mimic or copy and clearly done with the intent of confusing

6   customers and to take sales, the ever-increasing sales of

7   ILTACO with its label, piggyback on it, persuade customers

8   grab -- grab from the left side of the freezer case.  It's the

9   same thing.

10          And understand trade dress infringement, you'll see

11  this on Page 17, it's the packaging as a whole, whether it

12  acquired distinctiveness, whether the public identifies the

13  packaging with a particular source, and here I think even

14  Maria Lereno's testimony was that this label, the ILTACO

15  label, had acquired distinctiveness.  She saw it in Restaurant

16  Depot for many, many months, and there were lots of sales with

17  this new label.  That's the distinctiveness we're looking for,

18  and Dr. Maronick found that it's a distinctive label.

19          The third claim is a claim for infringement of the

20  Puffs trademark family.

21          THE COURT:  Just so you know, you're just a smidgeon

22  over 30 minutes right now.

23          MR. GEEKIE:  Thank you, Judge.

24          Could we see the family?  Next page.  And can you

25  expand the top part.

closing - plaintiff

694

1        I'm sure you all remember this.  Warren testified
2   about it, Adam testified about the family of Puffs products,
3   but you heard Warren testified about this, this exhibit, and
4   Warren talked about how he first created, and you'll remember
5   how he went about creating the Pizza Puff, this unique stuffed
6   sandwich, and then customers wanted different Puffs, and he
7   gave it to them.  He gave the customers what they desired, and
8   he grew the Puffs family.

9        When he grew outside Chicago, people wanted
10  pepperoni, so he gave them pepperoni.  People wanted beef; he
11  gave them beef.  People wanted spinach; he gave them spinach,
12  and he called them all Puffs.  He even called them more Puffs.
13  He created a Taco Puffs, Ham and Cheddar Puffs for breakfast,
14  Ham and Cheddar Cheese Jalapeño Puffs.  That's the family of
15  marks that we're talking about.

16        No, these are not registered marks, but they are --
17  were used for many, many years.  This list of Puffs goes back
18  into the early 1980s, early and mid-1980s.  ILTACO was using
19  and had established a family of Puffs before El-Greg, the
20  company, was even formed.

21        So they had this distinctive family, and people
22  associated it with ILTACO.  You heard the testimony.  You
23  heard about the customers and the people asking for different
24  Puffs, and so this family of Puffs is well established.

25        Now, El-Greg, did their use of various Puffs

closing - plaintiff

695

1    products, did their family of Puffs products infringe?  We say

2    they did.  They knew they couldn't use the term "Pizza Puff,"

3    but they started naming other products Puffs.  Chili Cheese

4    Puffs.  Well, they started naming their product Pizza Pies

5    Puff.  That wasn't a descriptor in the parentheses, it was on

6    the name line.  That's all infringement on the Puffs family of

7    marks.

8            Now, Claims 1, 2 and 3, there has to be a likelihood

9    of confusion.  You heard Dr. Maronick's testimony.  These were

10   similar, and there was a likelihood of confusion with the

11   public, and he gave testimony on that.

12           El-Greg's expert just said he did it the wrong way,

13   but he didn't really test whether or not there was a

14   likelihood of confusion.  He quibbled with Dr. Maronick's

15   survey, but he can't tell you it was wrong because he didn't

16   do his own.

17           If he was a legitimate expert to be relied upon, he

18   would have done his own survey and said Maronick did it the

19   wrong way, and here's my determination doing it the right way.

20   We didn't see that.  Mr. Block didn't -- didn't walk the walk.

21           Claim 4, false advertising.  Well, the false

22   advertising claim is "Makers of the Original Puffs."  That's

23   it, pure and simple.  Is that truthful advertising or false

24   advertising?  Because we know who the maker of the original

25   Pizza Puffs is and the Puffs family going way back into the

closing - plaintiff

1   '70s and '80s.  ILTACO was the original maker of Pizza Puffs

2   and Puffs, right?  We saw it.  It's unrebutted testimony.  The

3   best El-Greg can say is we were making pizzas in a pizzeria in

4   1986, and in 1989, we created -- we decided to create a

5   product, what was that product?  They admitted it was a

6   rip-off of Pizza Puffs.  They created Pizza Pies.  They

7   admitted, somebody came to them and said Pizza Puffs is doing

8   great, so let's make up a rip-off product, and they did.

9           Now, there's nothing to prevent them from making a

10  food product that's like ours, and we're not suing on that

11  because anybody can make any kind of food product they want,

12  okay?  But you can't call it the same thing.  You can't

13  confuse consumers by saying we're making a Pizza Puff, yet

14  they did, and then they falsely claimed and falsely advertised

15  that they were makers of the original Puffs.

16          And then lastly Claim 5, breach of contract.  That's

17  the settlement agreement.  Did El-Greg breach the settlement

18  agreement?  I think they did because they weren't supposed to

19  use Pizza Puffs in combination or with the design in any way.

20  Don't use Pizza Puffs, and they did here.

21          Now, their flimsy excuse is that was a descriptive

22  term, but look at the settlement agreement.  It doesn't say

23  you can use it as a descriptor.  A descriptive term is a

24  defense for a trademark and infringement claim.  You can say

25  it was merely descriptive, and, therefore, we're not liable,

closing - plaintiff

1     but the settlement agreement is the settlement agreement.  Its

2     language is written in stone, and it doesn't say you can't use

3     Pizza Puffs unless you want to be descriptive.  It says you

4     can't use Pizza Puffs in any combination or design, period.

5     Descriptor, descriptiveness, it's not a defense.

6           So in the end, we're going to ask you to award

7     damages.  And El-Greg made $1,282,839 in profit -- in revenue

8     from sales from its rip-off label and in breaching the

9     contract and infringing and falsely advertising, $1,282,839.

10           Moreover, as you heard from Mr. Polash -- and that

11     amount, by the way, that 1.282 million, that's undisputed.

12     Mr. Polash says they made -- that ILTACO also lost $147,000 in

13     profits that it would have made.  And El-Greg, their defense

14     is, well, you should deduct our costs, but we don't know what

15     those costs are.

16           Lindsey Fisher did a calculation, but her calculation

17     was based on false numbers.  She didn't have the real numbers

18     because Maria Lereno concealed the evidence.  So if the

19     evidence had been out there, maybe they'd have a real number

20     to produce, maybe we'd know what their actual cost was that

21     they could deduct from the 1.282 million, but why should

22     El-Greg profit from concealing evidence?  Why should they get

23     any credit?

24           Remember, it's their burden to show their costs, and

25     the undisputed evidence is they concealed the actual

closing - plaintiff

1   information.  It's undisputed.  You heard Maria Lereno sitting

2   right there.  She did not produce the Excel spreadsheet that

3   showed the costs, and it's their burden.

4           But what El-Greg wants to do is -- they say, we

5   concealed the evidence, but take it out of ILTACO's pocket.

6   Is that fair?  No.  When they bear the burden of proof of

7   showing what their costs are and then they admit they

8   concealed evidence, that should be on their heads, and they

9   should not be allowed to profit from the concealing of

10  evidence.

11          So in the end, you should award a verdict in favor of

12  ILTACO on every count, and the damages should be

13  $1.282 million.

14          And I'd also ask you again find willfulness.  The

15  evidence here shows that all of these trademark infringements

16  and infringements on the trade dress and -- it is clearly

17  intentional and willful, and I ask you to find willfulness on

18  behalf of El-Greg's conduct.

