**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| ILLINOIS TAMALE CO., an Illinois corporation, <br><br> Plaintiff, <br> v. <br><br> EL-GREG, INC., an Illinois corporation, <br><br> Defendant. | Civil Action No.: 1:16-cv-05387 <br><br> Judge Matthew F. Kennelly <br><br> Magistrate Judge Susan E. Cox |

## EL-GREG'S RULE 50 MOTION FOR JUDGMENT AS A MATTER OF LAW

Defendant El-Greg, Inc. moves for judgment under Federal Rule of Civil Procedure 50.

**1.  El-Greg is entitled to judgment on ITALCO'S claim for alleged breach of contract.**

ILTACO's assertion that El-Greg breached the 2004 settlement agreement failed as a matter of law because ILTACO failed to prove (1) El-Greg breached the Settlement Agreement; or (2) ILTACO suffered any actual damages as a result. *Swyear v. Fare Foods Corp.*, 2018 WL 6787325, *8 (7th Cir. 12/26/2018).

**A.  ILTACO failed to establish El-Greg breached the Settlement Agreement.**

*i.  The Settlement Agreement prohibited only the use of "Pizza Puffs".*

ILTACO's breach of contract claim cannot stand. Its contention that El-Greg breached the Settlement Agreement rests on a specious and unreasonable interpretation of that contract.

Under Illinois law, an unambiguous contract is interpreted by the court as a matter of law. *In re Duckworth*, 776 F.3d 453, 456 (7th Cir. 2014); *Berg v. eHome Credit Corp.*, 848 F.Supp.2d 841, (N.D.Ill. 2012). The Settlement Agreement is unambiguous – even more so if strictly construed so as to avoid restraint on competition as required by Illinois law. *Interim Health Care of Illinois, Inc. v. Interim Health Care, Inc.*, 225 F.3d 876, 879 (7th Cir. 2000).

The Settlement Agreement establishes that ILTACO sued El-Greg and Michael's Chicago Style Red Hots, Inc. ("Michael's") in 2002, alleging "claims for infringement of Illinois Tamale's **trademark "Pizza Puff,"** which was registered as" an Illinois trademark. PX11. The Settlement Agreement also established that El-Greg filed counterclaims and affirmative defenses challenging ILTACO's "trademark rights in "Pizza Puff"."

Therefore, the unambiguous intent of the Settlement Agreement was to address only the use of ILTACO's actual trademark "Pizza Puffs" as such and nothing else. Indeed, as indicated by the highlighted portion of the quote above, the Settlement Agreement **specifically defined** the phrase "Pizza Puffs" as ILTACO's registered trademark. See *Berg*, 848 F.Supp.2d at 846.

That the Settlement Agreement applied solely to ITALCO's registered trademark "Pizza Puff" as such and not its component parts "pizza" and "puffs" is further demonstrated by the operative terms of paragraph 2 which precluded El-Greg only from using ""Pizza Puff," alone or in combination with other words or designs."

The unambiguous intent of Paragraph 2 was to apply solely to the use of the registered trademark "Pizza Puffs" "alone", or "Pizza Puffs" in combination with other words. There is nothing in Paragraph 2 to suggest that anyone intended to prohibit use of the term "pizza" alone or in combination with other words, or to prohibit use of the term "puffs" alone or in combination with other words, or to prohibit use of the terms "pizza" and "puffs" separated by other words. Indeed, an axiomatic Illinois canon of contract interpretation is that the use of a list of examples necessarily means that the parties intended to address only examples of the same type. *Hugh v. Amalgamated Trust & Savings Bank*, 235 Ill.App.3d 268, 275 (1992); *FMS Inc. v. Volvo Construction Equipment*, 557 F.3d 758 (7th Cir. 2009). Therefore, the parties to the Settlement Agreement intended to use the list of examples in Paragraph 2 – "El-Greg Pizza Puff"

and "Stuffed Pizza Puff" – to mean that the restriction applied only to similar examples using the actual trademark "Pizza Puff" itself and not other permutations of "pizza" and "puffs."

