**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ILLINOIS TAMALE CO.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 16 C 5387** |
| | ) | |
| **EL-GREG, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Illinois Tamale Co., which owns the registered trademark "Pizza Puffs," among other "puffs" trademarks, brought this lawsuit in May 2016 against El-Greg, Inc. Illinois Tamale and El-Greg are Chicago-based businesses that manufacture and sell competing versions of a frozen, hand-held stuffed sandwich filled with meat, cheese, and sauce. This lawsuit concerns El-Greg's use of the product names "Pizza Pies™ (Puffs),"[1] "Chili Cheese Puff," and "Veggie Pizza Puff," among others, as well as similarities between the parties' slogans and packaging. Illinois Tamale asserted claims for trademark and trade dress infringement, unfair competition, and false advertising under the Lanham Act and state law. Illinois Tamale also asserted a state law breach of contract claim, alleging that El-Greg breached a prior settlement agreement in which it agreed not to use "Pizza Puff," alone or in combination with other words, to market, advertise, or identify its goods. The Court denied both parties' motions for partial

---

[1] For ease of reference, the Court will omit the "™" symbol from this term in the remainder of the opinion.

summary judgment.  *See Illinois Tamale Co. v. El-Greg, Inc.*, No. 16 C 5387, 2018 WL 1534971 (N.D. Ill. Mar. 29, 2018).

In October 2018, the case was tried before a jury, which found in favor of Illinois Tamale and against El-Greg on all claims.  The jury also made a finding of willfulness on each of the Lanham Act claims.  It awarded Illinois Tamale $100,000 on the breach of contract claim.  Because El-Greg asserted a laches defense to the Lanham Act claims, which the parties agreed the Court would adjudicate after the jury trial, the Court directed the jury to provide two sets of damages awards for those claims:  one for the entire infringement period and another for the infringement period post-dating the filing of the lawsuit.  After a bench trial held on November 7, 2018, the Court concluded that El-Greg had established its defense of laches and that, as a consequence, Illinois Tamale should not be able to recover "damages and profits that predate the filing of suit."  *See Illinois Tamale Co. v. El-Greg, Inc.*, No. 16 C 5387, 2018 WL 6590558, at *3 (N.D. Ill. Dec. 14, 2018) ("Laches Order").  The Court, therefore, adopted the jury's damages award for the infringement period post-dating the filing of the lawsuit:  $10,000 for Illinois Tamale's lost profits and $30,000 for El-Greg's profits resulting from the Lanham Act violations.  The Court directed the clerk to enter judgment in favor of Illinois Tamale on all of its claims against El-Greg, awarding Illinois Tamale damages in the total amount of $140,000.  *See id.*

Both parties challenge the judgment.  El-Greg has moved under Federal Rule of Civil Procedure 50(b) for judgment as a matter of law on all claims.  In the alternative, El-Greg has moved under Rule 59(a) for a new trial on all claims.  In that motion, El-Greg has made an alternative request for a remittitur of the damages award on the

breach of contract claim. Illinois Tamale, for its part, has moved under Rule 50(b) for judgment as a matter of law concerning the jury's award of El-Greg's profits on the Lanham Act claims. In the alternative, Illinois Tamale has moved under Rule 59(a) for a new trial on that award. Illinois Tamale has also moved under Rule 59(e) to alter or amend the Court's judgment on El-Greg's laches defense. Finally, Illinois Tamale has moved for a permanent injunction; enhancement of damages, a declaration of exceptional case, and attorneys' fees under 15 U.S.C. § 1117(a); and sanctions under 28 U.S.C. § 1927. The Court addresses each request in turn.

## Background

### A.   Evidence at trial

#### 1.   Illinois Tamale's products

Illinois Tamale's owner Warren Shabaz (W. Shabaz, to distinguish him from Adam Shabaz) testified that he created a tortilla-wrapped, deep-fried pizza product in or around 1976. He decided to call the product a Pizza Puff and trademarked the term Pizza Puffs in 1976. He testified that Illinois Tamale began selling Pizza Puffs "to the masses" in Chicago in 1976 and has used the trademark (which is also registered) continuously since then. Oct. 22, 2018 Trial Tr. at 66:10-11, 71:20-72:8. W. Shabaz testified that in the late 1970s and early 1980s, Illinois Tamale expanded its sales to the East Coast and began making and selling other "puffs" products, including a Pepperoni Puff, a Taco Beef Puff, and a Sloppy Joe Puff. He said that Illinois Tamale has advertised its puffs products together, such as by listing them as a group on price sheets for customers, since the 1980s. Illinois Tamale currently sells twelve puffs products, W. Shabaz testified, and it has trademarked each of them.

## 2.     El-Greg's products

El-Greg's co-owner Gregory Lereno (Mr. Lereno, to distinguish him from Maria Lereno) testified that he and his mother founded El-Greg in 1986 as a frozen pizza company.  According to Mr. Lereno, someone asked him in or around 1989 to make a product similar to Illinois Tamale's Pizza Puff.  He conceded that at the time, Illinois Tamale was the only company "selling this kind of product."  Oct. 22, 2018 Trial Tr. at 111:10-11, 112:2-4.  Mr. Lereno testified that El-Greg made a similar product and that while choosing a name for it, he knew that Illinois Tamale owned the Pizza Puffs trademark.  El-Greg called its product a "Pizza Pie" and began selling it in 1989.  El-Greg, Mr. Lereno testified, later introduced other products, including a beef Pizza Pie, also in 1989; a Spinach Puff in 1990; a Chili Cheese Puff in 2006; a Deluxe Beef Puff in 2010; and, at some point, a Veggie Pizza Pie.

## 3.     Illinois Tamale's 2002 lawsuit against El-Greg

In 2002, Illinois Tamale learned that El-Greg was selling Pizza Pies to certain Chicago-area restaurants, which were calling the products Pizza Puffs.  Illinois Tamale sued El-Greg, and the parties reached a settlement agreement in 2004.  Maria Lereno, El-Greg's chief financial officer (CFO) and vice president of sales, testified that the settlement agreement required El-Greg to recognize Illinois Tamale's ownership of the Pizza Puffs trademark.  The settlement agreement also provided that El-Greg

> will not use Pizza Puff alone or in combination with other words or designs; example, "El-Greg Pizza Puff" or "Stuffed Pizza Puff," as a trademark, service mark, trade name, trade name component, website, metatag, linked to their websites or other use in the marketing or advertisement of their respective goods or services except for comparative advertising.

Oct. 22, 2018 Trial Tr. at 82:15-23 (quoting Pl. Ex. 11).

4

### 4.    The accused Restaurant Depot label

The jury heard testimony that Illinois Tamale sells Pizza Puffs and El-Greg sells Pizza Pies to a national wholesale supplier called Restaurant Depot.  El-Greg sells only three Pizza Pies varieties to Restaurant Depot:  original (pork), beef, and halal.  In late 2008 or early 2009, Restaurant Depot asked its suppliers to create new labels for their products.  According to Ms. Lereno, Restaurant Depot made this request because its suppliers had been providing products in plain boxes and customers were having trouble identifying their contents.  Adam Shabaz (A. Shabaz), Illinois Tamale's CFO, and Mr. Lereno both testified that Restaurant Depot asked that the labels include the product's picture, brand name, quantity, and weight.

A. Shabaz testified that Illinois Tamale created a new label for Pizza Puffs as soon as possible and began selling newly labeled boxes to Restaurant Depot in August 2009.  The following photograph depicts Illinois Tamale's new label:



Illinois Tamale Opp. to Rule 50 Mot., Ex. D.

The jury heard testimony that El-Greg did not complete a new label until approximately May 2010. Mr. Lereno testified that he asked Restaurant Depot for guidance on how to create the label, and Restaurant Depot suggested that he look at other labels in the store. Based on this advice, Mr. Lereno testified, he and Ms. Lereno collected several new labels from Restaurant Depot, including Illinois Tamale's; sent them to a designer; and asked the designer to create something similar for El-Greg. The following photograph depicts El-Greg's new label:



Illinois Tamale Opp. to Rule 50 Mot., Ex. E.

At trial, Ms. Lereno agreed that El-Greg's new label "was very similar to" Illinois Tamale's. Oct. 23, 2018 Trial Tr. at 292:15-17. She conceded, for example, that the font on El-Greg's label is identical to that on Illinois Tamale's. She further testified that although El-Greg had not previously used the slogan "Makers of the Original Puffs," El-Greg put it on the new label after seeing the slogan "Makers of the Original Pizza Puff" on Illinois Tamale's label. Mr. Lereno testified that El-Greg added the word "puffs" in

6

parentheses to its product name, even though it had not previously called its Pizza Pie products "puffs."  According to Mr. Lereno, El-Greg added the word "puffs" to its product name to indicate that "the product cooks and puffs up."  *Id.* at 165:19-25.

A. Shabaz testified when he first saw El-Greg's new label, he "thought it was virtually a copy of" Illinois Tamale's.  Oct. 24, 2018 Trial Tr. at 487:19.  He further testified that in 2011, Illinois Tamale sent El-Greg a cease-and-desist letter concerning the label.  Illinois Tamale sent another cease-and-desist letter in December 2015, and it filed this lawsuit in May 2016.  Mr. Lereno testified that approximately seven months later, El-Greg removed the word "puffs" from its Restaurant Depot labels.

### 5.    Expert testimony on likelihood of confusion and family of marks

Illinois Tamale's survey expert, Thomas Maronick, testified that he conducted two surveys relevant to Illinois Tamale's claims.  One survey tested whether there is a likelihood of confusion when people see the Pizza Pies (Puffs) brand and the Pizza Puffs brand.  The other tested whether "consumers see the 'Puffs' brand mark as a family of marks."  Oct. 24, 2018 Trial Tr. at 377:24-378:3.  At trial, Maronick explained his methodology, including the questions he asked and their sequence.  He also walked the jury through the survey responses.  According to Maronick, the results of the first survey provide "very strong evidence that there is a likelihood of confusion" between Illinois Tamale and El-Greg's marks in the frozen sandwich market.  *Id.* at 374:20-23.  Similarly, Maronick testified that the results of the second survey "show[] pretty strongly that the Puffs name is a family name as it relates to the frozen stuffed sandwich market."  *Id.* at 380:4-8.

El-Greg's survey expert, Dr. Martin Block, also testified at trial.  Dr. Block did not conduct any surveys.  Instead, he testified that Maronick's survey methodologies were flawed and his conclusions unsound.

### 6.    Expert testimony on damages

### a.    Illinois Tamale's expert William Polash

William Polash, Illinois Tamale's damages expert, testified that as a result of the alleged infringement, El-Greg earned profits of $1,282,841 for the entire infringement period and $187,152 for the post-suit infringement period.  Polash also testified that Illinois Tamale's lost profits for the entire infringement period were $148,329.

Polash testified that he calculated El-Greg's profits based on its total (or gross) revenue from sales of Pizza Pies (Puffs)—original, beef, and halal—to Restaurant Depot during the infringement period.  El-Greg's financial records, Polash testified, show that revenue to be $1,282,841 for the entire infringement period and $187,152 for the post-suit infringement period.  Polash testified that he tried to calculate El-Greg's profit from those sales by deducting the cost of goods sold (COGS), but he could not do so because El-Greg "does not track [COGS] by product."  Oct. 23, 2018 Trial Tr. at 212:8-20.  Thus he did not deduct anything from El-Greg's total revenue.

Polash testified that he calculated Illinois Tamale's lost profits by estimating its lost sales as a function of El-Greg's sales and applying Illinois Tamale's actual profit margin.  He estimated Illinois Tamale's lost sales by comparing the number of accused products (*i.e.*, products bearing the new label) El-Greg sold to Restaurant Depot during the infringement period with the number of the same kinds of products El-Greg sold to other customers (*i.e.*, without the new label) during the infringement period.  Polash said

8

he assumed that absent infringement, El-Greg's sales growth at Restaurant Depot
would track its sales growth for other customers. When El-Greg's actual sales to
Restaurant Depot "were greater than what [Polash] projected them to be if there wasn't
an infringement," Polash counted them as Illinois Tamale's lost sales. *Id.* at 223:4-18.
Next, Polash calculated Illinois Tamale's profit margin on Pizza Puffs sales to
Restaurant Depot using records of the company's total revenue and COGS by product.
Applying the profit margin to the estimated lost sales, Polash testified, results in lost
profits of $148,329.