19          Thank you.

20          THE COURT:  All right.  You're going to have about

21  eight minutes left for rebuttal.

22          Mr. Becker?

23          MR. GEEKIE:  Thank you.

24          MR. JANSKI:  Your Honor, may I have the computer?

25          THE COURT:  Yep.

closing - defendant

1          MR. JANSKI:  Thank you.

2          MR. BECKER:  May I have a minute to do just a little

3     bit of housekeeping?

4          THE COURT:  Counts against your time.

5       (Pause.)

6          CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

7          MR. BECKER:  Now, at this point it's good afternoon,

8     ladies and gentlemen.  And my name is Alan Becker.  I

9     represent El-Greg, and I want to express appreciation of

10    myself, my colleague, and the family, the El-Greg family, for

11    your attention.  This has been one of the most attentive

12    juries I've ever seen, which is exemplified by the numerous

13    questions you submitted to us.  I've never seen that before.

14         One of the things that came out at the very end was

15    kind of the core of why we're here.  It's the resentment that

16    ILTACO has for a competitor.  That's why they say they ripped

17    off our product.  They admit that El-Greg is entitled to

18    compete with them, but they certainly resent having a

19    competitor in the marketplace, and so we are involved in this

20    litigation.

21         But one of the things that's extremely important in

22    your assessment of the evidence of this case is to assess the

23    evidence in connection with the law.  So we've heard lots of

24    colorful language about copying and rip-offs and nothing that

25    actually relates to what the law really involves, and so I'm

closing - defendant

1    going to discuss the issues in this case with you in

2    connection with the instructions that the judge has given you

3    and that you'll take with you into the jury room.

4           So the first claim that we have is this claim of

5    trademark infringement.  Okay.  What is the trademark?  The

6    trademark was simply Pizza Puffs, and what is the -- the label

7    that we have here, the one that they're complaining about?  It

8    says Pizza Pies™ (Puffs).  Okay.  It doesn't say Pizza Puffs.

9           So right to begin with, you don't have El-Greg using

10   Pizza Puffs.  El-Greg is not using the trademark that ILTACO

11   has.  So that takes us to a completely different question,

12   which is, is this -- is this use, Pizza Pies™ (Puffs), so

13   similar that it would be confusing?  And for that, we have to

14   look at the Judge's instruction about the likelihood of

15   confusion.

16          So, Ryan, if you could put that up for us, please.

17          When you consider the question of likelihood of

18   confusion, you don't only look at two things side by side.

19   There are a number of factors that you have to consider.  So,

20   yes, one is the similarity.  So let's look at that one first.

21          On the one hand, we have Pizza Puffs.  On the other

22   hand, we have Pizza Pies with the mark TM, indicating that

23   this label is the -- that the trademark that's being put on

24   here by El-Greg is the Pizza Pies trademark.  They're

25   identifying what they're calling the trademark.  It's not

closing - defendant

1    Pizza Puffs, it's Pizza Pies.

2           So what it comes down to is when you add Puffs to it,

3    does that somehow convert this into a confusing use of

4    trademark?

5           Well, what is the Puffs?  As we've said, it's

6    descriptive.  Greg Lereno explained that when you put this

7    product -- I wish this was still frozen -- when you put this

8    product into the deep fryer, it puffs up.  That's what makes

9    it a puff.  That's why puff is a descriptive word.

10          But one of the things I think we all know from all of

11   the products that we see in the stores day after day is there

12   are lots of trademarks, and the very common way of companies

13   displaying the trademark is to have a trademark followed by a

14   product.  Kellogg's Corn Flakes.  Kellogg's is the trademark,

15   Corn Flakes is the product.  What did ILTACO do, they pointed

16   out in their box?  Okay.  They have Pizza Puff®, registered

17   trademark, they have their R in the circle.  It's a Pizza Puff

18   snack, okay?

19          Here what El-Greg does is it has Pizza Pies™ (Puffs)

20   is what it modifies.  So Puffs is being used as a descriptive

21   reference to the product, whereas Pizza Pies is the trademark

22   that's being used.  So that's the first -- the first item.

23          Similarity of the products?  Certainly, the products

24   are similar.  Similarity as to where they're sold?  Yes.  What

25   we know is that the only place that the two companies'

closing - defendant

 1   products with these respective labels were sold at was at

 2   Restaurant Depot.

 3          All right.  Then we get to what I think is a very

 4   critical factor to consider:  The degree of care likely to be

 5   exercised by purchasers.  And Mr. Geekie talked about how he

 6   goes into a supermarket and occasionally will just grab the

 7   wrong thing out of the freezer case.

 8          Well, that's not what we have here.  This isn't

 9   going through -- this isn't a casual shopper rushing through a

10   supermarket picking up a dessert.  This is an 18-pound box

11   containing 48 not individually wrapped packages that are going

12   to be used in a restaurant.  This is not being sold for a

13   dollar and a half.  This is being sold, you saw the prices,

14   anywhere from around 25 or $30 a box.  This is not the sort of

15   thing that someone is just going to casually go by and grab it

16   out of a freezer case.

17          So one of the things to consider is who is -- who's

18   the purchasing public here?  The purchasing public is not the

19   casual consumer.  It's not Dr. Maronick's wife who might

20   purchase -- who theoretically could make a purchase for a

21   charitable organization she's a member of.  The customers for

22   this type of a product are these restaurants who sell it as

23   a -- as a part of their food offering, along with their hot

24   dogs and their french fries, and these are not the folks who

25   are going to casually pick up the wrong box.

closing - defendant

1          So as Mr. Geekie admitted -- well, then we have

2   strength of the trademark and the trade dress.  Is this a

3   strong trademark?  There's been no evidence as to strength of

4   this.

5          And then there's another very important factor,

6   actual confusion.  Not a single piece of evidence was

7   presented of a single purchaser who went into Restaurant Depot

8   intending to buy an ILTACO 18-pound box of product and came

9   back with an El-Greg product.

10         You would think with this label being out there for

11  six years, if there was actual confusion, something would have

12  shown up.  Somebody would have complained.  They would have

13  presented that evidence if they had it, but they don't have

14  that evidence.  There are no complaints.

15         And both Maria and Greg testified that they never got

16  complaints from anyone about this.  They never got complaints

17  from Restaurant Depot that someone had complained to

18  Restaurant Depot that they'd picked up the wrong package

19  because they were mistaken about the label or for any other

20  reason.

21         And then we have the factor about is there any intent

22  of El-Greg to palm off its products as those of ILTACO, which

23  was kind of suggested by Mr. Geekie.  But there can't be any

24  palming off because the label clearly says El-Greg.  This is

25  not like a fake Gucci handbag, where you can't tell where it's

closing - defendant

1        from, but you see the, you know, famous logos on it.

2              This label clearly says it's from El-Greg, and the

3        label isn't just floating in the air.  The label is attached

4        to this box, which says El-Greg, and it says El-Greg, and it

5        says Pizza Pies all over the place.  There's no way that this

6        could be palming off the El-Greg product as an ILTACO product.

7              So then we get to Dr. Maronick's survey.  Now,

8        Mr. Geekie says, well, we didn't put up our own survey.  It

9        wasn't our burden to do a survey.  It was ILTACO's burden to

10       put up a survey, and if they're going to use a survey to try

11       to prove likelihood of confusion, they need to do a decent

12       survey.

13             They didn't do a decent survey.  Why not?  Because

14       they didn't survey the right target audience because who is

15       the audience?  Who are the potential purchasers for this

16       product at Restaurant Depot?  Customers of Restaurant Depot or

17       at least people who buy for restaurants.