> ii. *ILTACO offered no evidence of any material breach of the Settlement Agreement when that contract is properly interpreted as required by law.*

Once the Settlement Agreement is properly interpreted, then it is indisputable that ILTACO failed to offer any evidence of a breach by El-Greg. First, since Paragraph 2 of the Settlement Agreement applied only to the use of the actual registered trademark "Pizza Puff" itself, it was not a breach for El-Greg to use the phrase "Pizza Pies™ (Puffs)" on the label mandated by Restaurant Depot. The term "pizza" does not appear next to the term "puffs" and thus there was no exact copying of the trademark "Pizza Puff."

**B. ITALCO failed as a matter of law to prove damages.**

ITALCO also failed to establish any actual damages resulted from the alleged breach. In a breach of contract claim, the plaintiff must prove its actual damages. *Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 694 (7th Cir. 2011). ILTACO had to prove that it suffered damage **because of** the alleged breach and it had to establish the correct measure of damages. *Harmon v. Gordon*, 712 F.3d 1044, 1053 (7th Cir. 2013). It failed to do so.

> i. *ITALCO offered no direct or circumstantial evidence of any damages.*

Here, ILTACO offered no direct or circumstantial evidence that it suffered any damages. There was not one iota of evidence to suggest that anyone ever went into Restaurant Depot intending to purchase ILTACO Pizza Puffs but mistakenly purchased the El-Greg product instead because it had the phrase "Pizza Pies™ (Puffs)" on the label. To the contrary, the witnesses acknowledged that they had no knowledge of any such occurrence. E.g., Tr. 170-71.

> ii. *ILTACO's expert testimony on damages lacked any probative value because it merely assumed as true what ILTACO had the burden to prove.*

The only purported evidence ILTACO offered in its feeble effort to establish damages was the baseless *assumptions* of its purported expert, William Polash. However, expert opinions cannot be based on assumptions which are unsupported by the evidence, nor can any expert's assumptions stand in for the substantive evidence necessary to meet the burden of proof. *Clark v. Takata Corp.*, 192 F.3d 750, 757-58 (7th Cir. 1999).

Polash's methodology was to compare the sales rates for three El-Greg's products at Restaurant Depot to the sales rates for the same products to other El-Greg customers for the period between 2010 and 2016. Polash then merely assumed – without any factual basis – that if El-Greg's sales rates were higher at Restaurant Depot than at other El-Greg customers, it was solely the result of the accused label. Tr. 222-23. Polash further assumed without any evidentiary support that ILTACO would have received the increased sales instead if the allegedly offending label had not been on the El-Greg product. Tr. 234.

Thus, Polash merely *assumed* without any evidentiary support exactly what ILTACO was supposed to *prove* with *evidence*: that El-Greg's alleged infringement or breach caused damages or lost profit to ITALCO. Tr. 231-33. Under *Clark v. Takata Corp.*, 192 F.3d 750 (7th Cir. 1999), Polash's assumptions as to ITALCO's alleged damages and lost profits was improper and lacked any probative value: "One problem with Lafferty's opinion ... is that Lafferty *assumes* as truth the very issue that Clark needs to *prove* in order to recover." *Id*. at 757-58.

The problems with Polash's opinions do not end there. Polash also essentially conceded that his opinions were based on unsound methodology. Polash assumed that the allegedly offending labels caused lost sales to ITALCO but nonetheless admitted that this purported effect did not show up for almost three years after El-Greg started using the labels. Tr. 228-230, 242-43. Indeed, El-Greg's sales at Restaurant Depot went *down* after it implemented the new label in

4

2010 and stayed down for almost three years. *Id*. Thus, the undisputed facts directly contradicted Polash's assumption. It is not sound methodology to rely on assumptions that are divorced from reality. *Target Market Publishing Co. v. ADVO, Inc.*, 136 F.3d 1139, 1142 (7th Cir. 1998).

Second, Polash admitted he ignored several other possible explanations for the increase in sales growth of El-Greg products at Restaurant Depot even though sound methodology required consideration of such factors: (1) El-Greg began selling to more Restaurant Depot locations in 2013 (the same year its sales to Restaurant Depot began to increase); (2) El-Greg participated in marketing programs with Restaurant Depot beginning in 2013 that increased El-Greg's sales at Restaurant Depot; (3) El-Greg introduced an entirely new halal product to Restaurant Depot in 2013 which also served to increase sales (ILTACO did not sell a halal product); and most importantly, (4) the effect that the considerably higher price of ITALCO's products would have on sales, even though he acknowledged that a price differential was a well-recognized reason for a difference in sales rates. Tr. 230-38. Polash admitted ILTACO's prices increased to as much as 24% more than El-Greg's during those years. *Id*. Therefore, Polash's methodology was worthless because he completely failed to consider alternative causes other than alleged infringement. See *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 433 (7th Cir. 2013); *Myers v. Illinois Central Railroad Co.,* 629 F.3d 639, 644 (7th Cir. 2013).