On cross-examination, Polash conceded that in the first year and a half after El-
Greg began using the new label, El-Greg's sales decreased. He testified, however, that
El-Greg's sales to Restaurant Depot had been decreasing in the years before the label
change; began increasing in 2012; and "increased exponentially after that." Oct. 23,
2018 Trial Tr. at 229:1-230:17. Polash also conceded that in calculating Illinois
Tamale's lost sales, he did not account for several factors during the infringement
period: El-Greg (1) began selling the products to additional Restaurant Depot locations;
(2) began participating in a Restaurant Depot marketing promotion program, while
Illinois Tamale did not; (3) introduced a new Pizza Pie product (halal) that Illinois
Tamale did not offer; and (4) charged increasingly lower prices than Illinois Tamale. On
the other hand, Polash testified that El-Greg did not provide data that shows how, if at
all, these factors affected its sales to Restaurant Depot.

### b. El-Greg's expert Lindsey Fisher

El-Greg's damages expert, Lindsey Fisher, also estimated the profits that El-Greg
earned by selling products bearing the accused label at Restaurant Depot. Unlike

9

Polash, however, Fisher did not calculate Illinois Tamale's lost profits.

In calculating El-Greg's profits, Fisher agreed with Polash that El-Greg's total revenue was $1,282,841 for the entire infringement period and $187,152 for the post-suit infringement period.[2]  She stated, however, that Polash should have deducted El-Greg's COGS from its total revenue even though El-Greg did not provide product-specific COGS information.  She calculated COGS using company-wide, rather than product-specific, costs from El-Greg's annual profit-and-loss statements and stated that after deducting COGS, El-Greg's profits on the sales at issue were approximately $504,000 for the entire infringement period and $72,000 for the post-suit infringement period.

After offering her opinion on the measure of El-Greg's profits, Fisher testified that Polash used a flawed methodology to calculate Illinois Tamale's lost profits.  Among other things, Fisher testified, Polash should have accounted for the factors mentioned above, such as that El-Greg started selling Pizza Pies to more Restaurant Depot locations during the infringement period.  Fisher, however, did not present the jury with any data showing how much, if at all, those factors actually affected El-Greg's sales to Restaurant Depot during the infringement period.

### Discussion

### A.  El-Greg's motion for judgment as a matter of law

El-Greg has moved for judgment as a matter of law on all of Illinois Tamale's claims.  Under Federal Rule of Civil Procedure 50(b), judgment as a matter of law is proper if "a reasonable jury would not have a legally sufficient evidentiary basis" to

---

[2] Illinois Tamale argues in its post-trial briefing that Polash and Fisher agreed on these numbers, and El-Greg does not dispute this point.

support a verdict for the nonmovant. FED. R. CIV. P. 50(a)(1), (b); *see Thorne v. Member Select Ins. Co.*, 882 F.3d 642, 644 (7th Cir. 2018). On a Rule 50(b) motion, a court "construes the evidence strictly in favor of the party who prevailed before the jury and examines the evidence only to determine whether the jury's verdict could reasonably be based on that evidence." *Passananti v. Cook County*, 689 F.3d 655, 659 (7th Cir. 2012). A jury verdict will be overturned only if the court concludes that "no rational jury could have found for the prevailing party." *Stragapede v. City of Evanston*, 865 F.3d 861, 865 (7th Cir. 2017) (internal quotation marks omitted).

### 1.     Breach of contract

As noted earlier, the settlement agreement between Illinois Tamale and El-Greg provided that El-Greg

> will not use Pizza Puff alone or in combination with other words or designs; example, "El-Greg Pizza Puff" or "Stuffed Pizza Puff," as a trademark, service mark, trade name, trade name component, website, metatag, linked to their websites or other use in the marketing or advertisement of their respective goods or services except for comparative advertising.

Oct. 22, 2018 Trial Tr. at 82:15-23 (quoting Pl. Ex. 11). At trial, Illinois Tamale argued that El-Greg breached the agreement "by selling goods with the label 'Pizza Pies (Puffs)' and through marketing a product as 'Veggie Pizza Puffs.'" Jury Instructions at 22. The Court instructed the jury that to prevail on its breach of contract claim, Illinois Tamale had prove, among other things, that El-Greg breached the agreement and that Illinois Tamale suffered damages as a result. *See id.* El-Greg argues that Illinois Tamale failed to establish these two elements.

On the issue of breach, El-Greg contends that the settlement agreement was unambiguous: it prohibited El-Greg from using Illinois Tamale's "actual trademark

'Pizza Puffs' as such and nothing else." El-Greg Rule 50 Mot. at 2. El-Greg notes that the agreement "specifically defined the phrase 'Pizza Puffs' as [Illinois Tamale's] registered trademark," and it emphasizes that the agreement provided examples of prohibited terms—specifically, El-Greg Pizza Puff and Stuffed Pizza Puff. *Id.* at 2-3. Because the parties listed these examples, El-Greg maintains, they intended for "the restriction [to] appl[y] only to similar examples using the actual trademark 'Pizza Puff' . . . and not other permutations of 'pizza' and 'puffs.'" *Id.* at 2-3 (citing *Hugh v. Amalgamated Tr. & Sav. Bank*, 235 Ill. App. 3d 268, 275, 602 N.E.2d 33, 38 (1992) (stating that under the "common law rule of *ejusdem generis*," "[w]hen general words or phrases follow a set of enumerated things . . . the general word is limited in meaning to the same kind or class as those previously enumerated" (internal quotation marks omitted)); *FMS Inc. v. Volvo Constr. Equip. N. Am., Inc.*, 557 F.3d 758, 764 (7th Cir. 2009) (similar)).

Whatever merit these arguments may have, El-Greg presented them to the jury, and the jury disagreed. Mr. Lereno, for example, testified that in entering the settlement agreement, El-Greg agreed only that it would not use the term Pizza Puffs on its own or "with modifiers like 'El-Greg Pizza Puffs.'" Oct. 23, 2018 Trial Tr. at 175:19-176:5; *see also, e.g., id.* at 268:16-21 (testimony by Ms. Lereno that El-Greg agreed not to use the term Pizza Puffs but never agreed not to use the term puffs). Illinois Tamale, on the other hand, presented testimony from W. Shabaz that as he understood the settlement agreement, El-Greg could not use "[a]ny combination of the Puff, Pizza Puff, Pizza Pie Puff . . . ." Oct. 22, 2018 Trial Tr. at 86:2-9. The jury did not act irrationally or

12

unreasonably in finding Illinois Tamale's interpretation more convincing.[3]  Alternatively,

the jury reasonably could determine that Pizza Pies (Puffs) falls "within the category of

potential breach examples listed in the agreement."  Illinois Tamale Opp. to Rule 50

Mot. at 13.  Either way, the jury's determination that El-Greg breached the settlement

agreement was reasonably supported.

El-Greg's contention that Illinois Tamale failed to prove damages as a result of

the breach is also unpersuasive.  First, El-Greg argues that the record lacks evidence

that customers "mistakenly purchased" its product instead of Illinois Tamale's because

El-Greg's label contained the term Pizza Pies (Puffs).  El-Greg Rule 50 Mot. at 3.  The

Court, however, did not instruct the jury that on the contract breach claim, Illinois

Tamale had to present evidence of actual confusion to show it was damaged.  Rather,

the Court instructed the jury that Illinois Tamale simply had to establish "[d]amages . . .

as a result" of El-Greg's breach of contract.  Jury Instructions at 22; *see also, e.g.*, *W.W.*

*Vincent & Co. v. First Colony Life Ins. Co.*, 351 Ill. App. 3d 752, 759, 814 N.E.2d 960,

967 (2004) (in order to prevail on a breach of contract claim under Illinois law, a plaintiff

---

[3] El-Greg also appears to argue in its reply that because both parties contend that the settlement agreement is "unambiguous," the Court should have interpreted the agreement as a matter of law.  El-Greg Rule 50 Reply at 1.  El-Greg waived this objection.  During trial, El-Greg conceded that it planned to ask one of its witnesses "whether he thought he was breaching the agreement and why not[.]"  Oct. 22, 2018 Trial Tr. at 84:11-16.  On that basis, the Court overruled El-Greg's objection to W. Shabaz "giv[ing] an interpretation of the settlement agreement that goes beyond" the agreement's "actual terms."  *Id.* at 83:24-84:16.  Moreover, each party's "unambiguous" interpretation is different, and each is reasonable.  Accordingly, reasonable minds could read the agreement differently, and the Court properly submitted the question to the jury.  *See Thompson v. Gordon*, 241 Ill. 2d 428, 441, 948 N.E. 2d 39, 47 (2011) ("[I]f the language of the contract is susceptible to more than one meaning, it is ambiguous."); *see also Quake Constr., Inc. v. American Airlines, Inc.*, 141 Ill. 2d 281, 288, 565 N.E.2d 990, 994 (1990) (if the language of a contract is ambiguous, its interpretation is a question of fact); *Harmon v. Gordon*, 712 F.3d 1044, 1051 (7th Cir. 2013) (same).

must establish, among other things, "resultant damages"); *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 886 (7th Cir. 2018) (citing same).  Illinois Tamale's damages expert, Polash, testified that Illinois Tamale lost $148,329 in profits due to El-Greg's infringement, which included its use of the term Pizza Pies (Puffs).  The jury reasonably could find that Illinois Tamale lost profits, and was therefore damaged, as a result of El-Greg's sales in breach of the agreement.

El-Greg contends that the jury could not reasonably rely on Polash's testimony because it "lacked any probative value."  El-Greg Rule 50 Mot. at 3.  Specifically, El-Greg maintains that in calculating Illinois Tamale's lost profits, Polash assumed "without any factual basis" that if El-Greg's sales growth at Restaurant Depot was higher than that for other customers, El-Greg's new label caused the increase.  *Id.* at 4 (citing *Clark v. Takata Corp.*, 192 F.3d 750, 757, 759 (7th Cir. 1999) (affirming exclusion of expert opinion under Rule 702 because, among other things, the opinion "*assume[d]* as truth the very issue that [plaintiff] need[ed] to prove in order to recover")).  But Polash provided evidentiary support for his assumption.  For example, he testified that changing a product's packaging can help sales.  He also testified that El-Greg's sales to Restaurant Depot had been declining before El-Greg adopted the new label yet began to increase "exponentially" in 2012—approximately one-and-a-half years after El-Greg adopted the new label.  Oct. 23, 2018 Trial Tr. at 229:1-230:17.  Based on this evidence, the jury reasonably could find that El-Greg's new label helped its sales recover and then grow and thus reasonably could credit Polash's assumption.

El-Greg also argues that Polash's "methodology was worthless" because he ignored factors that could have caused El-Greg's increased sales at Restaurant Depot,

including its sales to additional Restaurant Depot locations; participation in the marketing program; introduction of a halal product; and price decreases relative to Illinois Tamale's product. El-Greg Rule 50 Mot. at 5 (citing *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 433 (7th Cir. 2013) and *Myers v. Illinois Cent. R.R.*, 629 F.3d 639, 644 (7th Cir. 2010), for the proposition that when an expert fails to consider alternative causes, his methodology is unsound). But at trial, the jury heard that El-Greg failed to provide data that would allow Polash to quantify how these factors impacted El-Greg's sales. The jury also heard that El-Greg's damages expert, Fisher, made no attempt to quantify that impact. Finally, although El-Greg argues in its briefing that it started selling to more Restaurant Depot locations in 2013—"the same year its sales to Restaurant Depot began to increase," El-Greg Rule 50 Mot. at 5—both damages experts testified that El-Greg's sales began to increase in 2012. *See, e.g.*, Oct. 23, 2018 Trial Tr. at 229:22-23; Oct. 25, 2018 Trial Tr. at 605:10-606:7. Overall, the jury's finding that Illinois Tamale suffered damage as a result of the breach reasonably could have been based on Polash's testimony.