18             Instead, they do an Internet survey, and they ask a

19       different question, "Do you ever buy frozen stuffed sandwiches

20       for your company from a wholesale distributor?"  And Dr.

21       Maronick admitted people might think, well, that's Costco, but

22       that's not really.  That's just a big box retailer.

23             And just buying for your -- for your company,

24       somebody might have thought, well, I might have bought a

25       couple of frozen sandwiches for lunch one time.  That's not

closing - defendant

1   what this is about.  That's not what these boxes were about,

2   these competing packages.  These were sold in Restaurant Depot

3   designed for the restaurant trade, and Dr. Maronick didn't

4   survey the restaurant trade.

5          So he gets these Internet people who were there to

6   enter as many surveys as they can to get those points.  He

7   admitted he has no idea whether they really are purchasing

8   even for a business.  They just said they were, but they got

9   themselves into the survey, and then he shows them some

10  images.

11         So, Ryan?

12         So these are the three packages he shows them with

13  the objective to see if people will associate any two with

14  each other, and when you look at these three packages, the one

15  thing that occurred to me is this reminded me of the little

16  bit on Sesame Street, two of these things are not like the

17  other.  For a four-year-old, you know, it's a good question to

18  ask.  You learn how to discern things.

19         But this is awfully suggestive of which two to

20  associate with each other.  He said that this is a control,

21  but it's not very much of a control if it's so different that

22  it makes the choice being pointed.  It's like what we lawyers

23  would call a leading question.  But that's what Dr. Maronick

24  did.

25         But even with that, what kind of results did he get?

closing - defendant

1    And let's look at Table 3 of his results.  Remember, he had a

2    survey group of 212 people.  And how many of those 212 people

3    ultimately said they thought that these two, the ILTACO and

4    the El-Greg, came from the same place based on the label or

5    Puffs in the name?  18.  Now, he does 25 percent, but that's

6    not 25 percent of the whole group.  He's already discarded the

7    people that said I don't see any connection at all.

8         What it is is 18 out of 212.  It's less than -- in

9    this case, it's less than 10 percent of the people in his

10   survey group, not a significant number of people at all, and

11   on the basis of the responses of 18 anonymous people on an

12   Internet survey who are not likely to be people purchasing for

13   a restaurant, ILTACO is asking you to award over a million

14   dollars.

15        Okay.  Let's look at trade dress, and let's look at

16   the trade dress instruction, please.

17        From the argument that Mr. Geekie presented, you

18   might get the impression that any label is going to be

19   considered to be protectable trade dress.  Well, not every

20   label is.  There's a standard that you need to meet in order

21   to get there.

22        And what we want to look at is the definition of

23   valid trade dress because the -- ILTACO's witnesses have

24   admitted that they do not have a registered trade dress for

25   this label.  So we have to determine do they have a trade -- a

closing - defendant

1   label that would be considered to be protectable trade dress.

2          Well, there are two possibilities.  One is, is it

3   inherently distinctive?  The instruction tells you, "A trade

4   dress is inherently distinctive if purchasers would almost

5   automatically recognize it as identifying a particular brand."

6          Okay.  What can you think of as a trade dress that

7   would get you to automatically recognize it?  Well, the most

8   famous one that I can think of is the Coke bottle.  You see a

9   Coke bottle, you don't have to read the words on it.  You see

10  that bottle, and you say that's Coca-Cola.

11         But what do we have here?  We have a rectangular

12  label that has a picture on one side and information on the

13  other.  If you go in a grocery store, you will probably find a

14  thousand labels that are set up that way.  Sometimes they're

15  around cans, but if you took it off the can, put it out, you'd

16  see a picture and an information panel.  That's just a

17  standard not particularly distinctive design of how to do a

18  label.

19         So this is not an inherently distinctive label.

20         So you have to go to the next step then, and the next

21  step is, well, has this label acquired distinctiveness?  And

22  the test for that is whether a substantial portion of the

23  purchasing public identifies the packaging with a particular

24  source, okay, and in terms of timing, that acquired

25  distinctiveness would have had to be acquired before the

closing - defendant

708

1  El-Greg label went on, and we know there's only a space of

2  seven or nine months in between.

3         But there's no evidence that a substantial portion of

4  the purchasing public, purchasing public being customers at

5  Restaurant Depot, thought that that label in its generality

6  told them that that is -- that that is ILTACO.  We're not

7  talking about being able to get up there close and reading

8  ILTACO on it or reading Pizza Puffs.  It's that general

9  impression.

10        There's no evidence that that label had acquired

11  this -- acquired distinctiveness in that seven- or nine-month

12  period.  No evidence at all.

13        Nevertheless, ILTACO relies on Dr. Maronick again

14  with his -- with his study, and he did a study to try to serve

15  two purposes, the trademark and the trade dress issue.  And

16  here he -- it's our same chart, Table 3, and here when he got

17  results about the images or the packaging, he got, well, 14 or

18  22 or 43 at most if you put -- if you put it all together.

19  The best case he has is maybe just getting near 20 percent of

20  all the 212 people that were surveyed here.

21        Again, not a -- not a substantial part of that

22  purchasing public identifying in this case, just saying

23  whether the images look the same, but that isn't even the

24  right question.  The question is does this label have this

25  acquired distinctiveness that you say it comes from a single

closing - defendant

1   particular source, and Dr. Maronick didn't ask that question

2   either.

3         So what it comes down to is that the plaintiff has no

4   evidence, no evidence at all, that this -- that what they

5   claim to be the trade dress has a protected status as trade

6   dress.

7         Anyone -- in other words, anyone can come up with a

8   label that has a picture on one side and information on the

9   other side.  And that's what you have.  On the right-hand

10   side, you have information.  You have the weight.  You can't

11   change that.  The fact that these are competing products,

12   yeah, they sell it in the same size, same package, same 48

13   count, same 6-ounce, same 18 pounds.  Of course, those numbers

14   are going to be the same.

15         Okay.  They both provide information about other

16   varieties, not identical because the two companies have

17   different other varieties.

18         And Mr. Geekie has talked a lot about that slogan at

19   the bottom.  A couple things about that slogan, and I did ask

20   some questions about the slogan.  He must have just forgot

21   about those.  But one thing is they admitted they have no

22   trademark to that slogan.

23         The second thing is with all of these responses that

24   Dr. Maronick got, he didn't identify a single respondent who

25   said I associate the El-Greg package with the ILTACO package

closing - defendant

710

1    because of the slogan on the El-Greg package.  No one.

2            And so the question that you ultimately get to, going

3    back to is would the typical purchaser at Restaurant Depot be

4    influenced by that slogan to mistakenly buy the El-Greg

5    package instead of the ILTACO package?  And there's not an

6    iota of evidence to support that proposition.

7            Okay.  Talk a little bit about the family because

8    this gets us into -- into another area where you have to look

9    at what the law is and consider the evidence in connection

10   with the law.

11           So let's look at the definition of -- the definition

12   of family.  First thing it's important to know is a family of

13   trademarks is not the same thing as having a family of

14   products.  Lots of companies have families of products.

15   Having a family of products, even if you use the same term as

16   part -- as part of the name that you use or the name of the

17   product that you're using for different varieties, doesn't

18   mean that you suddenly own the rights to that word.  Frankly,

19   it's a pretty rare thing for somebody to have rights to a

20   particular word and say other people can't use that word for

21   their products.