(For the same reasons, El-Greg is also entitled to judgment as a matter of law that ILTACO failed to prove it suffered any actual damages in its Lanham Act claims.)

**2. El-Greg is entitled to judgment as a matter of law on ILTACO's claim for purported infringement of a "family of marks" based on the word "puffs".**

    **A. ILTACO did not establish the essential element of "secondary meaning" in "puffs" before 1990 when El-Greg introduced its own "puffs" product.**

ILTACO's claim for infringement of a family of marks fails as a matter of law because it

failed to establish the term "puffs" by itself had a secondary meaning associated with ILTACO *before* El-Greg introduced its Spinach Puffs in 1989 and Chili Cheese Puffs in 2006 respectively. Tr. 134-36. *See e.g., AM General Corp. v. DaimlerChrysler Corp.,* 311 F.3d 796, 819 (7th Cir. 2002); *Colony Foods, Inc. v. Sagemark, Ltd.,* 735 F.2d 1336, 1339 (Fed. Cir. 1984); *American Aloe Corp. v. Aloe Crème Laboratories, Inc.*, 420 F.2d 1248, 1256 (7th Cir. 1970). Descriptive terms such as "puffs" may be trademarked only if they have acquired secondary meaning. *Spraying Systems Co. v. Delavan, Inc.*, 975 F.2d 387, 392-93 (7th Cir. 1992). ILTACO did not even attempt to meet that burden of proof. It offered no evidence whatsoever that anyone in 1989 – or even in 2006 for that matter – associated the word "puffs" with ILTACO.

ILTACO cannot rely on the testimony of Joseph Maronick regarding a survey conducted in 2017 ("Maronick Study 2") to establish secondary meaning before 1990. Maronick Study 2 did not even attempt to simulate the market in 1989 or in any year other than 2017. The study also did not even purport to evaluate whether members of the public associated the word "puffs" with ILTACO in 1990, or in any year other than 2017. Therefore, Maronick Study 2 did not offer any support for ILTACO's claim of a family of marks during the relevant time period.

**B.      ILTACO failed to offer any evidence of secondary meaning associating the word "puffs" with ILTACO at any time.**

ILTACO also failed to offer any evidence to establish such a secondary meaning for "puffs" even now. ILTACO's only evidence at trial was that they sold a number of products that used the word "puffs" in their name. That was not enough by itself to make the necessary strong showing of a right to a "family" of marks as a matter of law. *Spraying Systems Co. v. Delavan, Inc.*, 975 F.2d 387, 393 (7th Cir. 1992); *J & J Snack Foods Corp. v. McDonald's Corp.*, 932 F.2d 1460 (Fed. Cir. 1991); 2 McCarthy § 23:19, at 103; *American Aloe Corp. v. Aloe Creme Laboratories, Inc.*, 420 F.2d 1248, 1253 (7th Cir. 1970).

6

Again, ILTACO cannot rely on Maronick Survey 2 to establish secondary meaning at any time because that study was never intended to prove any secondary meaning of "puffs" but rather solely to determine whether there was a likelihood of confusion between the ILTACO Pizza Puff mark and the El-Greg Chili Cheese Puff mark. Tr. 412. Moreover, Maronick admitted he did not even ask the survey respondents what company they associated the word "puffs" with, nor did he ask whether the respondents believed the word "puffs" was a brand. Tr. 412-13. A survey cannot prove what it did not even ask about. Thus, Maronick Study 2 could not support ILTACO's claim of a family of marks. See *Royal Crown Co., Inc. v. Coca-Cola Co.*, 892 F.3d 1358, 1371 (Fed.Cir. 2018); *Spraying Systems Co. v. Delavan, Inc.*, 975 F.2d 387, 394, n.4 (7th Cir. 1992).