Finally, El-Greg appears to argue that Illinois Tamale failed to "establish the correct *measure*," meaning amount, "of damages." El-Greg Rule 50 Mot. at 3 (emphasis added) (quoting *Harmon*, 712 F.3d at 1053). The Court cannot tell whether El-Greg is arguing that Illinois Tamale (1) had to do so to prevail on the issue of liability or (2) failed to establish the amount of its damages, having already prevailed on the issue of liability. If El-Greg's argument is the former, it is incorrect. The court in *Harmon* did not state that establishing an actual amount of damages is an element of a breach of contract claim. *See Harmon*, 712 F.3d at 1053. If El-Greg's argument is the latter, it

lacks merit. The law requires Illinois Tamale only to "establish a reasonable basis for computation of . . . damages." *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 632 (7th Cir. 2007) (quoting *Ellens v. Chi. Area Office Fed. Credit Union*, 216 Ill. App. 3d 101, 106, 576 N.E. 2d 263, 267 (1991)). Polash gave step-by-step testimony on how he calculated the $148,329 lost profits figure, and for reasons already discussed, the jury reasonably could find that his computation was sensible and well-supported. For the foregoing reasons, El-Greg is not entitled to judgment as a matter of law on the breach of contract claim.[4]

### 2.    Willful infringement of the alleged "puffs" trademark family

At trial, Illinois Tamale contended that it had "trademark rights in a family of trademarks based on the term 'puff' or 'puffs' and that El-Greg infringed [its] rights by selling products called 'Spinach Puffs,' 'Chili Cheese Puffs,' 'Deluxe Beef Puff,' 'Veggie Pizza Puffs,' and 'Pizza Pie (Puff).'" Jury Instructions at 18. To prevail on its claim, Illinois Tamale had to prove, among other things, that it "owned the family of marks before El-Greg began selling products using the term 'puff' or 'puffs.'" *Id.* The Court also instructed the jury that a "descriptive" term "can serve as a family name only if [Illinois Tamale] proves by a preponderance of the evidence that the term has acquired

---

[4] El-Greg states that based on the same arguments advanced in connection with the breach of contract claim, it "is entitled to judgment as a matter of law that [Illinois Tamale] failed to prove it suffered any actual damages in its Lanham Act claims." El-Greg Rule 50 Mot. at 5. For the reasons just discussed, El-Greg's arguments lack merit. The Court further notes that to prevail on its Lanham Act claims (and thus to collect damages on those claims), Illinois Tamale did not have to prove that there was actual confusion. Rather, the instructions to the jury provided that Illinois Tamale need only prove that El-Greg's actions were *likely* to cause confusion. *See* Jury Instructions at 13, 15, 18; *see also Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 897 (7th Cir. 2001).

16

distinctiveness, in other words that it indicates that the goods have a common origin."
*Id.*

According to El-Greg, Illinois Tamale did not establish that the term "puffs" acquired secondary meaning before 1990, when El-Greg introduced the first product it called a "puff" (the Spinach Puff).[5]  Illinois Tamale responds that "[o]nly descriptive marks require evidence of secondary meaning" and argues that a reasonable jury could have concluded that the term "puff" is arbitrary or suggestive.  Illinois Tamale Opp. to Rule 50 Mot. at 1; *see also, e.g.*, *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768-69 (1992) (suggestive, arbitrary, and fanciful marks "are deemed inherently distinctive and are entitled to protection," whereas descriptive marks can be protected only if they "acquire . . . distinctiveness"); *Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 393 (7th Cir. 1992).  Illinois Tamale's argument does not make sense because the jury instructions did not say or suggest that the family mark was suggestive or arbitrary.

That said, the Court agrees with Illinois Tamale that based on the evidence, the jury reasonably could find that the term "puffs" had acquired distinctiveness before 1990.  *See* Illinois Tamale Opp. to Rule 50 Mot. at 3.  For example, Illinois Tamale's expert, Maronick, testified that forty-two percent of participants in the family of marks survey stated that Chili Cheese Puffs, an El-Greg product, was from the same company as Pizza Puffs.  When asked why, approximately fifty-six percent of that cohort responded that puffs was in the name, the products had a similar brand name, or the

---

[5]  At one point in its briefing, El-Greg states that it introduced the Spinach Puff in 1989. *See* El-Greg Rule 50 Mot. at 6.  The Court assumes this was an error because elsewhere El-Greg states that it introduced the Spinach Puff in 1990.  *See id.* at 5; *see also, e.g.*, Oct. 23, 2018 Trial Tr. at 155:4-8 (testimony of Mr. Lereno); Oct. 22, 2018 Trial Tr. at 41:9-11, 43:1-2 (El-Greg's opening argument); El-Greg Enhancement of Damages Opp. at 5-6.

products were similar. Similarly, sixty-four percent of the cohort that said they saw an association between Pizza Puffs and Sloppy Joe Puffs, another Illinois Tamale product, gave the same explanation. According to Maronick, this data "shows pretty strongly that the Puffs name is a family name . . . ." Oct. 24, 2018 Trial Tr. at 380:4-8. El-Greg argues that Illinois Tamale cannot rely on Maronick's survey for evidence of secondary meaning before 1990 because he did not "attempt to simulate the market in 1989 or in any year other than 2017." El-Greg Rule 50 Mot. at 6. El-Greg also contends that Maronick did not "evaluate whether members of the public associated the word 'puffs' with [Illinois Tamale] in 1990, or in any year other than 2017." *Id.* El-Greg's arguments are unpersuasive because Maronick's survey studied consumers' perceptions of Sloppy Joe Puffs and Taco Puffs, both of which were available in the late 1970s or early 1980s.

El-Greg also argues that Maronick's survey cannot provide evidence of secondary meaning due to alleged methodological flaws. It contends, for example, that the survey was "never intended" to address secondary meaning, and it faults Maronick for failing to ask the respondents what company they thought was associated with the word "puffs" and whether they thought "puffs" was a brand. *See id.* at 7 (citing cases for proposition that "[a] survey cannot prove what it did not even ask about"). The Court determined, however, that these are matters of weight rather than admissibility in denying El-Greg's motion to exclude Maronick's testimony about the survey. And at trial, Maronick explained why he did not ask these questions. First, he stated that customers "don't . . . buy products on the basis of the company" but rather "on the basis of the brand." Oct. 24, 2018 Trial Tr. at 413:13-16. And he did not ask respondents whether they thought "puffs" was a brand, he said, because he was assessing whether

18

they associate products within a category (frozen stuffed sandwiches) based on product name.  *Id.* at 428:22-429:23.  In light of this testimony, the jury reasonably could find that Maronick properly assessed whether "puffs" had acquired secondary meaning even though he did not ask the questions El-Greg identifies.

In arguing that Maronick did not properly assess secondary meaning, El-Greg also contends that his survey questions "suggested to the respondents the desired answer[s]."  El-Greg Rule 50 Mot. at 7.   The Seventh Circuit has determined that a survey question did not "capture secondary meaning" because it "created a bias" in the responses.  *Spraying Sys.*, 975 F.2d at 394.  But here, the jury heard each survey question and could reasonably conclude that the questions did not suggest specific answers.  Furthermore, Maronick testified that after asking the questions El-Greg criticizes, he required respondents to explain their answers using their own words.  *See* Oct. 24, 2018 Trial Tr. 379:9-15.  He further stated that the answers to this follow-up question supported his conclusions.  From this, the jury reasonably could conclude that Maronick's questions did not create biased responses.

In a final effort to discredit Maronick's survey, El-Greg argues that if he had used the proper denominator—i.e., the total number of respondents rather than subgroups that answered particular questions—or if he had subtracted responses about the control variables, the results would have shown that only eighteen percent of respondents "associated . . . Chili Cheese Puffs with Pizza Puffs" on the basis that "both used the word 'puffs.'"  El-Greg Rule 50 Mot. at 8; *compare* Oct. 24, 2018 Trial Tr. at 379:22 (testimony by Maronick that fifty-six percent of respondents made the association on that basis).  El-Greg contends that eighteen percent is insufficient as a matter of law to

establish secondary meaning because in *Spraying Systems*, which was decided on summary judgment, the Seventh Circuit stated that a survey-response figure "in the thirties can only be considered marginal" evidence of secondary meaning.  *Spraying Sys.*, 975 F.3d at 394.  The court went on to conclude that the thirty-eight percent response rate at issue, in the context of other evidence, was insufficient to establish secondary meaning as a matter of law.  *Id.* at 394-95; *see also Uncommon, LLC v. Spigen, Inc.*, 926 F.3d 409, 425 (7th Cir. 2019) ("[C]ourts have recognized consumer recognition between 50 percent and 37 percent as sufficient to show secondary meaning, and lesser percentages are generally insufficient." (citing MᴄCᴀʀᴛʜʏ ᴏɴ Tʀᴀᴅᴇᴍᴀʀᴋs § 32:190 (5th ed. 2019))).  Here, however, the jury reasonably could credit Maronick's opinion that the response figure was fifty-six percent.  Specifically, he provided step-by-step testimony on how he calculated the results and opined that taking "percentages of percentages" is proper in the type of survey he conducted.  Oct. 24, 2018 Trial Tr. at 409:16-22.[6]  Maronick also testified that it would have been "inappropriate" to subtract control-related responses from the results because he could not "say unequivocally" that those responses did not reflect "an association with Pizza Puff."  *Id.* at 426:15-427:3.  Because the jury reasonably could find based on Maronick's testimony that fifty-six percent was the appropriate response figure, his survey passes muster under *Spraying Systems*, 975 F.3d at 394 ("[A] 50-percent figure is regarded as

---

[6] Maronick's testimony in this regard concerned the likelihood of confusion survey, and he did not specifically defend taking "percentages of percentages" in the family of marks survey.  But he testified that he designed the surveys similarly and used the same method to calculate response percentages for both surveys.  Particularly because El-Greg cross-examined Maronick on likelihood of confusion survey first, the jury reasonably could find that his defense of taking "percentages of percentages" applied to both surveys.

20

clearly sufficient to establish secondary meaning").

Even without Maronick's survey results, the jury's conclusion that Illinois Tamale established secondary meaning was reasonably supported. Secondary meaning "can be established through direct consumer testimony, consumer surveys, length and manner of use, amount and manner of advertising, volume of sales, place in the market and proof of intentional copying." *Id.* at 393. Illinois Tamale introduced evidence that it has used the term "puffs" continuously since the late 1970s or early 1980s; sold its "puffs" products to restaurants and retailers in Chicago and other regions since that time; and advertised its "puffs" products together, such as on price sheets, since the 1980s. There is also evidence tending to show that Illinois Tamale's "puffs" products have an established market presence. A. Shabaz, for example, testified that customers outside of Illinois Tamale's sales regions call to request Pizza Puffs and that trade show customers call Illinois Tamale "the Puff guys" or "the Puff booth." Oct. 24, 2018 Trial Tr. at 460:19-22. Finally, there is evidence tending to show that El-Greg intentionally copied Illinois Tamale's "puffs" marks—such as Mr. Lereno's testimony that El-Greg added the word "puffs" to its Restaurant Depot label after having seen Illinois Tamale's new label and despite having never described its Pizza Pies products as "puffs." Based on this evidence, the jury reasonably could find that the term "puffs" had acquired secondary meaning before 1990.

Separately, El-Greg argues that it is entitled to judgment on the question of willful infringement of Illinois Tamale's family of marks. It contends that Illinois Tamale did not assert any rights in its "puffs" family of marks until 2016, and it maintains that "[i]t is impossible for someone to willfully infringe on a purported claim without first knowing

21

that such a claim exists." El-Greg Rule 50 Mot. at 8. This argument is unavailing. First, there is evidence tending to show that Illinois Tamale did assert rights in its "puffs" family of marks before the infringement period by, for example, advertising its line of products as "puffs" since the late 1970s or early 1980s and trademarking each of its "puffs" products. Second, the Court instructed the jury that it could find willfulness not only "if [El-Greg] knew that it was infringing [Illinois Tamale's] trademark" but also if El-Greg "acted with indifference to [Illinois Tamale's] trademark rights." Jury Instructions at 27. El-Greg did not object to this instruction; in fact, El-Greg proposed it. *See* El-Greg Contested Proposed Jury Instructions, Dkt. No. 151-4, at 8. And El-Greg does not challenge the instruction now.