22           Puffs is what we call a descriptive term.  It

23   describes a characteristic of a product.

24           So what's the rule here?  A family of trademarks is a

25   group of trademarks having a recognizable common

closing - defendant

1   characteristic in which the trademarks are composed and used

2   in such a way that the public associates not only the

3   individual marks -- and that's all these trademarks that

4   ILTACO has -- but also the common characteristic of the family

5   with the trademark owner.

6           Okay.  The word that they're using as the common

7   characteristic here is Puffs, and ILTACO had the burden to

8   show by a preponderance of the evidence that that term, Puffs,

9   has acquired distinctiveness in that it indicates that the

10  goods have this common origin.  ILTACO must show that an

11  appropriate segment of the public identifies this term, Puffs,

12  with ILTACO.

13          Dr. Maronick's study did not go to that.  He didn't

14  ask any of the respondents who do you associate the word Puffs

15  with?  There's -- the fact that they sold a lot of products

16  with the name Puffs on it doesn't mean that the public

17  associates the word Puffs with ILTACO, as opposed to

18  associating Puffs with anyone else.

19          They've now admitted that they've put in their

20  labeling on their package Puffs in the category, their Pizza

21  Puffs in the category of a snack food.  Well, one of the names

22  that's come up in some of the testimony that I think is a much

23  better known snack food using Puffs is, since it's one of my

24  favorites, which is Cheetos Puffs.

25          I shouldn't have said that on the record.  My wife

closing - defendant

1   won't like that.

2        But Puffs is not a word that has been shown to be

3   recognized as being distinctly the property of ILTACO, and

4   without having that showing that an appropriate segment of the

5   public identifies this term with ILTACO, they do not have a

6   family of Puffs.

7        Dr. Maronick sought to use his study to try to

8   generate something to support this idea of a family of Puffs,

9   and he tried to do that with his second study.  So let's look

10   for a second at Table 4 of that study.

11        And this is the table where he was throwing up a

12   bunch of names, asking if the respondents associated any of

13   these names with Pizza Puffs, and he has a number of responses

14   regarding El-Greg's Chili Cheese Puffs product, but he gets an

15   extraordinary number of responses where people associate Lean

16   Pockets, Chicken Parmesan, and Hot Pockets, Beef Tacos and

17   chicken pot stickers with Chili Cheese Puffs.

18        Well, that's what's called noise.  That's what

19   constitutes people who go through a survey and click, click,

20   click, click, click, they're getting out of the survey as soon

21   as they finish it, they get their incentive.

22        And when you look at the data as Professor Block, who

23   Mr. Geekie kept calling Mr. Block.  I've tried to call Dr.

24   Maronick by his appropriate title.  Professor Block explained

25   that the customary practice, and Dr. Maronick said that it's

closing - defendant

1    usually what you do and he agreed with the propositions that I

2    put to him is usually adjust your data to subtract the noise

3    level from the data, but he didn't do that in this -- in this

4    case.

5           Without -- even without doing it, when you get to

6    Table 5, when you get to Table 5 with the Puffs in the name or

7    similar name, what did he come up with here?  39 out of his

8    214 people, not the 90 because he's already thrown out the

9    data from people who didn't see a connection at all.

10          You've got, again, less than 20 percent of the

11   respondents seeing any connection based on Puffs in the name.

12   That's simply not a level that would be an appropriate segment

13   of a public in order to give this company the exclusive rights

14   to the word Puffs.

15          Now, let's look at the instruction regarding false

16   advertising.  This is the -- this is the subject where they

17   are making their claims about the slogan.  Again, they

18   admitted they have no trademark, they have no copyright on

19   this slogan.  They simply claim that this is false

20   advertising, but what is the actual -- what is the actual

21   test?  It has to be a misleading statement of fact in a

22   commercial advertisement about the nature, quality or

23   characteristics of its product.

24          This slogan doesn't say anything about the product.

25   It says something about the company, something about El-Greg,

1   but that's not the legal standard.  The legal standard is

2   saying something that's not factual about the product.  So

3   right there, this slogan does not fit the law.

4           And as far as any questions about whether this slogan

5   had any effect on anyone, how much evidence is there that

6   anyone was deceived by this slogan and acted upon it, to

7   purchase an El-Greg product instead of an ILTACO product?

8   Zero.  No evidence at all.  It's just a lot of bluster about

9   the similarity of slogans.

10          And then we get to the contract.  And as Mr. Geekie

11  said, this contract, we're looking at Paragraph 2, that this

12  contract is etched in stone, it's very specific, and it is.

13  It's exceedingly specific.  It says that El-Greg will not use

14  "Pizza Puff."  It's in quotation marks.  It's a phrase.  Will

15  not use Pizza Puff, and it won't use Pizza Puff even if it's

16  modified, and they give some examples, like El-Greg Pizza

17  Puff.

18          Nothing in this agreement says that El-Greg can't use

19  the word "puff," but ILTACO would like to make you think it

20  does, but it doesn't.  Nothing in this agreement says that

21  El-Greg can't use the word "pizza" and the word "puff"

22  separately, and that's what they do on this label.

23          Pizza and Puffs are not connected in a phrase.  In

24  fact, they're separated by the trademark indicator on the

25  label.

closing - defendant

1          The contract says what is obligated.  It doesn't

2  impose any other obligations.  A further provision says this

3  can't be expanded.  ILTACO simply can't take this contract and

4  expand it to be an obligation by El-Greg not to use the common

5  word "puffs."

6          Okay.  So, let's talk then a little bit about this

7  question about willfulness, and this takes us back to that

8  letter in 2011 that ILTACO's lawyers sent to El-Greg, and this

9  is the one that Mr. Geekie said I spent too much time talking

10  about the retail products.

11          Well, the retail products were on the market at the

12  time of this letter, and when you read the letter, the letter

13  focused a great deal of its allegations on the retail

14  products.  And when I went through the differences between the

15  packages for the El-Greg retail products and the ILTACO retail

16  products going to all such things as the positioning of the

17  products, the backgrounds, what they sit on, all of that, I

18  think, can explain to you why El-Greg, after getting this

19  letter, didn't go about and change everything that it did.

20          You could look at these claims and think this is just

21  ridiculous, we're not even going to respond to this, and

22  El-Greg didn't respond to it.  And ILTACO didn't do anything

23  further as far as El-Greg about it.  This letter was in 2011.

24  Nothing is done until 2015.

25          So you can imagine that El-Greg figured, okay, they

 1  threw out this letter, we didn't bite, we're just going on

 2  with the way we're doing things.

 3          They get -- they get another -- they get another

 4  letter in 2015, and that one is followed by the lawsuit.  By

 5  this point, the lawsuit doesn't have the retail packages

 6  because, yes, El-Greg isn't doing the retail packages anymore,

 7  and after thinking about it for a bit, El-Greg says, okay,

 8  we'll change the label.  And they take Puffs off the -- off

 9  the label, and that takes care of that except the lawsuit goes

10  on because now ILTACO wants to recover all these sales that

11  El-Greg made going back to 2010 all this time when ILTACO

12  wasn't taking any further action about this.

13          So the first point is that having received this

14  letter and these allegations, not thinking that the

15  allegations are credible, El-Greg goes ahead, continues doing

16  what it's been doing.  That's not willfulness.  El-Greg's view

17  was that they weren't infringing, and if you think that you're

18  not infringing, then continuing to do what you're doing is

19  not -- that's not willful.