Other fundamental problems with Maronick Survey 2 also rendered it unreliable and of no probative value. The survey first informed the respondents that "Pizza Puffs" was a brand of stuffed sandwich. Tr. 378. The survey then presented respondents with six names that they were told were also "brands" of stuffed sandwiches: Chili Cheese Puffs (an El-Greg product), Hot Pockets Beef Tacos, Lean Pockets Chicken Parmesan, Chicken Potstickers, and two ILTACO products – Taco Puffs and Sloppy Joe Puffs. Tr. 378. The respondents were then asked if any of those "brands" came from the same company as Pizza Puffs.

However, the survey was fatally biased under *Spraying Systems* because it suggested to the respondents the desired answer. Specifically, by first separately informing the respondents that "Pizza Puffs" was a brand, the survey improperly highlighted that "Pizza Puffs" was the focus of the survey. Moreover, the survey then informed respondents that the other six names were also "brands" and then asked the respondents to identify any association between the brands. As a result, the Maronick Study 2 clearly compounded the bias by implying to the respondents that they should find an association between "Pizza Puffs" and those other brand

7

names which included the same word "puffs" as in "Pizza Puffs".

Even if the Maronick Survey 2 had been properly designed, its results failed to offer any proof of secondary meaning (or likelihood of confusion for that matter). The actual results were that *at most 39 of the 214 respondents, or 18%,* associated the El-Greg product Chili Cheese Puffs with Pizza Puffs because they both used the word "puffs". Tr. 416-17. In *Spraying Systems*, the Seventh Circuit ruled that even a 38% response rate associating the mark with a single company was "marginal" at best – a "scintilla" of evidence that did not raise a genuine issue of material fact and thus did not preclude summary judgment. *Id*. at 394-95.

Furthermore, Maronick Survey 2 established that the data it generated was largely noise. For example, the use of the Hot Pockets and Lean Pockets products was supposed to be a "control" to identify noise in the data. Tr. 415. While 39 out of 214 respondents answered that there was an association between Pizza Puffs and Chili Cheese Puffs, 49 respondents thought that Hot Pockets came from the same company as Pizza Puffs and 51 respondents thought that Lean Pockets came from the same company as Pizza Puffs. Tr. 415. After deducting for noise, the net percentage of those respondents associating Chili Cheese Puffs with Pizza Puffs was less than half of the percentage already declared by the Seventh Circuit in *Spraying Systems* to be insufficient as a matter of law.

        **D.**     **El-Greg is entitled to judgment on any claim that it "willfully" infringed on a family of marks.**

It is indisputable that ILTACO wholly failed to offer any evidence whatsoever to establish that El-Greg "willfully" infringed on its purported family of marks. ILTACO never asserted any rights to the word "puffs" under its family of marks theory until after it filed an amended complaint in this case in 2016. It is impossible for someone to willfully infringe on a purported claim without first knowing that such a claim exists.

8

## 3. El-Greg is entitled to judgment on ILTACO's claim for violation of "trade dress".

### A. Every aspect of ILTACO's label was merely functional.

Trade dress protection does not apply to product features that are functional. *Traffix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 29 (2001). In this case, ILTACO did not register its purported "trade dress" – what it characterizes as the overall configuration of the label it used at Restaurant Depot – so it had the burden of proving that the label was not functional. *Id*. at 29, 32; 15 U.S.C. 1125(a)(3). It failed to do so.

A feature is functional and cannot serve as a trademark if it is essential to the purpose of the article. *Traffix* at 32-33. In this case, the witnesses testified that every aspect of the label used at Restaurant Depot – the photograph, the item count, the net weight, the item weight, and even the list of available flavors – was functional and served the essential purpose of informing the customers of the box's contents. Indeed, such boxing of information indisputably performs an informational function. *Blau Plumbing v. S.O.S. Fix-It, Inc.*, 781 F.2d 604, 611 (7th Cir. 1986). Most importantly, since the contents of the label were functional, El-Greg could copy it rather than explore other designs. *Traffix*, 532 U.S. at 29, 33-34.

ILTACO asserted that its "overall configuration" was not itself functional; it could have had the photo on the opposite side, for example. But in *Traffix*, the Supreme Court held that the functional nature of the design at issue was not rendered protectable trade dress merely because it could have been configured differently. Likewise, the exact location of the information on ILTACO's label did not serve to eliminate the functional nature of the overall label itself. Therefore, El-Greg was free to offer the same description in a way that facilitated comparison by consumers. *Blau Plumbing v. S.O.S. Fix-It, Inc.*, 781 F.2d 604, 609 (7th Cir. 1986).