The jury reasonably could conclude that, even if El-Greg did not know until 2016 that Illinois Tamale had formally asserted rights in the "puffs" family of marks, it acted with indifference to Illinois Tamale's trademark rights. Among other things, Mr. Lereno testified that he knew in 1989 that Illinois Tamale owned the Pizza Puffs mark, and Illinois Tamale and El-Greg operate in the same region, where Illinois Tamale sold its "puffs" products and advertised them as a group. Nonetheless, El-Greg created its own "puffs" products (such as Spinach and Chili Cheese Puffs) and listed "puffs" flavors on its new Restaurant Depot Label. In addition, El-Greg called its Veggie Pizza Pie product a Veggie Pizza Puff on Facebook. Mr. Lereno testified that this was "an honest mistake" and that no one ever ordered a "Veggie Pizza Puff" from El-Greg. Oct. 22, 2018 Trial Tr. at 128:9-10. But he admitted that the error remained on Facebook for three-and-a-half years, most of which overlapped with the infringement period. El-Greg is not entitled to judgment as a matter of law on the willfulness question.

### 3. Willful trade dress infringement

The instructions to the jury on Illinois Tamale's trade dress infringement claim stated that "a valid trade dress is product packaging that is distinctive, which means that the packaging and overall presentation of the product is capable of distinguishing [Illinois Tamale's] products from the products of others."  Jury Instructions at 17.  The instructions also stated that Illinois Tamale's "trade dress is valid if it is inherently distinctive or if it has acquired distinctiveness."  *Id.*  El-Greg requested an instruction that "functional aspects of the package should not be considered."  El-Greg Final Proposed Jury Instructions, Dkt. No. 193, at 19; *see also* Oct. 25, 2018 Trial Tr. at 644:21-23.  Although it is true that "trade dress protection may not be claimed for product features that are functional," *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29 (2001), the Court denied El-Greg's proposed instruction because it was not consistent with "what . . . functionality in trade dress covers."  Oct. 25, 2018 Trial Tr. at 644:24-25.

El-Greg argues that the Court should enter judgment as a matter of law in its favor on Illinois Tamale's trade dress infringement claim because, it contends, "[e]very aspect of [Illinois Tamale's] label was merely functional."  El-Greg Rule 50 Mot. at 9.  But as indicated above, the Court determined that it was inappropriate to instruct the jury on functionality.  The Court's ruling was correct, and El-Greg does not expressly challenge it in its Rule 50 motion.[7]

Even if the Court had instructed the jury on functionality, the jury reasonably could have found in Illinois Tamale's favor based on the evidence.  A design is

---

[7] In its Rule 59 motion, El-Greg contends that the lack of a functionality instruction constitutes a basis for a new trial.  As discussed below, that argument also lacks merit.

functional "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *TrafFix*, 532 U.S. at 32 (internal quotation marks omitted). Several factors are relevant to this determination, including "the dearth of, or difficulty in creating, alternative designs for the item's purpose" and "the effect of the design feature on an item's quality or cost." *Georgia-Pacific Consumer Prods. LP v. Kimberly-Clark Corp.*, 647 F.3d 723, 727-28 (7th Cir. 2011). Even if a design is not functional under the first definition in *TrafFix*, it can be functional if it is a "competitive necessity," meaning that "its exclusive use 'would put competitors at a significant non-reputation-related disadvantage.'" *Arlington Specialties, Inc. v. Urban Aid, Inc.*, 847 F.3d 415, 419 (7th Cir. 2017) (quoting *TrafFix*, 523 U.S. at 32-33).

According to El-Greg, "the witnesses testified" at trial "that every aspect of the label used at Restaurant Depot—the item count, the net weight, and even the list of available flavors—was functional and served the essential purpose of informing the customers of the box's contents." El-Greg Rule 50 Mot. at 9. But El-Greg does not provide any examples of such testimony. To be sure, some witnesses testified that specific features of the label serve Restaurant Depot's intended purpose of telling customers what boxes contain. *See, e.g.*, Oct. 24, 2018 Trial Tr. at 495:11-22 (testimony by A. Shabaz). But the jury reasonably could have found that El-Greg easily could have designed the label differently (for example, by using a different photo and font) and configured the label differently (for example, by putting the photo, product name, slogan, and flavor list in different positions). Likewise, the jury reasonably could have found that if El-Greg had done so, the label would have conveyed the very same information. Accordingly, a determination that the label was not functional would have

been supported by the evidence. *See Georgia-Pacific*, 647 F.3d at 728 (*difficulty* of creating alternative design tends to indicate the design is functional). *Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.*, 781 F.2d 604 (7th Cir. 1986), cited by El-Greg, does not change this conclusion. There, the court determined that "boxing of information in a Yellow Pages advertisement serves to focus the reader's attention on a body of data and thus performs an informational function." *Id.* at 611. The court did not, as El-Greg contends, hold that a specific arrangement of product information on a label (box-like or otherwise) "indisputably performs an informational function." El-Greg Rule 50 Mot. at 9. Nor did the Court in *TrafFix* hold "that the functional nature of the design at issue was not rendered protectable trade dress merely because it could have been configured differently." *Id*. Rather, the Court concluded that the claimed design (dual springs on a traffic sign stand) was functional, including because it was "necessary to the operation" of the stand. *TrafFix*, 523 U.S. at 30. El-Greg is not entitled to judgment on Illinois Tamale's trade dress infringement claim for reasons relating to functionality.

El-Greg also argues that it is entitled to judgment on this claim because Illinois Tamale "did not even attempt to establish that its label was inherently distinctive." El-Greg Rule 50 Mot. at 9. But El-Greg offers nothing beyond this bare sentence. "[U]nsupported and undeveloped arguments" are waived. *Trs. of Chicago Painters & Decorators Pension, Health & Welfare, & Deferred Sav. Plan Tr. Funds v. Royal Int'l Drywall & Decorating, Inc.*, 493 F.3d 782, 789 (7th Cir. 2007). Moreover, the Court agrees with Illinois Tamale that the jury reasonably could find its label was inherently distinctive. The Court instructed the jury that "[a] trade dress is inherently distinctive if purchasers would almost automatically recognize it as identifying a particular brand or

source of the product. You should consider the packaging as a whole." Jury Instructions at 17. Based on details such as the product photograph, text font, slogan, and flavors listed in bullet-point columns, the jury reasonably could find that purchasers would almost invariably associate the label with the product's brand or source. *See supra* at 5 (photograph of Illinois Tamale's label).

Finally, El-Greg argues that Illinois Tamale failed to establish that the label acquired secondary meaning before El-Greg introduced its own label. Because a jury reasonably could find that the trade dress was inherently distinctive, Illinois Tamale was not required to show evidence of secondary meaning—that it had "acquired distinctiveness," as the jury instructions put it. *See Two Pesos*, 505 U.S. at 776. For purposes of completeness, however, the Court will address El-Greg's argument. The Court instructed the jury, in relevant part, that "[t]o show that its trade dress has acquired distinctiveness, [Illinois Tamale] must prove" that "[a] substantial portion of the purchasing public identifies [Illinois Tamale's] packaging with a particular source, whether or not purchasers know who or what the source is." Jury Instructions at 17. El-Greg maintains that "[s]imple geometrical shapes containing essential information are too common to be distinctive . . . ." El-Greg Rule 50 Mot. at 10. But that is not a reasonable description of Illinois Tamale's label. The photographs in the record plainly show that the label is not simply a rectangle containing information.

El-Greg also emphasizes that Illinois Tamale's label was in use for only nine months before El-Greg introduced its own, and it contends that "such a short time period renders it unlikely that the trade dress . . . acquired a secondary meaning." El-Greg Rule 50 Mot. at 10 (citing *Sunbeam Corp. v. Equity Indus. Corp.*, 635 F. Supp.

26

625, 630 (E.D. Va. 1986) (indicating that "it may take longer" than eighteen months "for a product's configuration or design" to "achiev[e] secondary meaning")). But A. Shabaz testified that Illinois Tamale sold approximately 12,000 cases of its newly labeled products during that time. Based on this evidence, a reasonable jury could conclude that a significant number of customers became familiar with the label even within nine months and began associating the label with one source. For all of these reasons, the jury reasonably could find secondary meaning at the relevant time based on the evidence presented.

### 4. Likelihood of confusion

El-Greg argues that the Court should enter judgment in its favor on Illinois Tamale's Lanham Act claims because it failed to offer relevant evidence concerning likelihood of confusion, an essential element of the trademark and trade dress infringement claims. *See* Jury Instructions at 13, 15, 18, 20.[8] El-Greg maintains that because the record lacks evidence of actual confusion, "there is a strong presumption that there is little likelihood of confusion" when "the marks have been in the same market, side by side, for a substantial period of time." El-Greg Rule 50 Mot. at 11 (quoting *Pignons v. Polaroid Corp.*, 657 F.2d 482, 490 (1st Cir. 1981)). The Court, however, instructed the jury—accurately—that "actual confusion" is but one of several factors to consider in determining likelihood of confusion. *See* Jury Instructions at 20.

---

[8] El-Greg appears to advance this argument concerning the false advertising claim as well. *See* El-Greg Rule 50 Mot. at 10-11 (referring to Illinois Tamale's "Lanham Act claims *including* trademark infringement (emphasis added)). This does not make sense because likelihood of confusion is not an element of false advertising under the Lanham Act. *See* Jury Instructions at 21. A false advertising claim does have elements similar to likelihood of confusion, such as "tendency to deceive." *Id.* In the next section of this opinion, the Court discusses why the jury reasonably could find that Illinois Tamale proved tendency to deceive by a preponderance of the evidence.

El-Greg did not object to this aspect of the jury instructions, *see* El-Greg Final Proposed Jury Instructions at 22, and it does not object in its Rule 50 motion. Among other factors the jury could consider were "[a]ny similarity between the trademarks/trade dresses in appearance and suggestion; [a]ny similarity of the products; [and] [a]ny similarity in how, where, and to whom the products are promoted or sold." *Id*. The Court also instructed the jury—again, accurately—that it could weigh the factors as it saw fit and that "[n]o particular factor . . . is required to prove likelihood of confusion." Jury Instructions at 20; *see also AutoZone, Inc. v. Strick*, 543 F.3d 923, 929 (7th Cir. 2008) ("No single factor is dispositive."); *Pignons*, 657 F.2d at 490 ("Evidence of actual confusion is not invariably necessary to prove likelihood of confusion . . . .").

The jury, in comparing the trademark Pizza Puffs with terms that El-Greg used to label its products, including Pizza Pies (Puffs), Spinach Puffs, and Chili Cheese Puffs, reasonably could conclude that the terms are similar "in appearance and suggestion." Jury Instructions at 20. And the jury reasonably could make the same determination about the parties' Restaurant Depot labels, including because they contained similar photographs, slogans, layouts, and fonts. In reaching these conclusions, the jury also reasonably could take into account the evidence that Restaurant Depot displayed the parties' products side-by-side with the labels facing the customers and that the parties sold their products in similar geographic markets. Finally, the jury reasonably could credit Maronick's testimony that survey responses provided "strong evidence that there is a likelihood of confusion" between Illinois Tamale and El-Greg's marks in the frozen stuffed sandwich market. Oct. 24, 2018 Trial Tr. at 374:20-23.

Of this evidence, El-Greg attacks only Maronick's surveys. But the jury

reasonably could determine that Illinois Tamale proved likelihood of confusion even absent the surveys. Furthermore, contrary to El-Greg's argument that the Court should not have permitted the jury to consider the surveys due to their alleged lack of probative value, *see* El-Greg Rule 50 Mot. at 11-12 (citing *Hornady Mfg. Co. v. Doubletap, Inc.*, 746 F.3d 995, 1005-06 (10th Cir. 2014); *Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1145 (10th Cir. 2013)), El-Greg's attacks on the surveys concern only their weight, not their admissibility.