20          Mr. Geekie tried to bring the contract in to say,

21  well, that's what shows willfulness because you made this

22  contract, you made this agreement, but as I pointed out, the

23  agreement was very specific.  It said don't use Pizza Puffs,

24  and using a -- using a label that does not use the phrase

25  "Pizza Puffs" viewed from the standpoint of El-Greg is we're

closing - defendant

1   not doing what -- we're not doing what we said we wouldn't do.

2   We never said that we wouldn't use the word "puffs."  We never

3   said that we wouldn't use the word "puffs" separate from

4   "pizza," so we're doing what we think we're entitled to do.

5           As far as the overall image of the label, as I said,

6   this is -- this structure of the label, picture on one side,

7   information panel on the other side, well, that's pretty

8   ordinary.

9           Well, what about the picture, the picture itself?

10  Well, ILTACO's witness told us that they created a picture,

11  the picture that they put on this label around 2008 or 2009.

12  El-Greg didn't copy that picture.  El-Greg had been selling

13  its retail products using that same picture going back to the

14  early 2000s.

15          So El-Greg simply took a picture it already had, it

16  didn't want to spend any more money than it had to, to put

17  this label on that Restaurant Depot demanded, and put its

18  picture, its picture on it.

19          So you saw a proof that the printer sent.  The

20  testimony from Greg and Maria is that they had a number of

21  sample labels that they gave to the printer to use.  The

22  printer apparently used the one from ILTACO to give them an

23  idea what it would look at, but they didn't put that label on

24  the product.  They changed the label to be a label for the

25  El-Greg products.  But just in a very -- what I would call a

closing - defendant

718

1   very institutional type form of label, plain information on

2   one side, a picture on the other side.

3          Why is all that information there?  Because

4   Restaurant Depot asked for it.  Restaurant Depot asked for a

5   picture.  They asked for the product information.  They asked

6   for a product name to go on there, and when Greg and Maria,

7   who are not in the business of doing -- designing labels said

8   can you give us some guidance, look around the store, see what

9   other people are doing.

10          So they grabbed some other ones.  They mentioned

11  several others that they got, not just the ILTACO one, that

12  were in the same general design.  Picture on one side,

13  information panel on the other side, and that's what they had

14  their printer do.

15          And so the label goes on, and that's what gets us

16  into the question of damages.  So the El-Greg label goes on,

17  and what -- what happens to El-Greg's sales?  Well, they don't

18  increase in the six months following putting the label on it.

19  They don't increase in the following year.  They barely

20  increase in the year after that.

21          The first time we start seeing an increase in

22  El-Greg's sales has nothing whatever to do with the label.

23  What it has to do with is that's when they sign up for this

24  marketing program, this program in which Restaurant Depot

25  promotes their product four times a year and they put it on

closing - defendant

1   special, and you saw it in the -- you saw it in the

2   illustration.

3           Ryan, can we put on the picture of the store?

4           This is plaintiff's exhibit, the image in the store,

5   but one of the things that really stands out is in that upper

6   left-hand portion, where you have "special," "special," and

7   the special prices for the El-Greg products.

8           For people who are buying this type of product for a

9   restaurant coming in, you know, once a quarter and being able

10  to get product at a special, some of those people could be

11  influenced by that.  Sure, there are going to be lots of

12  people who are loyal to the ILTACO product regardless of the

13  price, and there are going to be people who are loyal to the

14  El-Greg product because they like the El-Greg product.

15          And then there are people in the middle, those people

16  who actually are particularly concerned about price, and those

17  are the people who are going to be influenced by something

18  like having this on special.  Four times a year on special.

19  And, sure, you start -- you see a boost in El-Greg's sales.

20          At the same time during this time period, you have

21  another phenomenon going on, and that's how the prices of the

22  two companies are changing.

23          So, Ryan, if you can put that one on.

24          THE COURT:  And you have ten minutes left.

25          MR. BECKER:  Thank you.

closing - defendant

1          This is the data that was compiled by Lindsey Fisher,

2   and it showed that during this period between 2010 and 2016,

3   the price spread between the El-Greg product and the ILTACO

4   product kept getting bigger, and I think that just common

5   sense tells you that some of the customers, those who are

6   price sensitive and brand indifferent will shift from the one

7   to the other, while many customers will simply stay loyal to

8   the brand that they already like regardless of the price.

9          So, sure, the price difference doesn't take away all

10  of the sales from ILTACO, but there's -- and, in fact, it

11  doesn't -- ILTACO's sales stay pretty level during this

12  period, but sales for El-Greg increase, and there were these

13  other factors as well, the additional locations that El-Greg

14  was getting sales into and the introduction of the new

15  products.

16         So plaintiff brought on Mr. Polash, and he gave his

17  theory of actual damages based on assumptions, nothing more

18  than assumptions.  An assumption that a company's sales to one

19  company will mirror -- to one customer will mirror its sales

20  to another customer.  No -- nothing to support that, and no

21  logic to support that, but it's the bedrock of how he does his

22  calculations.

23         He did not consider any of these other reasons why

24  El-Greg's sales exceeded what he thought -- what he projected

25  the sales would be under his theory that things moved in

closing - defendant

1    lockstep.

2         And then he has an extraordinary result.  He's trying

3    to say that there are lost sales due to the label, and yet for

4    the first two-and-a-half years after the label goes on,

5    according to their expert's own theory, there's no lost

6    profits, and suddenly, suddenly, after two-and-a-half years,

7    this label has an effect, at least to lost profits?  It's

8    totally illogical.

9         Okay.  Last thing I want to talk about is the cost --

10   the cost-of-goods issue.  Mr. Geekie made a lot out of the

11   testimony at the end by Maria, but you need to consider all of

12   the testimony because she testified at the end that while she

13   created spreadsheets, she did not keep them historically so

14   that these -- this data was not available when Lindsey Fisher

15   was doing -- doing her study.

16        I think that you could -- you could see from the

17   witnesses that the witnesses for ILTACO made very smooth

18   presentations.  Perhaps Warren Shabaz has made his

19   presentation about the history of the company hundreds of

20   times.  He does it very well.

21        And Adam Shabaz's presentation about what the company

22   is doing and how it's growing and he goes to all these trade

23   shows and he's talking to people all the time, he's very good.

24   He does a very nice presentation.  These folks, these folks

25   are professionals.  They do a good job with what they do.

closing - defendant

1        El-Greg's a small company.  ILTACO's 15 times the

2  size of El-Greg.  El-Greg is simply run by Greg and Maria and

3  their mom who originally created the recipes, and they're not

4  professionals in bookkeeping.  They're not professionals in a

5  lot of things that you might like to have when you're doing a

6  company.

7        They're running a small business.  They're making a

8  relatively small amount of product, and they keep records --

9  they keep their records on QuickBooks.  And as Maria

10  explained, QuickBooks isn't really designed to capture the

11  type of detailed product-by-product data that you would need.

12        So Mr. Polash's comment was, well, since there wasn't

13  exact data of cost of sales, I treat it as zero.  What Lindsey

14  Fisher did was something that she's testified is commonly done

15  and is very reasonable.  She says these products make up --

16  the products that we're talking about make up the great bulk

17  of El-Greg's sales, 70 percent of their sales.  And so they

18  represent 70 percent of the sales, they must represent a lot

19  of the costs of sales.

20        We can take what the overall cost of sales is, and we

21  can use that as the percentage to apply as the cost of sales,

22  and she -- she does that.