### B. ILTACO did not even attempt to establish that its label was inherently distinctive or had secondary meaning within the relevant period of 9 months.

9

ILTACO's trade dress claim fails not only because it failed to prove non-functionality but also because it failed to prove the labels it used at Restaurant Depot had acquired secondary meaning *before* El-Greg introduced its own label. (ILTACO introduced its label in August 2009 while El-Greg introduced its label in May 2010.) Simple geometrical shapes containing essential information are too common to be distinctive and cannot be appropriated for use as trademarks without proof of secondary meaning. *Bretford Mfg., Inc. v. Smith System Mfg. Corp.*, 419 F.3d 576, 610 (7th Cir. 2005). But ILTACO did not offer any evidence at all that its label had a secondary meaning at any time, much less before El-Greg introduced its label. Neither Maronick Survey 1 or 2 was designed to establish secondary meaning. To the contrary, those surveys purported to address likelihood of confusion.

And ILTACO cannot now attempt to recraft those surveys into proof of secondary meaning. That is because Maronick Survey 1 suffers from the fatal problem that it did not separate the allegedly protectable trade dress – the overall configuration – from the clearly non-protectable functional elements. A survey which asks consumers to identify the source of a product based on its overall configuration when most of the product's configuration is functional is worthless in determining whether a particular product feature has acquired secondary meaning. *Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 662-63 (7th Cir. 1995); *Sunbeam Corp. v. Equity Industries Corp.*, 635 F.Supp. 625, 635 (E.D.Va. 1986).

Moreover, where, as here, the alleged trade dress has been on the market for such a short period of time – 9 months – such a short time period renders it unlikely that the trade dress has acquired a secondary meaning. *Sunbeam Corp. v. Equity Industries Corp.*, 635 F.Supp. 625, 530 (E.D.Va. 1986) (product on market for less than 18 months).

**4.     El-Greg is entitled to judgment on ILTACO's Lanham Act claims including**

### trademark infringement because ILTACO failed to prove likelihood of confusion.

ILTACO failed to offer any evidence with any probative value to establish the essential element of likelihood of confusion necessary to support all of its claims under the Lanham Act. Therefore, El-Greg is entitled to judgment as a matter of law on all of the Lanham Act claims.

**A. ILTACO offered no evidence of actual confusion.**

ILTACO offered no evidence of actual confusion on any of its Lanham Act claims. There was no evidence of any actual confusion resulting from the El-Greg label at Restaurant Depot, or the phrase "Pizza PiesTM (Puffs)", or the term "puffs", or from the use of the slogan "Makers of the original puffs." Indeed, the witnesses all testified that they were not aware of any confusion.

The lack of any evidence of actual confusion is particularly significant here because absent evidence of actual confusion, there is a strong presumption that there is little likelihood of confusion when the marks have been in the same market, side by side, for a substantial period of time. *Pignons v. Polaroid Corp.*, 657 F.2d 482, (1st Cir. 1981) (four years was substantial period of time). Here, ILTACO and El-Greg had competed side by side in Restaurant Depot stores for more than five years before the alleged infringement or breach. Therefore, there should be a strong presumption that there is no likelihood of confusion.

**B. The Maronick Surveys used fundamentally flawed methodologies and thus lacked any probative value whatsoever.**

Let's first put aside any notion that, merely because ILTACO offered survey evidence, that likelihood of confusion was necessarily a question for the jury to decide. To the contrary, the courts have uniformly recognized that a defendant can be entitled to judgment as a matter of law even when some of the factors to be considered on likelihood of confusion weigh in favor of the plaintiff and even when survey evidence is presented. See, *e.g.*, *Hornady Mfg. Co., Inc. v. Doubletap, Inc.*, 746 F.3d 995 (10th Cir. 2014); *Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d

1136 (10th Cir. 2013). Moreover, where an expert's survey evidence uses fundamentally flawed methodologies, it fails to offer any probative value as evidence and thus cannot serve to create an issue of fact for the jury to decide. *Hornady*, 746 F.3d at 1001; *Water-Pik*, 726 F.3d at 1145.

Therefore, the threshold question in this case is whether the Maronick Surveys were fundamentally flawed. Under the case law, there can be no question that they were. (Indeed, El-Greg has already established above the fatal deficiencies in Maronick Survey 2.)