El-Greg focuses primarily on Maronick's likelihood of confusion survey. It faults Maronick for, among other things, failing to limit survey respondents to restaurants, convenience stores, and other customers that would have "reason to go to Restaurant Depot." El-Greg Rule 50 Mot. at 12. But Maronick testified that restaurants are not Restaurant Depot's only customers and that, in accordance with generally accepted survey practices, he designed his screening questions to capture all potential customers. In addition, El-Greg contends that Maronick's survey did not replicate market conditions because, for example, the images shown for El-Greg's product did not include box panels that contained its name and logo. But the jury reasonably could have credited Maronick's testimony that customers do not necessarily see every side of a product box while shopping and, in any event, make purchasing decisions based on "end label[s]" like the ones shown in the survey. Oct. 24, 2018 Trial Tr. at 402:3-19. Finally, El-Greg faults Maronick for asking questions suggestive of answers; using the wrong denominator in calculating response percentages; and failing to subtract control-related responses from the results. These criticisms fail for the same reasons discussed in connection with the family of marks survey. The jury reasonably could find

based on the evidence that Illinois Tamale satisfied its burden of proof on the likelihood of confusion element of its Lanham Act claims.

### 5.    False advertising

Illinois Tamale contended at trial that "El-Greg's use of the slogan 'Makers of the Original Puffs' constitutes false advertising."  Jury Instructions at 21.  The Court instructed the jury that to prevail on this claim, Illinois Tamale had to prove that El-Greg made a false or misleading statement of fact about its product; the "statement actually deceived or had the tendency to deceive a substantial segment of El-Greg's audience"; the "deception was likely to influence" customers' purchasing decisions; and Illinois Tamale "has been or is likely to be injured as a result of the false statement, such as by diversion of sales from itself to El-Greg, or a loss of goodwill associated with [Illinois Tamale's] products."  *Id.*

El-Greg argues that it is entitled to judgment as a matter of law on this claim because its "slogan was solely about itself and not any product."  El-Greg Rule 50 Mot. at 15.  In its reply, however, El-Greg changes course and argues that the word "puffs" in the slogan referred to Spinach Puffs, not Pizza Pies (Puffs).  But the jury reasonably could find exactly the opposite based on the evidence, including the fact that El-Greg put the "Makers of the Original Puffs" slogan on its Pizza Pies (Puffs) label and did so after Restaurant Depot asked it to include information that described the product.

El-Greg next argues that it is entitled to judgment as matter of law because the record lacks evidence that any consumer "noticed the slogan," was deceived by it, or made a purchasing decision based on it.  *Id.*  But as indicated previously, the record shows that by the time El-Greg introduced its slogan, Illinois Tamale had sold

approximately 12,000 cases of Pizza Puffs with a label that identified Illinois Tamale as the "Makers of the Original Pizza Puffs."  In addition, Maronick testified that consumers associate the word "puffs" with a single frozen sandwich source.  Based on this evidence, the jury reasonably could determine that El-Greg's slogan had the *tendency* to deceive consumers into thinking that El-Greg's products came from Illinois Tamale and that the slogan was *likely* to cause Illinois Tamale's customers to buy El-Greg's products.  *See* Jury Instructions at 21.

Finally, El-Greg argues that it is entitled to judgment as a matter of law on this claim because Illinois Tamale failed to prove damages.  But the jury, among other things, reasonably could credit Polash's testimony that Illinois Tamale lost sales due to the infringing label.  Because the label contained the accused slogan, the jury reasonably could find that Illinois Tamale proved it was "injured as a result of the false statement."  Jury Instructions at 21.

For these reasons, the Court denies El-Greg's motion for judgment as a matter of law on the Lanham Act claims.

## B.    El-Greg's motion for a new trial

El-Greg alternatively moves for a new trial on all of Illinois Tamale's claims.  "A new trial should be granted only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience."  *Estate of Burford v. Accounting Practice Sales, Inc.*, 851 F.3d 641, 646 (7th Cir. 2017) (internal quotation marks omitted); *see also Kapelanski v. Johnson*, 390 F.3d 525, 530 (7th Cir. 2004) ("In ruling on a motion for new trial, federal law requires a district court to determine whether the verdict is against the weight of the

evidence[,] the damages are excessive, or . . . for other reasons, the trial was not fair to the party moving." (internal quotation marks omitted)).

### 1. Lanham Act claims

El-Greg seeks a new trial regarding liability on all of Illinois Tamale's Lanham Act claims. First, it argues that Illinois Tamale "failed to offer any evidence to prove the essential elements." El-Greg Rule 59 Mot. at 3. El-Greg supports this argument only by incorporating its Rule 50 motion by reference. As the Court discussed in denying that motion, the record contains ample evidence from which a reasonable jury could find in Illinois Tamale's favor. The verdict was not against the weight of the evidence.

El-Greg also contends that the Court erred in denying its motion *in limine* to exclude Maronick's opinions and that his trial testimony prejudiced El-Greg. But El-Greg did not move to exclude all of Maronick's opinions; rather, it moved to exclude only his opinion concerning the family of marks survey. *See* El-Greg Mot. *in Limine*, Dkt. No. 140, at 6-7. The Court denied the motion because the alleged flaws in Maronick's opinion were appropriately tested through cross-examination. El-Greg cross-examined Maronick and presented testimony from a competing expert. The Court properly allowed Maronick to testify on this point, and doing so did not result in an unfair trial.

Next, El-Greg argues that the Court should have allowed it to offer evidence on the defense that "puffs" is a generic term. El-Greg appears to contend that the Court excluded the evidence—USPTO references, restaurant menus, websites, and other sources found on the Internet that use the term "puffs"—because it was the wrong "type" of evidence. *See* El-Greg Rule 59 Mot. at 4 (arguing that it need not have presented consumer surveys or evidence concerning "sandwiches exactly like" Illinois

Tamale's).  But that was not the basis for the Court's decision.  The Court determined

that the evidence was inadmissible because it lacked foundation.  El-Greg planned to

introduce this evidence via testimony by one of its attorneys, but the attorney could not

"explain what any of the references mean[t]" because he knew "nothing about them

other than that they came up via Google and other Internet searches."  Order Regarding

Genericness Evidence and Defense, Dkt. No. 178, at 3.  Without proper foundation, the

Court reasoned, the evidence had "minuscule probative value on whether the term

pizza puff has become understood to describe a type of product rather than its source."

*Id.* at 4.  El-Greg offers nothing but a conclusory argument to challenge that ruling.  *See*

El-Greg Rule 59 Mot. at 4 (stating that El-Greg "presented a sufficient foundation to

render the evidence admissible").   "A party forfeits an argument . . . by raising it in a

perfunctory or general manner."  *United States v. Sheth*, 924 F.3d 425, 435 (7th Cir.

2019).  El-Greg also argues that it was prejudiced because the Court issued this ruling

"on the eve of trial in a manner that was arguably inconsistent with" the Court's ruling in

a prior case.  El-Greg Rule 59 Reply at 3.  But an adverse ruling was undeniably

foreseeable, and El-Greg could have and should have prepared a back-up plan.  Nor

can El-Greg credibly contend that the Court's ruling in another case under different

circumstances ten years ago was somehow binding in this case.

Finally, El-Greg contends that the Court erred in failing to instruct the jury on the

definition of functionality regarding the trade dress claim.  El-Greg argues that the

definition is not obvious to laypeople and complains that the "instructions as given did

not even alert the jury to the need to determine functionality."  El-Greg Rule 59 Reply at

3.  The Court did not err in rejecting El-Greg's requested instruction because, as

indicated above, it was based on a misstatement of the law.  *See* Oct. 25, 2018 Trial Tr. at 644:19-25.  Additionally, El-Greg has not pointed to evidence that would support a finding that Illinois Tamale's trade dress was functional, that is, evidence tending to show that "the particular layout of [Illinois Tamale's] photo and text on its label, the font types and sizes used," and other such features "were essential to the purpose of the label."  Illinois Tamale Rule 59 Opp. at 17.

For these reasons, the Court denies El-Greg's motion for a new trial as to liability on the Lanham Act claims.  The fact that El-Greg has "reserve[d] the right to waive" a new trial on these claims, depending on the outcome of Illinois Tamale's post-trial motions, *see* El-Greg Rule 59 Mot. at 2-3, is therefore immaterial.

### 2. Breach of contract

El-Greg also seeks a new trial on Illinois Tamale's breach of contract claim.  First, El-Greg maintains that the jury's liability verdict "was unsupported by the evidence with regard to the elements of breach, causation and damages."  El-Greg Rule 59 Mot. at 1. El-Greg supports this argument only by directing the Court to its Rule 50 motion.  For the same reasons the Court articulated in denying that motion, it concludes that the jury's verdict was not against the weight of the evidence.  El-Greg also contends that the Court erred in denying its motion *in limine* to exclude Polash's opinions and that Polash's trial testimony prejudiced El-Greg.  Again, the alleged flaws in Polash's methodology are matters of weight, and El-Greg had the opportunity to both cross-examine Polash and present testimony from a competing expert.  Allowing Polash's testimony did not make the trial unfair.

Next, El-Greg argues that it is entitled to a remittitur of damages for the breach of

contract claim to $30,000 because the jury's award of $100,000 is "inconsistent" with its award of $30,000 in damages for the Lanham Act claims. El-Greg Rule 59 Mot. at 2. El-Greg contends that the evidence does not support awarding a larger amount in contract damages because "the same act—El-Greg's use of the label at Restaurant Depot in 2010—constituted both a breach of the Settlement Agreement and infringement under the Lanham Act." *Id.*

The Court first notes that the jury did not award $30,000 in "damages" for the Lanham Act claims. The instructions to the jury defined "damages" for those claims as Illinois Tamale's lost profits. *See* Jury Instructions at 24. The jury provided two sets of lost profits figures: $20,000 for the entire infringement period or $10,000 for the post-suit infringement period. It is conceivable that El-Greg's reference to $30,000 is a reference to the sum of these figures. The jury also awarded El-Greg's profits to Illinois Tamale on the Lanham Act claims: $60,000 for the entire infringement period or $30,000 for the post-suit infringement period. Thus it is also possible that El-Greg's reference is to this $30,000 figure. But seeking remittitur of the contract award to match the award of El-Greg's profits would make little sense, because the jury was instructed that it could award El-Greg's profits only for the Lanham Act claims—and the measure of damages for breach of contract is the plaintiff's losses, not the defendant's profits. The Court therefore assumes that El-Greg is comparing the contract damages award to the Lanham Act damages award, *i.e.*, $20,000 or $10,000.

In contending that the breach of contract award is inconsistent with the Lanham Act damages award, El-Greg advances only one theory: the same conduct gave rise to both claims, but the awards are significantly different. This argument is unavailing for

several reasons.  First, the basis of liability differs, thus allowing for different damages awards.  Specifically, the breach of contract claim required Illinois Tamale to prove only use of a term prohibited by the contract, whereas the Lanham Act claim required proof of likelihood of confusion.  Thus the contract claim implicated a potentially broader range of lost sales and a correspondingly greater damages potential.  Second, even if that were not the case, though civil juries must, "[a]s a rule . . . return consistent verdicts," *Deloughery v. City of Chicago*, 422 F.3d 611, 617 (7th Cir. 2005), El-Greg cites no authority for the proposition that damages awards (as opposed to liability verdicts) must be internally consistent.  "[I]t is not this court's responsibility to research and construct the parties' arguments," *Gross v. Town of Cicero*, 619 F.3d 697, 704 (7th Cir. 2010), and "unsupported and undeveloped arguments" are waived.  *Trs. of Chicago Painters & Decorators Pension*, 493 F.3d at 789.  Third, El-Greg makes no attempt to justify its position that the lower of the allegedly inconsistent damages awards is the appropriate one.  Fourth, the $100,000 award for the breach of contract claim is not against the weight of the evidence.  To the contrary, it is within shouting distance of $148,329, the figure Polash calculated by, among other things, comparing records of El-Greg's actual sales to Restaurant Depot with records of its actual sales to other customers.