23        And can you put the chart up, Ryan?

24        Okay.  She does that, and she has two tables because

25  she's done this for two different time periods, so for the

closing - defendant

1    long time period she does this, and the profit margin that she

2    has for El-Greg, it's about, overall about 39 percent.  And

3    Dr. Maronick admitted that industry data indicates that -- in

4    a frozen food manufacturer, you would not see a profit margin

5    over 50 percent.  And we know that ILTACO's profit margin was

6    in the range of 19 to 32 percent, so Lindsey Fisher was not

7    low-balling this number.

8          This is a pretty rich number, but it reflects the

9    overall cost of goods, cost of goods and profit margin in

10   El-Greg driven by the products that are in question here.  And

11   so in these circumstances, it's perfectly appropriate to use

12   that percentage and to use that as the percentage to do your

13   calculation of what the profit would be on the sales that

14   El-Greg made to Restaurant Depot during this time period.

15         So this net profit for the long period of time, for

16   the six-year period, is a little over $504,000, and in the

17   short period, it's about $72,000.

18         We don't think that you should get to this area

19   because we think when you go down the claims of trademark

20   infringement, trade dress, family, advertising, contract,

21   based on -- based on the law and based on the lack of evidence

22   on critical points, I think if you consider the evidence in

23   light of the judge's instructions, where you come out is a

24   verdict for El-Greg.

25         If you see anything differently and you have to look

rebuttal - plaintiff

1    at this profit calculation, these are the appropriate numbers

2    to look at, not Mr. Polash's let's treat this as a cost of

3    goods of zero.  Treat this as if El-Greg manufactured its

4    products out of thin air.

5            So, ladies and gentlemen, I thank you for your

6    attention.

7            THE COURT:  All right.  Mr. Geekie.

8            REBUTTAL ARGUMENT ON BEHALF OF THE PLAINTIFF

9            MR. GEEKIE:  All right.  I'll try and cover this,

10   many of these, again, diversions.  I warned you about them.

11   Let's talk about a few of them.

12           What did Mr. Becker do the first thing he came up

13   here?  He took down these labels.  Why?  Because El-Greg knows

14   they're deadly.  This is El-Greg's kryptonite.  This proves

15   the case.  All you have to do is look at that.

16           What does Mr. Becker do?  He doesn't want you

17   thinking about these labels because when you do, you know that

18   El-Greg did all the things that we claimed here.

19           Now, he claims the Shabazes are, you know, for some

20   reason vindictive or have an axe to grind.  You heard these

21   people, Adam and Warren.  They're good people.  This isn't

22   anything but wanting to be treated fairly and have El-Greg

23   follow the rules.  But they don't follow the rules, do they?

24           We saw it with the settlement agreement.  We heard

25   Maria Lereno's false testimony.  She even lied about her

rebuttal - plaintiff

1    positions at the company.  She sat there and she said I'm not

2    the VP of sales, and then I showed her a document and she had

3    an excuse for that.  The Lerenos and El-Greg are outlaws who

4    think that the law doesn't apply to them.  They think that

5    contracts don't apply to them.

6         So when Mr. Becker took down those labels, the

7    kryptonite of El-Greg, what did he want to show you?  He

8    wanted to show you these two things.  He talked about this box

9    like this is the box that El-Greg was using.

10        No, this wasn't the infringing box.  He wanted you to

11   think about this box.  That's the box, okay?

12        This was their old box.  This box didn't have the

13   label.  We all know what the customer sees first is the label.

14   That's why Restaurant Depot wanted it.  That's why both ILTACO

15   and El-Greg put labels on.

16        Then what does Mr. Becker do?  More diversion.  He

17   talks about this product.  He starts talking about snacks and

18   Cheetos.  Well, there's no evidence about Cheetos here, and

19   Cheetos is not relevant.  Cheetos is not a stuffed sandwich.

20        But again, this is a diversion.  He wants you to

21   think snack.  He doesn't want you to focus on the labels and

22   the real issues here.

23        Now, I was absolutely stunned when he stood here and

24   he told you that Maria Lereno testified that she threw the

25   Excel spreadsheets away.  I'm stunned.  Because her testimony

rebuttal - plaintiff

726

1  was, and I asked her:  "And so you don't have any actual

2  company records that you could produce that show your actual

3  costs of your goods sold, right?

4          "I do.  I have some Excel spreadsheets actually.

5          "Okay.  So is it your testimony that you do have

6  records for cost of goods sold by product?

7          "Of course."

8          Current tense.  She said she had records.

9          Mr. Becker stood here and said she threw them away,

10  she didn't keep them.  Her own testimony.  Why do they keep

11  denying it?  Why do they keep misleading?

12          Well, they have to mislead because Ms. Fisher's

13  expert testimony, this, you know, 504,000 instead of 1.2

14  million in damages or 504,000 in damages, it's all based on

15  these lies.  She took other data.  She didn't take the actual

16  data, the Excel spreadsheets, which exist.  Maria Lereno said

17  they exist.  They didn't do those.

18          Who knows what they show?  Maybe they show virtually

19  no costs.  Maybe they show 100 or 200,000 in costs.  We don't

20  know, but Ms. Fisher's calculations are based on a lie.  Don't

21  award El-Greg for their lies and their deceptions.  It's what

22  they always do.  They did it here, they did it in the

23  settlement agreement.

24          El-Greg does not follow the rules, and they don't

25  play fair, and you've seen plenty of evidence here.

1           So disregard Ms. Fisher's calculations.  She's

2    probably a great expert.  She seems like a nice person.  She

3    apparently was lied to as well, but disregard her report and

4    her calculations.

5           Mr. Becker talked about the vendor program and how it

6    increased sales.  There's no empirical data regarding that.

7    There's no evidence.  People speculate, but we don't know.

8           Now, one thing about the trade dress.  Mr. Becker

9    said to you that there's no empirical data that the trade

10   dress had been established or was recognized by the consuming

11   public.  The trade dress, the labels.

12          But you heard evidence, even Ms. Fisher admitted it.

13   This label, the ILTACO label was out there for eight, nine,

14   ten months, and you heard about ILTACO's sales.  What were

15   ILTACO's sales doing?  Up and up and up from 2010 to 2016,

16   they were going up.

17          Now, with this old box, what was the evidence?

18   El-Greg's sales were going down, down, down.  And even after

19   they came out with the new box, the evidence is it took --

20   their sales continued to decline.  Why?  Because ILTACO had

21   been out there for ten months, and they had established a

22   leadership in the stuffed sandwich business because of their

23   new label.  They got a head start.  They did the right thing.

24   They legitimately and fairly put a new label on, and their

25   sales took off.

rebuttal - plaintiff

1      El-Greg sees their sales going great.  Let's copy it.

2  But it was too late because ILTACO was zooming because of that

3  new label.  And we all admit the label's a lot better than

4  this, right?  Consumers like fancy labels.

5      Willfulness.  Mr. Becker tries to divert you.  He

6  talks about willfulness and what happened after they got

7  letters, after El-Greg got the cease-and-desist letters.

8      That's not the test of willfulness.  Don't be

9  diverted.  The test for willfulness is what did they do in

10  creating this?  What did they do before?  They breached the

11  contract, they breached that settlement agreement, they

12  exchanged emails with their label company that said create a

13  label with the same things.

14      In fact, they got a label back that was identical,

15  and then they tweaked it by putting a parentheses there.

16  That's the willfulness, not what happened later, what happened

17  as they created that.