*i. Maronick Survey 1 used the wrong universe of respondents.* The crucial first step in designing a survey is to determine the universe to be studied; if the survey probes the wrong persons, the results are irrelevant. *Valdor, Inc. v. HTC Corp.*, 242 F.Supp.3d 448, 459 (E.D.Va. 2017). Customers who do not care about the source of goods must not be considered in the determination whether there is a likelihood of confusion. *Syndicate Sales, Inc. v. Hampshire Paper Corp.*, 192 F.3d 633, 636-37 (7th Cir. 1999). Maronick himself acknowledged that choosing the wrong universe rendered the survey results meaningless. Tr. 368.

In this case, the universe Maronick selected was not limited to customers who cared about the source of goods as required by the Seventh Circuit. Customers of Restaurant Depot were limited to restaurants and convenience stores. Contrary to the law, Maronick included respondents other than restaurants and convenience stores, including those who never had any reason to go to Restaurant Depot. Specifically, he included anyone who potentially could buy frozen stuffed sandwiches from "a wholesale distributor" not only for "a company you own or work for" but also just "***for an event*** you're involved in." Tr. 383-84. Even worse, Maronick failed to define "wholesale distributor" even though he knew respondents could interpret that term to include Costco or Sam's Club. Tr. 386-87. Maronick's universe thus included anyone who might buy a frozen stuffed sandwich at Costco or Sam's Club "for an event" such as a

birthday party. Tr. 387. That is not the relevant universe, and as Maronick himself admitted, choosing the wrong universe rendered his entire survey meaningless.

*ii. The Maronick Surveys used biased and leading questions.* Maronick Survey 1 showed the respondents three images – the labels from "Pizza Puffs", the label from "Pizza PieTM (Puffs)" and a label from Supreme Stuffers. He then asked the respondents whether they believed there was any association between one or more of the images. The surveys in *Water-Pik, Inc. v. Medi-Systems, Inc.*, 726 F.3d 1136, 1147-48 (10th Cir. 2013) and *Hornady Mfg. Co., Inc. v. Doubletap, Inc.*, 746 F.3d 995, 1006 (10th Cir. 2014) used essentially the same methodology as Maronick did in this case. The Tenth Circuit ruled in both cases that the questions were improperly leading because they begged the answer by suggesting to the respondent a link between the plaintiff and defendant. Consequently, Maronick's survey questions were fundamentally flawed and leading, rendering the results meaningless.

*iii. The Maronick Surveys failed to replicate market conditions.* The likelihood of confusion must be determined with reference to the realities of consumer behavior in the relevant market. *Dorr-Oliver, Inc. v. Fluid-Quip, Inc.*, 94 F.3d 376, 381 (7th Cir. 1996). The failure of a survey to approximate actual marketplace conditions can render the survey inadmissible or of no probative value. *Thoip v. Walt Disney Co.*, 690 F.Supp.2d 218, 231 (S.D.N.Y. 2010).

In this case, Maronick's methodology precluded the respondents from seeing the realities of the actual market conditions at Restaurant Depot. For example, the respondents did not see the Restaurant Depot stickers on the outside of the freezer. More importantly, the respondents did not see the other sides of the boxes showing large renderings of El-Greg's name and logo on almost every side. These flaws rendered the survey unreliable and of no probative value. *The Steak-Umm Co., LLC v. Steak 'Em Up, Inc.*, 868 F.Supp.2d 415, 435 (E.D.Pa. 2012); *Thoip v.*

*Walt Disney Co.*, 690 F.Supp.2d 218, 238, 239 n.153 (S.D.N.Y. 2010).

*iv. The Maronick Surveys failed to use required controls to account for noise.* A survey designed to estimate likelihood of confusion must include a proper control to eliminate background "noise" or "error" in the survey. *Water-Pik*, 726 F.3d at 1148; *Thoip v. Walt Disney Co.*, 690 F.Supp.2d 218, 240 (S.D.N.Y. 2010); 6 *McCarthy on Trademarks* 32:187 at 32-397 to 32-400. Without proper controls, a survey amounts to nothing more than meaningless word association and memory tests. *Simon Property Group v. MySimon, Inc.*, 104 F.Supp.2d 1033, 1035 n.2 (S.D.Ind. 2000).