That aside, if an "award is within the bounds of reason, the fact that the jury may not have used reason to arrive at it—may instead have negotiated an unprincipled compromise in order to avoid deadlock—will not prevent it from being upheld."  *Tuf Racing Prods., Inc. v. American Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000).  "In other words, the court looks only at the 'bottom line,' to make sure it's reasonable,

36

and doesn't worry about the mental process that led there." *Id.*; *see also, e.g.*, *Houskins v. Sheahan*, 549 F.3d 480, 496 (7th Cir. 2008) ("[T]he jury is entitled to disregard the amount of damages requested by a party, especially when evidence is introduced from which jurors could draw their own conclusions."); *Carter v. Chicago Police Officers*, 165 F.3d 1071, 1082 (7th Cir. 1998) (same). Even assuming the $100,000 resulted from a negotiation among the jurors, the amount, as just discussed, is grounded in the evidence and "within the bounds of reason." *Tuf Racing*, 223 F.3d at 591. The Court therefore denies El-Greg's motion for a remittitur of the contract damages award.

El-Greg also argues (albeit largely in passing) that the contract breach and Lanham Act damages awards are duplicative. This argument has greater force. Both damages awards involve lost profits on sales lost to Illinois Tamale due to El-Greg's labeling. As indicated earlier, the contract breach brought into play a potentially larger quantum of lost sales than the Lanham Act violation: any sales lost due to El-Greg's breach of contract, as opposed to sales lost due to the likelihood of customer confusion. Logically the sales lost due to the contract breach subsume those lost due to the Lanham Act violation. Because Illinois Tamale is not entitled to recovery twice for the same lost sales, the Court will order a remittitur. Specifically, El-Greg will be entitled to a new trial on breach of contract and Lanham Act damages unless Illinois Tamale accepts elimination of the $10,000 Lanham Act damages award.

## C. Illinois Tamale's motion for judgment as a matter of law on the award of El-Greg's profits

The Court instructed the jury that, in addition to damages (*i.e.*, Illinois Tamale's lost profits), it could award to Illinois Tamale the profits that El-Greg gained from its Lanham Act violations. *See* Jury Instructions at 26; *see also* 15 U.S.C. § 1117(a)

37

(providing, in relevant part, that for violations of the Act, "the plaintiff shall be entitled, . . . subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action").  The instructions to the jury stated that "[p]rofit is determined by deducting expenses from gross revenue."  Jury Instructions at 26.  The instructions further stated that Illinois Tamale "is required only to prove El-Greg's gross revenue," whereas El-Greg must prove "any expenses that it argues should be deducted . . . ."  *Id.*  Finally, the instructions stated that Illinois Tamale "is entitled to recover El-Greg's total profits . . . unless [it] proves that a portion of the profit is due to other factors."  *Id.*; *see also* 15 U.S.C. § 1117(a) ("In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed."); *WMS Gaming Inc. v. WPC Prods. Ltd.*, 542 F.3d 601, 608-09 (7th Cir. 2008) (stating that after plaintiff proves defendant's sales, the burden shifts to defendant to prove costs or deductions—such as by showing that "certain portions of its revenues . . . were not obtained through its infringement").

The jury awarded El-Greg's profits in the amount of $60,000 for the entire infringement period and $30,000 for the post-suit infringement period.  Illinois Tamale moves for judgment as a matter of law on the quantum of El-Greg's profits.  Illinois Tamale argues that Polash and Fisher's calculations were the only evidence of El-Greg's profits presented at trial.  Polash opined that El-Greg's profits were $1,282,841 for the entire infringement period, while Fisher opined that El-Greg's profits were $504,000 for that period.  Polash also opined that El-Greg's profits were $187,152 for the post-suit infringement period, while Fisher opined that El-Greg's profits were $72,000 for that period.  And El-Greg's attorney stated in closing argument that if the

jury found El-Greg liable and awards El-Greg's profits, it should use Fisher's numbers. The jury, however, did not adopt any of the experts' figures, and awarded profits that fell below both ranges presented.  Illinois Tamale contends that as a result, the award is "unsupported and arbitrary."  Illinois Tamale Rule 50 and 59 Mot. at 5.

In response, El-Greg argues that Illinois Tamale waived its Rule 50 motion because it "did not raise in [its pre-verdict Rule 50 motion] any argument regarding the amount of El-Greg's profits it was entitled to recover."  El-Greg Rule 50 and 59 Opp. at 1.  But Illinois Tamale argued in is pre-verdict motion that Polash had established El-Greg's profits to be $1,282,841 or $187,152.  Because the jury had not rendered its verdict, Illinois Tamale could not have objected that the verdict was unsupported or arbitrary.  Thus there was no waiver.

Next, El-Greg contends that the award of its profits was based on legally sufficient evidence because the jury reasonably could find, based on the evidence, that only a portion of El-Greg's allegedly infringing sales were attributable to the infringement.  For example, El-Greg presented evidence at trial that Restaurant Depot "was its customer for years" before it adopted the disputed label.  El-Greg Rule 50 and 59 Opp. at 4.  El-Greg also presented testimony that when customers make purchases for restaurants and convenience stores, they exercise care in making selections.  In addition, several witnesses testified that El-Greg's sales went down for "years after it started using" the disputed label.  *Id.*  Several witnesses also testified that during the infringement period, there was a growing price differential between Pizza Pies (Puffs) (which cost less) and Pizza Puffs (which cost more).  Finally, several witnesses testified that during that during the infringement period, El-Greg began participating in

Restaurant Depot's marketing program; started selling Pizza Pies (Puffs) to more Restaurant Depot locations; and introduced the halal product. *Id.* Based on this and other evidence, El-Greg maintains, "the jury would have been well within its rights to find that" *none* of El-Greg's profits were "caused by the alleged infringement." *Id.* at 3.

Illinois Tamale counters that it was El-Greg's burden to prove that some or all of its profits had "no relation" to the infringement, and maintains that El-Greg failed to satisfy its burden. Illinois Tamale Rule 50 and 59 Reply at 2 (quoting *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 206 (1942)). According to Illinois Tamale, El-Greg's cited evidence does "not actually establish which of its sales are not attributable to its infringement versus which are." Illinois Tamale Rule 50 and 59 Reply at 3. In this vein, Illinois Tamale emphasizes that El-Greg's damages expert, Fisher, "offered no testimony as to what amount of profits was supposedly attributable to something other than [El-Greg's] infringement." *Id.* at 4.

The Court recognizes that no witness presented evidence that would allow the jury to determine precisely what Pizza Pies (Puffs) sales were unrelated to El-Greg's infringement. But the instructions to the jury did not state that El-Greg had to prove non-infringing sales with exactitude. Rather, the instructions provided that El-Greg must "prove[] that a portion of [its] profit is due to other factors." Jury Instructions at 26. Illinois Tamale itself proposed this instruction. *See* Illinois Tamale Contested Proposed Preliminary Jury Instructions, Dkt. No. 151-3, at 54; Illinois Tamale Proposed Final Jury Instructions, Dkt. No. 190, at 26. Based on the evidence discussed above, the jury reasonably could find that a portion of El-Greg's profits was due to factors other than infringement. The jury, for example, reasonably could find that some buyers for

restaurants purchased Pizza Pies (Puffs) during the infringement period because they were looking for El-Greg's product, not because they were fooled by the accused label. *See Bridgeport Music, Inc. v. Justin Combs Publ'g*, 507 F.3d 470, 483-84 (6th Cir. 2007) (internal quotation marks omitted) (allocating an infringer's profits between infringement and other factors "is highly fact-specific . . . and should [be] left to the jury" (quoting *Andreas v. Volkswagen of Am., Inc.*, 336 F.3d 789, 797-78 (8th Cir. 2003)); *Dyson, Inc. v. SharkNinja Operating LLC*, No. 14 C 9442, 2019 WL 1454509, at *13 (N.D. Ill. Mar. 31, 2019) (quoting same).

In addition, the fact that the jury awarded profits in amounts lower than both parties' experts proposed is not a proper basis to overturn the award. The jury was free to determine its own measure of damages based on its assessment of the evidence. *See Houskins*, 549 F.3d at 496; *Carter*, 165 F.3d at 1082. Relatedly, although El-Greg's attorney argued in closing that the jury should use Fisher's calculations *if* it awards profits, the jury reasonably could interpret this an argument that it should not award any profits. Ultimately, the jury awarded profits in an amount between $0 and $1,282,841, Illinois Tamale's highest request. The award is supported by the evidence and "within the bounds of reason." *Tuf Racing*, 223 F.3d at 591. Accordingly, Illinois Tamale is not entitled to judgment as a matter of law on the quantum of El-Greg's profits. *See, e.g.*, *Outboard Marine Corp. v. Babcock Indus., Inc.*, 106 F.3d 182, 183-84 (7th Cir. 1997) (denying plaintiff's motion for judgment as a matter of law on damages where jury awarded plaintiff an amount between $303,000 (defendant's best-case scenario) and $12.38 million (defendant's worst-case scenario)).

*Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499, 506 (7th Cir. 1992), which Illinois

Tamale cites for the proposition that compensatory damages must be "estimate[d] . . . based on relevant data," is not to the contrary. For one thing, *Zazu* concerned a bench trial. *Id.* at 502. The Seventh Circuit has stated that it "isn't feasible to insist upon a demonstration that the jury arrived at its reasonable bottom line by reasoning to it the way a professional judge would do . . . ." *Tuf Racing*, 223 F.3d at 591. For another, as previously discussed, the jury reasonably could arrive at the figure it awarded based on the evidence.

The Court also denies Illinois Tamale's request (to the extent it is a separate request) to "award profits within the ranges discussed" pursuant to 15 U.S.C. § 1117(a). Illinois Tamale Rule 50 and 59 Mot. at 6. Under this provision of the Lanham Act, "[i]f the court shall find that the amount of the recovery based on profits is . . . inadequate . . . the court may in its discretion enter judgment for such a sum as the court shall find to be just, according to the circumstances of the case." 15 U.S.C. § 1117(a). Illinois Tamale argues that the profits award is inadequate for the same reasons it argues there is no legally sufficient basis for the award. *See* Illinois Tamale Rule 50 and 59 Mot. at 4-6. As discussed above, those arguments lack merit.

**D.     Illinois Tamale's motion for a new trial**

In the alternative, Illinois Tamale requests a new trial on the quantum of El-Greg's profits, cross-referencing its Rule 50 motion. The Court denies the motion for a new trial for the same reasons discussed in the previous section. *See also, e.g.*, *Outboard Marine Corp.*, 106 F.3d at 184, 186 (denying plaintiff's motion for a new trial on damages where "[t]he only estimates tendered to the jury were $303,000, $12.38 million, and $19.13 million" and "[n]o one kn[ew] how the jury came up with $4.4

42

million," because the test is one "of the reasonableness of the result rather than the reasonableness of the process that led to the result").

Separately, Illinois Tamale contends that it is entitled to a new trial because "the jury's incongruous profit numbers [are] evidently the result of El-Greg's litigation misconduct . . . ." Illinois Tamale Rule 50 and 59 Mot. at 6. This argument fails because it is premised on the erroneous contention that the profits award was "incongruous." *Id.* For reasons discussed in connection with Illinois Tamale's Rule 50 motion, the award was rationally based on the evidence. Moreover, Illinois Tamale's argument that the alleged litigation misconduct affected the amount of the award is speculative. It maintains that the jury awarded a low amount because El-Greg withheld evidence about COGS by product and its counsel "intentionally sought to curry sympathy from the jury" by suggesting "that El-Greg would go out of business if the money [Illinois Tamale] sought was awarded." *Id.* at 6-7. But the jury just as easily could have awarded what it did because it found based on the evidence that a portion of El-Greg's profits were not related to the infringement. The Court denies Illinois Tamale's motion for a new trial on damages.