18      What else is willful about this?

19      THE COURT:  You need to start wrapping up here.

20      MR. GEEKIE:  Excuse me?

21      THE COURT:  Wrap it up.  Finish the point.

22      MR. GEEKIE:  "Makers of the Original Puffs" --

23  "Makers of Original Pizza Puffs," "Makers of Puffs."  That's

24  willfulness.

25      You should enter a verdict for $1.28 million because

1    that's all the evidence we have here of the damages.  Don't

2    deduct anything because there's no legitimate proof of the

3    actual expenses of the infringing products.

4            Thank you.

5            THE COURT:  Okay.  So if you could turn to Page 30 of

6    the instructions, I'm going to read that last instruction

7    which you will now see on your screen there.

8            The verdict must represent the considered judgment of

9    each juror.  Your verdict must be unanimous.  You should make

10   every reasonable effort to reach a verdict.  In doing so, you

11   should consult with each other, express your own views and

12   listen to your fellow jurors' opinions.

13           Discuss your differences with an open mind.  Do not

14   hesitate to re-examine your own view and change your opinion

15   if you come to believe it is wrong, but you should not

16   surrender your honest beliefs about the weight or effect of

17   evidence just because of the opinions of your fellow jurors or

18   just so that there can be a unanimous verdict.  The 12 of you

19   should give fair and equal consideration to all the evidence.

20   You should deliberate with the goal of reaching an agreement

21   that is consistent with the individual judgment of each juror.

22   You are impartial judges of the facts.

23           Okay.  So here's where we are.  The first order of

24   business is going to be for the officer to take you to lunch,

25   and I suggest you get -- that happens pretty quickly, so you

1   can get something, and then you begin your deliberations.

2           The exhibits are all available to you off of that

3   computer in the big screen on the wall.  If there's any

4   technical problems, just let us know.  We'll get it fixed.

5           And all I need to do is swear in the officer, and

6   then you'll be ready to go.

7     (Court Security Officer sworn.)

8           THE COURT:  All right.  The jury's excused to

9   deliberate.  Take your notebooks and your instructions with

10  you.

11          COURT SECURITY OFFICER:  All rise.

12    (Jury exits courtroom.)

13          THE COURT:  So the one missing piece is the laches

14  issue, which, because of the timing, I can't deal with right

15  now because I have to be, literally a minute ago, in a meeting

16  where we're picking a new chief probation officer, and I've

17  got to do a sentencing and couple things after that.

18          What I'm going to suggest -- you're going to be

19  around here the afternoon anyway -- 3:30.  I'm assuming it's

20  relatively compact?

21          MR. BECKER:  The evidence is just the prosecution

22  history and subject to an admission of authenticity.

23          THE COURT:  Okay.  So just be prepared to do that

24  about 3:30.

25          Leave them there.  If they ask for them, we'll send

1    them back.

2              MR. JANSKI:  Okay.

3              THE COURT:  All right.  Thanks.

4         (The jury began its deliberations at 1:29 p.m., and the

5          proceedings were adjourned until 3:30 p.m.)

6                   C E R T I F I C A T E

7              We certify that the foregoing is a correct

8    transcript from the record of proceedings in the

9    above-entitled matter.

10

11   _____
          */s/ Joseph Rickhoff*

12

13        */s/ Kathleen M. Fennell*            October 26, 2018

14   _____  _____
          Official Court Reporters                Date
          United States District Court
15        Northern District of Illinois
             Eastern Division

16

17

18

19

20

21

22

23

24

25

732

```
 1                    IN THE UNITED STATES DISTRICT COURT
                         NORTHERN DISTRICT OF ILLINOIS
 2                             EASTERN DIVISION

 3    ILLINOIS TAMALE CO.,              ) Docket No. 16 C 5387
      an Illinois corporation,         )
 4                                      )
                        Plaintiff,      )
 5                                      )
                  vs.                   )
 6                                      )
      EL-GREG, INC.,                    )
 7    an Illinois corporation,         ) Chicago, Illinois
                                        ) October 25, 2018
 8                      Defendant.      ) 3:46 o'clock p.m.

 9                      TRANSCRIPT OF TRIAL PROCEEDINGS
            BEFORE THE HONORABLE MATTHEW F. KENNELLY, AND A JURY
10
      APPEARANCES:
11
      For the Plaintiff:          SAUL, EWING, ARNSTEIN & LEHR, LLP
12                                BY:  MR. JOSEPH M. KUO
                                       MR. EUGENE J. GEEKIE, JR.
13                                     MS. KELLIE Y. CHEN
                                  161 North Clark Street, Suite 4200
14                                Chicago, Illinois  60601

15    For the Defendant:          LITCHFIELD CAVO, LLP
                                  BY:  MR. ALAN I. BECKER
16                                     MR. RYAN D. JANSKI
                                  303 West Madison Street, Suite 300
17                                Chicago, Illinois  60606

18    Court Reporter:             MR. JOSEPH RICKHOFF
                                  Official Court Reporter
19                                219 S. Dearborn St., Suite 1232
                                  Chicago, Illinois  60604
20                                (312) 435-5562

21                * * * * * * * * * * * * * * * * * *

22                          PROCEEDINGS RECORDED BY
                            MECHANICAL STENOGRAPHY
23                      TRANSCRIPT PRODUCED BY COMPUTER

24

25
```

1        (Proceedings had in open court:)

2            THE COURT:  So, back on the Illinois Tamale case.

3            So, the note from the jury said, "Can you please

4    provide Lindsey's exhibits from the testimony?"

5            I assume that's Ms. Fisher.

6            Honestly, you probably have a better sense of what

7    they're talking about than me.

8            MR. BECKER:  Those would be -- I think they're Tables

9    1 and 2, 6 and 7, 8, Graph No. 1, and I think it's Table 9.

10   It's just the tables.  There's no text.

11           THE COURT:  And are those part of the exhibits that

12   are on the thumb drives?

13           MR. KUO:  They are not because they are part of her

14   expert report, which doesn't -- didn't go into evidence.

15           THE COURT:  They're not admitted into evidence.

16           So, does anybody think I can give them exhibits that

17   aren't in evidence?

18           MR. KUO:  No.

19           MR. BECKER:  They were displayed to the jury without

20   objection, your Honor.  I think they can go to the jury.

21           THE COURT:  Well, I -- actually, there's a pretty

22   pointed case about that in which one of my colleagues down the

23   hall got reversed for doing exactly that, sending a

24   demonstrative exhibit that wasn't admitted into evidence back

25   to the jury.  It involved ladders, if I recall correctly.

734

1        I don't think I can do that.  What I'm going to --

2   let me just think about what I want to write out here.

3      (Brief pause.)

4        THE COURT:  So, what I propose to write -- and I

5   understand this is over the defendant's objection:

6        I cannot provide these exhibits.  They were

7   demonstrative exhibits that were not admitted into evidence --

8   that were not admitted as part of the evidence in the case.

9   You should rely on your collective recollection of their

10  contents.

11       So, having overruled your objection, do you have any

12  problem with the wording of that?

13       MR. BECKER:  No, your Honor.

14       THE COURT:  Okay.

15       So, just give me a second to write that out.  I'll

16  have Pam make a copy for both of you before she takes it.  I'm

17  just going to write it right on here.

18     (The jury continued its deliberations, after which the

19  following proceedings were had in open court, at 4:38 p.m.:)

20       THE CLERK:  Case No. 16 C 5387, Illinois Tamale vs.

21  El-Greg.

22       THE COURT:  All right.  So, we are here to talk about

23  laches.