Here, Maronick recognized that sound methodology required a control. He even admitted that the image of Supreme Stuffers was intended to act as a control. However, in rendering his opinion, Maronick refused to actually apply that control to eliminate noise, rendering his survey irrelevant, unreliable and inadmissible. *Black & Decker, Inc. v. North American Philips Corp.*, 632 F.Supp. 185, 194 (D.Conn. 1986); *Thoip,* 690 F.Supp.2d at 241.

*v. Even at face value, the Maronick Surveys failed to demonstrate likelihood of confusion as a matter of law.* In Maronick Survey 1, only 18 out of 212 respondents said that they saw an affiliation between El-Greg and ILTACO's product because of the use of the word "Puffs" in the labels. That constitutes only 8.4%, which is deficient as a matter of law to establish likelihood of confusion. *Spraying.,* 975 F.2d at 394 (38% considered marginal); *citing, 2 J. Thomas McCarthy, Trademarks and Unfair Competition* § 32:54, at 786 (2d ed. 1984).

Finally, as demonstrated in El-Greg's Motion for Directed Verdict and incorporated here, ILTACO failed to establish any of the other factors that are considered for likelihood of confusion. El-Greg is entitled to judgment as a matter of law because no rational juror would find a likelihood of confusion. *Hornady,* 746 F.3d at 1008.

**5. El-Greg is entitled to judgment on ILTACO's claim for false advertising.**

ILTACO's false advertising claim was based solely on El-Greg's use of the slogan "Makers of the Original Puffs" on the label mandated by Restaurant Depot, but ILTACO offered no evidence whatsoever to establish several essential elements of such a claim: (1) a false statement of fact by El-Greg about its own product; (2) the statement actually deceived or had the tendency to deceive a substantial segment of its audience; (3) the deception was material, in that it was likely to influence the purchasing decision; and (4) the plaintiff has been injured as a result of the false statement. *Hot Wax, Inc., v. Turtle Wax, Inc.*, 191 F.3d 813 (7th Cir. 1999).

In this case, El-Greg's slogan was solely about itself and not any product. Furthermore, there is no evidence whatsoever to establish anyone was deceived or that any alleged deception was material. Indeed, there is no evidence at all that anyone even noticed the slogan much less based a decision to buy the product on that slogan. Moreover, as repeatedly demonstrated above, ILTACO failed to prove damages. Therefore, El-Greg is entitled to judgment as a matter of law.

El-Greg, Inc. respectfully prays pursuant to Rule 50 that the Court enter judgment in its favor as a matter of law on all counts and notwithstanding the jury verdict.

Date: January 11, 2019  Respectfully submitted,

LITCHFIELD CAVO LLP,
By:   /s/Alan I Becker
     ALAN I. BECKER

Alan I. Becker
Ryan D. Janski
**Litchfield Cavo LLP**
Attorneys for Defendants
303 W. Madison Street, Suite 300
Chicago, Illinois 60606
Tel:   (312) 781-6622 (Becker)
      (312) 781-6667 (Janski)
Fax:  (312) 781-6633
*becker@litchfieldcavo.com*
*janski@litchfieldcavo.com*

**CERTIFICATE OF SERVICE**

      The undersigned, an attorney, states that he served a copy of **Defendant El-Greg, Inc.'s Rule 50 Motion for Judgment as a Matter of Law** upon counsel registered with the Clerk of the Court using the CM/ECF system, on January 11, 2019.

- ☒ With the Clerk of the Court using the CM/ECF system which will send notification of such filing to the parties of record.
- ☐ Personal service
- ☐ U.S. mail, by depositing it in the U.S. mail at 303 West Madison Street, Chicago, Illinois at or before 5:00 p.m. with proper postage prepaid to the address listed above.
- ☐ Overnight delivery to the address listed above.
- ☐ Facsimile machine from Chicago, Illinois, to the telephone number(s) listed above.
- ☐ E-mail from Chicago, Illinois, to the email addresses of the parties listed above.

                          LITCHFIELD CAVO LLP

                          s/ Alan I. Becker

Alan I. Becker
Ryan D. Janski
Litchfield Cavo LLP
303 W. Madison Street, Suite 300
Chicago, Illinois 60606
Telephone: (312) 781-6622 (Becker)
Telephone: (312) 781-6667(Janski)
Fax: (312) 781-6630
becker@litchfieldcavo.com
janski@litchfieldcavo.com