## E.    Illinois Tamale's Rule 59(e) motion to amend the judgment on laches

Illinois Tamale has moved under Federal Rule of Civil Procedure 59(e) to amend the judgment on El-Greg's laches defense and find the defense inapplicable. To prevail, Illinois Tamale must "demonstrate a manifest error of law or fact or present newly discovered evidence." *Lightspeed Media Corp. v. Smith*, 830 F.3d 500, 505-06 (7th Cir. 2016) (internal quotation marks omitted). A "manifest error" is the "wholesale disregard, misapplication, or failure to recognize controlling precedent." *Burritt v. Ditlefsen*, 807

F.3d 239, 253 (7th Cir. 2015) (internal quotation marks omitted).

"The application of laches depends upon a showing of an unreasonable lack of diligence by the party against whom the defense is asserted and prejudice arising from the lack of diligence." Laches Order, 2018 WL 6590558, at *1 (citing *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 822 (7th Cir. 1999)). "A party's unclean hands may stand as an obstacle to the application of the doctrine of laches in certain circumstances." *Hot Wax*, 191 F.3d at 825. Illinois Tamale challenges the Court's conclusion that the jury's findings of willfulness did not bar El-Greg's laches defense. It contends the Court committed a manifest error in determining that something more was necessary—namely, a showing that El-Greg engaged in "the type of 'actual fraud'" that the Supreme Court has stated bears directly on the issue of laches. Laches Order, 2018 WL 6590558, at *3 (citing *Hot Wax*, 191 F.3d at 826; *La Republique Française v. Saratoga Vichy Spring Co.*, 191 U.S. 427, 439 (1903)).

The cases that Illinois Tamale cites do not show that the Court misapplied the law. In *Hot Wax*, the Seventh Circuit stated that "willful, egregious, or unconscionable conduct or bad faith" can constitute unclean hands. 191 F.3d at 826. It did not, however, state that a finding of willful infringement is always sufficient to establish unclean hands that would defeat the application of laches. In the remaining cases Illinois Tamale cites, the courts stated that *intentional* infringement bars application of a laches defense. *See Abraham v. Alpha Chi Omega*, 708 F.3d 614, 620 (5th Cir. 2013); *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 956-57 (9th Cir. 2001); *Hermes Int'l v. Lederer de Paris Fifth Avenue, Inc.*, 219 F.3d 104, 107 (2d Cir. 2000). Here, the jury's findings of willfulness were not necessarily premised on findings of intentional

44

infringement, because the jury was instructed that El-Greg could act willfully if it "acted with indifference" to Illinois Tamale's rights. Jury Instructions at 27. The record also lacks evidence of "passing off." *See* Laches Order, 2018 WL 6590558, at *2.

Illinois Tamale also argues that the Court should not have considered "the entire period between discovery of the infringing acts to the filing of the lawsuit" to be a delay. Illinois Tamale Rule 59(e) Mot. at 11 (discussing *Hot* Wax, 191 F.3d at 823). But the Court rejected this argument when Illinois Tamale made it the first time, Laches Order, 2018 WL 6590558, at *2, and it argues nothing new. *See Vesely v. Armslist LLC*, 762 F.3d 661, 666 (7th Cir. 2014) ("[A] Rule 59(e) motion is not to be used to 'rehash' previously rejected arguments.").

Illinois Tamale also cites *Hot Wax* for the proposition that for shorter delays, greater showings of prejudice are required to prove that laches should apply. It argues that its delay was not lengthy, and that El-Greg's alleged prejudice—its inability to cut off damages at an earlier date by changing its label—is insufficient in comparison. This, too, simply repackages Illinois Tamale's earlier argument.

Finally, Illinois Tamale argues that "merely incurring additional damages is not prejudice in the context of laches." Illinois Tamale Rule 59(e) Mot. at 13. But in finding for El-Greg on laches, the Court did not say that the mere piling on of damages constitutes prejudice. For these reasons, the Court denies Illinois Tamale's motion to amend the laches determination.

## F. Illinois Tamale's motion for permanent injunction

Illinois Tamale has also moved to permanently enjoin El-Greg from using or assisting others in using Pizza Pies (Puffs), puff, or puffs in "any trademark, trade name,

45

product name, or other indicator of source of goods or services for any dough-enrobed sandwich product." Illinois Tamale Perm. Inj. Mot. at 2. It also seeks to enjoin El-Greg's use of the trade dress at issue "or any trade dress that is confusingly similar." *Id.* Finally, Illinois Tamale seeks to enjoin El-Greg "from making any claim that it is the 'Makers of the Original Puffs' or any statement with similar meaning." *Id.*

The Lanham Act permits a court to award an injunction following a finding of trademark infringement and other violations of the Act, "according to the principles of equity and upon such terms as the court may deem reasonable." 15 U.S.C. § 1116(a). The Seventh Circuit has articulated a presumption of irreparable harm in trademark infringement cases. *See, e.g.*, *Ty, Inc.*, 237 F.3d at 902. More recently, however, the Supreme Court called this presumption into question when it rejected the categorical rule that a permanent injunction must issue upon a showing of patent infringement. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391-94 (2006). In *eBay*, the Court stated that in evaluating a request for an injunction after patent infringement had been established, the district court should have applied "the traditional four-factor framework that governs the award of injunctive relief." *Id.* at 394.

Although the Seventh Circuit has not yet addressed whether *eBay* applies to requests for injunctions in Lanham Act cases, it has held that "*eBay* governs a motion for a preliminary injunction in a copyright case." *Flava Works, Inc. v. Gunter*, 689 F.3d 754, 755 (7th Cir. 2012). This Court sees no reason why the Seventh Circuit would reach a different conclusion in a Lanham Act case. Moreover, other circuits have held that *eBay* applies in this context. *See, e.g.*, *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013); *Audi AG v. D'Amato*, 469 F.3d 534,

550 (6th Cir. 2006). This Court has likewise applied *eBay* beyond the patent infringement context. *See, e.g.*, *Nat'l Fin. Partners Corp. v. Paycom Software, Inc.*, No. 14 C 7424, 2015 WL 3633987, at *11-15 (N.D. Ill. June 10, 2015). Accordingly, the Court will evaluate Illinois Tamale's motion for a permanent injunction under the traditional four-factor test. Illinois Tamale must demonstrate that: (1) it has suffered an irreparable injury; (2) remedies available at law are inadequate; (3) the balance of hardships weighs in favor of Illinois Tamale; and (4) the public interest would not be disserved by an injunction. *eBay*, 547 U.S. at 391; *see also, e.g.*, *Nat'l Fin. Partners*, 2015 WL 3633987, at *11-15.

Illinois Tamale argues that because the jury found that El-Greg's conduct was willful and likely to cause confusion, the first two elements—irreparable harm and inadequate remedy at law—are presumed. Illinois Tamale Permanent Injunction Br. at 3 (citing, *inter alia*, *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 469 (7th Cir. 2000); *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992)). The Seventh Circuit cases that Illinois Tamale cites in support of its argument, however, were decided before *eBay*. Although some courts in this district have nonetheless applied the presumption post-*eBay*, *see, e.g.*, *Monster Energy Co. v. Zheng Peng*, No. 17-cv-414, 2017 WL 4772769, at *6 (N.D. Ill. Oct. 23, 2017), this Court respectfully disagrees. *See, e.g.*, *Herb Reed*, 736 F.3d at 1249 ("[A]ctual irreparable harm must be demonstrated to obtain a permanent injunction in a trademark infringement action."); *Nat'l Fin. Partners*, 2015 WL 3633987, at *11-13 (evaluating whether the evidence established irreparable harm and inadequate remedy at law).

In arguing that it has suffered irreparable harm, Illinois Tamale emphasizes that

the Seventh Circuit has "clearly and repeatedly held that damage to a trademark holder's goodwill can constitute irreparable injury for which the trademark owner has no adequate legal remedy." Illinois Tamale Perm. Inj. Br. at 3 (quoting *Re/Max N. Cent., Inc. v. Cook*, 272 F.3d 424, 432 (7th Cir. 2001)). But Illinois Tamale did not present evidence at trial of loss of goodwill. *See* Oct. 25, 2018 Trial Tr. at 642:12-14 (discussing final jury instructions) (THE COURT: "The defendant wanted me to remove the 'loss of goodwill' instruction. I asked the plaintiff whether they had put on evidence of that. They said no. I took it out.").

Additionally, in response to El-Greg's argument that legal remedies are adequate because the record lacks evidence of actual lost sales, Illinois Tamale contends that the lack of such evidence "actually illustrates the very purpose of the presumption, which 'is based on the judgment that it is virtually impossible to ascertain the precise economic consequences of intangible harms.'" Illinois Tamale Perm. Inj. Reply at 4 (quoting *Abbott*, 971 F.2d at 16). Again, however, Illinois Tamale must point to evidence showing that it suffered irreparable harm rather than rely only on the presumption. It has identified no such evidence in the record.

Finally, Illinois Tamale contends that if the Court does not enter an injunction, El-Greg will be free to resume its infringement, which will "caus[e] further irreparable injury." Illinois Tamale Perm. Inj. Br. at 3. But El-Greg changed its Restaurant Depot label seven months after Illinois Tamale filed this lawsuit—well before the entry of judgment—and has not used the label with other customers. Illinois Tamale's argument also concerns potential future harm rather than harm it has already suffered. It has offered no basis to believe that El-Greg will resume its infringing activity if the adverse

48

judgment in this case is upheld. The judgment itself will stand as a deterrent, for it plainly will subject El-Greg to a high risk of enhanced damages if it again decides to engage in infringing conduct. Illinois Tamale has not made a showing that it suffered irreparable harm, and the Court therefore denies its motion for a permanent injunction.

Illinois Tamale separately asks the Court to "enter judgment that El-Greg was found to have violated the Illinois Uniform Deceptive Trade Practices Act [IUDTPA] (815 ILCS §§ 510/1-510/7)." Illinois Tamale Perm. Inj. Br. at 2. Illinois Tamale included these claims in its preliminary draft jury instructions. It contends that the Court "decided to simplify the trademark issues for the jury" by instructing the jury only on the Lanham Act claims, "which were similar or duplicative of the state law claims." *Id.* at 1-2. Illinois Tamale provides no record cite for the Court's decision, and the Court cannot find one. That aside, entering judgment as Illinois Tamale requests would make no difference in this case because this Court applies federal law in determining whether to grant or deny injunctive relief. *See, e.g.*, *Turnell v. Centimark Corp.*, 796 F.3d 656, 661-62 (7th Cir. 2015); *Gen. Elec. Co. v. American Wholesale Co.*, 235 F.2d 606, 608 (7th Cir. 1956); *LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, 790 F. Supp. 2d 708, 730 (N.D. Ill. 2011) (IUDTPA case). Illinois Tamale does not argue otherwise. Accordingly, the Court denies its motion to enter judgment that El-Greg was found to have violated the IUDTPA.

## G. Illinois Tamale's motion for a declaration of exceptional case and attorneys' fees under 15 U.S.C. § 1117(a), and for sanctions under 28 U.S.C. § 1927

### 1. Declaration of exceptional case

The Lanham Act provides that in "exceptional cases," the court "may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). Illinois Tamale

has moved for relief under this provision. A case is exceptional, such that the winning party can recover reasonable attorneys' fees, "if the losing party was the plaintiff and was guilty of abuse of process in suing, or if the losing party was the defendant and had no defense yet persisted in the trademark infringement or false advertising . . . in order to impose costs on his opponent." *Nightingale Home Healthcare, Inc. v. Anodyne Therapy, LLC*, 626 F.3d 958, 963-64 (7th Cir. 2010). Courts may also declare a case exceptional when the "acts of infringement are malicious, fraudulent, deliberate or willful." *BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1099 (7th Cir. 1994); *see also Neuros Co. v. KTurbo, Inc.*, 698 F.3d 514, 521 (7th Cir. 2012). Finally, courts may declare a case exceptional "where the defendant's litigation conduct was oppressive." *Te-Ta-Ma Truth Found.-Family of URI, Inc. v. World Church of the Creator*, 392 F.3d 248, 263 (7th Cir. 2004).