24       So, Mr. Becker, go.

25       MR. BECKER:  Well, the first item is an evidentiary

1   matter.  We've asked to submit into evidence the exhibits that

2   relate to the prosecution history of the trademark.

3              THE COURT:  Just give me numbers.

4              MR. JANSKI:  DX 781, DX 782, DX 803, DX 804, DX 806,

5   and DX 807.

6              THE COURT:  And it's the prosecution history of the

7   trademark?

8              MR. BECKER:  Of the trademark.

9              THE COURT:  Okay.

10             Do you have any objection to those?

11             MR. KUO:  I'm not sure who would speak to that.

12             THE COURT:  Seriously, we're going to do that?

13             MR. KUO:  Well --

14             THE COURT:  What are these things?  Are they out of

15  the files of the Patent and Trademark Office?

16             MR. KUO:  Yeah.

17             MR. BECKER:  There's the initial rejection --

18             THE COURT:  So, fine.  We can subpoena in here

19  somebody from Washington and we can do that.

20             I mean, really?

21             MR. KUO:  I'm not so much --

22             THE COURT:  You can argue their relevance, but are

23  you really going to dispute the foundation?  Because --

24             MR. KUO:  No, no, no, no, no.

25             THE COURT:  -- I'm happy to continue this --

1                    MR. KUO:  I'm not.

2                    THE COURT:  -- to another day.

3                    MR. KUO:  No, I'm not.

4             I'm not disputing they're from the Trademark Office

5     or anything like that.  As far as their contents are

6     concerned.

7                    THE COURT:  We're not going to argue the laches

8     issues today.  I just want to get the evidence in the record.

9     Then we're going to figure out whether I even need to deal

10    with it once we get a verdict from the jury.  And, then, I'm

11    going to have you come back on another date and argue it.

12                   MR. KUO:  Okay.

13                   THE COURT:  That's what we're going to do.  I just

14    want to get the evidence in so we know what it is.

15                   MR. BECKER:  Okay.

16                   THE COURT:  So, I am admitting those exhibits.

17         (Aforementioned Defendant's Exhibits received in

18    evidence.)

19                   THE COURT:  What else?

20                   MR. BECKER:  I should say Ryan just reminded me one

21    of those exhibits is -- two of those exhibits have to do with

22    the requests to admit and response to authenticate these

23    documents.

24                   THE COURT:  Oh, okay.  Fine.

25             So, anything else you're admitting?  Just that.

1     Then it's going to be argument, basically?

2     MR. BECKER:  That's all.  The other evidence has come

3 in.

4     THE COURT:  Yeah, I can consider everything.

5     Is there any additional evidence beyond what's

6 already in that you want to offer on the anti-laches side?

7   (Brief pause.)

8     MR. KUO:  Not that I can think of.

9     THE COURT:  A long, thoughtful pause.

10     Okay.  So, none.  So, fine.  So, I've heard all the

11 evidence on that.

12     So, what I'm going to do is we'll -- I don't know if

13 we'll get a verdict tonight or not.  If we do, then I will set

14 another date -- it's not going to be next week, because I'm

15 going to be out; it will probably be the week after -- for you

16 to come back and argue about that.

17     MR. KUO:  As far as if they come back --

18     THE COURT:  Well, so, here is what I was -- I was

19 about to say what I would normally do right about now -- it's

20 4:40 -- is send them back a note which basically says, please

21 let me know how long you plan to go tonight and what time

22 you're going to come back in the morning.  I'm not intending

23 to influence the length of your deliberations.  That's

24 completely up to you.  I just need to know so we can have

25 people in place.

1          Does anybody have a problem with me doing that?

2          MR. KUO:  No, your Honor.

3          MR. BECKER:  No, your Honor.

4          THE COURT:  Then I'm going to do that.  So just stick

5   around because we'll get an answer back in five minutes

6   probably.

7          MR. KUO:  Okay.

8      (The jury continued its deliberations, after which the

9   following proceedings were had in open court at 5:17 p.m.:)

10          THE COURT:  Recalling 16 C 5387.

11          The lawyers are here.  It's 5:17.  The jury has

12   reached a verdict, and they're on their way out.

13      (Jury in.)

14          THE COURT:  All right.  Everybody can have a seat.

15          I understand the jury has reached a verdict.  Is that

16   correct?

17          A JUROR:  Yes.

18          THE COURT:  Please hand it to the officer.

19      (Document tendered to the Court.)

20          THE COURT:  The first thing I'm going to do is staple

21   it back together.

22          I apologize for forgetting to give you a separate

23   one.

24          Okay.  I'm going to read the verdict into the record.

25   Here's what it says:  We, the jury, find as follows on the

1    claims of ILTACO against El-Greg:

2          On the claim of Claim 1, trademark infringement, the

3    finding is in favor of ILTACO; and, on the question of whether

4    the infringement was willful, the answer is "Yes."

5          Claim 2, trade dress infringement, the finding is in

6    favor the ILTACO.  On the question of willfulness, the answer

7    is "Yes."

8          Claim 3, trademark infringement, Puffs family, the

9    finding is in favor of ILTACO.  On the question of willful

10   infringement, the answer is "Yes."

11         Claim 4, false advertising, the finding is in favor

12   of ILTACO.  On the question of willfulness, the answer is

13   "Yes."

14         On the question of damages with regard to Claim 1, 2,

15   3, and 4, I'm just going to read it as it says:  State the

16   amount of damages, if any, that are to be awarded to ILTACO

17   for the following time periods.

18         So, for July, 2010, to December 31, 2016, it says

19   $20,000.  For the shorter period, May 19th, 2016, to December

20   31st, 2016, it says $10,000.

21         Under B, state the amount of El-Greg's profits, if

22   any, that are to be awarded for ILTACO, for the period of July

23   -- the longer period, July, 2010, to December 31, 2016, it

24   says $60,000.  For the shorter period, May 19th to December

25   31, it says $30,000.

1       Claim 5, breach of contract, the finding is in favor

2   of ILTACO and the amount of damages awarded is a hundred

3   thousand dollars.

4       The verdict is signed by all 12 jurors.  It will be

5   made a part of the record in the case.

6       That completes your service in this case.  I want to

7   thank you for your patience and for your willingness to serve.

8   What I said at the beginning of the case I really meant.  The

9   system does not work unless people like you are willing to

10  serve; and, you were and you did, and I appreciate it.  And I

11  want to thank you on behalf of the court.

12      You're excused from further service at this time.  If

13  anybody wants to stick around for even a couple minutes, I'll

14  be back there in a couple minutes.  I'd like to get any input

15  you might be able to give us for anything we can do better;

16  and, any questions you have, I'll do my best to answer them.

17      If you need to leave, that's, of course, fine because

18  it's late in the day.  It's 5:20.

19      I thank you for your service.

20    (Jury out.)

21      THE COURT:  Okay.  So, I'm going to set you for

22  argument on the laches issue.  It can't be next week because

23  I'm going to be out.

24      How about Wednesday, the 7th of November, at 10:30?

25      MR. BECKER:  I'm sorry?

741

1           THE COURT:  Wednesday, November the 7th, at 10:30.

2           MR. KUO:  That's fine with me, your Honor.

3           MR. BECKER:  That works fine, your Honor.

4           THE COURT:  Okay.  That will be the date.  So, I'll

5    see you then.

6           Thanks.

7           MR. JANSKI:  Thank you, your Honor.

8                        *    *    *    *    *

9

10   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

11

12
     /s/ Joseph Rickhoff                    October 26, 2018
13   Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25