### a.   Willfulness evidence

Illinois Tamale argues that this case is exceptional, and that the Court should award attorneys' fees, because the jury found all four of El-Greg's Lanham Act violations to be willful. The evidence supporting these findings, Illinois Tamale continues, "is voluminous." Illinois Tamale Exceptional Case Mot. at 2. The Court agrees that the record contains ample evidence of egregious, willful infringement and that an exceptional case declaration is warranted. *See BASF Corp.*, 41 F.3d at 1099 (court may declare case exceptional when infringement is willful). For example, it is undisputed that El-Greg added the word "puffs" to its Pizza Pies label despite knowing that Illinois Tamale owned the Pizza Puffs trademark and despite having entered into a settlement agreement with Illinois Tamale concerning that mark. The record also

50

contains evidence that El-Greg copied Illinois Tamale's trade dress almost exactly, down to the text size and font. Indeed, it is undisputed that El-Greg sent Illinois Tamale's label to its designer; asked the designer to create something similar; and even asked the designer to include a slogan ("Makers of the Original Puffs") nearly identical to Illinois Tamale's—despite having never used the slogan and notwithstanding its knowledge that Illinois Tamale was the first company to make Pizza Puffs.

El-Greg responds that the jury's findings of willfulness and the evidence on which they are based do not "suffice under *Nightingale*" to establish that this case is exceptional. El-Greg Exceptional Case Opp. at 3. El-Greg appears to be arguing that in *Nightingale*, the Seventh Circuit created a new "exceptional case" standard that superseded all others. El-Greg is incorrect. For example, in a case that post-dates *Nightingale*, the Seventh Circuit stated that an exceptional case finding is appropriate if the standard set forth in *Nightingale* is satisfied *or* if a party's Lanham Act violation is "especially egregious," as discussed in *BASF Corporation*. *Neuros*, 698 F.3d at 521.

Additionally, as Illinois Tamale points out, the Supreme Court more recently clarified the meaning of the "exceptional case" provision in § 285 of the Patent Act. *See Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 553-54 (2014). In *Octane Fitness*, the Court stated that the standard Federal Circuit had been applying— which permitted an exceptional case finding only when there was "litigation-related misconduct of an independently sanctionable magnitude" or when "the litigation was both brought in subjective bad faith and objectively baseless"—was "overly rigid." *Id.* at 554-55 (internal quotation marks omitted). The Court held that an exceptional case for purposes of § 285 "is simply one that stands out from others with respect to the

substantive strength of a party's litigating position . . . or the unreasonable manner in which the case was litigated." *Id.* at 554. The Court stated that district courts may consider "the totality of the circumstances" in determining whether a case is exceptional. *Id.* The *Octane Fitness* standard is broader than the standard in *Nightingale* that El-Greg references. And although the Seventh Circuit has not addressed whether *Octane Fitness* applies in Lanham Act cases, the court's past consideration of § 285 in interpreting the Lanham Act suggests it would hold that it does. *See Te-Ta-Ma*, 392 F.2d at 261 ("look[ing] to the interpretation" of § 285 "for guidance with interpreting § 1117(a)"). For these reasons, proof that El-Greg lacked legitimate defenses and "persisted" in Lanham Act violations "to impose costs on" Illinois Tamale is not necessary for an exceptional case finding. *Nightingale*, 626 F.3d at 963-64.

El-Greg separately argues that an exceptional case finding is unwarranted because, it contends, a jury's finding of willfulness is insufficient to render a case exceptional. El-Greg also attempts to minimize the jury's four separate willfulness findings by arguing that the accused conduct "involve[d] the same label, not a multiplicity of different infringing events." El-Greg Exceptional Case Opp. at 3-4. And El-Greg argues that its infringement was not "truly egregious," including because it never used Illinois Tamale's "actual trademark." *Id.* at 4. None of these arguments is persuasive. First, in *Neuros*, the Seventh Circuit indicated that a party's Lanham Act violation is "especially egregious" if it is willful. *See* 698 F.3d at 521 (citing *BASF Corp.*, 41 F.3d at 1099). Second, even assuming that an exceptional case finding does not automatically follow from a willfulness finding, this Court has already explained why the

evidence of willfulness in this case was especially strong.  Finally, the Lanham Act prohibits conduct broader that exact copying, so the lack of exact copying here does not assist El-Greg.  *See* 15 U.S.C. § 1114(a)(1) (prohibiting "colorable imitation" that is "likely to cause confusion").

### b.    Litigation misconduct

Illinois Tamale also argues that this Court should declare the case exceptional because, it maintains, El-Greg engaged in egregious litigation misconduct:  pursuing a baseless genericness defense; concealing spreadsheets that contained data on COGS by product; and attempting to sway the jury by suggesting it  would go out of business if the jury awarded damages as Illinois Tamale requested.  Though the points discussed under the heading "Willfulness evidence" are sufficient alone to warrant an exceptional case finding, the latter two points cited by Illinois Tamale amount to "oppressive" litigation misconduct that also support a finding that the case is exceptional.  *Te-Ta-Ma*, 392 F.3d at 263.

First, the record is clear that data on COGS by product was highly relevant to the calculation of damages.  Furthermore, under the Lanham Act, El-Greg carried the burden to prove costs and deductions.  *See* 15 U.S.C. § 1117(a).  And the record tends to show that El-Greg's damages expert, Fisher, requested data on El-Greg's COGS by product while she was preparing her report.  *See* Oct. 25, 2018 Trial Tr. at 596:13-19 (testimony by Fisher that Ms. Lereno and counsel for El-Greg told her that El-Greg does not keep data on COGS by product).  Finally, as indicated, El-Greg did not produce such data during discovery.  Yet at trial, Ms. Lereno testified that she "of course" keeps data on COGS by product.  Oct. 23, 2018 Trial Tr. at 351:18-20; *see also id.* at 354:1-2

53

(testifying that she does not keep the data "historically"). Even giving El-Greg the benefit of the doubt and assuming it inadvertently overlooked the data, its counsel made a bad situation worse by stating during his closing argument that because El-Greg does not keep the data "historically," it was "unavailable" during the discovery period. Oct. 25, 2018 Trial Tr. at 721:9-15. This statement was misleading and weighs in favor of a declaration that this case was exceptional.

El-Greg responds that its failure to produce the COGS data was not like the oppressive conduct in *Te-Ta-Ma*, where a party disregarded court orders and harassed its opponent. But the fact that other litigants have behaved worse is hardly a defense. Nor is El-Greg's contention that the data "would not have supported" Illinois Tamale's case. El-Greg Exceptional Case Opp. at 9. The data was relevant to the claims and defenses in this case and El-Greg had a duty to produce it. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ."). Moreover, because El-Greg did not produce the data, the jury had no opportunity to assess whether it supported Illinois Tamale's case. Finally, and significantly, El-Greg fails to address the misleading statement its attorney made during closing argument. In short, its arguments are unpersuasive.

The Court turns next to El-Greg's attempt to elicit trial testimony concerning the "effect" a $1.2 million verdict "would have on [El-Greg's] business." Oct. 23, 2018 Trial Tr. at 339:9-14. In sustaining Illinois Tamale's objection to the question, the Court stated that it was "outside the bounds of what is even conceivably appropriate" and "seem[ed] [to be] a deliberate attempt to claim poverty." *Id.* at 339:19-23. The Court

also stated that it would consider granting a mistrial if Illinois Tamale requested one. *See id.* at 340:12-17. El-Greg argues that it asked the question to mitigate the alleged prejudicial effect of an earlier question Illinois Tamale had asked. But El-Greg was not entitled to cure alleged prejudice with a prejudicial question of its own.

Considering the jury's willfulness findings on all four Lanham Act claims; the egregiousness of El-Greg's infringement; and the two instances of litigation misconduct just discussed, the Court grants Illinois Tamale's motion to declare this case exceptional and for an award of reasonable attorneys' fees. Illinois Tamale has filed supporting invoices for its fees request, *see* Illinois Tamale Exceptional Case Mot., Exs. D-E, but El-Greg has not addressed whether the amount of fees Illinois Tamale seeks is reasonable. Pursuant to Local Rule 54.3, the Court orders El-Greg to file a brief on this issue within fourteen days of this order. The Court orders Illinois Tamale to file a reply within seven days of El-Greg's response.

### 2. Attorneys' fees under 28 U.S.C. § 1927

Illinois Tamale has also moved for sanctions against El-Greg's attorneys under 28 U.S.C. § 1927. It contends that sanctions are warranted because (1) El-Greg's attorney "attempt[ed] to claim poverty," as discussed above, and (2) El-Greg pursued its genericness defense even though, in Illinois Tamale's view, the defense was meritless. Illinois Tamale Exceptional Case Mot. at 6-7.

Section 1927 provides that an attorney who "multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." *Webb v. Frawley*, 906 F.3d 569, 583 (7th Cir. 2018) (quoting 28 U.S.C. §

1927)). El-Greg's "poverty" question was certainly inappropriate, but this single incident was not enough to "multipl[y] the proceedings" and does not warrant sanctions under § 1927. Nor is Illinois Tamale entitled to sanctions for El-Greg's pursuit of its genericness defense. "An attorney runs afoul of § 1927 if he . . . files a claim that lacks a plausible legal or factual basis [or] justification." *Webb*, 906 F.3d at 583 (internal quotation marks omitted). The fact that El-Greg had "years to develop" the defense, Illinois Tamale Exceptional Case Mot. at 7, yet ultimately submitted evidence that the Court determined had little probative value, does not mean that the defense lacked a "plausible factual or legal basis." *Webb*, 906 F.3d at 583. Sanctions are not justified merely because a party is on the losing end of an argument. *See, e.g.*, *Olson v. Reynolds*, 484 F. App'x 61, 65 (7th Cir. 2012) ("[A]lthough [defendant] ultimately abandoned or lost his counterclaims and many of his affirmative defenses, this does not require a finding that these pleadings were implausible when he filed them or that he had pursued them unreasonably."); *Goldberg v. 401 N. Wabash Venture,* LLC, No. 09 C 6455, 2013 WL 5376556, at *6 (N.D. Ill. Sept. 25, 2013) (similar). The Court denies Illinois Tamale's motion for sanctions under § 1927.

## H.     Illinois Tamale's motion for enhancement of damages

Finally, Illinois Tamale has moved for enhancement of damages under 15 U.S.C. § 1117(a), which provides that "[i]n assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount." As indicated, this provision applies to damages; it does not apply to a defendant's profits, which the Lanham Act treats as a distinct form of recovery. *See id.* (if a court finds "the amount of the recovery

based on profits" to be "inadequate or excessive," it can "enter judgment for such sum as the court shall find to be just"); *see also, e.g.*, *Badger Meter, Inc. v. Grinnell Corp.*, 13 F.3d 1145, 1157 (7th Cir. 1994) (noting differences in methods for a court to adjust damages versus profits under § 1117(a)); *Thompson v. Haynes*, 305 F.3d 1369, 1380 (Fed. Cir. 2002) ("for profits," unlike for damages, "the court is not authorized to award up to three times the amount proved"); *Black & Decker Corp. v. Positec USA Inc.*, No. 11 C 5426, 2015 WL 5612340, at *4 (N.D. Ill. Sept. 22, 2015) (same). Because the Court has ordered a remittitur of the Lanham Act damages from $10,000 to $0, there is no basis to enhance damages; three times zero is zero.

## Conclusion

For the foregoing reasons, the Court denies El-Greg's Rule 50 Motion for Judgment [dkt. no. 222]. With regard to El-Greg's Rule 59 Motion for a New Trial [dkt. no. 223], El-Greg will be entitled to a new trial on breach of contract and Lanham Act damages unless Illinois Tamale accepts, by September 23, 2019, elimination of the $10,000 Lanham Act damages award. The Court otherwise denies the motion. The Court also denies Illinois Tamale's Motion for a Judgment, for a New Trial, or to Alter or Amend the Judgment [dkt. no. 220], its Motion for a Permanent Injunction [dkt. no. 205], and its Motion for Enhancement of Damages [dkt. no. 207]; grants its Motion for a Declaration of Exceptional Case and Attorney Fees; and denies its Motion for Sanctions [dkt. no. 209]. The case is set for a telephone status hearing on September 17, 2019 at 8:30 a.m. to set a schedule for Illinois Tamale's fee petition under Local Rule 54.3.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: September 13, 2019

57